ACCEPTED
15-25-00016-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 3:55 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00016-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 3:55:15 PM
CHRISTOPHER A. PRINE
Clerk

**IN THE**

**FIFTEENTH COURT OF APPEALS**

**AUSTIN, TEXAS**

In re,

MARTY BERRY AND AXIS MIDSTREAM HOLDINGS, LLC

*Relators*

**RELATORS' APPENDIX**
**VOLUME 3 OF 5**

Original proceeding brought from Business Court 11A,
Cause No. 24-BC11A-0025
The Honorable Sofia Adrogue, Presiding

Douglas A. Allison
State Bar No. 01083500
LAW OFFICES OF
DOUGLAS A. ALLISON
403 N. Tancahua Street
Corpus Christi, TX 78401
Telephone: (361) 888-6002
Facsimile: (361) 888-6651
Email: doug@dallisonlaw.com

COUNSEL FOR RELATORS

## VERIFICATION OF APPENDIX

STATE OF TEXAS          §

COUNTY OF NUECES      §

Before me, the undersigned notary, on this day personally appeared Douglas A. Allison, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Douglas A. Allison. I am of sound mind and capable of making this affidavit. The facts in this affidavit are within my personal knowledge and are true and correct.

"I am serving as counsel for the relater. All of the documents included in the appendix to this petition are true copies."

*/s/ Douglas A. Allison*

<u>         Kim Brunkenhoefer         </u>
NOTARY SIGNATURE

KIM BRUNKENHOEFER
Notary ID #5348297
My Commission Expires
August 4, 2025

<u>     8 - 4 - 25     </u>
COMMISSION EXPIRATION

60

APPENDIX VOLUME 3 OF 5

TABLE OF CONTENTS

APPENDIX 31…………………………………………….……..…….….Dec. 6, 2024
Partial Hearing Transcript
Cause No. 24-BC11A-0025
11th Business Court, Harris County, Texas

# EXHIBIT A



110

# EXHIBIT B

# BYLAWS OF

# BERRY CONTRACTING, INC.

## I.

TITLE: The title of the corporation is Berry Contracting, Inc.

## II.

LOCATION: The location of its principal office shall be 1414 Corn Products Road in the City of Corpus Christi, Nueces County, Texas

## III.

CORPORATE SEAL: The corporate seal of the company shall have inscribed thereon: "Berry Contracting, Inc."

## IV.

DIRECTORS: The property and business of the company will be managed and controlled by a board of directors consisting of not less than three nor more than seven members. They shall hold office until the next annual meeting of the shareholders or until their successors are elected and have qualified.

## V.

POWERS OF DIRECTORS: The board of directors shall have the management of the business of the company and in addition to the powers and authorities by these bylaws expressly conferred upon them, may exercise all such powers and do all such acts and things as may be exercised or done by the corporation, but subject, nevertheless, to the provisions of the statute, of the charter and of these bylaws and to any regulations from time to time made

112

by the shareholders, provided that no regulations so made shall invalidate any prior act of the directors which would have been valid if such regulations had not been made.

Without prejudice to the general powers conferred by the last preceding clause and other powers conferred by these bylaws, it is hereby expressly declared that the board of directors shall have the following powers, that is to say:

To purchase and otherwise acquire for the company and property, rights or privileges which the company is authorized to acquire, at such prices and on such terms and conditions and for such consideration as they think proper. At their discretion, to pay for any property or rights acquired by the company, either wholly or partially, in money or in stocks, bonds, debentures, or other securities of the company.

To appoint, and at their discretion, remove or suspend, such subordinate managers, officers, assistants, clerks, agents, and servants, permanently or temporarily, as they may from time to time think fit, and to determine their duties and fix, and from time to time change their salaries or emoluments, and to require security in such instances and in such amounts as they think proper.

To confer, by resolution, upon any officer of the company the right to choose, remove or suspend such subordinate officers, agents or factors.

To appoint any person or persons to accept and hold in trust for the company any property belonging to the company or in

113

which it is interested or for any other purpose, and to execute and do all such duties and things as may be requisite in relation to any such trust.

To create, make and issue mortgages, bonds, deeds of trust, trust agreements and negotiable or transferable instruments and securities, secured by mortgage or otherwise, and to do every other act and thing necessary to effectuate the same.

To determine who shall be authorized to sell on behalf of the company bills, notes, receipts, acceptances, endorsements, checks, releases, contracts and documents.

From time to time to provide for the management of the affairs of the company in such manner as they think proper and in particular, from time to time to delegate any of the powers of the board of directors to any committee, officer or agent, and to appoint any person to be the agent of the company with such powers, including the powers to subdelegate, and upon such terms as may be thought proper.

## VI.

MEETINGS OF THE DIRECTORS: The directors elected at the annual meeting of the shareholders shall meet immediately following each such meeting for the purpose of electing officers and considering any other business that may come before the board.

Other meetings of the directors may be held at such times, at such places and upon such notice as may be determined from time to time by the board.

114

A majority of the whole board of directors shall be necessary to constitute a quorum for the transaction of business at all meetings.

*VI-A added aug 11, 1981*

## VII.

MEETINGS OF THE SHAREHOLDERS: Meetings of the shareholders shall be held in the City of Corpus Christi, Nueces County, Texas, unless otherwise specified in the notice of any such meeting or waiver thereof.

All shareholders entitled to vote may vote at all meetings, either in person or by proxy in writing. All proxies shall be filed with the secretary of the meeting before being voted upon. A majority of the shareholders in amount of stock issued and outstanding, represented by the holders in person or by proxy, shall be requisite at all meetings to constitute a quorum for an election of directors or the transaction of other business.

The annual meeting of the shareholders shall be held on the second Tuesday of each August at 10 o'clock a.m. in each year, beginning with the year 1963, if not a legal holiday, and if a legal holiday, then on the day following, when they shall elect by a plurality vote, by ballot, a board of directors to serve for one year and until their successors are elected and have qualified, each shareholder being entitled to vote for each share of stock standing registered in his or her name on the twentieth day preceding the election, exclusive of the date of such election.

Notice of the annual meeting shall be mailed by the secretary to each shareholder entitled to vote at his or her last known post

office address, at least ten days prior to the meeting.

Special meetings of the shareholders may be called by the president, and shall be called at the request in writing or by vote of a majority of the board of directors or at the request in writing of the holders of a majority of the stock of the company issued and outstanding. Notice of each special meeting, indicating briefly the object or objects thereof, shall be mailed by the secretary to each shareholder at his or her last known post office address at least five days prior to the meeting.

## VIII.

STANDING COMMITTEES: The board of directors may appoint from their number, standing committees and may invest them with all their own powers, subject to such conditions as they may prescribe, and all committees thus appointed shall keep regular minutes of their transactions and shall cause them to be recorded in books to be kept for that purpose in the office of the company and shall report the same to the board of directors at their regular meeting.

## IX. *amended Aug 11, 1981*

OFFICERS: The officers of the company shall consist of a president, one or more vice presidents, a secretary and treasurer, and one or more assistant secretaries or treasurers, and such subordinate officers as may from time to time be elected or appointed by the board of directors. Any person may hold more than one such office, except that the president and secretary shall not be the same person.

116

OFFICERS - HOW CHOSEN: At the first meeting after their election and annually thereafter beginning on the second Tuesday of August, 1963, the directors shall elect the officers of the corporation, such officers to hold office for one year and until their successors are elected and have qualified. They shall be subject to removal during their respective terms of office for cause and may be removed at any time by a majority vote of the directors then in office.

## XI.

PRESIDENT: The president shall be the chief executive officer of the company; he shall preside at all meetings of the directors; he shall have general and active management of the business of the company; and shall see that all orders and resolutions of the board are carried into effect. He shall execute all contracts and agreements authorized by the board. He shall have the general supervision and direction of all the other officers of the company and shall see that their duties are properly performed. He shall be ex-officio member of all standing committees and shall have the general powers and duties of supervision and management usually vested in the office of the president of a corporation.

The president shall submit a report of the operations of the company for the fiscal year to the directors at their first regular meeting in each year, and to the shareholders at their

117

annual meeting, and from time to time shall report to the directors all matters within his knowledge which the interests of the company may require to be brought to their notice.

XI-A - *added aug 11, 1981*
XII *amended aug. 11, 1981*

VICE PRESIDENT: Any vice president shall be vested with all the powers and shall perform all the duties of the president in his absence, and shall perform such other duties as may be prescribed by the board of directors.

XII-A *added aug 11, 1981*
XIII.

SECRETARY: The secretary shall attend all sessions of the board and act as clerk thereof and record all votes and the minutes of all proceedings in a book to be kept by him for that purpose and shall perform like duties for the standing committees when required. He shall keep in safe custody the seal of the company and when authorized to do so shall affix the seal of said corporation to any instrument requiring the same, and the seal when so affixed shall be attested by the signature of the secretary.

He shall see that proper notice is given of all meetings of the shareholders of the company and of the board of directors and shall perform all such other duties as may be prescribed from time to time by the board of directors or the president.

XIV.

TREASURER: The treasurer shall keep full and accurate records of receipts and disbursements in books of accounts belonging to the company and shall deposit all money and other valuable effects in the name and to the credit of the company

in the depository or depositories designated from time to time by resolution of the board of directors.

He shall disburse funds of the company as may be ordered by the board, or the president, taking proper vouchers for such disbursements, and shall render to the president and directors at the regular meetings of the board, or whenever they may require it, an account of all his transactions as treasurer and of the financial condition of the company. He shall keep the accounts of stock registered and transferred in such form and manner and under such regulations as the board of directors may prescribe. If required by the board of directors, he shall give the company a bond in form and in a sum with security satisfactory to the board of directors, for the faithful performance of the duties of his office and the restoration to the company, in case of his death, resignation or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession belonging to the company. He shall perform such other duties as the board of directors may from time to time prescribe or require.

XV *Amended Aug 11, 1981*

VACANCIES: If the office of any director, or of the president, vice president, any secretary or treasurer or other officer or agent, one or more, becomes vacant by reason of death, resignation, retirement, disqualification, removal from office or otherwise, the directors in office, although less

119

than a quorum, by a majority vote, may choose a successor or successors who shall hold office for the unexpired term in respect of which such vacancy occurred.

XVI. *Amended Aug 11, 1981*

DUTIES DELEGATED: In the case of the absence of any officer of the company, the board of directors may delegate the powers and duties of such officer to any other officer or to any director for the time being.

XVII.

CERTIFICATE OF STOCK: Every shareholder shall have a certificate, signed by the president or vice president, and either the treasurer or the secretary, certifying the number of shares owned by him in such corporation.

XVIII.

TRANSFERS OF STOCK: All transfers of the stock of the company shall be made as required by the Uniform Stock Transfer Act. Certificates shall be surrendered and cancelled at the time of transfer. No transfer of stock shall be made within ten days next preceding the day appointed for paying a dividend.

XIX.

LOSS OF CERTIFICATES: In the case of loss or destruction of a certificate of stock, another may be issued in its place upon proof of such loss or destruction and the giving of a satisfactory bond of indemnity. The provisions of the Uniform Stock Transfer Act as to court order may be required.

XXI.

DIVIDENDS: Dividends upon the capital stock of the

120

company when earned may be declared by the board of directors at any regular or special meeting. Before the payment of any dividends or making any distribution of profits there may be set aside out of the net profits of the company such sum or sums as the directors from time to time in their absolute discretion think proper as a reserve fund to meet contingencies, or for equalizing dividends, or for any such other purpose as the directors may think conducive to the best interest of the company.

## XXII.

CHECKS FOR MONEY: All checks, drafts, or orders for the payment of money shall be signed as directed by resolution of the board of directors from time to time.

## XXIII.

DEPOSITORY: A depository or depositories for the corporation shall be designated from time to time by the board of directors, and requested and directed to honor checks, drafts or other orders for the payment of money drawn in this corporation's name, including those payable to the individual order of any person or persons who name or names appear thereon as signed or signers thereof, when bearing or purporting to bear the signature of any person or persons authorized to sign the same by resolution of the board of directors, and said depository or depositories shall be entitled to honor and to charge this corporation with such checks, drafts, or other orders so drawn

121

until and unless such authority and designation is revoked by resolution of the board of directors of said corporation and upon due notice to said depository or depositories.

## XXIV.

BOOKS AND RECORDS: The books, accounts and records of the company shall be open to inspection by the shareholders at all reasonable times which are to be fixed by resolution of the board of directors.

## XXV. *Amended Aug 9, 1966*

NOTICE: Whenever under the provisions of the statute or by these bylaws notice is required to be given to any director, officer or shareholder, it shall not be construed to mean personal notice, but such notice may be given in writing by depositing the same in the post office or letter box in a postpaid, sealed wrapper, addressed to such director, officer or shareholder at his or her address as the same appears in the books of the corporation; and the time when the same shall be mailed shall be deemed to be the time of the giving of such notice.

## XXVI. *Amended Aug 9, 1966*

WAIVER OF NOTICE: Whenever any notice whatever is given or required to be given to any director, officer or shareholder, a waiver thereof in writing, signed by said shareholder, director, or officer, whether before or after the time stated in said waiver, shall be deemed equivalent thereto.

## XXVII.

AMENDMENT OF BYLAWS: These bylaws may be amended at any

122

time and from time to time by a majority of the entire board of directors then in office at any regular or special meeting of the board of directors or by the vote of a majority of the shareholders in amount of the stock then issued and outstanding at any regular or special meeting of the shareholders.

By-Laws approved as correct:

_Marvin L. Berry_
Marvin L. Berry, President

By-Laws attested as duly adopted:

_Mattie L. Boyce_
Mattie L. Boyce, Secretary-Treas.

## AMENDMENT TO THE BY-LAWS
## BERRY CONTRACTING, INC.

BE IT RESOLVED that the By-Laws of Berry Contracting, Inc. be amended as follows:

That Article XXV and XXVI be amended by adding the following phrase to said Article XXVI:

"Attendance in person or by proxy at any meeting of shareholders, either annual or special, shall constitute waiver of notice of such shareholders meeting and it will not be necessary for a formal written waiver of notice to be executed by such shareholders."

"Attendance in person at any directors meeting, whether annual, regular, special or called, shall constitute waiver of notice of call of such meeting and shall not be necessary for such director so attending in person to execute a formal written waiver of notice of same."

By-Laws adopted this 9th day of August, 1966, at the annual meeting of shareholders and a copy ordered signed and affixed to the By-Laws of the Corporation.

Certified correct:

ATTEST:

_Marvin L Berry_
Marvin L. Berry, President and
Chairman of Shareholders Meeting

_Mattie L. Boyce_
Mattie L. Boyce, Secretary of
Shareholders Meeting and Secretary-
Treasurer of Corporation

124

NOTICE OF DIRECTORS MEETINGS: No notice of annual meeting need be given directors.

IX
(As Amended)

OFFICERS: The officers of the company shall consist of a President, an Executive Vice President, one or more Vice Presidents, a General Counsel, a Secretary and Treasurer and one or more assistant Secretaries or Treasurers and such subordinate officers as may from time to time be elected by the Board of Directors or appointed by the President.

X
(As Amended)

OFFICERS - HOW CHOSEN AND REMOVED: The President, Executive Vice President, Vice Presidents and the Secretary of the Corporation shall be elected by the Board of Directors at either its annual meeting (to be held on the second Tuesday of August of each year immediately following the annual meeting of the Shareholders) and shall serve for one year or until their successors have been elected provided however, that vacancies may be filled or new officers elected at any special meeting of the Board of Directors called for such purpose. All other Corporation employees shall be appointed by the President. The salaries and emoluments of all officers shall be determined by the President subject only to the right of review by the Board of Directors on the written request of a majority of the entire Board of Directors, but provided that no such review shall have retroactive effect on any officer. Any officer may be removed by a majority vote of the Board of Directors.

XI-A
(New Section)

EXECUTIVE VICE PRESIDENT: There is hereby created the office of Executive Vice President, The Executive Vice President shall be a person thoroughly familiar with the broad spectrum of activities and projects of the Corporation and its subsidiary entities and shall be a person knowledgeable in the business and professional affairs of the Corporation. The Executive Vice President shall act for, as and in the place of the President in the event of absence or disability of the President. In addition, the Executive Vice President shall supervise the Vice Presidents, the Secretary, managers, departments and activities as directed by the President and is vested with broad executive management of the Corporation subject to direction of the Board of Directors and the President.

XII
(As Amended)

VICE PRESIDENT: If both the President and the Executive Vice President be absent, disabled or unable to serve or fulfill their duties, any vice president may and shall serve in the place of and perform all or any of the duties of the President and/or Executive Vice President; and shall, in addition, perform such regular and other duties, including supervision of departments, as may be prescribed by the Board of Directors or delegated or assigned by the President or Executive Vice President.

XII-A
(New Section)

GENERAL COUNSEL: There is herewith created the office of General Counsel of Berry Contracting, Inc. The person appointed General Counsel may be also designated as Vice President and shall receive such compensation and be employed on such terms and conditions as may be properly designated. The General Counsel shall supervise the Legal Department of the Corporation, shall be responsible for and direct the legal affairs of the Corporation including drafting and preparation of documents and instruments, shall provide legal counsel to the Corporation, and shall direct and hangle litigation and shall

generally perform the duties of Corporate Attorney under the direction of the President, Executive Vice President and the Board of Directors. The General Counsel shall be a licensed attorney at law and a person schooled and knowledgeable in general corporation law and other activities in which the company engages. If the General Counsel is also named Vice President, he shall perform such executive duties as pertains to the office of Vice President and as be assigned and being in addition to that of General Counsel.

## XV
### (As Amended)

VACANCIES: If the office of any director or any officer becomes vacant by reason of death, resignation, retirement, disqualification or removal from office or otherwise, the Directors then in office, although less than a quorum may, by a majority vote, choose a successor or successors who shall hold such office for the unexpired term of such officer or officers and until their successors be nominated and elected.

## XVI
### (As Amended)

DUTIES DELEGATED: In the case of the absence of any officer of the Company, the Board of Directors or the President may delegate for temporary purposes the powers and duties of such officer to any other officer or to any other Director.

I, R. W. Black, being Secretary of Berry Contracting, Inc. do certify that the foregoing amendments to the Bylaws of Berry Contracting, Inc. were duly, lawfully and legally adopted at an annual meeting of the Board of Directors held pursuant to the Bylaws on the 11th day of August, 1981.

WITNESS my hand and the seal of the corporation.

_____
R. W. BLACK, Secretary

136

# AMENDMENT TO THE BY-LAWS
## BERRY CONTRACTING, INC.

BE IT RESOLVED that the By-Laws of Berry Contracting, Inc. be amended as follows:

That Article IV be amended as follows:

The Board of Directors shall consist of not less than two directors.

By-Laws adopted this 9th day of August 1982.

CERTIFIED CORRECT:

_____
Marvin L. Berry, President and
Chairman of Shareholders Meeting

ATTEST:

_____
D. E. Spangler, Secretary-Treasurer

127

# EXHIBIT C



P.O. Box 4858
1414 Valero Way
Corpus Christi, Texas
78469-4858
Bus: (361) 693-2100

May 30, 2023

Sean Strawbridge, Director
Port Of Corpus Christ
400 Harbor Drive
Corpus Christi, TX 78401

Dear Mr. Strawbridge,

After immense consideration, the principals at Berry G.P. have decided to open two strategic properties to the marketplace. The property's synergy directly enhances one another and will be packaged as one. This asset's development would greatly benefit the port and the immediate properties contiguous, thus Berry G.P. would like to offer this to the Port as a first option. The Port of Corpus Christi will be responsible for the offer, based on knowledge of future growth and economic strategy. Please be respectful in timing of response, as this divestment will be presented for open offers. Attached you will find surveys and legal descriptions for both tracts. Thank you very much.

Sincerely,

Robert Rickett
Berry, G.P.
361-693-2841
409-771-1267
RickettR@Bayltd.com

Safety ■ Quality ■ Productivity
*The Winning Combination*

# EXHIBIT D



# CERTIFICATE OF CORPORATE RESOLUTIONS
## OF
## BERRY GP, INC

I, M. G. Berry, Secretary of BERRY GP, INC, a Texas corporation (the "Corporation"), do hereby certify as follows:

1.  I am the duly elected and qualified Secretary of the Corporation and the custodian of the Corporation's records.

2.  Set forth below is a true and correct extract from the records of the Corporation showing resolutions duly adopted either: (a) at a meeting of its Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of the Corporation, which resolutions have not in any way been amended or modified and are in full force and effect:

    RESOLVED, that the President, any Vice President, or Secretary of the Corporation be and is hereby authorized and directed to obtain a loan in the amount of $20,000,000.00 from FROST BANK ("Lender"), upon such terms and conditions as the said officer shall in his or her sole discretion deem necessary or advisable; to execute and deliver on behalf of the Corporation all promissory notes, deeds of trust, security instruments, documents, certificates and agreements (collectively, the "Loan Documents") required by Lender, and to pledge as security for the loan such assets of the Corporation as such officer deems necessary or advisable; and to do any and all things in connection with such loan or any renewal, extension or rearrangement thereof that such officer deems necessary or advisable and in the best interests of the Corporation.

    FURTHER RESOLVED, that the President, any Vice President, or the Secretary of the Corporation be and hereby is authorized and empowered on behalf of the Company from time to time to execute, acknowledge and deliver any interest rate swap agreement, interest rate exchange agreement, currency exchange agreement, foreign exchange agreement, interest rate and currency exchange agreement, forward rate agreement, rate floor agreement, interest rate protection agreement, interest rate cap agreement, rate collar agreement, any option agreement respecting the foregoing, International Swaps and Derivatives Association, Inc. (ISDA) Master Agreement, or any similar agreement or arrangement and any schedule, confirmation, exhibit, document or instrument evidencing any interest in a transaction covered by any such agreement as the same may be modified, supplemented, amended or revised and in effect from time to time;

    FURTHER RESOLVED, that all acts of the President, any Vice President, or the Secretary of the Corporation authorized and directed herein, including the execution and delivery of the Loan Documents and all other documents referenced herein relating to the loan herein referenced, are reasonably expected to benefit, directly or indirectly,

the Corporation;

FURTHER RESOLVED, that the officers of the Corporation are hereby severally authorized to (a) sign, execute, certify to, verify, acknowledge, deliver, accept, file and record any and all instruments and documents, and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Corporation or otherwise, as in any such officer's judgment is necessary, desirable or appropriate in order to consummate the transactions contemplated by or otherwise to effect the purposes of the foregoing resolutions;

FURTHER RESOLVED, that all actions heretofore taken by the directors or the officers of the Corporation, and all things done by their authority, in connection with the transaction described herein, be and the same are hereby ratified, approved and adopted as the acts of the Corporation;

FURTHER RESOLVED, that said officers are authorized and empowered to perform all acts and execute and deliver all instruments, documents and agreements required by Lender to carry out the purposes of these resolutions;

3. The following are duly elected, qualified and serving officers of the Corporation, and that the signature set out opposite the name of each officer is the genuine signature of such person, to-wit:

| Name | Title | Signature |
|------|-------|-----------|
| Robert Powers | President | |
| M. G. Berry | Secretary | |

4. (a) all franchise and other taxes required to maintain the Corporation's corporate existence have been paid when due and that no such taxes are delinquent; (b) no proceedings are pending for the forfeiture of the Corporation's Certificate of Incorporation or the Corporation's dissolution, voluntary or involuntary; (c) the Corporation is duly qualified to do business in the State of Texas and any other states in which it is doing business, and is in good standing in such states; (d) there is no provision of the Articles of Incorporation or Bylaws of the Corporation limiting the power of the Board of Directors to pass the resolutions set out above, and that such resolutions are in conformity with the provisions of said Articles of Incorporation and Bylaws.

IN WITNESS WHEREOF, I have hereto set my hand this 29th day of June, 2023.

M. G. Berry, in the capacity of Secretary

# EXHIBIT 5

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § § | |
| Defendants. | § | 94TH JUDICIAL DISTRICT |

## COUNTER-PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION ASSERTING COUNTER-CLAIMS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Berry GP Inc., Berry Operating Company LLC, Berry Contracting LP, and Marty Berry, sometimes collectively referred to as Counter-Plaintiffs, and make and file this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims complaining of A. Lawrence Berry, in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, sometimes referred to as Counter-Defendants, and in support of same would show:

1

## I.

## PARTIES

1. Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP is one of the "Berry Entities" as may be referenced herein.

2. Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry Operating is one of the "Berry Entities" as may be referenced herein.

3. Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4. Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. Marty Berry resides in Nueces County, Texas.

5. A. Lawrence Berry ("L.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. A. Lawrence Berry resides in Harris County, Texas. A. Lawrence Berry may and shall be served by notice of these proceedings upon legal counsel for A. Lawrence Berry: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6. Allen Lawrence Berry, as Trustee of the Allen Lawrence Berry Trust ("ALB Trust") is a trust wherein Allen Lawrence Berry serves as trustee of the ALB Trust, and is – along with others – a beneficiary of the Trust. ALB Trust has already appeared in these proceedings, and thus this

2

135

Counter-Plaintiffs First Amended Original Petition Asserting Counter-Claims will be served upon Allen Lawrence Berry, Trustee, and the Trust by service upon their attorney: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6. Berry GP, Berry Operating, Bay Ltd., Marty Berry, and A. Lawrence Berry may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7. L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition"). The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas. A Counter-Plaintiffs' Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97. L.Berry, adding Lawrence Berry in his capacity as trustee of the Allen Lawrence Berry Trust ("Trust"), then filed Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction. This Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims is now being filed as counter-claim to Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction in compliance with Texas Rule of Civil Procedure ("TRCP") 97.

## II.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all Parties. Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas. M.Berry and L.Berry reside in Texas. As such, all Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

9.     Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) inasmuch as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred. See Exhibit C (with attachments). Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3). See Exhibit B.

## III.

## DISCOVERY

10.    Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## EXECUTIVE SUMMARY

11.    Counter-Plaintiffs file this amended counter-petition asserting claims against L.Berry and the Trust for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud, and other causes of action. Counter-Plaintiffs' causes of action pleaded against and complaining of L.Berry and Trust are directly responsive to L.Berry's claims for self-dealing and breach of fiduciary duty filed against one or more Counter-Plaintiffs. For all claims referenced in this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims, Counter-Plaintiffs now sue Counter-Defendants.

## VI.

## FACTUAL BACKGROUND

12.    The Berry Entities and Berry-Related Entities are a large organization of companies engaged in various businesses throughout the United States, and have successfully done so since the 1950s.

4

13. Marvin Berry had four (4) sons: Marty Berry (M.Berry), Dennis Berry (D.Berry), A. Lawrence Berry (L.Berry), and Kenneth Berry. After Marvin Berry passed in 1997, control of the Berry Entities shifted to Laura Berry (Marvin's wife), and then to their (Marvin's and Laura's) sons — M.Berry, D.Berry, and L.Berry. LDMA LP ("LDMA") sits at the top of the Berry Entities. LDMA's 3% general partner is Beacon Inc. which is owned by M.Berry, D.Berry, and L.Berry. LDMA owns Berry GP which, through a series of legal entities, own Berry Operating and Bay Ltd. The Board of Directors of Berry GP (M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojosa Phd.) — in accordance with the by-laws of Berry GP — primarily govern Berry GP, the Berry Entities, and some of the other affiliated entities (indirectly). All considered (generally), ownership of the Berry Entities is vested with M.Berry, Bonnie Berry, and L.Berry (shareholders); and control of the Berry Entities (generally, at a policy level) is with M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojsa Phd. (all serving as directors of Berry GP).

14. For purposes of this pleading, the Berry Entities refers to Berry GP, Berry Operating, and Bay Ltd. For purposes of this pleading, the Berry-Related Entities refer to the Allen Lawrence Berry 2007 Trust, Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca ICI Development ("Orca ICI," a Texas partnership), Orca ICI Development JV, Orca Petroleum Ltd., Orca Properties LLC (a/k/a Orca Specialty Equipment LLC, Providence Plantation, and/or Casa de Juego), West 17th Resources LLC, Gansevoort Investments LLC, Halcon Mineral Interest LLC, Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Southern Comfort Equipment, Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, CEC Ridgefield Holdings LLC, Blue Wagon Energy Investments LLC, Alamo Resources IV JV LLC, B.B.I. Inc., Escopeta Oil & Gas

Corporation, Furie Operating Alaska LLC, Helios Power Capital LLC, Danskammer Energy LLC, Berry Y&V Fabricators LLC (and related companies). The Berry Entities and Berry-Related Entities may be sometimes referred to as the "Berry Companies."

15. The Berry Companies, except for the Trust, are and have been started up, owned (legally and/or beneficially), held in trust, managed, developed, operated, and/or controlled at various times by and through Berry GP, and/or by and through (in part) M.Berry, D.Berry, and/or L.Berry (one or all of them), since the 2000s. Such business practices are investments for one or more of the Berry Entities and/or their owners/shareholders.

16. As an example of how Berry Entities invested, Counter-Plaintiffs invested substantially in ICI, ICI Orca, and Orca. Specifically, Counter-Plaintiffs seeded capital (money, assets, manpower) to Orca to start-up, manage, develop, operate, and/or control an investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets (including mineral interests as assets) for several of the Berry-Related Entities (the "Investment").

17. From time to time, M.Berry, D.Berry, and/or L.Berry (or all of them) had meetings to discuss how to manage the Investment, whether to sell or continue with the Investment, and other business-type meetings/discussions.

18. Seeded capital money/assets from Counter-Plaintiffs to ICI to Orca/ICI to Orca involved an agreement/contract as between these legal entities requiring payment-in-full for the base value of the seeded money/assets received by Orca. In contravention of such agreement/contract, L.Berry, individually and as trustee for the Trust, has very recently refused to pay as required by the agreement/contract.

19. Seeded capital money/assets from Counter-Plaintiffs to ICI to Orca/ICI to Orca also included the agreement/contract that L.Berry/Orca/Trust (all or in part) would initiate the

6

139

Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment in trust and for the benefit of Counter-Plaintiffs. In contravention of such agreement/contract, L.Berry/Orca/Trust (all or in part) has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs.

20. Specifically, L.Berry/Trust has participated in self-dealing transactions involving the Investment (and the Investment's earnings) — taking of seeded money and assets of value (wealth) for personal benefit, and not for the benefit of any one or more of the Counter-Plaintiffs. This on-going practice by L.Berry/Orca/Trust of self-dealing transactions and ultra vires transactions violates the fiduciary obligations owed by L.Berry, individually and as trustee of the Trust, to Counter-Plaintiffs (and others).

21. In furtherance of L.Berry's/Trust's wrongful conduct, L.Berry/Trust has intentionally obscured self-dealing transactions by transfers of money/assets of substantial value to and/or through the Berry-Related Entities. All such transactions constitute L.Berry's, individually and as trustee for the Trust, wrongful taking of money and assets belonging to, held in trust for, and held for the benefit of Counter-Plaintiffs. L.Berry, individually and as trustee for the Trust, has and is engaged in wrongful takings, and also has failed to disclose same (as is required by his (L.Berry's, individually and as trustee of the Trust) fiduciary duties owed).

22. L.Berry's (individually and as trustee of the Trust) wrongful conduct (as described herein) continues to-date. Counter-Plaintiffs file this legal action to demand L.Berry (individually and as trustee of the Trust) provide financial information as shall be requested through the legal discovery process. Counter-Plaintiffs now plead the following claims and causes of action against L.Berry

7

140

(individually and as trustee of the Trust) and the Trust: conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, and fraud.

## VII.
## CAUSES OF ACTION
### Count 1
### Conversion

23. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 1 in their entirety.

24. Counter-Plaintiffs would show that L.Berry (individually and as trustee of the Trust, Counter-Defendants) are liable to Counter-Plaintiffs for conversion of Counter-Plaintiffs' Investment (+ earnings). Specifically, Counter-Plaintiffs seeded capital (money, assets) to L.Berry/Orca/Trust (and their benefit) to start-up, manage, develop, operate, and/or control an investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets for several of the Berry-Related Entities (the Investment). L.Berry and the Trust were to hold the Investment (+ earnings) in trust for Counter-Plaintiffs.[1] Wrongfully, L.Berry and the Trust have absconded with the Investment (+ earnings) through a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs. L.Berry's wrongful conduct is a conversion of Counter-Plaintiffs' Investment (+ earnings).

25. The elements of conversion are: 1) claimants (Counter-Plaintiffs) owned or were entitled to possession of property; 2) another assumes or exercises control of the property in an unauthorized manner to the exclusion of the claimants; and 3) the claimants' demand for return of

---

[1] Although some monies have been paid by L.Berry or one of his legal entities to one or more Counter-Plaintiffs as part of these transactions, the amounts of money paid have only been a partial repayment of monies owed to Counter-Plaintiffs — still in disregard for that which was agreed to be held in trust by L.Berry for Counter-Plaintiffs.

8

the property is refused. By this Counter-Plaintiffs' First Amended Counter-Claim these Counter-Plaintiffs continue to request return of all converted assets. In this case, Counter-Plaintiffs clearly own and are entitled to possession of the Investment (+ earnings). Such Investment (+ earnings) were supposed to be held in trust by L.Berry, individually and as trustee for the Trust (the sole person in control of such Investment (+ earnings)) for Counter-Plaintiffs. Counter-Defendants have wrongfully assumed and exercised control over such Investment (+ earnings), and done so in a manner unauthorized by Counter-Plaintiffs and to the exclusion of Counter-Plaintiffs. Further, and in disregard of requests from Counter-Plaintiffs, Counter-Defendants have failed and refused to return the Investment (+ earnings) to Counter-Plaintiffs. This is a wrongful conversion of such Investment (+ earnings) — the money/assets — belonging to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

26.     Counter-Defendants' wrongful conversion of Counter-Plaintiffs' Investment (+ earnings) has caused substantial financial harm and losses to Counter-Plaintiffs. Counter-Plaintiffs now sue for the return of such Investment (+ earnings), or alternatively for the value of such Investment (+ earnings).

## Count 2
## Breach of Fiduciary Duty

27.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 2 in their entirety.

28.     Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendants held the Investment (+ earnings) in trust for Counter-Plaintiffs all relevant times. As such, Counter-Defendants owe fiduciary duties to Counter-Plaintiffs for all relevant times. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs include, but are not limited to, the duty of loyalty, duty of utmost good faith and

9

fair dealing, and duty of fairness and honesty. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs further include putting Counter-Plaintiffs' interest before his (L.Berry's, individually and as trustee of the Trust) own interest, inclusive of devoting full time and efforts in favor of Counter-Plaintiffs' best interests — not L.Berry's own or just the Trust's interests. These duties that Counter-Defendants owe to Counter-Plaintiffs encompass obligations and/or duties to refrain from self-dealing transactions and to make full disclosures of information.

29.     While owing fiduciary duties to Counter-Plaintiffs, Counter-Defendants have engaged in, directed, approved, and/or taken actions in contravention of fiduciary duties owed, including but without limited to the following:

a.     L.Berry/Trust took substantial money/assets from Counter-Plaintiffs, and failed to invest same in the name of and/or for the benefit of Counter-Plaintiffs (thereby putting their own financial interest ahead of Counter-Plaintiffs' financial interest). By way of example, L.Berry and Trust took Counter-Plaintiffs money/assets yet wrongfully placed things of value (mineral leases) into Orca (a legal entity that ultimately (later) was determined to be 100% for the benefit of Trust). This breach of fiduciary duty caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

b.     L.Berry/Trust were supposed to hold the Investment (+ earnings) in trust for Counter-Plaintiffs, yet L.Berry/Trust refuses to account for and surrender such Investment (+ earnings) in favor of Counter-Plaintiffs — but rather appears to have absconded with the Investment (+ earnings). This failure to hold, account for, and then surrender the Investment (+ earnings) for the benefit

of Counter-Plaintiffs is self-dealing — and a breach of fiduciary duty. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

c.  L.Berry/Trust took the Investment (+ earnings) for their own benefit (as set forth above), and did so without full disclosure of details of the Investment (and earnings) to Counter-Plaintiffs.   Rather than comply with Counter-Defendants' fiduciary duties owed, Counter-Defendants have engaged a series of transactions to obscure Counter-Plaintiffs' rights to its Investment (+ earnings). This lack of full disclosure is L.Berry's and Trust's breach of fiduciary duty of full disclosure and candor owed to Counter-Plaintiffs. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

d.  L.Berry/Trust have used Counter-Plaintiffs money/assets to promote and make profit for their own businesses in various manners and locations. This is more self-dealing, and a breach of the fiduciary duty owed by L.Berry/Trust to the Counter-Plaintiffs. This breach of fiduciary duty has caused substantial financial harm and losses to the Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

e.  There are additional transactions / ventures by Counter-Defendants that are a breach of fiduciary duties owed to Counter-Plaintiffs, and all of which have caused substantial financial harm and losses to Counter-Plaintiffs. For same, Counter-Plaintiffs now sue.

11

144

30.     Counter-Defendants have taken money/assets/manpower from one or more of the Counter-Plaintiffs; the Investment (+ earnings) from one or more of Counter-Plaintiffs; misappropriated equipment, personnel, and other assets from one or more of the Counter-Plaintiffs; and all to the detriment of one or more of the Counter-Plaintiffs — while only benefiting Counter-Defendants. This is self-dealing.  All such conduct described herein evidences Counter-Defendants' breaches of fiduciary duties owed; that is, self-dealing, advancing their (L.Berry's/Trust's) own interest rather than Counter-Plaintiffs' interest, breaches of loyalty to the Counter-Plaintiffs, breaches of good faith and fair dealing owed to Counter-Plaintiffs, breaches of full disclosure and candor owed to Counter-Plaintiffs, and more.  Counter-Defendants' misconduct has been and continues to be designed as a subterfuge of obligations to the Counter-Plaintiffs (whereas other shareholders who may have received benefits account for same to the Berry Entities).  Counter-Defendants' breaches of fiduciary duties owed to Counter-Plaintiffs have caused substantial financial harm and losses to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

**Count 3**
**Breach of Contract**

31.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 3  in their entirety.

32.     As noted herein, seeded capital money/assets from Counter-Plaintiffs included the agreement/contract that L.Berry, individually and as trustee of the Trust, would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment (+ earnings) in trust and for the benefit of Counter-Plaintiffs.  In contravention of such agreement/contract, L.Berry, individually and as trustee of the Trust, have refused to perform as promised, but rather engaged a series of self-dealing transactions designed to allow L.Berry and

the Trust to keep all (or some) of the Investment (+ earnings) for himself (L.Berry) and/or the Trust.

33.     Counter-Defendants' refusals to abide by the agreement/contract is a breach of agreement/contract.  Counter-Defendants' breach of the agreement/contract has caused Counter-Plaintiffs substantial financial harm and losses, and for such substantial financial harm and losses Counter-Plaintiffs now sue.

**Count 4**
**Unjust Enrichment**

34.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 4  in their entirety.

35.     Recent events now give rise to a concern on Counter-Plaintiffs' behalf that Counter-Defendants may deny the agreement/contract (and/or some terms of the agreement/contract) as between Counter-Plaintiffs and Counter-Defendants — all in an effort by Counter-Defendants to wrongfully abscond with Counter-Plaintiffs' Investment + earnings.  Such a result would be inequitable, and unjustly enrich Counter-Defendants.

36.     Counter-Plaintiffs would show that Counter-Plaintiffs did, in fact, provide seed capital money/assets from Counter-Plaintiffs to Orca/ICI /Orca as a benefit to Counter-Defendants, and to allow Counter-Defendants to invest (again, the Investment).  This benefit to Counter-Defendants was provided by Counter-Plaintiffs, and it will cause a substantial detriment to Counter-Plaintiffs if the Investment + earnings are not returned to Counter-Plaintiffs.  As such, equity demands that the Investment + earnings be returned to Counter-Plaintiffs or compensation for value.

37.     For these reasons set forth herein, Counter-Plaintiffs now sue Counter-Defendants for unjust enrichment, as fairness demands Counter-Plaintiffs be made whole by: (1) return of all

13

146

Investment (+ earnings); or (2) the value of all Investment (+ earnings) be paid by Counter-Defendants to Counter-Plaintiffs.

## Count 5
## Breach of Constructive Trust

38.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 5  in their entirety.

39.     As noted above, Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times.  Counter-Defendant L.Berry held the Investment (+ earnings) in trust for Counter-Plaintiffs for all relevant times.  L.Berry, as trustee for the Trust, held the Investment (+ earnings) in trust for the Counter-Plaintiffs for all relevant times.  As such, Counter-Defendants owed and owe fiduciary duties to Counter-Plaintiffs for all relevant times.

40.     Counter-Plaintiffs made transfer of monies/assets to Counter-Defendants (money, manpower, and assets).  Counter-Plaintiffs made these transfers of monies/assets in reliance upon Counter-Defendants' promise to protect and deliver Counter-Plaintiffs' share of the Investment (+ earnings) to Counter-Plaintiffs.

41.     Counter-Defendants now refuse to perform upon Counter-Defendants' promise (but rather now wants to keep for L.Berry's and his Trust's own gain/profit all of the Investment (+ earnings)).  As such, Counter-Defendants will be unjustly enriched.  Given these facts, Counter-Plaintiffs now sue for breach of constructive trust for the Investment (+ earnings) and related, traceable monies/assets.  All such monies and assets should be placed in a constructive trust for the benefit of Counter-Plaintiffs or distributed to same.

14

## Count 6
## Fraud

42.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 6 in their entirety.

43.     As noted above, Counter-Plaintiffs invested heavily ($millions$, the Investment) in ICI, Orca ICI, Orca, and other Berry-Related Entities for the benefit of Counter-Plaintiffs. Such Investment was seed-money/assets for — and investment in — Berry-Related Companies.

44.     Counter-Plaintiffs invested the millions of dollars/assets based specifically upon Counter-Defendants' representations/promises to start-up, manage, develop, operate, and/or control investments in the Eagle Ford Shale and/or Permian Basin for the benefit of Counter-Plaintiffs (which is also for the benefit of L.Berry and his Trust, in part).

45.     More specifically, and to induce the Investment, Counter-Defendants promised to re-pay the original value of the Investment ($millions$) to the Counter-Plaintiffs; and further promised that the Investment would be for the benefit of the Counter-Plaintiffs (and understandably so given that L.Berry and the Trust would still share substantially in the benefits/profits).

46.     Instead, Counter-Defendants — although Counter-Defendants have paid some interest-only payments from time to time — have absconded with all or a substantial portion of the value of the Investment monies/assets + earnings. On information and belief, Counter-Defendants apparently made interest payments to prolong the process (run out the clock) — all the while never intending to re-pay the original value of the Investment; and all the while never intending to deliver such Investment (+ earnings) to Counter-Plaintiffs.

47.     Presently, Counter-Defendants have gone dark on this discussion, and thereby indicated that L.Berry, individually and as trustee for the Trust, never intended to abide by the representations/promises designed to induce the Investment.

15

148

48.     Counter-Defendants' fraud/fraud in the inducement has resulted in substantial, unearned profits for Counter-Defendants, personally and for the Trust; and great financial losses to the Counter-Plaintiffs.

49.     The above-described conduct constitutes fraud and fraud in the inducement, and thus is actionable in favor of one or more of the Counter-Plaintiffs. For such fraud and fraud in the inducement, the Counter-Plaintiffs now file and assert all such claims and causes of action against Counter-Defendants.

## VIII.
## CAUSATION

50.     Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

51.     Counter-Plaintiffs would show that all causes of action/claims set forth herein have been the cause, proximate cause, producing cause, and cause-in-fact of substantial harm and financial losses to Counter-Plaintiffs. For all such harm and financial losses, these Counter-Plaintiffs sue.

## IX.
## LEGAL DAMAGES

52.     Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

53.     For all harm and financial losses suffered by Counter-Plaintiffs and arising from wrongful and/or inequitable conduct of Counter-Defendants, these Counter-Plaintiffs now sue.

54.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the substantial harm and financial damages suffered by Counter-Plaintiffs; to wit; compensatory damages, actual damages, consequential damages, restitution damages, disgorgement damages, and other damages. Counter-Plaintiffs claims asserted herein are for substantial harm and financial losses greatly in excess of $1,000,000.00.

16

55. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; attorneys' fees.

56. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; prejudgment and post-judgment interests — as allowed by law.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein, for costs of court in addition thereto, and for such other and further relief to which Counter-Plaintiffs may show themselves justly entitled as against Counter-Defendants (L.Berry and the ALB Trust).

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
    Douglas A. Allison
    State Bar No. 01083500
    doug@dallisonlaw.com
    403 N. Tancahua Street
    Corpus Christi, Texas 78401
    Telephone: (361) 888-6002
    Facsimile: (361) 888-6651

    ATTORNEY FOR MARTY BERRY,
    BERRY GP, INC., BERRY
    OPERATING COMPANY, LLC and
    BERRY CONTRACTING LOP

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of April 2024, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

    */s/ Douglas A. Allison*
    Douglas A. Allison

17

# EXHIBIT 6

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                   )   IN THE DISTRICT COURT
Individually and                  )
derivatively on behalf            )
of BERRY GP, INC.                 )
                                  )
  Plaintiff,                      )
                                  )
BERRY GP, INC.,                   )
                                  )   94TH JUDICIAL DISTRICT
  Nominal Plaintiff,              )
                                  )
v.                                )
                                  )
MARTY BERRY, ROBERT               )
RICKETT, ROBERT POWERS,           )
MICHAEL HUMMELL, BERRY            )
GP, INC., BERRY                   )
OPERATING COMPANY, LLC            )
and BERRY CONTRACTING             )
LOP                               )
                                  )
  Defendant                       )   NUECES COUNTY, TEXAS

_____

MOTION FOR TEMPORARY INJUNCTION
_____

On February 16, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE BOBBY GALVAN, Judge Presiding, held in Corpus Christi, Nueces County, Texas..

Proceedings reported by Machine Shorthand.

---

APPEARANCES:

MR. BARRETT REASONER
SBOT NO. 16641980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, Texas  77002
(713) 650-8805

AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77098
(713) 589-8477

AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas 78411
(361) 887-4700

ATTORNEYS FOR PLAINTIFF, LAWRENCE BERRY

MR. DOUGLAS A. ALLISON
Law Office of Douglas Allison
SBOT NO. 01083694
403 North Tancahua Street
Corpus Christi, Texas 78401
(361) 888-6002

ATTORNEY FOR DEFENDANTS, BERRY GP, BERRY OPERATING, BERRY CONTRACTING AND MARTY BERRY

---

APPEARANCES (CONTINUED):

MR. F. VAN HUSEMAN
SBOT NO. 10323500
Huseman Law Firm
615 North Upper Broadway Street, Suite 2000
Corpus Christi, Texas  78401
(361) 883-3563

ATTORNEY FOR DEFENDANTS, MIKE HUMMELL AND ROBERT RICKETT

MR. CLAY STEELY
SBOT NO. 00791725
Porter Hedges, LLC
1000 Main Street, Floor 36
Houston, TX 77002
(713) 226-6669

ATTORNEY FOR DEFENDANT, ROBERT POWERS

---

INDEX

FEBRUARY 16, 2024                          PAGE

COURT CALLS CASE.............................. 6
ANNOUNCEMENTS BY COUNSEL...................... 6
PRELIMINARY MATTERS.......................... 6
TEMPORARY INJUNCTION
OPENING STATEMENTS
  BY MR. REASONER........................... 13
  BY MR. ALLISON............................ 22
  BY MR. HUSEMAN............................ 37

PLAINTIFF'S WITNESSES:
LAWRENCE BERRY
  DIRECT BY MR. BOYD........................ 40,88
  CROSS BY MR. ALLISON...................... 115,125
  CROSS BY MR. HUSEMAN...................... 177
  CROSS BY MR. STEELY....................... 206
  REDIRECT BY MR. BOYD...................... 216

MARVIN MARTY BERRY
(ADVERSE)
  CROSS BY MR. REASONER..................... 228

PROCEEDINGS ADJOURNED........................ 268
COURT REPORTER'S CERTIFICATE................. 269

INDEX TO EXHIBITS
FOR THE PLAINTIFF:

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| PTX1 | EMAIL 01/16/23 | 54 | 54 |
| PTX2 | COMBINED & CONSOLIDATED BALANCE SHEETS 09/21/23 | 59 | 59 |
| PTX3 | COMBINED & CONSOLIDATED BALANCE SHEETS 10/31/22 | 62 | 62 |
| PTX4 | COMBINED & CONSOLIDATED BALANCE SHEETS 10/31/22 | 62 | 62 |
| PTX5 | EMAIL 03/03/23 | 65 | 65 |
| PTX6 | LETTER 03/13/23 | 68 | 68 |
| PTX7 | EMAIL/LETTER 03/20/23 | 71 | 71 |
| PTX8 | EMAIL 12/06/23 AND PROMISSORY NOTE 07/08/22 | 74 | 74 |
| PTX9 | AFFIDAVIT (DENNIS & MARTY) | 79 | 79 |
| PTX10 | GENERAL LEDGER 01/19/24 | 84 | 84 |
| PTX11 | LETTER 05/30/23 | 87 | 87 |
| PTX12 | MEMO AND EMAIL 04-18-23 | 93 | 93 |

INDEX TO EXHIBITS

FOR THE PLAINTIFF: (CONTINUED)

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| PTX13 | NOTICE SPECIAL MTG 12/01/23 | 96 | 97 |
| PTX14 | MINUTES SPECIAL MTG | 99 | 99 |
| PTX15 | BOARD MINUTES | 101 | 101 |
| PTX16 | RESOLUTIONS SPEC. MTG | 102 | 102 |
| PTX17 | LEDGER | 104 | 105 |
| PTX18 | SECT. OF STATE DOCS | 106 | 106 |
| PTX19 | RESOLUTIONS SPEC. MTG 02/13/24 | 108 | 108 |
| PTX20 | EMAIL 06/14/23 | 223 | 224,225 |
| PTX21 | EMAIL 07/07/23 | 223 | 224,225 |
| PTX22 | EMAIL 07/21/23 | 223 | 224,225 |
| PTX23 | EMAIL 12/06/23 | 113 | 113 |
| PTX26 | EMAIL 04/13/23 | 72 | 72 |
| PTX27 | PROMISSORY NOTE 07/08/22 | 239 | 239 |
| PTX28 | PROMISSORY NOTE 07/08/22 | 239 | 239 |
| PTX29 | LETTER 02/24/23 | 246 | 246 |
| PTX30 | CONSOLIDATED FINANCIAL REPORT 10/31/22 | 250 | 250 |
| PTX31 | EMAIL/LETTER 03/28/23 | 265 | 265 |
| PTX32 | EMAIL/LETTER 03/30/23 | 265 | 265 |

FOR THE DEFENDANT MARTY BERRY:

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 4 | PROMISSORY NOTES (MARVIN & DENNIS) | 167 | 168,169 |
| 5 | SUBORDINATION AGREEMENTS | 170,172 | 172 |
| 8 | EMAIL 02/01/23 (ONE PAGE) | 182 | 182 |
| 10 | EMAIL 01/27/22 | 173,175 | 176 |
| 11 | EMAIL 02/10/23 | 173,175 | 176 |
| 12 | EMAIL 03/03/23 | 173,175 | 176 |
| 14 | EMAIL 02/05/24 | 173,175 | 176 |
| 15 | EMAIL 02/19 (BAY 001819) | 173,175 | 176 |

FOR THE DEFENDANT MIKE HUMMELL:

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | RESOLUTIONS SPEC. MTG 12/07/23 | 227 | 227 |
| 2 | LETTER 12/07/23 | 227 | 227 |
| 3 | RULE 11 AGREEMENT (Nueces) | 227 | 227 |
| 4 | RULE 11 AGREEMENT (Harris) | 227 | 227 |

P R O C E E D I N G S

(February 16, 2024)

THE COURT: All right. Be seated. Court calls 2024DCV-45C, Lawrence Berry v. Marty Berry, et al. I guess, let's get appearances.

MR. REASONER: Good morning, Your Honor, Barrett Reasoner for the plaintiff and we have our client here, Mr. Lawrence Berry, Butch Boyd, Mike Absmeier, Gabbie Canales and Bruce Baldree. Thank you, sir.

THE COURT: All right.

MR. STEELY: Your Honor, Clay Steely here on behalf of Robert Powers and he's in the courtroom as well.

THE COURT: Okay.

MR. ALLISON: Your Honor, Doug Allison here. I represent Marty Berry and what we call Berry GP, Berry Contracting, and Berry Operating. And also with me today is my client Marty Berry, and also, Ms. Bonnie Berry. I don't know if the Court's aware of it, the three brothers are all Dennis and Marty and Lawrence.

THE COURT: Yeah.

MR. ALLISON: Thank you.

MR. HUMMELL: I would normally have Mr. Huseman, my attorney introducing me, but since he's just now walking in --

THE COURT: There he is. I'm a little early.

MR. ALLISON: It's your cue.

THE COURT: We're just taking announcements.

MR. ALLISON: Make an announcement for the record, Van.

MR. HUSEMAN: I'm here for Mike Hummell, Your Honor, I'm ready to go.

THE COURT: Okay.

MR. HUSEMAN: I got caught in a line. I showed up over there, there's nobody at the check in. Three seconds later, there are 20 people lined up.

THE COURT: I got you. No, I mean, I'm early, so. I mean, unless we had -- if anybody's missing, I'll wait.

MR. HUSEMAN: If you're ahead of me, I'm late.

THE COURT: No, no, no, you're not late. You're not late. I'm just early. Okay. Well, I'm ready.

MR. ALLISON: We have a preliminary matter that we think we need to address before, a couple of things.

THE COURT: Okay.

MR. ALLISON: One, I think that our intention, even if we say "We're offering this into evidence," I think for today's purposes -- and there's a provision in our protective order that we'll submit to the Court -- we haven't done it yet, but we've all agreed to it -- that allows us to handle documents in camera if they are sensitive, which there's probably a lot of financially sensitive information that will be handled today. So I think we're going to handle exhibits today, even if we say "we offer it into evidence," what we're really doing is giving them in camera to the Court.

THE COURT: Okay. So they're in evidence, but under seal?

MR. ALLISON: Yeah. And I don't -- I think we have to probably go through a different process if we actually seal them, but we're going to treat them like they're sealed and let you hold them in camera for now.

MR. ABSMEIER: That's right, Your Honor. Our agreed protective order allows us to do that and then we confer and we either publicly file them or come back and ask the Court to seal them. So that's what we'll do after the hearing.

THE COURT: Okay. I'll work with you. If that's you-all's agreement, that's fine with me.

MR. ALLISON: One other matter that's a preliminary matter for us, Your Honor.

THE COURT: Okay.

MR. ALLISON: I say preliminary, it goes to the motion. Are you ready for that?

THE COURT: Yeah.

MR. ALLISON: For their application.

THE COURT: I don't have anything else here on the docket all day long.

MR. ALLISON: Before we get into any of the merits, Your Honor, they filed a, basically, a minority shareholder suit.

THE COURT: I thought -- and I've tried some of those over the years, but I thought that wasn't a cause of action in Texas anymore.

MR. ALLISON: It's extremely limited after the *Richie* case, okay, and that's the seminal case on it, and then it shook the earth when it came down from the Texas Supreme Court.

THE COURT: I remember.

MR. ALLISON: Okay. And what they have done, Your Honor, is they have filed for Lawrence Berry -- let me say it correctly -- for Lawrence Berry

on his behalf, and derivatively, on behalf of Berry GP, Inc. And it's a shareholder's derivative claim. He's not a shareholder, so we're asking the Court to dismiss it. There's a defect in the parties, and it's just unequivocal. He is not a shareholder of Berry GP.

THE COURT: Well, I mean, I --

MR. ABSMEIER: Your Honor, there's no motion -- no 91a motion to dismiss before the Court today.

THE COURT: I mean, that's not before the Court today.

MR. ALLISON: It's a jurisdictional issue.

THE COURT: Well, I'm not hearing it today, Mr. Allison.

MR. ALLISON: You're not?

THE COURT: You're dropping it right on me right now and I'm not going to hear it today without -- I'm not going to make a snap judgment like that. You may be correct.

MR. ALLISON: Okay.

THE COURT: But to make a snap judgment like that on a case is not --

MR. ALLISON: Okay.

THE COURT: -- how I operate.

MR. ALLISON: I'll say it this way, it is

incumbent on us to point out a defect in the parties and to --

THE COURT: And to set it for hearing.

MR. ALLISON: Well, no, and to tell the Court that -- inform the Court however -- by whatever means. And we came to the realization that Berry GP is wholly owned by a partnership, LDMA, and we have that certificate.

THE COURT: I mean, all that may be true --

MR. ALLISON: Okay.

THE COURT: -- but we just need to hash this out, and I think -- I mean --

MR. ALLISON: Okay.

THE COURT: -- you're dropping something on me that takes some thought and I haven't thought about it because this is the first I've heard of it.

MR. ABSMEIER: Okay. Right, Your Honor. It's either plea to the jurisdiction or Rule 91a motion to dismiss.

THE COURT: I mean, we can do all that.

MR. ALLISON: It's jurisdictional to you. You can take it up at any time.

THE COURT: I can take it up at any time and I guess it can even be brought up on appeal.

MR. ALLISION: And you're not taking it up

now. I heard you.

MR. REASONER: And like you, Your Honor, this is the first we're hearing this argument.

THE COURT: So, I mean, I can't make a snap judgment like that. I don't feel comfortable, so. But we can set that for hearing and we'll hash it out. Okay?

MR. ALLISON: Thank you, Your Honor.

MR. REASONER: Your Honor, we -- in talking among the two parties, if the Court will allow it, we thought a brief 15, 20-minute opening a side would be helpful.

THE COURT: Yeah. I'm up for it.

MR. REASONER: Okay. Thank you. May I proceed or anything else?

THE COURT: You may proceed.

MR. REASONER: Okay.

THE COURT: Now do I need to get anybody on Zoom?

MR. REASONER: I don't -- not on our end, Your Honor.

THE COURT: Does anybody -- does anybody -- and maybe even later on if anybody has an out of town witness that wants to testify by Zoom, just let me know and we can do that. Okay?

MR. REASONER: Thank you.

THE COURT: So I'm not going to get on Zoom then. I'm just pulling up the file electronically.

All right. Go ahead.

MR. REASONER: And, Your Honor, may I approach?

THE COURT: Yes, sir.

MR. REASONER: Some slides that we'll have them on the screen, but just for Court and counsel.

Your Honor, Barrett Reasoner on behalf of Lawrence Berry and we very much appreciate the opportunity to be heard today.

This is an extremely important matter to Mr. Berry. As the Court, I think knows, this involves a family business founded in part by the Berrys' father back in the '50s, that has continued over the years, and this is a dispute about serious concerns with the way it's being managed and what's happened here with insider transactions that have come to light.

As the Court, I believe knows, Lawrence Berry is a one-third owner, Marty Berry is a one-third owner, and sadly, the estate of their brother Dennis, as the Court, I believe is aware, is a one-third owner as well. And in recent years, Lawrence Berry has been frozen out of the management and operation of the Berry

entities, and has, through persistence, discovered some self-dealing insider transactions that are extremely troubling and that are the reason for this lawsuit.

If you go to the second slide, Your Honor, we, just at a very high level, we note what's going to be talked about today. The first is Marty Berry having a $45,000,000 loan, that was not disclosed to Lawrence, to Berry GP back in 2022. Another issue is the placing up for sale of a dock and adjacent property that was extremely important to the Bay business and was again done -- put up for sale without disclosure. Lawrence Berry had to learn of it from a third party.

You will also hear that Marty Berry personally bought and leased back a number of cranes. He bought in the company of his own, a number of cranes and leased those back to the company, again, without disclosure to Lawrence. That was -- it was through an entity, you'll hear, Your Honor, called Western Gulf Equipment. It was originally set up for the purpose of purchasing one crane in a Canadian transaction where Marty Berry owned part of it and Bay owned part of it. What happened then, though, was the acquisition of additional cranes that were rented back to Bay at 50, $60,000 a month, et cetera. You'll see the numbers. Again, without board approval, without disclosure to

Lawrence Berry, a classic self-interested or insider transaction.

You'll also hear, Your Honor, evidence about Marty and other defendants failing to notify Lawrence Berry of a meeting with the president of IBC, the banking institution that the company had a banking relationship with over 25 years, a meeting scheduled with Dennis Nixon who was coming in from Laredo for such a meeting. Lawrence never informed about that, folks didn't show up for the meeting, and a notice of default was sent that very -- was sent out that very end of the day. So a relationship of 25-plus years, providing lifeblood of the company, ended, again, with Lawrence being woven into the discussion.

They now, Your Honor, after this lawsuit has been filed, you're going to see a series of resolutions where they had been the last couple of few months tried to ratify this conduct that's taken place over a period of time, ratify this -- these actions. And I sub -- I'll submit to the Court that not only is that not effective to cleanse actions that took place earlier, it shows the inadequacy of what was actually done during the real time when these transactions were actually going on.

Your Honor, we've included here, also, a

timeline, which I will not -- I will not take the Court through piece by piece, but it's just for your reference to orient you as to when some of these events took place. You'll hear that these loans, that there was by Marty for 45,000,000, and his brother Dennis for 30,000,000 to the company, for a total of 75 back in July of 2022. And in January, you'll see Lawrence Berry is making inquiries, trying to get documentation when reference is seen to that in some financials down the road. And Mr. Powers indicates, well, I don't believe those have been signed up yet. So again, he gets on the scent of this and finds out about it. No question, Judge, as to this, the crane transactions, and other things you'll hear about that they were insider transactions.

You'll hear the other side trying to suggest that Lawrence Berry knew, but you won't hear them be able to fairly challenge the idea that these were insider related party transactions; the loans, the crane rentals and the like.

Again, the marketing of the dock, a key asset for the company, that's something you'll hear that Lawrence Berry had to learn about from a third party.

Now, where are we, Your Honor, in the -- in the status of this case? As the Court knows, I think

from previous hearings, there was a TRO down in Houston, which was turned into an agreed TRO when the case was transferred here. That had an injunction against sales and against modifying the composition of the board and the idea was that it would remain in effect till this Court could hear and decide the issue.

Here today, Your Honor, we have narrowed the relief we are requesting, if we go to the next slide. What we're asking at this point, Your Honor, through the trial of this case is two things: One, that defendants be enjoined from removing Lawrence Berry from the board of directors. That's critical. Their ability to remove -- and let me say, in agendas for shareholder meetings and board meetings, they've talked about consideration -- on the agenda, consideration of removal or addition of board members and board member actions, et cetera. No question that's on their -- on their plans, on their minds and in their plans. Removal would keep Lawrence Berry even further in the dark about what the company's doing and any insider transactions.

The second thing we're asking for in this -- in this targeted relief, Your Honor, is again, just two weeks notice of a sale of real property, just two weeks written notice with details about what the sale will involve. What that will allow Lawrence Berry

to do, is if there is something untoward or something where it's appropriate, he could come to the Court and, you know, challenge or complain about the transaction. If not, he wouldn't. But he would have the information, he would have notice. That is not an onerous thing to ask of the company and not something that's going to keep the company from going about its business. These folks can and have outvoted him on issues. That's not why we're here.

On the temporary injunction standard, Your Honor, if we go to the next slide, the Court is well familiar with the requirements for that. I want to hone in on the elements of the probable injury piece which has subcategories, if we can go to the next slide.

Importantly, Your Honor, we need not, and we cite the *Intercontinental Terminals* case to you. We need not show that we will prevail. We think the evidence you'll see points you in that direction, but that's not the standard here today. We have to show that the causes of action are there and that we've got some evidence that tends to sustain them. And we believe that the evidence that's going to be presented to this Court will well meet that standard.

The second bullet there is critical, though here, fiduciary self-dealing context, and that's where

we are. You're not going to hear a denial that, for example, Marty Berry owed a fiduciary duty to the company as a director, I don't believe that's going to be contested, and that there were transactions in which he was on both sides. In those instances, Your Honor, the law is that there is a presumption of unfairness and that involves a burden shifting to Mr. Berry to prove the fairness of the transactions. So that's a critical burden issue for the Court to keep in mind.

And finally, we cite the *Health Discovery* court case there at the bottom which says that if that presumption cannot be rebutted at the TI stage, it should be granted if the plaintiff presents a prima fascia case, which we believe we absolutely are able to do here.

If we go to the status quo, Your Honor, in the next slide, that, as you know, is the last peaceable noncontested status, and that's -- that's what we're asking for, board -- that the board seat remains through this trial until the case is decided and that notice be provided. There's a situation where that's completely justified when you look at additional debt on an insider transaction that was not disclosed, and there's an expression, you'll see, in shareholder resolutions that they've passed after this case came, after we filed this

case. That resolution says they're going to continue marketing the -- not sell until after the TRO issue is resolved, but there's an attempt to continue marketing that, so this is an issue that is ripe for discussion.

And as I said there at the bottom on the threat to remove Lawrence Berry, that has been implicit in the notices and things that they have filed and that they have served on the -- on the shareholders and the directors.

The imminent harm piece, again, their actions and this course of conduct where insider transactions have gone on make it clear that there is a demonstrable -- demonstrable intent to do these things, and that express intent that's implicit to take Mr. Lawrence Berry off the board.

On irreparable harm, Your Honor, the Court is well familiar with the general standards there about something that cannot be adequately compensated in damages, but the third point in particular, I think, is important there, Judge, about real property, and I think we brought this up before.

Texas case law is strong on the notion that real property is unique and irreplaceable, and in situations like that, that's something that money cannot replace and something that is generally appropriate for

injunctive relief, and that's what we're asking for here.

The final slide, Your Honor, what you're going to hear from the other side, I have no doubt, and it will be eloquently done, but the point is going to be, look, he is a minority shareholder, he's -- I mean, minority director. He's one of three directors. He's getting outvoted. Too bad. That happens. So sad, but it's not the basis for a lawsuit. That's the argument. What that misses, Your Honor, is a critical issue here, and we've cited to the Court there on the right side of the page, the Texas Business Organizations Code, Section 21.418. It talks about self-interested transactions, a transaction between a corporation and one or more directors. Again, loans, personal loans to the company, renting equipment that you own to the company, nobody's going to be able to fairly deny that those are such transactions.

What do you need for that to be viable? What do you need for that to -- to pass muster under Texas law? Two things: Disclosure under (b)1 there, Your Honor, the material facts have to be disclosed or known by, that's critical. And you'll see that that was not present here. But also, at the bottom, it's got to be approved by a majority of the disinterested

directors, and in these transactions, it's undeniable that Lawrence Berry was a disinterested director.

There are some where Ms. Berry, Bonnie Berry, as the successor to her husband, is disinterested as well. But you look at a vote for a -- from a majority. There are transactions that the company is treating as having been passed and having been approved by a vote from Marty Berry that he can vote, but you need disinterested votes for it to be a legitimate transaction.

And finally, Judge, in a similar case, the *Florie Rinehart* case out of the Houston First Court of Appeals in 2017, a situation where the Court was faced with a similar situation involving a TI where there was an effort to remove a disinterested director and ratification by an interested director. The Court affirmed a temporary injunction in that instance and that's what this Court should do here.

Thank you very much for your time.

THE COURT: Thank you. We'll see if you're going to put this eloquently as counsel --

MR. REASONER: I've seen him before.

MR. ALLISON: I lose. I lose. I lose.

Like Doug Tinker said one time, "I'm old, I'm fat, and I'm bald, and I don't deserve any of that."

So I don't think I'm going to be so eloquent, and I'm not going to be so beautiful, but I am going to be direct and I'm going to be candid. And I want to -- I do have a presentation, and I'm going to get to that in a second, but I want to be real up front with the Court. You've already heard me say, I don't think they have a cause of action pleaded. One of the elements for their request for a temporary injunction is they have to show a probable relief, a probable --

THE COURT: Probable right of recovery.

MR. ALLISON: -- right of recovery. Okay. I knew I was going to mess that up right from the beginning. A probable right of recovery. If they don't have a cause of action and they did it incorrectly, they lose. If they try -- if they have the right entities here, which they don't; if they had the shareholder here, which they don't, they don't even have a shareholder in this lawsuit for Berry GP, okay, which is the only shareholder derivative suit that they've stated. So if they don't have a shareholder in the lawsuit, they don't have the right parties, it's a defect in the parties, they lose.

Let's assume for a minute they had one -- and now I'm going to get to the point the Court brought up a moment ago. Let's assume that they had a

shareholder, in which they don't, but let's assume they did and then we're under the *Richie* case, okay? *Richie* talks about really six causes of action, none of which are this one. One of them has to do with books and records. And it says your remedy -- they do plead that, but it says your remedy is to come to court and get them to give you the books and records. One of them is withholding or refusing to declare dividends. That's not pleaded. One of them is termination of employment and a shareholder can have a claim for that. That's not pleaded and not in this case. One of them is misapplication of funds. If you stretch it, maybe that's what they're saying, but they don't get there, and let me circle back to that because that comes up to what they just talked about, which is 21.418. And then, the other one is manipulation of stock value, and you don't have that.

On 21.418, and this is super interesting, what they're really trying to do, Judge, is create a new cause of action. They cited you 21.418 and you're right when you said earlier, I thought the Supreme Court pretty well did away with those. They did, they left very few exceptions and they drew a hard line in the sand. And now they are saying that under 21.418, there's a cause of action created. They say it's under

418(e). I have that here in front of me. 418(e) says -- by the way, I'm going to be just up front. It doesn't create a cause of action in any way, shape, or form. It talks about -- this is a safe harbor statute. In other words, if you do certain things, you can't be sued. It does not say if you do this or that you can be sued. And they specifically cite in their pleading the 24.418(e) that says this: If at least one of the conditions up there are satisfied, and that is, if the shareholders say the loan was fair, okay, neither the corporation nor any of the corporation's shareholders will have a cause of action against the persons who did what they called self-dealing.

It's saying you don't have a cause of action if you do these things up here. It does not in any way, shape, or form say you have a cause of action under a -- what they characterize as self-dealing. That's a very different matter that requires a very different -- well, first of all, I don't even think they're alleging that the loan from Marty Berry to the company -- we'll get to that in a minute. But I don't even think they're even alleging that it was not in the company's best interest. And under a shareholder derivative lawsuit, we don't owe a fiduciary duty, Marty does not owe a fiduciary to Lawrence. So I think they

have completely failed to state a cause of action.

I want to, in just very bullet-point fashion, before I launch into the presentation say this: Yes, Marty Berry did loan $45,000,000 to the company. He did it in the wake of COVID. He did it when there were no bank loan monies available. He did it when the company needed money for growth because they had two great prospects, Tesla and Venture Global, okay? And it was done for the benefit of the company in, I think, probably late July of 2022, super important because I've just heard this story about how they didn't know and he had to fight for knowledge, and he was kept in the dark and how tenacious he was. And on their own timeline, it says he knew because of -- and it's true. When you look at the balance sheet, it's on there and it was given to him by email and so he knew. One was in July of 2022. He knew as of September 2022, and the loan was not documented until February of 2023. Interest rate, and signed, and all that, because finally the auditor said, no, we've got to have a piece of paper for it. So he wasn't kept in the dark. He was told and I want to point this out.

For September, October, November and December of 2022, they didn't rush over here to the courthouse and say, "Stop that loan, it's a terrible

thing, it's self-dealing." For January, February, March, April, May, June, July, August, September, October of 2023 -- sorry.

THE COURT: Yeah, you broke the speed limit.

MR. ALLISON: I know, I saw the look. I saw the look.

For those months, they didn't come over and ask for a TRO. Why? Because it was good for the company, okay? Those notes are at five -- or excuse me, those notes -- those loans were made at a quarter percent above prime. Those notes have been subordinated to -- it would have been IBC if they renewed, and now Frost.

Everybody's interested. Lawrence is interested in them. Marty's interested in them. Dennis, by the way, gave 30,000,000. Mrs. Berry has made loans to the company the same way. I mean, they waited a year and a half and now they're claiming there's going to be some imminent harm if you don't enjoin them.

The other one that they brought up is the dock being for sale. Now you will hear conflicting testimony on it. We are sure as we can be that it was talked about and that Lawrence knew always, up front and

ahead of time. I'm sure he's going to say he didn't know, but okay. All those conversations were taking place in March and April of 2023. There was a letter sent to the Port of Corpus Christi in May of '23. They have -- that kind of -- that went nowhere. The only other interested party has been Buckeye, and that was in about September. Lawrence has always known about it. He didn't run in May of 2023. He didn't run to the courthouse and say you got to stop this sale. I mean, he waited another six, eight months, and now they're acting like the sky is falling.

I don't know how you can -- by the way, it's very clear to us, we are not going to sell it, obviously with the TRO in place. We are not going to sell it with -- without a vote on it, okay? It has to go in front of the board. That's just -- that's in our bylaws. They don't need any additional protection. And we are only going to sell it if we get the right price and the right terms. But there's no board approval needed to market it. That's within the purview of the CEO to -- to -- which is Mr. Rob Powers, that's been within his purview to sell it or at least to market it, okay?

The last one that they brought up that I want to talk about real quickly is the removal as a

director. The *Richie* case is very, very clear. They've declined, in very strong words, the Texas Supreme Court did, that they are not here to create common law causes of action. We have a statutory scheme that governs corporations, period. And the courts, and they were talking about -- they were talking about trial courts here and they were talking about the Texas Supreme Court essentially, they didn't use this word, but loathed the idea of taking over when the legislation -- when the legislature has spoken. If the legislature puts a rule into place, they made it pretty clear we're going to follow those rules. They did that on the books and records in accounting and they said that in their opinion.

In this case, there's a specific statute, I want to say it's 21.419, but I may be wrong on that, and it expressly allows directors, like Mr. Berry, like Lawrence Berry, to be appointed or removed by majority vote, period. There's no -- there's no exception. There's no interested party exception in this statute. It is very clear.

I will go ahead and see if I can bring all this up. Because we are here, obviously, on a TI. He has said the exact same two things: They want to enjoin us from being able to sell the dock without notice,

completely unnecessary. There's no reason for it. It's in our bylaws how that has to be handled. We should follow the bylaws. We do not need the Court to be stepping in, with all due respect, to this governance issue. We will follow the Texas Business Organizations Code. We will follow our bylaws. We have never not done that with regard to the sale of property. They want to be -- want us to be enjoined from removing Lawrence Berry. By the way, that was -- he was -- the exact agenda item that they're terrified about that says, consider appointment removal of directors, was on the agenda in December 7th. They had that meeting and they appointed Bonnie Berry. They didn't remove and they could have. They didn't. It was on the agenda again, because yeah, with all this erratic behavior, it needs to be talked about. What will happen, I don't know, but what I do know is Texas law says it is the decision of a majority of the board.

This is some of the language out of *Richie*, the second part of the slide. "This Court has the prerogative to superimpose a common law cause of action upon statutory framework, though not to alter or contravene the statutory framework."

Respectfully, that's what they're asking you to do by stepping in and forbidding the company to

follow 21.419, which allows removal of a director on a majority vote. I think -- I think what they're asking you to do runs directly afoul of what the Texas Supreme Court has told us.

They have the burden, Your Honor, to prove, obviously a probable right of relief. I understand the Court was very clear with me. We are not jumping to that issue solely as a matter of law, the defected parties, but it is their burden to prove that the right parties are here. And then, if it's -- if they carry their burden and prove that the right parties are here, I'm going to tell you they can't do that. We have the certificate and it's -- he has zero shares. 100 percent of the shares of Berry GP are owned by the partnership, LDMA, don't ever get confused by the A. It's Allen Lawrence Berry. So it's Laura, Dennis, Marty, Allen Berry. LDMA is the partnership. It has 100 percent ownership of the shares. They have the burden to carry that. They cannot.

They have the burden then to prove that they have a cause of action in the wake of *Richie* as a shareholder, if they're a shareholder, which they're not. I'm moving on. They have the burden to prove that they have a cause of action. They have not pled any of the recognized causes of action under *Richie*, except

they're trying to invent a new cause of action under the guise of self-dealing, a new cause of action under the guise of self-dealing, under 4.18 -- 21.418, and as I've gone through with the Court, they can't do that because it's a safe harbor provision. It does not create a cause of action when you read it.

So they have that burden and then they have the burden to prove imminent harm and irreparable injury. How can there be imminent harm when we don't even have a buyer for the property? It's been on -- it's been on the market and they've known it's been on the market for months. We say -- we say almost a year. They'll tell you months. And now we're rushing to the courthouse to get a TRO, to what? To prove -- to prove I'm mighty? To ask the Court to do something, quite frankly, that we don't think in any way, shape, or form is supported? But what we do know is they cannot show imminent harm because it is -- there's no buyer. There's nothing imminent. There's nothing imminent that's going to happen. And they -- with all due respect, they can't show irreparable injury.

For all we know right now, when the buyer shows up, if they gave a fantastic offer -- I don't want to ever say that. If they gave a fair offer, one we really, really, really liked, maybe all three of them

would agree to sell it. We can't know because -- we can't know because we don't even know if there's a harm because we don't even know what the purchase price would be.

With regard to the same burdens, they have the same burdens when it comes to proving their ask that Lawrence Berry not be removed. They have to show that they have a cause of action for it, first of all, and I want to point this out, it was not -- there was no mention of don't remove Lawrence Berry as director in their original pleading that was filed November 28th, 2023. What they did is when they saw the agenda item that resulted in Bonnie being put on the board, appointed director, they hit the panic button and ran over and did an amended TRO and said, don't remove him, we went up and agreed to it. You know the rest of that story.

They have not pleaded any cause of action that precludes removal of Lawrence Berry. In fact, to the contrary, Texas law tells us you can remove him. And I don't know of any cause of action that says you cannot, that they can prove a probable right of recovery.

I do want to -- because they emphasized it, I do want to go through the full timeline on the Berry

dock. There was a -- they did talk about it at a director's meeting early 2023. We've known that Lawrence doesn't want to sell it. We know that Marty and Dennis do want to sell it. One of the reasons that Mike Hummell, knowing of course, Dennis' health situation, asks for there to be those meetings in the December and I guess February time frame that we have had was to have it of record. And now we have Lawrence Berry saying, oh, it never happened. We say it did happen. So Mr. Hummell, as general counsel, wanted to make sure we had a record that both Dennis and Marty were in favor of marketing it. So we had that meeting. They think it's something sinister. We think that they have a right to have meetings and to ratify the actions of their members and to make sure the wishes of the directors are recorded, which they did.

But that was also discussed back in early 2023, voted two to one. Lawrence knew the dock was being marketed. It was marketed to the Port. It's been marketed to Buckeye. This is interesting. We have a text message -- and of course, remember, their claim is that Lawrence had defied it and was kept in the dark and what a terrible -- what a terrible life he's had trying to get information. We have a text message. He said, Hey, what property's for sale? Rob Powers sends him

back and says, you know, no serious offers and he refers to a dock and a piece of property over in Sinton. That was in October of '23.

And so right after Mr. Berry gets the information that there's no serious buyers or nothing really happening on a property that's being marketed, he goes and gets a TRO and formed no real discussions in October of '23.

Presently, there are no active negotiations or anything that looks like it's going to be a sale of the dock, nothing imminent. And I've already touched on the last one that the bylaws require the board of directors to vote. That's on 21, on the provision relating to removal of directors.

I probably want to end by, kind of, circling back to the last point, because what they really tried to do -- and I guess, hats off, creative, trying to get around *Richie*, trying to say 419 creates a cause of action. But it's even worse than that. What they say is -- and this is super important under 419 -- that if you are a -- if you're not disinterested, okay, the only thing that 418 precludes you voting on is that transaction between you and the company. That's it. It would not preclude Marty or Dennis, now Bonnie, from voting on a contract to sell real property. That's not

a transaction between the director and the company. 418 is limited to the director and the company. 418 would not preclude a vote on adding or removing a director. Adding or removing a director is not the loan from Marty or the loan from Dennis. So when you read 418, which of course, doesn't create a cause of action, you will also need to understand, please, that at most, it precludes Marty or Dennis, now Bonnie, from voting on the loan at most if they can prove that they're somehow contrary to the corporation on it. It, at most, precludes a vote there. Never would it preclude them voting on the sale of real estate and never would it preclude -- which I don't think they're even asking that now. It sounds like now they're only asking for notice which, under our bylaws, we've got to give it anyway, so we don't need -- there's no -- let me say it this way. If the bylaws already require it, they don't need relief. There's no imminent harm threatened. We're going to follow our bylaws. I don't think the Court needs to enter an order that restrains us from disobeying our bylaws.

All of that said, we look forward to kind of putting on the evidence, Your Honor. I think you will see clearly that this idea that he thinks were secreted or hid from them, I don't mind telling you, I think the loans are private. I know they're private. I

know my client, Marty, wishes nobody knew about it. I mean, that's just not his thing, okay? It doesn't mean that they were hidden or kept secret. Put on the books. Lawrence got it in September and knew about it for a year and a half before right now, where he's now, for the first time, really complaining about it to the Court.

So we think the evidence will show also on IBC, he was kept informed, on Frost, he was kept informed. We have emails where we sent him the notes. We have emails where he participated in the decision making with IBC. We have emails where he was informed about the Frost line of credit and how that was evolving, kept him in the loop on all of that and we'll show those to Your Honor.

So, respectfully, we don't think there's any reason -- we don't think they can carry their burden, and we don't think there's any reason for injunctive relief.

Thank you.

THE COURT: Okay.

MR. HUSEMAN: If I might have a couple of minutes of your time, Your Honor, on this. Following him is sort of like drafting in a bicycle race. He's sort of gets sucked along. And Doug's presentation I

thought was factually, conceptually, and legally pretty dense, and pretty much on point. But there's one thing, which I wanted to focus the light on a little bit more, because I think it has the ability to be a key to this whole thing.

Mr. Reasoner and Doug both passed lightly over the ratification process by the shareholders of the company which has occurred now and documented. The basic concept, and it's true not just for this company, but for basically any business you want to talk about, the owners get to decide how the business is run. That's why even AT&T has shareholders because they get direction from the owners as to how things are to be done.

In this particular case, the importance of this, in that they have had duly-called shareholder meetings in which the things that they are complaining about were ratified. In other words, given a stamp of approval by the shareholders, the people who own the company, in fairly open meeting, basically it has the effect, in my view, of mooting a lot of these issues on this. And even if you were to assume there was something wrong with the way things have been done last year, or the year before or whatever, once the ratification has occurred by the owners of the company,

that's basically the end of it.

And the idea, and Doug said this, the truth is he said it, the idea of getting the Court to come in here and undo what is the express voted will of the owners of the company without any basis in law to do that, is, I think, a step too far. So that was the one point I wanted to put a little light on, Your Honor.

THE COURT: Okay.

MR. STEELY: I'm going to reserve my comments till the end, Judge, in the interest of time.

THE COURT: Okay, all right. Well, then let's take some evidence.

MR. BOYD: Your Honor, we'll be calling Mr. Lawrence Berry next. Could I ask if he could have two minutes to run to the restroom?

THE COURT: Yeah, we can -- we can take a short break.

(Recess.)

THE COURT: All right. Be seated, call your first witness.

MR. BOYD: Your Honor, plaintiff calls Mr. Lawrence Berry.

THE COURT: All right, come on down.

(Oath administered.)

THE COURT: Be seated. You may proceed.

ALLEN LAWRENCE BERRY,
having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BOYD:

Q. Good morning, Lawrence. Would you please state your full name for the record?

A. Allen Lawrence Berry.

Q. Lawrence, where were you born and raised?

A. Corpus Christi, Texas, in Annaville.

Q. How long had you -- did you live in Corpus before you moved?

A. I moved in '98.

Q. Okay. And you were born in '65?

A. Yes, sir.

Q. Okay. What school did you attend here in Corpus?

A. Tuloso-Midway.

Q. And did you go to college?

A. Yes, sir, Texas A&M.

Q. Okay. At some point in your career, you moved to Houston; is that right?

A. Yes, sir.

Q. Okay. What brought you to Houston or took you to Houston?

A. I was getting a divorce, so I moved to Houston.

Q. Did you continue to work for the Berry companies?

A. Yes, I have, to this day.

Q. And when I say the "Berry companies," I'm talking about all of the companies, and there are many, correct?

A. Yes, sir. You need a flow sheet to understand it.

Q. Okay. Who are the owners of the Berry companies, presently?

A. The heirs of Dennis Berry, Marty Berry, and Allen Lawrence Berry.

Q. All right. What percentage are owned by each of the three?

A. A third, a third, and a third.

Q. Okay. And that's how your parents structured their succession plan; is that right?

A. Yes, sir.

Q. Okay. I want to talk about the board as it existed during the 2000s. That would have been yourself, and your older brothers, Marty Berry and Dennis Berry?

A. Yes, sir.

Q. Historically, how did the three of you get along?

A. Great.

Q. Were you-all able to manage the company, handle any differences you may have without problems?

A. Yes, sir. I think we've been good custodians of the company, probably up until Ed Martin's demise.

Q. All right. And who was Ed Martin?

A. The previous CEO that after my -- we lost my father, that we brought in to manage the various assets.

Q. Okay. And you said, Ed Martin, his demise, you're talking about when he got ill and --

A. Yeah, when he had a stroke, yes, sir.

Q. Okay. Were there times when matters would come before the board where the vote would be three to zero in favor?

A. We usually tried for unanimity, yes.

Q. All right. Were there times when it was three to zero against doing projects?

A. With a few notable exceptions, usually we strove for unanimity.

Q. Okay. However striving for that, were there also times where there were two-to-one votes?

A. Of course.

Q. Okay. Were there instances where you were outvoted by Dennis and Marty?

A. I'm sure there are.

Q. And you didn't sue in those instances, did you?

A. No, sir.

Q. And you're not here in this lawsuit trying to change the majority rules of the Berry companies, right?

A. No, sir.

Q. Do you believe that the majority should manage a company?

A. I think the enterprise should be managed in what's in the best interest of the enterprise.

Q. Okay. So as long as it's in the best interests of the company, you don't object to the two-to-one vote?

A. Of course not.

Q. Okay. I want to talk a little bit about what precipitated this lawsuit. Can you tell the Court what was going on that was disturbing to you from a 30,000-foot level -- we'll get into some of the details when we get to the exhibits -- that caused you concern enough to file this lawsuit? And let me stop there. Did you want to file this lawsuit?

A. No, sir.

Q. Did you feel like you had no other choice?

A. Yes, sir.

Q. Okay. Tell the Court a little bit about what precipitated you filing the lawsuit?

A. Well, I've been working on projects, trying to

increase utilization at the Berry dock. We had to deal with Marathon back in the day that almost got to completion and then collapsed with the price collapse in Eagle Ford in probably about '12 or '13. So we have the Citgo attached acreage and the Bay yard and Redfish Bay Terminal -- pardon me, and Diamond Cut, which is sort of all interconnected with some right-of-way stuff. And so we've been marching there, and then we had an opportunity, it looked like, with Pin Oak, who are the successors to, I guess, Trifinery and Trisergeant.

We had an opportunity to take the dock to deep water for Pin Oak to increase the capacity there. They've got a deal that was conceived by A.J. Brass that's not very good, and ideally, we get the barrels going across the dock and increase cash flow.

Part of that process, this was really Ken Luhan's project, the ex-president of Bay, or the retired president of Bay. So in order to do the -- there's two different methodologies, Ken's and my way and we end up kind of a hybrid. It's been evaluated and engineered about 20 times, but we looked at the most cost effective way was to move the bulkhead line, leave the docking that currently existed and put a bridge out. And so I've been working towards that with Pin Oak.

So I had a request to Sean Strawbridge

162

about moving the bulkhead line and where Strawbridge was replaced, I went down to meet with Kent Britton at the -- at the Port of Corpus Christi to see what the status was on moving the bulkhead line, because you know, there was not much a hand over with regards to Strawbridge, or at least it was not transparent.

Q. Okay. Let me -- let me stop you right there. When was that meeting?

A. Right before I -- this is right before I filed lawsuit.

Q. Okay. And Kent Britton is whom?

A. Is the new CEO of the Port of Corpus Christi.

Q. And he took Mr. Strawbridge's place, right?

A. Yes, he did.

Q. Back up a little bit. We're going to get to that meeting, and I know that was the meeting where they gave you the letter that Mr. Rickett had written to Mr. Strawbridge.

In terms of information flow, traditionally through the years, were you able to get the information you requested?

A. Yes, sir.

Q. Okay. As a board member of the Berry companies, as an owner of the companies, along with your brothers, you were entitled and historically had been

able to get this information?

A. Yes, sir.

Q. Did that change at some point?

A. Yeah, I think the market change was after Ed's demise.

Q. I'm sorry?

A. After Ed left, yes. It's been a much more difficult post Ed Martin.

Q. Okay. Did that cause you frustration?

A. Yes, sir.

Q. Why did you want the information?

A. Because I'm a good custodian -- I want to know what's going on. From a business standpoint, there's a lot of risk modeling incurred here in the contracting business and I had dire and desperate concerns, and still do, about -- about operationally where we are and I'm still being fire-walled out.

Q. All right. Has the board ever or the company ever sold real property?

A. Yes, sir.

Q. Many times?

A. I wouldn't say -- we're not really developers. We usually buy, but yes, we sold property on occasion.

Q. Okay. And have you voted to sell real property if you thought it was in the best interest of the

company?

A. Yes, sir, at the last board meeting, I believe.

Q. At the last board meeting. When was that?

A. Like, lately.

Q. Like, this past --

A. Yes, sir.

Q. It was this week, wasn't it?

A. Yes, sir.

Q. Okay. What did you vote to sell?

A. Some miscellaneous tract that was a borrowed source in Sinton.

Q. And was that indeed a three-zero vote?

A. Yes, sir.

Q. Okay. You voted for it, Marty Berry voted for it, and Bonnie Berry voted for it?

A. Yes, sir.

Q. Okay. On that vein, have you-all been having regular board meetings even after this lawsuit was filed?

A. Yes, sir.

Q. Have you-all been conducting business?

A. Yes, sir.

Q. Have you been holding votes?

A. Yes, sir. They've been holding votes.

Q. And that's what you-all have done for years at

the board level?

A. Yeah, we've historically been all pulling on the rope together.

Q. I want to look at just the micro timeframe for a minute. Since you filed the lawsuit, have there been instances, just like we just discussed, where the vote's been three to zero?

A. Pardon me?

Q. Have there been three-zero votes like there was on selling that property?

A. Yes, sir.

Q. Have there been two-to-one votes?

A. Yes, sir.

Q. And the company has taken the position on all those two-to-one votes that those resolutions or those projects passed; is that right?

A. Yes, sir.

Q. Let's talk about the Berry dock, that's the Berry inner-harbor dock; is that right?

A. Yes, sir.

Q. All right. Who -- under whose leadership was that either acquired or constructed?

A. My father built the dock in the late '70s for the Corpus Christi Petro-Chem project to bring in the vessels. You know, it was a pretty massive cap X, but

nonetheless, he thought there was room for a heavy-lift dock on the inner harbor and he was correct as we found, you know, billions of dollars of stuff that's gone through that dock through the years. And, of course, it was a significant contributor when the refinery was running.

Q. Okay. And by the refinery, what are you referring to?

A. The refinery is -- when I refer to the refinery, I'm saying when Trifinery was there, which was originally my father, Baynes Manning and Sandy Brass. Baynes Manning ends up, ultimately, I believe, staying at Saber/Valero in the trading capacity and didn't come in. So the refinery was built by dad and Sandy Brass.

And then, it's -- with the economic model being based off of a off-date agreement with P to V divide discount, asphalting heavies that the unit would process, it was kind of a lay up deal, the discount was so deep. And then, lo and behold, Mr. Brass gets caught. Right when we're going to start the plant, Mr. Brass gets caught selling feedstock as bunker in Miami and we lose the agreement and then just kills that project.

Q. All right. And through the years, has the dock been a valuable asset to the Berrys?

A. Business couldn't have been here without it.

Q. Okay.

A. Until -- until we -- until those tanks went there and we lost our fabrication facility. Our fab area there, it was instrumental to this business, probably the most important piece.

Q. Okay. Earlier in his opening statement, you heard Mr. Allison state that under the bylaws, they have to give the board ten days' notice before they can sell real property. Do you remember that part of his opening?

A. Yes, sir.

Q. All right. That wouldn't be true if they kicked you off the board, would it?

A. No, sir.

Q. Tell me about docks in the inner harbor. Are there many docks?

A. Numerous docks.

Q. Are there many for sale?

A. No, sir.

Q. Do you believe that the Berry dock would be irreplaceable if it was sold?

A. I think the maximum value for the company is to own it and tariff there just like we have for decades.

Q. All right. If an offer was made for the Berry

dock and the 16 acres, which we'll talk about in a moment, and you felt it was in the best interest of the company, would you vote to sell it?

A. Yes, sir.

Q. So you would weigh the value of the dock versus the value of the offer in the best interest of the company?

A. Of course.

Q. All right. I'm going to turn now and talk about some of the exhibits.

MR. BOYD: Your Honor, if I may approach?

THE COURT: You may.

Q. (BY MR. BOYD) I'm going to hand you what's marked as PTX1. Mr. Berry, without going into the contents of the email chain, do you recognize this email chain?

A. Yes, sir.

Q. All right. The subject matter of the email chain is going towards the loans that Marty Berry and Dennis Berry made to the company; is that right?

A. Yes, sir.

Q. Okay. And this is dated January the 16th and you're making inquiry after having seen it in accounting records that were provided to you and your staff in Houston; is that right?

A. Yes, sir.

Q. Okay. Do the Berry companies maintain a Houston presence?

A. Yes, sir.

Q. All right. Can you tell the Court what goes on in Houston, historically? I know there's been some changes.

A. Well, we have maintenance agreements at the Valero plants, base load maintenance. We've done large-scale capital work there, some successful, some not so successful through the years. We have had a yard there since the -- I don't know, I bought that from I believe Halliburton in probably '99. I can't remember, somewhere in there, in Friendswood, which we later -- I later replaced with the facility that was Belma's on Alameda where the shops and storage -- where the steel warehouse is now.

Q. Okay. Having seen the related party --

A. Oh --

Q. Okay. Go ahead. I'm sorry.

A. You asked what transpired in Houston. Then my office, historically, at Riverway has been a sales and marketing office as well as administering all of our work -- all of our international work out of there, which was significant.

Q. Okay. Does Bay still have an office at Riverway in Houston?

A. No, sir. They moved out.

Q. Going back to this email, at some point in time -- and we're going to talk about it -- you received some accounting records from the company that showed a related party note or notes in the amount of $75,000,000; do you remember that?

A. Yes, sir.

Q. At that point in time, had you ever seen any loan documentation related to that transaction?

A. No, nowhere had it ever been mentioned to me.

Q. Okay. Had it ever been brought up at a board meeting?

A. No, sir.

Q. Had it ever been voted on by the three owners of the company?

A. No, sir, it had not.

Q. Okay. Had the company ever done a transaction of that size without documenting it contemporaneous to the transaction?

A. Absolutely not.

Q. Do you find that to be abnormal or normal?

A. It's unusual.

Q. Okay. And having seen the financial statements

where this transaction or these transactions were listed in the accounting records, did that cause you concern?

A. Yes, sir, compounded with the absence of any information, absolutely.

Q. All right. And is that what this email is about?

A. Yes, sir.

MR. BOYD: Your Honor, at this point, we'd offer PTX1.

MR. ALLISON: No objection, Your Honor.

THE COURT: It's admitted.

Q. (BY MR. BOYD) All right. Let's talk about the email. If you go to the second page of the exhibit, that's an email that really starts on the first page, page 1 of 2. From Mr. Powers -- and who is Mr. Powers? He's here in the courtroom today, but who is he?

THE COURT: I don't mean to interrupt you, but if you want me to look at this contemporaneously, I've only got one page.

MR. BOYD: I think it's on the very back. Sorry. It's on the very top. It's very short.

THE COURT: Oh, it's little. Okay. I'm sorry. My fault.

Q. (BY MR. BOYD) So Mr. Powers emails you and what does he say? And this is on the back of page 1.

A. "Is this what you're looking for? Let me know. Thanks."

Q. And the PDF that's referenced --

A. Orca note.

Q. Okay. And that was not what you were looking for?

A. No, sir.

Q. All right. And so what did you respond to Mr. Powers?

A. No. That I requested the paperwork for the $75,000,000 related party receivable on the Berry GP books.

Q. All right. And the date of that?

A. January 16th.

Q. And what was Mr. Powers' response to your clarifying exactly what you wanted?

A. "Okay. That is not executed yet to my knowledge. I will follow up and see if it's signed yet."

Q. Okay. After he told you that the paperwork had not been executed, what did you say in response to that?

A. "I know nothing about any of this," because I did not.

Q. All right. We're going to go to Exhibit 2.

MR. BOYD: May I approach?

THE COURT: Yes, sir. Is that one for me?

MR. BOYD: Yes, sir. Some of this will also be front and back.

THE COURT: That's okay.

Q. (BY MR. BOYD) All right, Mr. Berry, I need you to take a look at PTX No. 2. Without going into details of its content, let me know if you recognize it?

A. Yes, sir.

Q. Okay.

MR. BOYD: Clay, this is one of the ones that was not produced by you-all.

MR. STEELY: Got you. These two stacks, Butch, are they one exhibit? I'm trying to figure out what you handed? You handed Doug two stacks or am I wrong?

MR. ALLISON: And just so you know, I know you didn't mean anything, but I do think they're both produced, but skipping aside, you're obviously using one without Bates page numbers, and that's okay, we've just got to mark them or something.

MR. BOYD: They're marked as PTX2.

MR. ALLISON: Okay. Great.

MR. ABSMEIER: And I can explain why there's some thin ones. The only document I think Mr. Boyd is going to show is the first attachment. So

you have a copy there that has the full attachment. The second attachment is a very long spreadsheet that we're not even getting into. So you have one for --

MR. ALLISON: The income statement versus the balance sheet, I think?

MR. ABSMEIER: Yes, some kind of spreadsheet. It's a balance sheet that's a 45-pages --

MR. ALLISON: I understand your comment.

MR. ABSMEIER: -- spreadsheet.

MR. STEELY: You're going to mark the whole one?

MR. ABSMEIER: I'm marking the whole one for the record.

THE COURT: There's two.

MR. STEELY: That's why I was wondering why we got two exhibits when we were talking about one. Thank you.

Q. (BY MR. BOYD) Have you had a chance to review this? And for your reference, Mr. Berry, I'm only going to be talking about the email chain and then, three pages of over it's Combined and Consolidated Balance Sheets.

A. Okay.

Q. Tell the Court who Tonja Fulghum is.

A. My assistant and aide-de-camp.

Q. I'm sorry?

A. My assistant and aide-de-camp.

Q. All right. Who does she work for presently?

A. For me.

Q. Who did she work for the past 27 years?

A. Berry GP.

Q. And she was officed in Houston?

A. No, she was originally officed here. I poached her from Coastal.

Q. But during that time period that she was working in Houston, by whom was she employed?

A. Berry GP.

Q. And she worked for the Berry companies for 27 years?

A. Yes, primarily, yes, sir.

Q. Who does she now work for you?

A. She was terminated.

Q. When?

A. Last couple of weeks.

Q. So after this lawsuit was filed?

A. Yeah. More than one person terminated without cause.

Q. Her husband was also terminated, right?

A. Yes. After 40 something years of making us money, yes, without cause.

Q. And he worked for the Berrys for 40 years?

A. Yes, sir.

Q. And having looked at this email chain and the attached accounting records, do you recognize these to be Berry GP, Inc., and affiliates Combined and Consolidated Financial Statements for the period ending July 31st, 2022?

A. Yes, sir.

Q. Okay.

MR. BOYD: Your Honor, at this time, I would move to introduce PTX2.

MR. ALLISON: No objection.

THE COURT: No objections? All right. Hearing no objections, it's admitted.

Q. (BY MR. BOYD) Was it common practice for Ms. Fulghum, when she worked both for you but really for Berry GP, to ask Corpus accounting to send over accounting records?

A. Yes, sir.

Q. Okay. And as part of her job function, would she facilitate various transactions between really the owners in the company and assist the accounting department here in Corpus?

A. Yes, sir.

Q. When she would request this, was that typically

at your request?

A. Sometimes, yes. Yes.

Q. Okay.

A. Yes, but not always. I couldn't say.

Q. All right. I want to turn over to the Combined and Consolidated Balance Sheet.

A. Yes, sir.

Q. July 31st, 2022. And I want you to come down three-quarters of the page and tell me if you see the Note payable - related party?

A. Yes, sir.

Q. Is this the accounting record where you first learned about the related party note payable?

A. Yes, sir, I believe so.

Q. Now, this is for the period ending July 31st, 2022, but this was actually sent over to you and Tonja on September 21st; is that right?

A. Yes, sir, I would assume so.

Q. Okay. How was that entry on the books and records brought to your attention?

A. By accounting at Riverway.

Q. Did you then, after it was brought to your attention by an accountant, have a meeting with Tonja about this?

A. Of course.

Q. Okay. And this is what you testified earlier that caused you concern?

A. Yes, sir.

Q. I'm going to hand you PTX3 and PTX4. And PTX3 starts at Bates Bay 000473, and 4 starts at Bay 000479.

MR. BOYD: May I approach?

THE COURT: Yes, sir.

MR. BOYD: With your permission, I'll approach freely, if you'll allow it?

THE COURT: That's fine.

MR. BOYD: That's PTX3 and PTX4.

THE COURT: Okay.

Q. (BY MR. BOYD) Again, Mr. Berry, without going into the contents, can you just tell the Court what PTX3 and PTX4 are?

A. They appear to be Combined and Consolidated Balance Sheets for Berry GP.

Q. Okay. And --

A. But it's a format I'm not used to seeing.

Q. Okay. This was an Excel spreadsheet that was converted to a PDF. It kind of --

A. Okay.

Q. -- it changes the formatting, so we didn't have the data. You see on there, you can tell that by the number signs in certain columns; do you see that?

A. Yes. Yes.

Q. Do you know what causes that?

A. Pardon me?

Q. Do you know what causes that not to be an actual number and to be a string of number signs?

A. No, I do not.

Q. Okay. Well, when a PDF -- when an Excel spreadsheet is converted to a PDF and the column is not wide enough to hold the number in this format, it defaults to a number sign.

A. Okay.

Q. All right. And fortunately, for us, the numbers I want to talk to you about are here.

MR. BOYD: With that said, Your Honor, I would offer PTX3 and PTX4.

MR. ALLISON: No objection.

THE COURT: All right, hearing no objection, they're admitted.

Q. (BY MR. BOYD) On PTX3, what is the date at the top?

A. October 31 of 2022.

Q. All right. On the note payable - related party for October 2022, what is the amount shown?

A. 75,000,000.

Q. Okay. What I want you to do now, is if you'll

take PTX4 and fold -- not fold, crease, but just bend PTX3 so you can see both sheets note payable row, okay?

A. Yes, sir.

Q. Are you with me?

A. Yes, sir.

Q. Before we do that, what is the date on PTX4?

A. October 31st of 2022.

Q. So it's the very same date as the PTX3?

A. Yes, sir.

Q. Okay. On PTX3, you testified the amount shown for this related party note is $75,000,000; is that right?

A. Yes, sir.

Q. What is the amount shown for the very same period on PTX4?

A. 76,361,301.

Q. Okay. Can you explain the discrepancy?

A. No, sir.

Q. Why not?

A. Same date, same -- it would need to backup.

Q. Do you have the backup?

A. I do not.

Q. Have you requested the backup?

A. Yes, sir, I have.

Q. Has it been forthcoming?

A. No, sir.

Q. Now I want to turn to Exhibit PTX5, which is Bates Bay 000953. Lawrence, in the spring of 2023, prior to your current lender, who was the long-standing lender for the Berry companies that provided your revolving line of credit?

A. International Bank of Commerce.

Q. How long had that relationship existed?

A. Twenty-plus years.

Q. All right. Who was your -- who were the Berrys -- who was the Berrys' banker at IBC?

A. Gus Barrera here in town and, of course, Dennis Nixon's the chairman who runs the bank.

Q. All right. Did you-all have -- you-all being the Berrys -- have a relationship with Dennis Nixon?

A. Pardon me?

Q. Did you have a relationship with Mr. Nixon?

A. Yeah, I know Dennis.

Q. Okay.

A. He knows us. He's been our banker a long time.

Q. All right. Have you seen this email before this litigation?

A. No, sir.

Q. Okay. But you see that it's from the bank to Mr. Powers, right?

A. Yes, sir.

Q. Okay. Did you come to learn, at some point, that Mr. Nixon traveled to Corpus Christi to meet with the board of the Berry companies?

A. Yes, sir, in a board meeting.

Q. Okay. Were you ever informed of that board meeting?

A. No, sir. Was I ever informed of this meeting?

Q. Yes, sir.

A. No, sir.

Q. But you were -- you did learn, after the fact, that Mr. Nixon traveled to Corpus?

A. Yes, sir.

Q. How did you learn that?

A. In the board meeting when I was informed that we had -- that they canceled our revolving line of credit.

Q. Okay. We're going to talk about that in a minute.

MR. BOYD: At this time, Your Honor, I would offer PTX5.

MR. ALLISON: No objection.

THE COURT: All right. Hearing no objection, 5 is admitted.

Q. (BY MR. BOYD) Okay, in this email from

Mr. Barrera to Rob Powers, what is he seeking?

A. Seeking a meeting with the -- with the board of directors with Dennis Nixon, which is not unprecedented. This had occurred once before, a long time ago.

Q. When the chairman of the board of a bank that is extending a $50,000,000 or greater line of credit so the Berry companies asks for a meeting, what would you do?

A. Pick up the phone and call everybody and say, we better get our stuff together.

Q. Okay. It's a serious event, right?

A. Probably the most serious one in an ongoing enterprise of this scale.

Q. Can you explain why that is?

A. We can't transact business with our clients with these -- with as much -- as much stuff gets disputed, it's just every time it takes so much capital and there are never -- they're never -- the payments are never timely, nobody scheduled it, and then when you throw in the disputes and retainers, et cetera, you've got to have a revolver, man.

Q. Okay. The company, the Berry companies, does it require a lot of capital to continue as a going concern?

A. Massive amounts, yes, sir.

Q. What -- at the board meeting, what did you learn had happened when Mr. Nixon flew to Corpus for the meeting on the 13th?

A. He showed -- he showed up for the meeting and we weren't there. He apparently hollered at -- at Mr. Powers and then left.

Q. Okay. And you learned that during the board meeting?

A. Yes, sir.

Q. Okay. After the board meeting, did you have occasion to visit with your brother, Marty Berry?

A. Yes, sir.

Q. About the meeting?

A. Yes, sir.

Q. Did you ask him why he wasn't at the meeting?

A. I certainly did.

Q. What did he say?

A. He said, "I'm not going to that meeting with Dennis Nixon and get my ass eat out."

Q. So he didn't want to go have the meeting with Mr. Nixon because he knew it was not going to be an easy meeting?

A. Well, the previous time when this had occurred, it was not an easy meeting.

Q. I'm going to hand you PTX6, which is Bates Bay

000111 and ask you if you recognize that?

A. Yes, sir.

Q. All right. Have you seen this before today?

A. I believe so.

Q. Was this discussed at the March 14th board meeting?

A. Yes, sir.

MR. BOYD: At this point, I would offer PTX6.

MR. ALLISON: No objection.

THE COURT: All right, hearing no objection, 6 is admitted.

Q. (BY MR. BOYD) Can you tell the Court who Scott Landreth is? Do you know?

A. I assume he's counsel for the bank.

Q. All right. And so he wrote this letter on March 13th, 2023. And right above Mr. Powers' name it was, I guess to the attention to or written to, he writes in all bold caps "Notice of Default." Do you see that?

A. Yes, sir.

Q. What does that mean to you?

A. That contractually, we're not -- we're not in our lane.

Q. Okay. Meaning that you're out of compliance

with the loan companies?

A. Yes, sir.

Q. If you'll read the first two sentences of Mr. Landreth's letter, please, into the record.

A. "This law firm represents International Bank of Commerce, the Lender, in connection with the referenced revolving line of credit loan. I'm writing you to inform you that the lender recently determined that the borrowers are in default under the loan agreement for at least two reasons."

Q. Okay. Were these items the reasons this letter discussed at the March 14th board meeting?

A. Okay. One more -- restate the question.

Q. Did you-all discuss the fact that IBC viewed you to be in default at the March 14th board meeting?

A. Yes, I believe we did.

Q. Okay. Would you agree that a notice of default from the bank holding your revolving line of credit to an entity the size of the Berry companies is a serious event?

A. Yeah, it's a major crisis.

Q. Okay. I'm going to show you PTX7, which is Bay 000122, I'm going to ask you to review that while I'm passing that out. I'm going to organize that and get it back.

Mr. Berry, I'm going to ask you to take a second and review of that document and we'll talk about it, please.

A. Yes, sir.

Q. All right. Again, this letter is written by Scott Landreth, right, on the third page?

A. Yes, sir.

Q. The attorney representing IBC Bank. And who is it addressed to?

A. Mike Hummell.

Q. Okay. Mr. Hummell's here in the courtroom today and his role with the Berry companies is what?

A. General counsel.

Q. Okay. Can you go to the middle of the first paragraph where it says, "You probably also know"?

A. Yes, sir.

Q. And read to the end of that paragraph.

A. "You probably also know that the resulting audit has raised numerous concerns on this end. My client had nonetheless hoped to have its questions answered and reach an agreement concerning a year-long extension. That was the purpose of a meeting to include Berry family members scheduled for last Monday."

Q. Okay. Let's go on to the second paragraph, and if you'll read that for me?

A. "For reasons unknown to us, the meeting was unilaterally canceled and no resolution was reached. We are left to believe the financial condition of the borrowers has gotten even worse as my client has yet to receive required financial statements for the quarter ending January 31st, 2023 or the detailed financial information requested by Mr. Barrera. Timely reporting of accurate financial information has been a reoccurring problem."

Q. Okay. Again, if you had known about the meeting, you would have arrived in Corpus, and even if you were by yourself, had the meeting; is that right?

A. Absolutely.

Q. Okay. I'm going to skip over to PTX6 -- 26. I'm sorry.

MR. BOYD: Your Honor, in case I didn't do it, I would offer PTX7.

MR. ALLISON: No objection.

THE COURT: Hearing no objection, it's admitted.

So is this 26?

MR. BOYD: Yes, sir.

THE COURT: Okay.

Q. (BY MR. BOYD) Have you had a chance to review PTX26?

A. Yes, sir.

Q. All right. Do you recognize it?

A. Yes, sir.

Q. Generally speaking, what is it?

A. A letter to me -- from me to Dennis Nixon requesting a meeting.

Q. Okay.

MR. BOYD: At this time, I would offer PTX26.

MR. ALLISON: No objection.

THE COURT: All right. Hearing no objection, 26 is admitted.

Q. (BY MR. BOYD) All right. So it is indeed a letter from you to Mr. Nixon, the chairman of the board of IBC, and what are you conveying to him or requesting from him?

A. I'm requesting a meeting so I could find out what, from his perspective, what transpired.

Q. Why -- why did you want that meeting?

A. Because it was nonsensical to me --

Q. What was?

A. The termination. And I wanted to hear from the horse's mouth why it occurred.

Q. Okay. Did you ultimately have that meeting?

A. Yes, I did.

Q. Okay. When was that meeting?

A. Sometime after this letter. I've had --

Q. Do you remember --

A. -- multiple meetings with Mr. Nixon.

Q. Okay. Was Mr. Nixon -- did he convey that he was upset that there was nobody there to meet him at the board of directors?

A. Yes, sir.

Q. What did you say to him?

A. I apologized profusely and told him I didn't have knowledge of the meeting or I would have been there. What else are you gonna do?

Q. Why did you do that?

A. Well, because this is a small -- this is a small village down here and you're going to need those bankers later on and I wanted to make sure we could always go back. I mean, IBC's a bank.

Q. All right. At least as between you and Mr. Nixon, did the meeting end on good terms?

A. Absolutely.

MR. BOYD: I'm going to go to PTX8.

Q. (BY MR. BOYD) Lawrence, I'm going to hand you PTX8, and as with the other exhibits, ask you to review it and I'll talk about it, please.

THE COURT: Okay.

Q. (BY MR. BOYD) Have you had a chance to review PTX8?

A. Yes, sir.

Q. Okay. And this is an email from Marty Berry and the company's lawyer to the lawyers sitting at this table; is that right?

A. Yes, sir. I believe so. Yes, sir.

Q. Okay. And it attaches a promissory note; is that right?

A. Yes, sir.

Q. And do you now recognize the promissory note?

A. Yes, sir, I see it here.

Q. Okay. And the date of this transmittal is December 6, 2023, correct?

A. That is correct.

Q. Okay.

MR. BOYD: At this time, I would offer PTX8.

MR. ALLISON: No objection.

THE COURT: All right, hearing no objection, 8 is admitted.

Q. (BY MR. BOYD) So on December the 6th, in the afternoon, Mr. Allison transmits to us via email, "us" being the lawyers in this room. I think Mr. Huseman had not entered an appearance at that time, but he sent it

to everybody at this table and Mr. Steely. Do you see that?

A. Yes, sir.

Q. Okay. And what's the subject line say?

A. "Marty's loan doc to Berry GP."

Q. Okay. And indeed attached is a promissory note signed by Marty Berry, correct?

A. That is correct.

Q. All right. This was not Bates stamped. It was prior to production, but the actual promissory note is Bay -- or the actual Bates stamp promissory note is Bay 000023. What is the date of the promissory note?

A. July 8th of 2022.

Q. Okay. I want you to find at your witness stand, please, Exhibit No. 1, please.

A. Yes, sir.

Q. All right. So some seven months later, Mr. Powers emails you and tells you that the promissory note or loan docs had not been executed yet. Do you remember that exhibit and that email?

A. Yes, sir.

Q. Okay. If his email is accurate and truthful, and I assume you'd expect your CEO to be truthful with you?

A. Yes, sir.

Q. Then this document would necessarily have to have been created after that date and backdated; is that right?

A. Yes, sir.

Q. Is this the first time you became aware of the loan documentation that you had been asking for for quite sometime?

A. Yes, sir.

Q. This was sent on January -- or December 6. Were you aware that not only was there a board meeting going on over here on December 7th; you attended, right?

A. (Nodding head up and down.)

Q. But that your -- you lawyers were in court in Harris County, Texas; do you remember that?

A. Yes, sir.

Q. And you and I talked on the phone some, and Mr. Allison was talking with Mr. Hummell and, perhaps, Mr. Berry out in the hall. Do you remember that?

A. Yes, sir.

Q. Okay. And during that board meeting, Bonnie Berry was elected to the board?

A. Yes, sir.

Q. Okay. And I've listened to the board meeting. What did you ask Dennis before he voted?

A. If Bonnie was taking his place.

Q. Well, did you also ask him if that's what he wanted?

A. Yeah.

Q. Okay.

A. Yes, sir.

Q. And he told you yes?

A. Yes, sir.

Q. And how did you vote?

A. Yes, affirmative.

Q. And you stand by that vote?

A. Of course.

Q. At any time, have you been provided a plan by the CEO, by the company, to pay this note back?

A. No, sir, I have not.

Q. Does that cause you concern?

A. This whole thing causes me concern. It's the largest transaction, financial transaction we've probably ever done, individually with the enterprise, and there's no -- where it says contracting on the front side and when you turn it and there's no contract and there's no note, and then, like this is abnormal.

Q. Okay. And it obviously caused IBC concern?

MR. STEELY: Objection as to speculation, Your Honor.

THE COURT: Sustained as to speculation.

A. Since --

THE COURT: Wait, wait. It's sustained.

Q. (BY MR. BOYD) Let me ask it a different way. Did IBC default the loan?

A. Yes, IBC defaulted our loan, yes, sir.

Q. I want you to look at the Term of Payment for the note, please, sir; do you see that? It's right on the first page.

A. Yes, sir. Yes, sir.

Q. Okay. Tell us what the Term of Payment, first paragraph says.

A. "The interest shall be accrued monthly beginning July 31st of 2022 and payable upon maturity. The note is due and payable in full on May -- December 21st of 2024."

Q. So the note specifically sets out what the terms are, right?

A. Yes, sir.

Q. Does it require any payments of either interest or principal before December 31st of 2024?

A. No, it does not.

Q. All right. I'm going to show you Plaintiff's Exhibit 10 -- oh, I'm sorry, 9, PTX9. Have you had a chance to review this?

A. Yes, sir.

Q. Okay. I'm going to represent to you that this was attached to a pleading filed in Harris County on December 7th for that hearing that was conducted in Harris County on extending, amending the TRO. What is the date that this was signed by Marty Berry? It's on the last page.

A. 7th day of December 2023.

Q. Okay. I want to talk about Marty Berry's sworn testimony to the Court in Harris County. I want to go to the loans to Berry GP.

A. Yes, sir.

Q. Start reading where it says "The company need." If you'll read that into the record, please, sir.

MR. ALLISON: Not --

THE COURT: What page are we on? I'm confused.

MR. BOYD: I'm sorry?

MR. ALLISON: Have you offered it yet?

MR. BOYD: No, you're right. No. Thanks. We offer PTX9.

MR. HUSEMAN: I'm sorry, what number?

THE COURT: Hearing no objection, it's admitted. I think the witness might be a little confused too.

A. Yeah, I am.

Q. (BY MR. BOYD) I want you to go to the first page.

A. Yes, sir.

Q. Loans to Berry GP. Do you see that?

A. Yes, sir.

Q. And come to the second sentence of that paragraph and start reading "The Company need."

A. "The Company need for money in the summer of 2022 was so extreme that we decided -- we met to decide how to best handle a capital infusion. We decided to put in money ourselves. Lawrence refused to contribute to the effort, so the two of us put up the entire $75 million."

Q. Okay. Let me stop you there. Number one, did you have any idea that the company needed capital at that point in time?

A. No, sir.

Q. Did -- was a cash call, a formal cash call ever presented to you as one of the owners --

A. No, sir.

Q. -- of the Berry companies?

A. No, sir.

Q. Had you even heard about this potential transaction in the summer of 2022?

A. No, sir.

Q. Did you ever refuse to contribute to the effort?

A. No, sir.

Q. Okay. I want to come down into that paragraph where it starts, almost three or four lines up, "We've not been repaid for our loans." Do you see where Marty Berry swears --

A. Yes, sir.

Q. -- under oath to that sentence?

A. "We have not been repaid for our loans and are unlikely to recover our loans anytime soon. We have not received any interest payments."

Q. Okay. We're going to come back to that in just a second, but if you'll read the very last sentence of that page that goes into the top of the next page, please.

A. "He continues to refuse to use his personal funds to assist the company."

Q. All right. That last sentence, is that true?

A. No, it's a lie.

Q. All right. Had you spent personal funds to benefit the Berry companies?

A. Still doing it every day.

Q. Millions of dollars?

A. I've spent millions, yes, sir.

Q. Okay. What types of expenditures have you made on behalf of the Berry companies?

A. Salaries, capital expenditures incrementally, buying cranes for no markup and tender them to the company.

Q. Do you routinely buy industrial-type equipment and iron at auctions?

A. Yes, sir, for the -- usually for only -- mostly for the benefit of corporate.

Q. Okay. And you don't turn around and mark that up after you buy it?

A. No, sir, I do not.

Q. I want you to describe for the Court even though -- well, I want you to describe for the Court the Citation X transaction that the company owns.

A. Citation X was in a SCC forfeiture auction in Waco, Texas. I kind of watch all the government auction stuff and Dennis had expressed some desire for a Citation X at one time, so I took the liberty of having my pilots review the -- my personal pilots review the dataset, and then I had corporate's pilots go up and do a once over on the bird because they were more Cessna oriented. Looked good. Went to the auction. It was just a perfect storm, just me and the engine guy there, and we captured it for 2,000,000 and some change.

Q. Okay. Based on fair market value of that airplane at that time, what would it have been approximately?

A. Probably 7. I think I could have flipped it for 7. I had somebody call. I can't remember. I think George Dodge called me at the time and asked me if I'd sell it.

Q. And George Dodge is who?

A. Charter operator in Houston, one of the big ones, Western Airways.

Q. All right. Could you -- I mean, were you prohibited from purchasing this for yourself?

A. No.

Q. Okay. How did the purchase get structured?

A. Corporate closed it.

Q. And corporate owns that airplane?

A. Yes, sir.

Q. Did that airplane, or airplanes in general, come up at the last meeting of the owners?

A. Yeah. Yes, it did.

Q. And was there an agenda item for approval to sell the corporate aircraft?

A. Yes, there was.

Q. All right. And Marty Berry voted in favor of that?

A. Yes, sir.

Q. Bonnie Berry voted in favor of that?

A. Yes, sir.

Q. And how did you vote?

A. I don't recall. I think I voted no.

Q. Well, I think that you also said, if you want to sell the airplanes, that's fine; is that what you said?

A. Yes, sir.

Q. Okay. So few sentences up, Marty Berry swears under oath that he hasn't been repaid for the loans; do you see that, and you read it into the record, right?

A. Yes, sir.

Q. Okay. I'm going to hand you PTX10. Lawrence, do you recognize this as a financial document of Berry GP, Inc.?

A. It appears to be a Berry GP ledger account.

MR. BOYD: At this time I would offer PTX10, which is Bay 000025.

MR. ALLISON: No objection.

THE COURT: All right. Hearing no objection, it's admitted.

Q. (BY MR. BOYD) All right. So this is part of the company's general ledger, and I want to come down, and if you look at 7/8/2022, we have M. Berry loan

172

proceeds; do you see that?

A. Yes, sir.

Q. And M. Berry is Marty Berry?

A. I would assume so, yes, sir.

Q. And it has a credit amount of how much?

A. $45,000,000.

Q. After that, the entry is 4/11/2023 note payment; do you see that?

A. Yes, sir.

Q. And it has the initials this time, MGB. That's Marty Berry, right?

A. Yes, sir.

Q. And it reflects a payment in the amount of $10,000,000, does it not?

A. Yes, sir, it does.

Q. Okay. And you would agree with me, would you not, that 4/11/2023 is before December 7th, 2023, correct?

A. Yes, sir.

Q. And we know what happened on December 7th, 2023, Marty Berry swore under oath that he had not received loan payment; do you recall that?

A. Yes, sir.

Q. And you do understand, from our conversation, that this document was presented to the judge in Harris

County presiding over this case at that time; do you understand that?

A. Yes, sir.

Q. Okay. So Marty Berry lied to that Court?

A. Yes, sir.

Q. That's perjury, right?

A. Yes, sir, I believe it is.

Q. All right. I want to turn over to PTX11, which is Bay 001342. Let me know when you've had an opportunity -- I'm only going to be talking to you about the first page. The complete exhibit is much longer.

A. Yes, sir. I'm familiar with it.

Q. All right. And it's a letter from -- I don't want to get into the subject, but it's a letter from Robert Rickett to Sean Strawbridge at the Port Authority, right?

A. Yes, sir, it is.

Q. And who is Robert Rickett?

A. Robert Rickett is Marty's son-in-law, and sort of the land guy at Berry Contracting now.

Q. All right.

A. The real property guy. Pardon me.

Q. Okay. When this lawsuit was filed, he was included as a defendant; is that right?

A. Yes, sir.

Q. And you authorized your lawyers to dismisses him from this lawsuit this week, right?

A. Yes, sir.

Q. Okay. And is that because he had signed an affidavit acknowledging that the property he was holding belonged to corporate?

A. Yes, sir.

Q. Okay.

A. And agreed to return -- to transfer it.

Q. All right. And your complaint about all that was what, in terms of him holding title to property that really belongs to the Berry entities?

A. There's no reason for it.

Q. What you wanted was it to be deeded to the company, the rightful owner who had paid for it?

A. Yes, as it should be.

Q. Okay.

MR. BOYD: At this time, I would offer PTX11.

THE COURT: Any objection?

MR. ALLISON: No, Your Honor.

THE COURT: Hearing no objection, it's admitted.

All right. I'm going to take a little break and we'll continue on.

THE BAILIFF: All rise, please.

(Recess.)

THE COURT: Okay. Are we ready? Let's do it. Witness back on stand. Mr. Berry is still under oath. You-all can be seated. Are we ready?

MR. REASONER: Yes, Your Honor, we're ready.

THE COURT: Okay. Let's do it. You may proceed.

MR. BOYD: Thank you, Your Honor.

DIRECT EXAMINATION (CONTINUED)
BY MR. BOYD:

Q. Lawrence, when we took our break, we were looking at PTX11 which has been admitted. Could you tell the Court what this letter is about?

A. It's a letter to Sean Strawbridge from Robert Rickett. It states that the principals of Berry GP have decided to open two strategic properties to the marketplace.

Q. Okay. Is this the first time that you learned it was an active marketing campaign for the Berry dock?

A. Yes, sir.

Q. Okay. And this was presented to you by whom at the Port?

A. Well, I went down to talk about moving that

bulkhead line with Kent and there was a couple of other Port guys there, I can't remember whom, and in the process I said I want to know what the status is. They said, why would you care, you're selling it? I go, no, but the dock's not for sale. They say, yeah, it is. I said, no, it's not. They start laughing, and say, yeah, it is. And they said, we'll give me a second and they came back with the letter.

Q. And you had never seen this letter?

A. No, sir, I did not, had not. In thinking that this property was incremental for the business, you know, you're going to make -- you're going to lock up, you know, a lot of infrastructure that you can't use it anymore without the dock.

Q. And I understand this meeting took place on November 14th of 2023; does that comport your memory?

A. I believe so.

Q. Okay. The first sentence of Mr. Rickett's letter to Mr. Strawbridge -- and by the way, was Sean Strawbridge at the Port on May 30th of 2023, or had he already severed --

A. No, he was still there then, I believe.

Q. Okay. "After immense consideration, the principals at Berry GP have decided to open two strategic properties to the marketplace." It talks

about synergy. The two properties are the Berry dock and then that 16-acre tract close to the Berry dock, right?

A. Yes, sir, that we commonly refer to as the Citgo property.

Q. Right. Would you agree, those properties are synergist?

A. Yes, sir.

Q. Does that provide Berry entities with strategic operations to combine a facility of some sort on the 16 acres with the Berry dock?

A. Yes, sir.

Q. And what was the purpose of you wanting to discuss the bulkheads; what does that do to the Berry companies?

A. Decreases the cap X on the ship dock.

Q. And why is that?

A. Because you don't have to tear out the existing dock ideally.

Q. I want to go to the first phrase or the first sentence. "After immense consideration, the principals at Berry GP." First, who are the principals at Berry GP?

A. Marty, Dennis and -- the Estate of Dennis Berry and Lawrence at this time.

Q. On May 30th, 2023, it would have been Marty, yourself and Dennis Berry?

A. Yes, sir.

Q. Okay. Were you ever given an opportunity for immense consideration for this letter to go out?

A. No, sir.

Q. Okay. Did you ever decide to open two strategic properties to the marketplace?

A. Not for sale.

Q. So you had no idea this had been presented to the Court?

A. No, sir, I did not.

Q. You did understand that perhaps Marty, and perhaps Dennis, might have disagreed with you?

A. Yes, sir.

Q. Okay. Would you have liked to have had the opportunity to have an in-depth discussion before this was actually proffered to the Port of Corpus Christi?

A. Yes, I told them whenever, after I found out about it, I told them at the time that they couldn't sell the property because it was their lender's now.

Q. Okay. There have been occasions where you have made specific requests of management to provide you certain information, correct?

A. Yes, sir.

Q. Can you -- can you sit here today and state with certainty, the dates you made the request, number one?

A. Numerous times.

Q. But can you state the specific dates?

A. No, sir, I can't state specific dates.

Q. Can you tell the Court, on a specific date, I requested these specific documents?

A. I -- yes, I can, probably if I had the document.

Q. Okay. But, I mean, I know you know you made requests, but I'm talking the line item specific request. Can you sit here and recite that right now?

A. The request?

Q. Yeah.

A. No, I cannot.

Q. Okay. I'm going to hand you PTX12 and ask you to review it. I'm going to ask you to review the email and attachment for me, please, and take your time.

A. Okay, yes, sir.

Q. Have you had a chance to review it?

A. Yes, sir.

Q. As it relates to April 18th, does this refresh your recollection of the specific items you requested of Mr. Powers and Mr. Klein?

A. Yes, sir, it does.

Q. And who is Mr. Klein?

A. The CFO --

Q. Okay. And --

A. -- who replaced Diane Decou.

Q. I'm sorry?

A. The CFO that replaced Diane Decou.

Q. Okay. And would this agent testify to the Court accurately about what you were requesting from the company?

A. Yes, sir, it will.

MR. BOYD: I offer PTX12.

THE COURT: No objection? Objection, no objection?

MR. ALLISON: No objection.

THE COURT: All right. It's admitted.

Q. (BY MR. BOYD) All right. So the front page of this is an email from you to Mr. Powers and Mr. Klein advising them to see an attached request for information; is that accurate?

A. Yes, sir.

Q. All right. If you'll look at the attachment, and that is a memo indeed from you to Mr. Powers and Mr. Klein?

A. Yes, sir.

Q. And you cc'd your partners, right?

A. Yes, sir.

Q. And Marty and Dennis?

A. Yes, sir.

Q. Okay. Can you tell us what type of information you were looking for, first off?

A. The key information it requires to properly administer my part to -- for the betterment of the enterprise.

Q. Okay. The first three items relate to what topic?

A. The IBC line.

Q. Okay. You wanted to have a better understanding about what transpired between the company and IBC?

A. Yes, sir.

Q. All right. Because that had concerned you the way that that had gone down; is that right?

A. Yeah, the line was canceled before I ever knew there was a problem.

Q. Okay. Item 4, what does that relate to?

A. A copy of the loan agreement, the loan between Marty and Dennis and Berry GP.

Q. Okay. That would be -- loan agreement, would include a loan agreement, loan docs, notes?

A. A payment schedule plan, there's like a whole bunch of hoops you have to jump through historically to borrow this kind of money.

Q. All right.

A. Or to lend it.

Q. And some seven months, three weeks later is the first time you get that note through litigation; is that accurate?

A. Yes, sir.

MR. STEELY: Objection, leading, Your Honor.

THE COURT: Don't lead, sustained.

Q. (BY MR. BOYD) What does item 5 relate to?

A. All equipment assets that were purchased on the IBC revolving letter of credit.

Q. All right. And what were you wanting that information for?

A. Trying to find -- I was trying to find out if we were squandering our revolving that's supposed to be for current receivables because the way it functions now it's not like it was way back in the day when I was there actively, you know, on the fourth floor. I wanted to make sure that they haven't, you know, bought static assets, i.e., equipment, whatever, with that LC that's supposed to be a revolver for invoices. Because the way

it's done it's not tied directly to the invoices anymore.

Q. Okay. Is this all information that you were requesting as an owner, as a board member, and --

A. And executive.

Q. Yeah. Did you ever receive this information?

A. No, sir, no one ever answered.

Q. I'm going to hand you PTX13. Lawrence, if you'll take a minute to review PTX13 which is Bates Bay 000026. Have you had a chance to --

A. Yes, sir.

Q. Do you recognize this document?

A. Yes, sir.

Q. Okay. This is a Notice of Special Meeting of Directors that was sent out on December 1st for a meeting on December 7th?

A. Yes, sir.

Q. Okay. This is the type of meeting-type communications that you received related to the board function; is that accurate?

A. Yes, sir.

MR. BOYD: Okay. At this time, I offer PTX13.

MR. ALLISON: No objection.

THE COURT: All right, hearing no

objection, 13's admitted.

Q. (BY MR. BOYD) Did you indeed attend the meeting on December 7th?

A. Yes, sir, I did.

Q. Okay. Item No. 1 that was put up for consideration and vote was defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in this lawsuit which at that time was pending over in Harris County?

A. Yes, sir.

Q. All right. Did that indeed come up for consideration?

A. Yes, sir.

Q. Okay. And how did Marty Berry vote?

A. For it.

Q. How did Dennis Berry vote?

A. For.

Q. And how did you vote?

A. Against.

Q. Okay. On item No. 3, in December of last year, late last year, what is that item relating to?

A. Clarification and ratification concerning previous board actions on loans from shareholders Dennis and Marty Berry to Berry Contracting LP, and offer to Lawrence Berry to participate in said loans for up to

100 percent.

Q. Okay. Did that come up for consideration by the board?

A. Yes, it did.

Q. Okay. Is that the first time that participation in these related party notes had been offered to you?

A. Yes, sir, it was.

Q. How did you vote on this?

A. On this, no.

Q. And you're the only partner in the company who didn't have a related party note related to the 75,000,000; is that right?

A. That is correct. And this is a do-over, you know, it's after the fact, and you know, the methodology was poorly executed, you know, we lost our revolver for God's sake.

Q. Why didn't you participate in this offer?

A. Because I still don't have enough information to decide one way or the other.

Q. Had it been offered to you contemporaneously with the original transaction and loan, would you have considered it?

A. I would have considered it.

Q. Would you have done so without full

information?

A. No.

Q. I'm going to show you PTX14. Do you recognize this document?

A. Yes, sir.

Q. And it appears to be your red line of board minutes, as a general description?

A. Yes, sir.

MR. BOYD: At this time I offer PTX14.

MR. ALLISON: No objection.

THE COURT: It's admitted.

Q. (BY MR. BOYD) After receiving the board minutes, which would be the black line here, you took opportunity to have those minutes red lined, correct?

A. Yes, sir.

Q. What did you do with your red line copy?

A. Sent it to Mike Hummell.

Q. I'm sorry?

A. Sent it to Mike Hummell, if I recall.

Q. Okay. Does this accurately reflect your disagreement with the company's version of the minutes from that meeting?

A. Yes, sir.

Q. Okay. At the meeting to adopt the minutes, what happened?

A. None of these were incorporated.

Q. Did you state that you had sent your red lines, your objections to the minutes?

A. Yes, I did.

Q. And this wasn't included in the corporate record?

A. No, but they passed it anyway.

Q. I'm sorry?

A. No, but they passed them anyway.

Q. What were you told as to why they weren't put into the corporate records?

A. They couldn't open them.

Q. Couldn't open them. Wasn't this sent in a PDF?

A. Yes, sir.

Q. So did you have any trouble opening it?

A. No, sir.

MR. BOYD: Out of abundance of caution, if I didn't offer it, I offer PTX14.

MR. REASONER: It was admitted already.

MR. BOYD: I think so.

MR. REASONER: It was admitted.

MR. STEELY: It's up to the Judge to decide.

MR. REASONER: He already did.

Q. (BY MR. BOYD) I'm going to hand you PX15, and

it's Bates Bay 000001. Are these the minutes of that very board meeting we were talking about?

A. Yes, sir.

Q. Okay. And you were in attendance at this meeting?

A. Yes, sir.

MR. BOYD: Offer PTX15, Your Honor.

MR. ALLISON: No objection.

THE COURT: All right, it's admitted.

Q. (BY MR. BOYD) All right. If you go down to the item that says, "Marty made a motion to accept meeting minutes for 2023." Do you see that? It's about halfway down the page.

A. Yes, sir.

Q. Okay. Can you read that into the record, please?

A. "Marty made a motion to accept meeting minutes for 2023. Dennis seconded motion and all were in favor with no one opposed. Lawrence said he sent Hummell a red line of the meetings."

Q. All right. It says, "no one opposed" but you made it clear you didn't agree with the minutes?

A. No, I said -- I said --

MR. STEELY: Objection, leading, Your Honor.

THE COURT: Sustained, don't lead.

Q. (BY MR. BOYD) Did you make it clear?

A. Yeah, I thought. I think I did, that it was a railroad, and it wasn't being addressed.

Q. This PTX16 is Bate Bay 000027. Lawrence, if you could review that for us, please?

A. Yes, sir.

Q. Is this a Berry GP, corporate resolution at a special meeting of directors?

A. Yes, sir.

Q. Dated December 7th, 2023?

A. Yes, sir.

MR. BOYD: Plaintiff's offers PTX16.

MR. ALLISON: No objection.

THE COURT: All right, it's admitted.

Q. (BY MR. BOYD) So this came up for vote in front of the three partners, right?

A. Yes, sir.

Q. And did you have any interest in this transaction or involvement with this transaction?

A. No, sir.

Q. Okay. And how did you vote?

A. Well, I would have voted no.

Q. When the 75,000,000 influx of capital came into the corporate coffers, did you have an opportunity to

learn what it was spent on?

A. No, I have not.

Q. Has Jim Klein ever reported to you on what items that money went to fund?

A. No, the only -- I think the only knowledge I have came from Dennis Nixon that when Dennis Nixon asked him what happened to the 75, he said he spent it.

Q. Is that something that you want your CFO saying to your chairman of the board of the bank giving you a revolving line of credit?

A. I think it was probably the death nail for our revolver.

Q. To this day, do you have any idea what this money was used for?

A. I would assume it was spent to pay off vendors at B&B, but I don't really understand the methodology to dump in $75,000,000 for either draw down or a milestone schedule. There's just a whole bunch question marks that make -- that are nonsensical to me.

Q. My, question though is, to this day, do you have any idea what this money was spent for?

A. No, sir.

Q. In your view, why is this transaction not fair to the Berry entities?

A. I don't know what the interest rate was, wasn't

given the opportunity to participate. I mean, we all had the same pile of money, equal shares, so I don't understand why I wasn't included, honestly.

Q. What was your view of the corporate plan related to paying these notes back?

A. I don't know of it.

Q. Nobody's ever shared with you a strategy to pay these notes back?

A. No, sir.

Q. And as it appears on the books we've talked about earlier, in December of this year, some $65,000,000 will come due, plus interest, on those notes; is that your understanding?

A. Yes, sir.

Q. I'm going to hand you PTX17. Lawrence, let me ask you to review this, and after reviewing it, do you appreciate that this is an accounts payable ledger of the Berry companies?

A. It would appear to be so, yes, sir.

Q. Okay. In the middle there, I know it's tough to read --

MR. BOYD: Well, but before that, I would offer PTX17.

THE COURT: Any objection?

MR. ALLISON: No, Your Honor.

177

THE COURT: All right. Then it's admitted.

Q. (BY MR. BOYD) That appears to be an accounts payable to what entity? It's at the bottom of those columns there.

A. Western Gulf Equipment.

Q. Okay. And what is Western Gulf Equipment?

A. It's apparently Marty Berry's basic equipment company. It's a -- it's an equipment leasing company owned solely by Marty and his wife.

Q. All right. And if you look at the ledger, how many cranes does it appear that Marty and Courtenay Berry are building to the Berry entities?

A. Seven, I believe.

Q. How many cranes are you aware of that that company owned?

A. I wasn't aware it was a company. I was aware that Marty -- we had a one-off that we did on a big crane that we were using money that we jointly had from our -- our Canadian entities that we own solely, and we had money and we had -- we had a new requirement here for a crane and Marty said he'd make up the shortfall for his own account, which I wouldn't have a problem with, you know, and that was fine, for one, for one. But the rest of these I had no knowledge of.

Q. All right. If you add up the billings, which

appears to be from 7/1 to 9/1, which is three months, what is the total rental revenue to Western Gulf?

A. A million 347.

Q. So it's significant monies?

A. Yes, sir.

Q. Who owns the equity in those cranes?

A. That would be Marty and Courtenay.

Q. I'm going to hand you PTX18. Mr. Berry, do you recognize this to be documents from the Secretary of State and Texas Franchise Tax Public Information Report related to Western Gulf Equipment?

A. Yes, sir.

Q. And this is the company you just testified is owned by your brother Marty?

A. Yes, sir.

Q. And your sister-in-law Courtenay?

A. That's what I was told.

Q. And if you turn --

A. Yes, sir.

MR. BOYD: At this time I offer PTX18.

MR. ALLISON: No objection.

THE COURT: All right, hearing none, it's admitted.

Q. (BY MR. BOYD) If you turn over to the second page, who is the registered agent?

A. Mike Hummell.

Q. And if you turn --

A. Hold on, hold on, I'm sorry, Chuck Vanaman.

Q. That was the first page. Chuck Vanaman used to be general counsel; is that right?

A. Yeah, that is correct.

Q. Okay. And he's since retired, right?

A. Yes, sir, yes, sir.

Q. And Mr. Hummell is his successor?

A. Yes, sir, that is correct.

Q. All right. So, originally, it was Chuck Vanaman, and then when he retired, I presume, that's when Mike Hummell took over. But regardless, Mike Hummell is the registered agent?

A. Yes, sir.

Q. If you turn over to the next page Texas Franchise Tax Public Information Report; do you see that?

A. Yes, sir.

Q. Section A?

A. Yes, sir.

Q. Where it says name, title and mailing address of each officer, director, member, general partner or manager?

A. Yes, sir.

Q. Who is listed?

A. Marvin Berry.

Q. Marvin is Marty?

A. Marvin Glen, yeah.

Q. What is his title?

A. Manager.

Q. Who is the second manager?

A. Courtenay Berry.

Q. And she is Marty's wife?

A. Yes, sir. She's the manager as well.

Q. Okay. I'm going to hand you PTX19, Bates Bay 002145. Lawrence, if you'd take a minute to review that.

A. Yes, sir.

Q. Does this document purport to be the resolutions of a special meeting of shareholders that occurred earlier this week?

A. Yes, sir.

Q. And this is one of the corporate documents maintained by Berry entities?

A. Yes, sir.

MR. BOYD: Move to introduce PTX19.

MR. ALLISON: No objection.

THE COURT: All right, hearing none, it's admitted.

Q. (BY MR. BOYD) You attended this meeting; is that right?

A. Yes, sir, I did.

Q. And this is a resolution related to the topic we were just talking about, right?

A. Yes, sir.

Q. Okay. Can you read into the record what the resolution was?

A. "Be it resolved that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that equipment to any Berry company for performing the work of that Berry company, is approved. To that extent such conduct has occurred in the past, it is ratified."

Q. All right. Marty Berry voted on this?

A. Yes, he did.

Q. Okay. And of course, this subject matter directly relates to a company that he and his wife owned; do you degree with that?

A. Yes, solely.

Q. Okay. How did he vote?

A. Affirmative.

Q. Okay. You're totally disinterested from this transaction, would you agree, as the director?

MR. ALLISON: Objection, leading.

A. I'm disinterested?

THE COURT: Sustained.

MR. BOYD: I didn't hear the objection.

THE COURT: It's a leading question.

Q. (BY MR. BOYD) As a director, do you have any ownership interest in Gulf Western?

A. No, I do not.

Q. Okay. Do you have any financial or other ties to that company, other than the fact that the company you co-owned with your partners makes payments?

A. At the end -- this ain't right. This is just wrong. I mean, this is Basic Equipment made over, but just for Marty.

Q. All right. How did you vote?

A. No.

Q. Bonnie Berry is in the same position as you, I suspect; she doesn't have an interest?

MR. ALLISON: Objection, leading.

THE COURT: Sustained.

Q. (BY MR. BOYD) Does Bonnie Berry have an interest in Gulf Western?

A. No, she does not, as far as I know.

Q. Okay. And she voted yes?

A. Nonsensical, I just don't think she has enough

knowledge yet, honestly.

Q. What is it specifically that upsets you about that transaction, Gulf Western --

A. This is how --

Q. -- and the arrangement --

A. This is how we came to own Berry Contracting. I mean, we started Basic Equipment way back in the day as the leasing entity to Berry Contracting. Over term, our father was kind enough to let us take risk and build value by leveraging off of his books, and ultimately, when we folded -- that's how we originally came in by folding in the equity that we built up in Basic for this, and this -- this ain't right. That's why it upsets me. I just can't believe that, like, I had no knowledge of this.

And by the way, it can't be fair. I mean, all the evaluation, everybody running, all the sales force, even the procurement site is all going to be actuated by Berry GP direct employees, okay, finding them, scoping them out, hiring consultants, et cetera, but Marty's closing them in his name and then re-renting to us, no, without giving his partners the opportunity to participate.

Q. Is that historically how the partners have conducted themselves?

A. Absolutely not.

Q. Lawrence, I'm going to hand you PTX23. Lawrence, if you'll take an opportunity to review the email except for the date, the attachment to that email?

A. Yes, sir.

Q. Do you recognize this document?

A. Yes, sir.

Q. All right. And the email is dated what date?

A. December 6th.

Q. Okay. And who is it sent to?

A. Marty Berry, Dennis Berry, Rob Powers and Mike Hummell.

Q. All right. And the attachment, without getting into the details of the substance, what would you describe this document to be?

A. A clear description of the situation as I see it.

Q. Okay. In what capacity were you sharing this with your partners and the general counsel and the CEO?

A. All three as a owner, shareholder, and employee.

Q. And the purpose related to the record was what?

A. To substan -- to clearly state my position.

Q. Okay. As a board member?

A. Yes, sir.

MR. BOYD: Plaintiffs offer PTX23.

THE COURT: Okay, no objection?

(No audible or visible response.)

THE COURT: Hearing none, it's admitted.

Q. (BY MR. BOYD) Lawrence, I want you to take your time going through this. And I want to turn your attention to page 3 and ask you to read that into the record?

A. The whole -- all of page 3?

Q. No, that paragraph that says, "I object." I'm sorry.

A. "I object to the improper 'ratification' of 'previous board action,'" in parenthesis -- I'm sorry.

"I object to the improper 'ratification' of 'previous board action' that never took place and I cannot vote in any favor of any such 'ratification' unless I determine it's in the best interest of the company after full disclosure of all material facts."

Q. Okay. And why is it that you take that position that's articulated in that paragraph? Why are you stating this and why are you taking this position?

A. Because they -- you can't just sit around and have a do-over on all -- on all the minutes, and to say this is just the way it is -- we did all these things back in the day, that now we're going to say they're

okay. Come on.

Q. At this time that you wrote this, did you have full disclosure of all material facts?

A. I still don't.

Q. Earlier we talked about Tommy Naybar and Tonja Fulghum?

A. Yes, sir.

Q. Do you remember that?

A. Yes, sir.

Q. The termination?

A. Yes, sir.

Q. Were there any other employees that worked in Houston who were terminated?

A. Yeah, Mike.

Q. And in your view, were those key personnel or not?

A. I think the key person, T.J. Smith was terminated at the same time to which I didn't -- I didn't have notice of, I had to hear about it from somebody else, and he's probably -- other than people with the last name Berry -- -the longest-term employee there and a double vice president, I might add. And somebody that was on dad's never fire list but.

MR. BOYD: Give me one second, Your Honor.

THE COURT: Okay.

MR. BOYD: Pass the witness.

THE COURT: Who goes first?

MR. ALLISON: I guess I do.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. ALLISON:

Q. Mr. Berry, may I call you Lawrence, so the record's clear, since we have several Berrys?

A. Sure. Yes, sir.

Q. And I want to make sure that we get -- our lunch hour's coming pretty quick, so I want to make sure before we break for lunch, whenever that happens, that we have our arms around, really, the core of your complaints; okay?

A. Yes, sir.

Q. And I understand that -- well, let me back up. You heard your lawyer in opening say the only thing that you're looking for injunctive relief on are two things, right?

A. Yes, sir.

Q. One of those things you're looking for injunctive relief is that the sale of real property not occur without, I forget what he said, 10 or 14 days' notice to you. That's one of your requests for injunctive relief, right?

A. Yes, sir.

Q. The other request for injunctive relief is that you not be removed from the board, right?

A. Yes, sir.

Q. And obviously, you have a series of things where you have disagreed on votes with your brothers, and also, more recently, with Bonnie, right?

A. I believe that's in votes where we voted different ways, but yes.

Q. Okay. I mean, sometimes those were two-to-one votes, with you being on the short end of that two-to-one vote?

A. Yes, sir.

Q. And the list of things where you think you have these complaints about being on the short end of those votes include votes that ratified the very -- the very -- the loans from Marty Berry and Dennis Berry, right?

A. Okay. Restate the question, please.

Q. Yeah. One of the things that you -- there was a vote to ratify the loan from Marty Berry to the company, right?

A. Yes, sir.

Q. And the vote when Dennis was there was two to one, with you being on the short end of the vote, right?

A. Yes, sir.

Q. And the vote when Bonnie was there was two to one, again, with you being on the short end of the vote, right?

A. Yes, sir.

Q. Okay. And that's one of the things where you feel like you've been treated unfairly, I guess, by the process of how you came about knowing it, et cetera?

A. Yes.

Q. Okay. And another thing that I think that you were outvoted on it sounds like was the meeting minutes, right?

A. Yes, sir.

Q. And you got outvoted on that. Again, that was when Bonnie was there and Marty and you, right?

A. I believe so, yes, sir.

Q. And a two-to-one vote against you?

A. Yes, sir.

Q. And you thought that was also unfair?

A. Since they weren't corrected, yes.

Q. Okay. Well, according to them, they voted to approve the minutes and you thought the minutes were incorrect, right?

A. Yes, sir.

Q. And that's why you had the split two-to-one vote?

A. Yes, sir.

Q. Okay. And -- and the other thing that you had voted have been on short end of the two-to-one vote has been on whether or not the company should sell the dock, right?

A. Yes, sir.

Q. And you think the company should not sell the dock and you got outvoted two to one, first by Dennis and Marty against your one vote, and then later in a meeting, Bonnie and Marty voting to continue to market and you were against that, right?

A. Yes, sir.

Q. Were you voting against marketing the dock, that's all that it was about, right?

A. I don't have enough information to decide one way or the other currently.

Q. Okay. You don't have enough information to know whether you should vote for marketing the dock, right?

A. I think we had enough pending opportunities for the dock, it probably wasn't the right time to be marketing, honestly, the highest and best use. So this is really about me helping preserve the position of the enterprise, and nothing else, and there's -- there was numerous -- I mean, I've been steady pinging away with

Pin Oak for years and I'm the one -- and when we didn't have control of this dock, I'm the one that got it back, for God's sake.

Q. Okay. Try and listen my question. You said you didn't have enough information to make a vote, is that what you said a moment ago?

A. No. I said, I needed more information, but so at the end of the day, it's going to be no.

Q. Okay. So you voted no not because you're against it, you voted no because you didn't know enough information about it?

A. I voted no -- no -- both.

Q. You voted yes and no?

A. No, I voted no for both of those reasons.

Q. For -- for -- okay, and the two reasons are because you didn't have enough information to have a yes vote, right?

A. Well, there's no compelling reason to market it, so the answer's no.

Q. And that's something I think that you actually felt very strongly about, correct?

A. Yes, I'm trying to increase the -- the revenue streams to the company.

Q. But is it fair that you felt very passionately about your no vote on the dock, you're strongly against

it?

A. I think without proper review, yes, I'm strongly against it.

Q. Okay. And, you know, you're strongly against it even though you don't have enough information on it, right?

A. Well, there's no -- I couldn't say, I'm -- I would not sell the dock because you're stranding a bunch of assets there. So the answer is it would have to be a really compelling number to get me to sell the dock.

Q. Okay. And so --

A. And I think it weakens our position to market a key operating asset that we're trying to get a throughput agreement for from one of our clients that's actually paying day in and day out, you know, it's not the right -- I don't think it's the right thing to do.

Q. So if it were a big enough number -- you just said, if it were a large enough amount of money, you would consider voting yes for the sale of the dock, right?

A. At some number, of course.

Q. Okay. And so it's not that you're against selling it, it's just you want to make sure you get the right price for it?

A. I would -- no, that's not what I said. There's

always going to be a price you can sell something, okay, so, and at the end of the day, this is a key operating asset of this company, like it would drastically impact it to sell it. I'm against selling the dock, simple as that.

Q. Okay. The only way you can know if you're going to get a number that you'd say yes to is to market the dock; agreed?

A. No. Unsolicited offers come in all the time.

Q. Okay. So, but one of the ways that you can find out if you can get a big enough number is to market the dock?

A. Yeah, but I'd probably tell my partners if I was going to.

Q. Oh, you were going to market the dock?

A. Yeah.

Q. Okay. And you told that -- when you say "partners," did you tell Marty and Dennis both that you were going to market the dock?

A. No, I didn't say that. I said if I was going to, I would tell my partners.

Q. Okay. And have you ever --

A. I haven't marketed the dock.

Q. Okay. Let me make sure we get our list complete and we'll come back to that in a little bit.

Other than voting no against the Berry loans and the loans from Marty -- by the way, you're also against, I guess, any -- are you also against the loan that Dennis made? Are you opposed to the one that Dennis made for $30,000,000 to the company at the same time Marty made his loan?

A. I'm not suing Dennis.

Q. I realize that. But are you opposed to it the same way you're opposed to Marty?

A. I'm opposed to things transpiring that I'm not given a notice of and so the answer would be yes.

Q. Okay. So you're equally opposed to what Dennis did as you are to what Marty did?

A. I don't have enough information to say that. Dennis was sick --

Q. What's --

A. Dennis was sick and I didn't see him. I don't know what Dennis was told, okay?

Q. Well, you don't know what Marty was told either, right, if you weren't there?

A. This is true, but Marty's the one orchestrating this, not Dennis.

Q. Well, and your mother has also made loans as well, right?

A. I'm sure.

Q. Yeah. And are you equally opposed to those loans when she made them in support of the company?

A. No, I wouldn't say I would be because --

Q. Would you be in favor of the loans --

A. -- if I had knowledge of them.

Q. Okay. But you would be in favor of loans if your mother made them, even though you're against loans if Marty makes them?

A. I'm against loans I don't have knowledge of.

Q. Okay. And that's so you would be -- I mean, equally against Dennis and Marty and your mother if they made loans to the company?

A. I'm -- I will be opposed to loans I don't know about.

Q. Okay. But you obviously know about the one that Marty made, right?

A. No, I didn't know about it.

Q. Well, no, you've already told us and it's in your attorney's timeline that you knew about it as of September of 2022, right?

A. Yes, sir.

Q. Okay. And so you -- it happened, apparently, the transfer of funds happened in, I guess July of 2022; you've seen that document, right?

A. Yeah, but I was asking for this data all the

way through.

Q. And it looks like when you sent an email to Jim Klein, he's the CFO, right?

A. Yes, sir.

Q. It looks like when you sent an email to him, he sent you back the documents that showed the loan same day?

A. I don't think so.

Q. Pardon?

A. I don't think so.

Q. And whatever the email indicates it was like -- are you complaining about Jim Klein, too?

A. Pardon me?

Q. Are you complaining about Jim Klein also?

A. I -- I -- you'd have to reference the document. I mean, you're going pretty quick and you're not really --

MR. ALLISON: May I approach, Your Honor? I'll show it to him.

THE COURT: Yeah. Show him the document. Let's do this go ahead and break for lunch and you can find the document and you can show the witness after lunch. See you-all at 1:30.

MR. BOYD: Thank you, Your Honor.

MR. ABSMEIER: Thank you, Your Honor.

MR. BOYD: Thank you, Your Honor.

(Noon recess.)

THE COURT: All right. Are you ready on cross?

MR. ALLISON: Yes, sir.

THE COURT: All right. Go ahead.

CROSS-EXAMINATION (CONTINUED)

BY MR. ALLISON:

Q. Before the break, Lawrence, I think we were talking about -- my mistake -- this way, it was kind of two different things, the dock, and then we were also looking over here for some documents on how you received information. We were looking for a document at the break. Do you recognize, I'm going to call this Defendant's Exhibit 6?

THE COURT: Is that already in evidence?

MR. ALLISON: No, it is not.

THE COURT: Okay.

MR. ALLISON: And I figure since there's no jury, doing it this way so everybody can see it.

THE COURT: No, it's fine, I like -- I don't mind doing it this way.

MR. ALLISON: Okay.

THE COURT: I just -- if something's in evidence, maybe we can just not get a -- some --

MR. ALLISON: I went and looked, the one I was looking for before the break, I think I determined I couldn't find it in evidence, that's why --

THE COURT: If it's not in evidence, go right ahead.

MR. REASONER: Do you have a Bates number or an exhibit number?

THE COURT: So they can get their copy out.

MR. ALLISON: 1971 Bates number is the first page of it.

MR. BOYD: Do you have a copy for us or not?

MR. ALLISON: I do not. I did mine electronically.

MR. REASONER: I thought you-all put it in evidence. That looks like the one introduced.

MR. ALLISON: I thought. I couldn't find it into evidence.

MR. BOYD: It's PTX2.

THE COURT: Hold on. Hold on.

MR. BOYD: But ours doesn't have a Bates. Okay.

THE COURT: Is it 2?

MR. BOYD: I'm looking.

THE COURT: 2 is kind of thick but.

MR. ALLISON: And I have it in a small document. That may be what they're looking for.

MR. BOYD: No, it's the same. It may be shorter because that's what they're using, Your Honor, but it appears to be the same.

THE COURT: Okay.

MR. ALLISON: Have you got it?

THE WITNESS: I think so.

THE COURT: Oh, it's the back side, right?

THE WITNESS: It's configured different but I think it's the same thing.

MR. BOYD: It is configured different, but it is the same communication.

MR. ALLISON: I'll use theirs for the moment.

THE COURT: Then use theirs, it's PTX2.

Q. (BY MR. ALLISON) On PTX2, before the break, we were talking about that, and I think that was one of the documents you talked about sort of one of the typical ways you would receive information would be through Tonja?

A. Yes, sir. And --

Q. And this one's the email from Tonja, and PX-2 the way we see it there, would that be typically how you would receive information about the company when you

would make requests?

A. Yes -- yes, sir.

Q. And in this particular instance, it looks like Tonja sent the -- Tonja sent the email on what day? Was it September 21, 2022?

A. If it is -- oh, there we go at the bottom, September 21, 2023.

Q. At 12:36 p.m.; is that right?

A. Yes, sir.

Q. And asking for basically current P/L and B/S meaning balance statement, right?

A. Apparently, yes, sir.

Q. And got a response from Jim that says, "Apologize for the delay." Do you see that?

A. Yes, sir. I'm reading backwards.

Q. That's okay. And Jim responded, his response, although he's apologizing for the delay, was same day at 2:24 p.m., right?

A. Yes, sir.

Q. And I think you told us earlier this September time frame is when, to your recollection, you first remember learning about the $75,000,000 loaned to the company, 45 of it from Marty, and 30 from Dennis, right?

A. Yes, sir.

Q. Okay. Do you recall -- and I'll be very

specific about this. Do you recall having conversations with Marty Berry where he encouraged you to also pitch in, in other words, loan money to the company?

A. No.

Q. Did you ever have conversations with Dennis where he encouraged you to pitch in or loan money to the company?

A. Way back then?

Q. Yes, sir.

A. No, sir.

Q. In 20 -- let's say just in 2022?

A. No, sir, not that I recall.

Q. Okay. And I appreciate the caution in your answer. You're not saying, no, you're saying you just don't recall it if you did?

A. No, I'm saying no.

Q. You're saying no?

A. Yeah, I'm pretty sure I'm saying no, yes.

Q. Okay. Okay. And --

MR. ALLISON: I need a charger.

(Discussion off the record at counsel table.)

THE COURT: If you're in front of the jury it never fails it doesn't work.

Q. (BY MR. ALLISON) I want to walk through the

kind of your recollection then. The next document I want you to look at is going to be Plaintiff's Exhibit No. 7. Do you recall this series of emails?

A. Where are we?

THE COURT: Why don't you let them know what -- is it already in or?

MR. REASONER: It should be in front of him, Your Honor, I think Plaintiff's 7, if you can find it.

MR. BOYD: Plaintiff's 7 is the letter from IBC's lawyer.

MR. ALLISON: It's Defendant's Exhibit 7. Sorry, I said Plaintiff's.

MR. BOYD: Oh, Defendant's 7. Do we have a Bates on that?

MR. ALLISON: Yeah, it's 1967 Bates page.

Q. (BY MR. ALLISON) Do you remember this exchange of emails in January, sir?

MR. BOYD: And that's PTX No. 1.

THE COURT: This is 1?

MR. ABSMEIER: Yes, Your Honor.

MR. BOYD: Yes, Your Honor.

MR. ABSMEIER: Same as PTX.

THE COURT: Well, all right, it's already in evidence, I guess, Mr. Allison, PTX1.

MR. ALLISON: I'll refer to it as PTX1.

THE COURT: Yeah, PTX1. Do you have it, Mr. Berry?

THE WITNESS: Yes, I've got it in my hand.

Q. (BY MR. ALLISON) Do you recall this email exchange?

A. Yes, sir.

Q. And initially, this email exchange you asked, I guess, for company's receivables and so you got something back other than the Marty Berry and Dennis Berry loans which would be booked as payables, right?

A. Yes, sir.

Q. And what you got back then -- okay, but you understand from reading the financials, that clearly, the place you noticed in September of 2022, what you noticed were the Marty and Dennis loans listed as notes payable by the company, because it's money owed back to Lawrence, right? I'm sorry, money owed back to Marty and Dennis, right?

A. Yes, sir.

Q. Okay. But this one you got a receivable, and this one talks about Orca. Can you tell us what Orca is?

A. Orca -- Orca was an EMP company that owned conventional space.

Q. Okay. And Orca is a company that you took lead on; is that a fair statement?

A. I believe I'm the founder, yes, sir.

Q. Okay. And but it's also a company that millions of dollars were put in by the Berry brother companies, right?

A. I don't think it was put in, it was lent.

Q. You don't think it was what?

A. It wasn't put -- it wasn't contributed, it was lent.

Q. Okay. And so right now the note -- the note is about a $16,000,000 note that you owed to the company, right?

A. I think we'd have to have some accountants to figure that out.

Q. But it's in the millions?

A. Yes, sir, but there's -- there's a bunch of mitigating factors.

Q. But it's in the tens of millions; you'd at least know that, right, sir?

A. Yes, sir, but I'm not sure what the amount is.

Q. Okay. So but it's tens of millions, however many tens of millions?

A. I don't personally don't think it's anything, but no -- yes, it's posted in the books as some number.

Q. Okay. And you know that's come up at recent board meetings, correct?

A. Yes, sir.

Q. And the Orca discussion also includes discussion of what they call ICI, right?

A. Yes, sir.

Q. And there was discussion -- did you guys have a discussion about how much was owed and that you needed to pay it?

A. Yes, sir, I said once the accountants get done figure and out what we owe, I'll pay.

Q. And so, was that a unanimous vote that you would pay what you owed?

A. I don't know that a vote transpired.

Q. Okay. But you -- if there's a specific amount and you disagree with the amount, will you vote no on it?

A. Pardon me?

Q. If there's an accounting done, and you disagree with that accounting, are you going to vote no to that repayment?

A. I couldn't say.

Q. Pardon?

A. I couldn't say.

Q. You're going to have to -- you're going wait

and see what the facts are and then vote?

A. I couldn't -- I couldn't say right now. I'm not following what your query is.

Q. Well, let me put it this way. You talked earlier in your testimony that sometimes you're lacking information, right?

A. Yes, sir.

Q. Are you telling us you lack information on your own note to the company?

A. No, how it's administered and accounted for at Bay.

Q. Okay. Did you keep track of how much you owed, how many tens of millions?

A. Yes, sir, there's accountants in my office that keep track of these things.

Q. Okay. And would you trust your accountant to say how many tens of millions it is that you owe to the company?

A. It's not tens, it's not plural. It would be ten million or more, but not tens of millions.

Q. Okay. Ten plus million, okay.

A. X.

Q. And if you agree with the accounting done by your accountant and they ask for that amount, would you vote yes on it?

A. If -- if it's clear -- it's going to be what I owe and what I'll pay.

Q. But if -- let me try it again. If you agree with your accountant on the amount owed and that's the amount they want, the companies want back, would you vote yes that you have to repay it?

A. Yes, sir, I guess I would.

Q. Okay. So you think -- and you think you should be entitled to vote on that, right?

A. Pardon me?

Q. You would vote on it like you just said because you feel like you have a right to vote; don't you?

A. It's -- I would have a right to vote if I knew about it, yes, knew it was disclosed, of course.

Q. Okay. And so, would you be interested in that loan?

A. I'm not sure I understand the question.

Q. Well, in your memo, that memo where you talked about -- do you remember this memo, Plaintiff's Exhibit No. 23, the long email from you to Marty and Dennis and Robert and Michael Hummell; do you remember that?

A. Yes, sir.

Q. If you look down on page 3 of it. And you told us earlier -- I'll let you find it.

A. Okay.

Q. You got it?

A. Yes, sir.

Q. I'm on page 3 of that. Do you remember you told us earlier that you wrote this to Marty and the different people that are listed?

A. Yes, sir.

Q. And how long did it take you to write it, would you say?

A. I couldn't say, I don't recall, or --

Q. You can't recall?

A. No, I can't say.

Q. Pardon?

A. I can't -- I couldn't say.

Q. Okay. But you -- do you see where on page 3 you cited Section 21.418, down at the bottom?

A. Yes, sir.

Q. And you used the phrase there "by approval of the majority of the disinterested directors," and you put it in bold. Do you see that?

A. Yes, sir.

Q. Do you know where -- you've got that phrase, I guess, by your interpretation of 21.418?

A. I'm sure counsel assisted me with this.

Q. Okay. A minute ago you said you wrote it. Did you write all this?

A. Did I draft every item here? Well, it's under my signature, so I guess, ultimately, yes.

Q. Okay. So you wrote it. And when you talk about a disinterested director, do you see that at the bottom of page 3?

A. Yes, sir.

Q. Would you -- because what you're saying in this memo is that you think only disinterested directors should be allowed to vote, right?

A. That is correct.

Q. And so with the Orca note for 10,000,000 plus dollars, you said you would vote, you would vote in favor of paying it if you owed it, right?

A. Well, who was I voting for? Myself or the company or whom? I'm confused about your query.

Q. As the director, that's the only way you get to vote?

A. I would pay, but these are apple and oranges is what you're talking about.

Q. Okay. Well, did you -- for example, if you didn't owe the money and they said you owed it, would you vote against them making you repay it?

A. Say that again.

Q. Would you vote against them making you repay it if they brought it up for a vote?

A. Would they --

Q. Would you say, no, I don't vote -- I don't owe it, I vote no?

A. The question -- okay, I'm just having a hard time following you.

Q. I apologize. Let's say they said you owed $30,000,000 when they do their accounting?

A. Okay.

Q. And they make a motion for you to pay $30,000,000.

A. Okay.

Q. Are you going to vote yes or no?

A. If I owed 30,000,000, yes.

Q. What if your accounting says you only owe $15,000,000?

A. Then I would probably vote no.

Q. Okay. But you have a right to vote?

A. It would -- well, I wouldn't -- this is -- disinterested, interested. This is not -- this is apple and oranges compared to what the case we're talking about.

Q. Okay. Well, in the Orca, the example that we're using here, there's a written note, a promissory note, right?

A. Yes, sir.

Q. Okay. And that's a note or a transaction between you and the company, right?

A. Yes, sir, it's a -- well, yes, sir.

Q. Okay. And so do you think, though, that the rule about interested and disinterested voting part -- let me ask you this. If you were -- let's change it a little bit. Let's say that -- well, let me back up. Do you think you are an interested person in that note that has your name on it, that promissory note?

A. I would say I think it would be by definition.

Q. Okay. Now, Orca though, did all kinds of other business not related to that note, correct?

A. Yes, sir.

Q. I think they developed mineral interest, correct?

A. Yes, sir.

Q. And did investments; is that correct?

A. Yes, sir, I guess.

Q. Okay. And each one of those required company approval, right?

A. Okay, I'm not following you. Which company?

Q. Well, whichever company. Orca, we're talking about Orca, using it as an example?

A. Okay.

Q. Okay. And were you -- do you think it was fair

and right for you to be able to vote on other business of Orca like investments and direct where those investments went?

A. As the CEO? Once again, I don't understand.

Q. Well, you were an owner, weren't you, one of the owners?

A. I am the owner.

Q. Okay. Originally, though, for years, it was three owners, right, you and your brothers?

A. No, sir.

Q. No?

A. I don't think so.

Q. So you were taking Berry company money and putting into Orca, but they weren't getting the ownership; is that your position?

A. They were a party to every bit of it, and it was for a fee, and if you go back and look through the documents, you'll see it's all addressed. It was completely disclosed to everybody.

Q. Okay. Well, let's not get sidetracked here. So were you the sole decision maker then, or were there other partners that you had as you developed those assets?

A. Well, it was a team effort, but -- yeah, I guess. Yes, I made the decisions.

Q. Okay. And but some of them, I think you joint ventured later on with Conoco and other people, didn't you?

A. Well, we were going to get in petroleum haul, there's working interest, there's not interest participant, there's all kinds of stuff mixed in it.

Q. Right. Some of them had multiple people that would vote on investments, right?

A. On a well by well basis?

Q. Sure.

A. Sure.

Q. Okay. And even though you were interested in this Orca loan, because you've told us you were interested in the Orca loan with the company, do you think it was okay for you to vote on other subject matters?

A. I'd have to see specifically what you mean, because I'm not following.

Q. Okay. But, I mean, you can be interested in the loan and be uninterested in other votes; is that fair to say?

A. You'd have to give me a better scenario than that, I'm not following.

Q. Okay. Well, let's go ahead and go to -- and I'll go ahead and pull it out.

MR. ALLISON: It's 26, Plaintiff's Exhibit 26, Your Honor, and I don't believe it's in evidence. Actually, I have a hard copy too, if it helps.

MR. BALDREE: Plaintiff's Exhibit 26?

MR. ALLISON: I'm sorry, Defendant's Exhibit 26.

MR. BALDREE: Your screen is not working, Doug.

MR. ALLISON: Like I said, I've got a hard copy, too. We'll do it that way.

I've got all kinds of technical problems today. I apologize, Your Honor. May I approach?

THE COURT: Yes.

MR. BOYD: Do you have one for us?

MR. ALLISON: It's a statute.

THE COURT: I think John got it up. John got it to work.

MR. ALLISON: Okay. I'll give him a courtesy copy then.

THE COURT: Okay.

MR. ALLISON: Your Honor, we'd offer Defendant's Exhibit 26.

MR. BOYD: Well, I guess --

THE COURT: I mean, if it's a statute, I'll just take judicial notice of it.

MR. BOYD: And that document is not a complete copy of the section, but I --

THE COURT: I'll take judicial notice of the statute.

MR. BOYD: Understood.

Q. (BY MR. ALLISON) Tell me when you're through reviewing it, sir.

A. Okay.

Q. You see that if you look at Section A that this section applies to a -- first of all, it's got to be a contract or transaction; do you see that?

A. Yes, sir.

Q. Between the corporation, and let's say that's Berry GP, because that's what we're talking about here today; fair enough?

A. Yes, sir.

Q. So this section or statute applies to a contract or transaction between a corporation and one or more directors; do you see that?

A. Yes, sir.

Q. Okay. So it's a contract or transaction that is not with the director, then this statute does not apply, correct?

MR. BOYD: Objection, calls for a legal conclusion.

MR. ALLISON: Your Honor, it's -- he wrote a -- he wrote a four-page memo on it.

THE COURT: He can -- I'll allow it.

Q. (BY MR. ALLISON) If it's not --

THE COURT: With the understanding -- are you an attorney?

THE WITNESS: No, sir.

THE COURT: Okay. With the understanding he's a lay witness.

MR. ALLISON: I understand, Your Honor. With the same understanding that he wrote the four- or five-page memo.

MR. BOYD: Objection, he said he wrote --

THE COURT: Sidebar, sustained.

Q. (BY MR. ALLISON) Do you see where it says that: This section applies to a contract or a transaction between a corporation and one or more officers or directors, right?

A. Yes, sir.

Q. And so that is -- this is the statute you've quoted in this case as sort of defining what is or what is not a disinterested director, right?

A. Yes.

Q. And it only applies to the contract or transaction between the corporation and the director,

right?

A. I assume so.

Q. You say you think so?

A. I assume so, I don't know.

Q. Okay. You see where it says that in the paper in front of you, right?

A. Well, is there a question?

Q. It says that: This section only applies to the contract or transaction between a corporation and one or more directors that enter into a contract or transaction, right?

A. Yeah. Where are we on this?

Q. A1?

A. A1. Okay. Yes, sir.

Q. Do you see that?

A. Yes, sir.

Q. Okay. Let me make sure we're good. This section relating to disinterested or interested directors only applies to a contract or a transaction with one or more directors or officers, right?

A. Yes, sir.

Q. Okay. And obviously, if there was a sale of real property, that would be a contract between Berry GP and some third party, whether it's the Port, or Buckeye, or somebody else, whoever might buy it, right?

MR. BOYD: Objection, vague.

THE COURT: That's overruled.

A. Say that. Okay. Is there a question in there?

Q. (BY MR. ALLISON) Right. This would -- if there was a contract for the sale of a dock, that would be a contract between Berry GP and the Port, or Buckeye, or some third party, right?

A. Yes, sir.

Q. Okay. And so since this section only applies to contracts between or transactions between the corporation and the directors or officers, this section wouldn't apply to the sale of the very dock, right?

MR. BOYD: Objection --

A. I don't agree.

MR. BOYD: -- legal conclusion, vague.

THE COURT: I mean, it does call for a conclusion from a lay witness. I mean, you can certainly make the pitch to me later on.

MR. ALLISON: I am going to follow up and you give me guidance here.

THE COURT: Okay.

Q. (BY MR. ALLISON) You say you disagree. What's the basis of your disagreement?

A. Well, because -- their interested directors closed the loan --

MR. BOYD: Objection, Your Honor.

A. -- transaction on real --

MR. BOYD: Hang on, Mr. Berry. You sustained the objection.

THE COURT: I did.

MR. BOYD: He's now answering the question that came on the heels of your sustaining.

THE COURT: Well then ask another question.

MR. ALLISON: And I just -- he had a reason I was --

Q. (BY MR. ALLISON) The next question, it's the next question. Give us your reasoning. Give us your reasoning about how this applies?

MR. BOYD: Same objection.

THE COURT: I think -- I think it's a legal conclusion. It calls for a conclusion and he's not an expert witness.

Q. (BY MR. ALLISON) On the Berry dock, right now it accounts for -- I know you keep referring it to as a core asset, correct?

A. Yes, sir.

Q. And revenue per year is about 2.2, 2.3 million per year, correct?

A. Might be right now.

Q. Okay. And the overall revenue of the company

right now is more in the neighborhood of 7 to 800,000,000 a year, right?

A. It's -- yes, it's a lot.

Q. Pardon?

A. Yes, sir, it's a lot.

Q. Right. And so even though you refer to it as a core asset, the math that we just said, meaning that it's, what, two out of 100 would be 2 percent so it's an eighth of that which is less than a half percent of your revenue, the dock?

A. But you're not -- well, you're -- it's an incomplete question. You're not --

Q. Let me try again. Right now -- and it's been this way I think for years -- the dock is less than a half percent of the company revenue, right?

A. I think we'd have to go historically to get to where you're going.

Q. Okay. But you recognize that $2,000,000 if that's all it's revenuing, and you're making 800 in revenue a year, that's less than a half percent on the dock, for the dock?

A. This is true, but I also would say that you've got a couple of a hundred -- a vast amount of -- at some cost at 1414 Corn Products Road that needs that heavy -- that needs that facility to be valuable at all,

otherwise, you can just cut it all and sell it for scrap as the way things currently set.

Q. Okay. Part of --

A. So it's inner connected to the main Berry yard, so to say it has no value because of what's being transpired or transacted right now, I would say we can't afford to sell it because there's a lot more super module projects coming down with L and G attached to the ones that are already permitted, so we need to keep our options open.

Q. Okay. And so one of the discussions when you've been debating in the back room, so to speak, or at the directors meetings whether or not you're going to sell the dock, Marty has told you, has he not, well, if we sell it, we can reserve the right to remove super modules - using your words - super modules across the dock for a fixed fee, right?

A. I wouldn't know any of that, would I?

Q. Well, but that's -- that would be part of the sales condition that Marty's proposed, right?

A. I don't know.

Q. You didn't hear him say those things?

A. No, I don't know what happens. But I tell you one thing, you're going to have a hard time. You need that dock.

Q. Well, how often have you used it in the last year?

A. Things get used every day.

Q. No, for the -- I don't mean -- I don't mean Pin Oak or the small barge companies. How often have you -- when's the last time you did a super module --

A. I flew in this morning and there's a vessel sitting on it for shipping that wasn't there yesterday.

Q. No, no, no. How often --

A. It wasn't on there the last time I was here.

Q. How often has Berry -- when's the last time Berry did a super module?

A. There, I don't know that. I think it was quarters for Leviathan.

Q. July?

A. I said the quarters for Leviathan. I don't remember the day it shipped.

Q. Okay.

A. It's been a while.

Q. Okay. More than once in the last year?

A. I couldn't say.

Q. Okay. So it's rarely used by Berry for the super modules?

A. It's got a vessel sitting on it right now and you couldn't go out with it. Once again, you sure do

have a lot of yard there and we all know the heavy lift dock in the ports is not accessible so.

Q. Do you recall, though, the conversation with Marty where he said, if we sell it, we can reserve the right to a certain amount of use over that dock to meet our business needs?

A. No, I don't recall that conversation, actually.

Q. Okay. Would that be a smart thing to do?

A. Absolutely, it would be a necessary, but like I said, if you sold it you ain't going to be able to use it.

Q. Unless you reserve some right on it?

A. Yes, sir, but then how restrictive can you be, you've got to have to taker pays there, okay, so you got LDs, and so how often are you going to get to use it.

Q. Because most of the docks in the Port of Corpus Christi are moving liquids, right?

A. Yes, sir, this port is all, pretty much all liquids.

Q. Yeah, and so that's --

A. With a few exceptions Gulf or Kiewit.

Q. Yeah. Liquids are probably the highest and best use for docks in our port?

A. Depends on how you look at it. It depends if you look at it from an employment standpoint, and from

the enterprise, you know, we're in the service business so I would say, no, liquids probably isn't the highest and best use in regards to our company because we ain't in the liquids business unless it's totaling.

Q. Well, let me put it this way. When companies that are doing liquids across the crude oil, across their docks, they're making hundreds of millions of dollars instead of $2,000,000 off their dock, right?

A. Yes, but our dock's moving hydrocarbon liquids across it, that's where the revenue's coming from now is liquids.

Q. Okay. And so you recognize that your super modules are not the highest and best use for a dock, right?

A. From the corporate standpoint, I'd have to disagree. You got a couple of hundreds million dollars of some cost there you're going to abandon? No, I don't think so.

Q. From a money standpoint you can make more money moving liquids across them than you can super modules?

A. Yeah, but you'd have to have contracts and a lot of other things. It's a big question mark, so I couldn't say that.

Q. Anyway, so that's -- what I've just kind of laid out with you, that's really been the disagreement

189

between you on the one hand and Dennis and -- and Marty on the other hand about sell the dock or don't sell the dock, right?

A. No, not really, I think the disagreement was that I didn't know about it.

Q. Okay. So now that you know about it, you're okay with selling the dock, if the price is right --

A. I didn't say that.

Q. -- like you told us?

A. I didn't say that. I said at some point there's a number there that we sell, but we have -- we have -- we have pending stuff with Pin Oak, there's other options for the dock.

Q. And -- and you know for -- for how many years have you and Marty and Dennis, until recently, of course, how many years have you-all been making those decisions together?

A. At least since '98.

Q. Yeah. And have -- you know, even though I understand sometimes one or the other of you would disagree, except most of those were unanimous decisions, you told us, right?

A. Yes, sir, and we don't sell much.

Q. We don't what?

A. We don't sell much.

Q. Okay. No, but I mean, the business decisions, you do a lot of business decisions?

A. Yes, sir.

Q. And so, what, are you all in agreement over the last 20 plus years 80 percent of the time, 90 percent making business decisions?

A. Probably 90 percent of the time, actually.

Q. 90?

A. Yes, sir.

Q. Okay. And so what we're talking about on whether or not you would sell the dock or not sell the dock is obviously just a matter of business judgment and you disagree with them?

A. I wouldn't sell operational assets, period. If I was going to sell assets that belonged to the company to pay back the loans, I would sell superfluous assets all day long.

Q. Okay. Is that a yes to my question? You have a disagreement with them about whether or not you should sell the dock for business reasons?

A. For business reasons. Okay. You're going to have to -- say it again.

Q. Your business judgment is different than theirs, that's why it's a two-to-one vote?

A. No, it's not at all. I think their conditions

are different. They have this loan and that's the driver.

Q. Well, actually, the loan, since you bring it up, the loan is actually collateralized by the dock, right?

A. It is now.

Q. The Frost Bank loan, right?

A. Yes, sir.

Q. And the Frost Bank loan is also -- the IBC Bank was also collateralized by the dock, right?

A. Yes, sir.

Q. And so, any money from selling the dock would first go, at Frost's option, to repay the Frost Bank loan, right?

A. It may or may not, it depends on if you get a waiver from them or not.

Q. Okay. But they have the first right, it's up to them?

A. Yes, sir.

Q. Okay. And so that's how loan proceeds would go first, or excuse me, that's how any dock sales proceeds would go first would be to pay off debt normally, right?

A. Not necessarily.

Q. Okay. Who would you pay first?

A. If I was Marty Berry over there, I'd pay myself

at the end of the day, but in all truthfulness, it doesn't really make any difference because the -- like I said, there's conflict -- they made these loans and the only reason we're talking about -- we never sell anything, okay, that's the bottom line. And for -- we wake up, and all of a sudden, we are selling things. And operational assets when we've got all these, a multitude of properties that are superfluous that aren't core assets, I just don't understand.

Q. Okay. Didn't you say earlier that you just voted to sell some property like a week or two ago?

A. No, like this week.

Q. Pardon?

A. This week.

Q. Yeah. So you do sell things?

A. Very seldom.

Q. But you just said you don't sell things?

A. Very seldom do we sell things. I think the history will prove that very seldom do the Berrys sell anything.

Q. And the Three Rivers yard, didn't you take lead on selling that real estate?

A. No, if I'd have took lead, I'd had it papered correctly. I did not.

Q. Okay. But you're the one who voted for selling

it, didn't you?

A. Because it was past the tipping point.

Q. So, is that a yes to my question, you voted yes to sell that real estate?

A. Yes, sir.

Q. Okay. So you just said on the note, if it were your note, you'd pay yourself back?

A. Well, I was being facetious, okay, honestly, okay? The money's going to come in, it's going to go where it's supposed to go.

Q. And that's the way you would expect it to be handled here, right?

A. Pardon me?

Q. That you would expect it to be handled exactly that way if the dock sold?

A. I would expect to be given knowledge that we were going to start selling things would be the first thing.

Q. Okay. And then when it sells, you would expect the money to be done or utilized in a way that was in the best interest of the business?

A. Of the enterprise, yes, sir.

Q. Okay. And you would expect that that would happen, right?

A. If we -- if we all agree to do something, yes.

Q. Or if it's even a two-to-one vote, sometimes it's a two-to-one vote and you've got to follow the two-to-one vote; you've testified to that already?

A. Yes, sir.

Q. Okay. Because you -- I want to point -- you understand, usually, you used the term I think in your memo, "self-dealing." Do you know what I'm referring to?

A. Yes, sir.

Q. And that's usually used when somebody is taking money from the corporation, right, taking something of benefit? Dealing for yourself as opposed to dealing for the corporation?

A. For the enterprise, yes.

Q. Okay. And in this instance, I mean, a classic self-dealing is if I give my -- if I just take, you know, tens of millions of dollars from the company and don't pay it back, that would be self-dealing, right?

A. If you buy a crane and lease it to the company, that would be self-dealing too.

Q. Well, use my example. If you take tens of millions of dollars from the company and you don't pay it back, is that self-dealing?

A. Pardon me?

Q. If you take tens of millions of dollars from

the company and you don't pay it back, is that self-dealing?

A. I would have to see the scenario.

Q. Well, like the Orca scenario where you took tens of millions --

A. Once again, I'm going to restate, on the work, if I owe it, I'm going to pay it. There's -- it's as simple as that.

Q. Yeah, but you haven't, have you?

A. Because it's been a performing note.

Q. It's in default now, isn't it?

A. May very well be. This is a legal question, in all honesty.

Q. Okay. So, but would that be self-dealing if you took -- just hypothetically, if you took tens of millions of dollars for yourself and didn't pay it back from the company, would that be self-dealing?

A. It may be.

Q. Okay. What if you gave tens of millions dollars to support your company? That would be selfless, wouldn't it?

A. No, sir. I would give my partner the opportunity to participate.

Q. Okay. And are you telling -- and if they give you the opportunity to participate, then do you agree

that it is not self-dealing?

A. If there's been no change in condition and everything's ideally the same point, then you might be -- you'd be right if I would have said no back in the day. But I never was given that opportunity, Doug.

Q. Okay. But let's just try to stay focused here. If you're given the same opportunity to participate as Marty has and Dennis has, then we agree, that is not self-dealing, right?

A. If we were all three at the same time at the same conditions then, if it's all -- no, how would it be self-dealing? We'd all be in.

Q. Okay. And you're telling us neither Dennis nor Marty ever offered you that opportunity, right?

A. Absolutely.

Q. Okay. And so there's no recording of a board meeting where they made you that offer recently?

A. Okay. Once again, I qualified and said it had to be ideal to the same situation. No, the change of conditions, everything's different. Okay, I can't get any information and you're saying it's the same. No, it's not the same.

Q. Okay. Well, they -- for example, the note is at prime plus a quarter percent; you know that, right?

A. I know I've seen documents here that say that,

but where were those documents when I asked for them? They've been backdated for God's sake. I mean, where were they? I don't understand.

Q. I know you don't understand, so listen to my question. Five and a quarter percent, do you think that's a fair interest rate?

A. I don't know, I'd have to see what T bills are at.

Q. Okay. You've had -- I think you've been asked several times whether or not you think -- because if they voted in the meetings, whether or not it was a fair transaction; do you remember those votes, you voted against it?

A. Yes, sir.

Q. And that's been going on -- the first one of those meetings, they've had repetitive meetings since December, early December, right?

A. Yes, sir.

Q. Okay. And every time they have a meeting, you say you need more information, right?

A. Yes, sir.

Q. To decide if it's fair or not, right?

A. Okay. I'm listening.

Q. In other words, you keep saying, I need more information to decide if it's fair, right?

A. I need more information, period.

Q. Okay. And you got, obviously, lawyers and I think you mentioned your accountant a while ago. With resources like your lawyers and accountants, can you -- wouldn't they be able to help you know what was a fair loan, a fair advance?

A. It would be fair if I was given knowledge of it and I didn't have to sue to find out about it and get the documents.

Q. Okay. So your complaint really, and we know that you found out about it in September instead of July of 2022. Your complaint is that two-month delay? At least the documents show us that much, right?

A. Okay. Once again, you're losing me. So my complaint is what?

Q. Your complaint is -- because we've already seen the timeline, your lawyer put it up on the board -- that the loans were made in July and that you found out about it in September of 2022, same year?

A. No, there's a line item on -- on a -- on a deal. Where's the loan agreements? Where's the worksheets? Where's the repayment schedule? No, I didn't find out about it. So they got -- there's an entry in here that just says related party loans. So, once again, where's all the worksheets? Where's the

documents? Where's the repayment schedule? I never heard of such a thing of this scope and scale. Okay, what if you don't have a plan? Hell, I don't know that. They must be pretty easy.

Q. But is a .25 percent above prime, do you think that's a fair interest rate?

A. I'd have to see --

MR. BOYD: Objection, asked and answered.

A. I'd have to see what the --

THE COURT: Sustained.

A. -- T bills are at today.

THE COURT: Asked and answered.

Q. (BY MR. ALLISON) And you know that the loan now is subrogated to Frost, right?

A. Yes, sir.

Q. Okay. And that means that Frost gets paid before Dennis or Marty ever see a penny, right?

A. Well, yes, sir.

Q. And so do you think that is a great position to be in for Dennis and Marty?

A. They're the ones that threw their money in, not me. And they agreed to it, so that would be a question you'll have to ask Marty when he's sitting up here.

Q. And when, in fact, you would refuse to do it if you were subrogated, right?

A. Pardon me?

Q. You would refuse to make the loan to the company if you were subrogated, right?

A. I couldn't say that.

Q. Well, you know it's a disadvantageous position to be subrogated, right?

A. Doug, I understand that.

Q. Okay. And you know that it's also a loan that was made without security, right?

A. Yes, sir.

Q. Now, when the banks, when they get -- when they give a loan, like Frost, or IBC, I think it's true of both of them, they actually require a lot of pledge of assets or collateral in order to secure the loan, right?

A. Yes, sir.

Q. And you know that, for example, Frost then and IBC, because they're requiring security for the loan, that means, by comparison, the Marty loan and the Dennis loan are disadvantaged, right?

A. I'd say they are what they are.

Q. Well, you'd rather be -- as a businesses man, you'd rather have security for your loan than have no security like Marty and Dennis, right?

A. Yes.

Q. Okay. So the fact that they're at five and a

quarter percent, and they're subrogated, and they're not -- there's no security supporting or collateral supporting the loans that's -- that's a bad loan if you're the lender, right?

A. Yeah. It wasn't like that when they made the loan, though, was it?

Q. Well, you were saying there used to a pledge agreement or a collateral agreement?

A. No, I'm saying there wasn't.

Q. Right. And not having -- let me put it this way. Banks -- banks we know insist on having collateral?

THE COURT: I think I get your point on this thing.

MR. ALLISON: Pardon?

THE COURT: I think I get your point on this thing.

MR. ALLISON: Okay.

Q. (BY MR. ALLISON) By comparison, Frost also required, you know this, $20,000,000 in a cash CD as part of the collateral for the Frost line of credit, right?

A. Incrementally, yes, sir, I believe so.

Q. Okay. And obviously, Marty and Dennis did not get the benefit of cash in a CD from the company in

order to make the loan, right?

A. I couldn't say.

Q. Well, have you ever seen any evidence that somebody put a cash CD in securing --

A. I don't even -- Doug, I don't even know where the money was spent so I couldn't say.

Q. I'm not trying to argue with you. You know that you don't have any evidence that there's any CD backing Marty's loan or Dennis's loan, correct?

A. No, sir.

Q. I think we had a double negative in there. We're agreeing with each other, right?

A. I guess we are.

Q. Okay. So -- and again, very different than taking money from the company if you're giving money to the company and it's at a prime plus a quarter rate, and no security, no collateral, and it's subrogated to the line of credit, in this instance with Frost, that is a great loan for the company, isn't it?

A. It was so great it got our revolver counsel, okay? That's the bottom line, that's how good it was, it affected the lifeblood of this company, calls IBC, because it was poorly planned and poorly executed and Dennis Nixon when, okay, came to talk about it, Jim Klein told him that they'd spent the money and the bells

went off, okay? And when he asked for the --

MR. STEELY: I'll object to hearsay --

THE COURT: Sustained.

MR. STEELY: -- to what Mr. Klein is saying and what --

THE COURT: Sustained as to hearsay.

Q. (BY MR. ALLISON) Okay. I'm going to use two things in your answer. You said it was so great and then you also talked about your belief that it was the cause of IBC breakup, right?

A. Once again, from the time that Jim Klein told Dennis Nixon that the money was spent --

MR. STEELY: Objection, hearsay.

A. -- Dennis is a damn good banker --

THE COURT: Sustained as to hearsay.

A. Dennis is a damn good --

THE COURT: Wait, wait, wait. Ask another question.

MR. ALLISON: I don't think it's been put into evidence, Your Honor. This is Defendant's Exhibit 4, it's the promissory note. We'd offer that into evidence. We've talked about it.

MR. BOYD: I'm sorry, which one?

MR. ALLISON: Did you-all put it in?

THE COURT: It's the note. I think it's

part of -- isn't it part of an exhibit?

MR. BOYD: Dennis Berry's note is not into evidence.

THE COURT: Okay, all right.

MR. BOYD: And we have no objection.

THE COURT: All right. It's admitted.

MR. ALLISON: And also we have --

THE COURT: But I need a hard copy.

MR. ALLISON: Okay. And we coordinated with the court reporter ahead of time and I think we have that worked out.

MR. REASONER: Doug, what exhibit was that?

MR. ABSMEIER: Defendant's 4, right?

MR. ALLISON: Pardon?

MR. REASONER: Defendant's 4 is Dennis Berry's note, is that the same?

MR. ALLISON: Yes.

MR. ABSMEIER: And is it --

MR. ALLISON: It doesn't have anything else in it so we're clear on the record.

MR. ABSMEIER: If it's Bay 21 and 22, I have a hard copy I can give the Court.

MR. ALLISON: I've already gone over the terms with him. I'm not going to do it. I'm just making sure they're in the record.

MR. BOYD: But is the Bates the same?

MR. ALLISON: It is Bates page 21 through 25.

MR. BOYD: Okay. So it's both notes?

MR. ALLISON: Yes, it's both notes and actually the ledger.

THE COURT: Okay. So no objection, I take it, over here?

MR. BOYD: No objection.

THE COURT: All right, it's admitted.

COURT REPORTER: Which ones were those, 5? What numbers were they?

MR. ALLISON: Defendant's 4, I believe.

THE COURT: It's Defendant's 4, it's one exhibit, right?

MR. ALLISON: Yes.

THE COURT: It's several pages long.

MR. ALLISON: It's the note with Dennis, the note with Marty and the ledger.

THE COURT: Okay. And you've provided a hard copy for --

MR. ALLISON: I've not, but I'm not going to ask him any questions on it.

THE COURT: No, I'm with you.

MR. ALLISON: But for the court reporter?

THE COURT: For the court reporter. I mean, because she holds the exhibits, and -- and if I have to go back and take this under advisement, or whatnot, I've got to be able to see the exhibits.

MR. ALLISON: Okay. I will get us a hard copy. I know we called and we were under the impression to go ahead and do them electronically, but we'll go ahead --

THE COURT: Oh, did you file it electronically?

MR. ALLISON: I don't know if we filed it or not. I know that they communicated.

THE COURT: If you filed it electronically, it's fine but.

MR. ALLISON: Okay. I will double-check and make sure we close that loop.

THE COURT: Because then I can -- then I can --

MR. ALLISON: And then we'd offer Exhibit 5, we've already talked about it, Your Honor, it's the subrogation agreements.

MR. BOYD: Just for clarification, and I apologize. When you say "filed" through the Court's e-filing system?

MR. ALLISON: That is normally how we would

do that.

MR. BOYD: How are we going to do that with our confidential?

MR. ALLISON: Oh, yeah. Okay, thank you.

THE COURT: Yeah, true enough.

MR. ALLISON: We'll get hard copies and handle them the way we've talked about, Your Honor.

THE COURT: And if -- and if it does get -- and if it -- and if you have filed it, I can -- I guess, I don't know, I guess I'll have to seal it.

MR. BOYD: I don't believe it's been filed because I didn't see a docket notification come up.

THE COURT: Okay, okay.

MR. STEELY: I haven't seen it.

THE COURT: Okay.

MR. ALLISON: Your Honor?

THE COURT: Sometimes it hasn't been accepted and nonetheless.

MR. ALLISON: Your Honor, we'd offer --

MR. BOYD: It's a complicated world we live in.

THE COURT: It's a complicated world and the computers run half of it.

MR. BOYD: True.

THE COURT: And it's true. It becomes very

frustrating, but it's true.

MR. ALLISON: And, Your Honor, we'd also offer Exhibit No. 5 which are the subrogation agreements.

MR. ABSMEIER: Doug, can you give us the Bates number on those?

MR. BOYD: No objection.

THE COURT: All right.

MR. BOYD: Subject to this house cleaning, which we need to do after the fact.

MR. STEELY: They have 9 through 20. Bates 9 through 20.

MR. ALLISON: Yes.

THE COURT: Then 5 is admitted.

Q. (BY MR. ALLISON) And it raises a point, not only were Marty and Dennis's loans subrogated to the Frost loan, but there's a separate line of credit for equipment with Wells Fargo, correct?

A. Yes, sir.

Q. And they were also subrogated to the Wells Fargo loans, right?

A. I'm not sure about that, but I guess, if you say so.

Q. Well, Exhibit No. 5 is in evidence now, if you want to look at it. See that says Wells Fargo and --

A.  Yes, sir.

Q.  -- you can read it if you want.  If the record shows that, you're --

THE COURT:  I mean, if you want to take -- it's about time for a break.  If you want him to be able to look at the document --

MR. ALLISON:  I don't think I need to.  I'm just moving on.

THE COURT:  All right.  Well, I'm going to take a little break and then we'll start up again.

THE BAILIFF:  All rise, please.

(Recess.)

THE COURT:  All right.  Ladies and gentlemen, be seated.  Still your cross.

MR. ALLISON:  I believe we coordinated with plaintiffs' counsel and the court reporter.  We have a series we're going to go through and we're going to offer them, they've been previewed already.  I don't think there's any objections, I think we're going to get her hard copies.  I think we have a plan.  Do you guys agree?

MR. BOYD:  Agreed, Your Honor.

THE COURT:  Okay.  Very good.

MR. ALLISON:  With that, Your Honor, we will offer Defendant's Exhibits 10, 11, 12, 13, 14, and

15.

THE COURT:  All right.  No objection?

MR. ABSMEIER:  One question, sorry.  You told me when we conferred that you were not offering 13 so if you're offering it, I need to know the Bates number and confirm.

MR. ALLISON:  I thought I said I'm not offering 8, but that's okay, I'm going to use your 5 instead of 8 and then let me try and answer your question for 13.

MR. ABSMEIER:  Can we go through exhibit by exhibit with you giving us the Bates number and us telling you agreed or not?

MR. ALLISON:  Oh, you know what?

MR. ABSMEIER:  That way it's on the record what the document is.

MR. ALLISON:  Yeah, I don't need 8, because you already put it in.  We did have that discussion too.  So it's --

MR. STEELY:  Are we on the record?

THE COURT:  I don't know.

(Laughter.)

MR. STEELY:  Before we start announcing all these agreements, let's get it on the record.

COURT REPORTER:  We are, we are.

THE COURT:  All right.  Apparently, we are.  It's on the record.

MR. ALLISON:  We're offering 10, 11, 12, 14 and 15.

THE COURT:  All right.  And with that?

MR. ABSMEIER:  I just need to know the Bates number for each of those.  Is --

MR. ALLISON:  I'll just call them out as we went is what I thought you wanted me to do.

MR. ABSMEIER:  No.  I want you to put them on the record before we agree.

MR. ALLISON:  Okay.

MR. ABSMEIER:  That way we're agreeing on a Bates number that represents Exhibit 10 instead of an unknown document that --

MR. STEELY:  How about I help you out, Doug?

MR. ALLISON:  Yeah.

MR. STEELY:  Exhibit 10 is Bates 0799.

MR. ABSMEIER:  Agreed.

MR. STEELY:  What's the next one?

MR. ABSMEIER:  11.

MR. STEELY:  Exhibit 11 is Bay 0902.  And this will be 11.

MR. ABSMEIER:  Agreed.

MR. STEELY:  Doug, 12.

MR. ABSMEIER:  You said opening Bates number.

MR. STEELY:  Yeah.

MR. ABSMEIER:  Oh, yes, sir.

MR. STEELY:  It looks like it's 0954.

MR. ABSMEIER:  Agreed.

MR. REASONER:  14 is next.

MR. STEELY:  Bay 0984 through 0987.

MR. ABSMEIER:  Agreed.

MR. REASONER:  And 15.

MR. STEELY:  15, Doug, also?

MR. ALLISON:  15 is in it, yes.

MR. STEELY:  This looks like it is Bay 01819.

MR. ABSMEIER:  That's agreed.

So no objections, Your Honor, to those exhibits.

THE COURT:  Then they are all admitted.

COURT REPORTER:  Just for clarification, 13 is or isn't?

MR. ABSMEIER:  13 is not being offered.

MR. ALLISON:  I'm going to use -- my 13 is their No. 6, so I'm going to use that.

THE COURT:  Okay.

MR. ALLISON: May I proceed, Your Honor?

MR. STEELY: So 10 through 15 are in, but not offering to 13?

MR. ALLISON: Correct.

CROSS-EXAMINATION (CONTINUED)

BY MR. ALLISON:

Q. Right before the break you were saying that the failure to disclose Dennis and Marty's notes, that's what blew up the IBC Bank?

A. Yes, sir.

Q. Why do you say that blew up the IBC Bank loan?

A. One of the first things Dennis Nixon told me.

MR. STEELY: Objection, hearsay.

THE COURT: Okay, let's do this. We can't talk about what other people said. You can say there was a conversation with Dennis Nixon.

MR. ALLISON: Okay.

THE COURT: Okay.

MR. ALLISON: I'll try to ask my question more where I wouldn't elicit hearsay.

Q. (BY MR. ALLISON) Let me rephrase it this way. Were you at the March 13th meeting when Dennis Nixon came to Corpus Christi?

A. I didn't have notice, no, I was not there, nor did I have notice of that meeting.

Q. Okay. And did you review any of the paperwork in that late February, early --

(Cellphone ringing.)

MR. ALLISON: Can you-all hear that or is it just me?

THE COURT: No, we can hear it.

(Pause in proceedings.)

Q. (BY MR. ALLISON) Were you at -- have you reviewed any of the paperwork from the bank from IBC in that late February, early March time frame for the March 13th meeting with Dennis Nixon?

A. I need to see the document. I couldn't say.

Q. Okay. And what you do know, though, Plaintiff's Exhibit 5, that's a letter your counsel referred to a moment ago, is that right, during his questions of you?

A. Yes, sir.

Q. And go ahead -- go ahead and tell us the date of that letter.

A. March 3rd.

MR. BOYD: Doug, just so we have clarity, that's Bay 000953 email; is that right?

THE WITNESS: Yes, sir.

MR. BOYD: Okay.

Q. (BY MR. ALLISON) And go ahead and read that

March 3rd email is from who to who?

A. From Gus Barrera, our banker, to Rob Powers on March 3rd at 2:16. "Rob, hello. My boss, Dennis Nixon, would like to set up a meeting with the Board of Directors for Berry the week of March 13th. Please let me know what date would work best for the meeting. Thank you for your help. Gus Barrera."

Q. So the proposed meeting was going to be the week of March 13th, correct?

A. Yes, sir, yes, sir.

Q. Okay. It doesn't say which day during the week of March 13th, right?

A. No, sir.

Q. And it doesn't say a time, right?

A. No, sir.

Q. Would you agree that it's fair to characterize that as a request for a meeting?

A. Yes, sir.

Q. Sometime during that week?

A. Yes, sir.

Q. And have you ever seen any other email or text message or anything that confirmed a date or time for the meeting?

A. No, sir, I have not.

Q. For example, do you know if there's anything

out there that set the meeting for March 14 or March 15, or March 16 or March 17?

A. Not that I have seen, no, sir.

Q. Okay. So far as you know -- based upon the evidence that we have here, as far as you know, there was no specific date or time ever set for the meeting?

A. I know Dennis Nixon got on a jet and flew to Corpus for a meeting, so he must have thought there was.

Q. He must have thought there was, right?

A. Yes, sir.

Q. Okay.

A. And I never had notice, so if there's going to be -- I'm on the board of directors and nobody told me about it, so I really couldn't say one way or the other.

Q. Yeah. And Rob, from Mr. Powers' standpoint, that's who the letter is to or the email is to, right? Correct, sir?

A. Yes, sir.

Q. And he -- he would be the one to know if there was ever an actual meeting set up or just this request for the meeting; fair enough?

A. Yes, sir.

Q. Okay. And so if Mr. Powers testifies that it was never solidified which day of the week or what time they were coming, you would have no information to

disagree with that?

A. Other than Dennis Nixon showed up for a meeting.

Q. Obviously, Dennis Nixon thought it was on one day, and from the record, it looks like Rob has no information about which day of the week?

A. Well, I know I never got any inquiry about a meeting in this week, in this period.

Q. Yeah. And for all you know, Marty never got notice either because there was no date set?

A. No, I know Marty said he -- there was a meeting and he told me that in his office right after the board meeting.

Q. Yeah. Marty said there was a meeting, yes. After it happened -- I'm repeating what you said. After it happened, Marty knew there was a meeting, right?

MR. BOYD: Objection, mischaracterizes his testimony.

MR. ALLISON: That's exactly what he said.

A. No, Marty knew there was a meeting.

THE COURT: Overruled, that's overruled.

Q. (BY MR. ALLISON) When in compare -- and the meeting happened, or at least Dennis Nixon showed up on March 13th, we know that, right?

A. The day before the board meeting.

Q. And when were the --

MR. ALLISON: I am going to need Exhibit No. 8, which is Bates page numbers 894, and I'll use that page only.

MR. BOYD: 894?

MR. ALLISON: Yes. We'd offer Exhibit 8, Your Honor, modified to be that one page only, Bates page 894.

MR. ABSMEIER: Let me just check it very quickly.

MR. REASONER: Defendant's Exhibit 8.

MR. BOYD: No objection, Your Honor.

THE COURT: All right, it's admitted.

Q. (BY MR. ALLISON) Just so we can start working through some dates here, Lawrence, if you look, you can see that the date that Marty's and Dennis's notes were sent to IBC is on what date?

A. February 1st of 2023.

Q. Okay. And then Exhibit No. 11 already's been admitted. On February 10 which is after the -- excuse me, which is nine days after the notes, formal notes were provided for Marty and Dennis to the bank to IBC. On February 10th, what is this? I'll blow it up for you a little bit.

A. Thank you.

MR. REASONER: I'm sorry, what exhibit is this, Doug?

MR. ALLISON: 11.

MR. BOYD: Lawrence, if you need to get closer, with the Court's permission, you can walk over --

THE COURT: Yeah, you can. Can you see it or?

THE WITNESS: Yes, sir, I see it.

THE COURT: Okay.

A. I read it.

Q. (BY MR. ALLISON) Do you see that Exhibit No. 11, it's a letter from Gus Barrera, you said he's the president of IBC, right?

A. No, I think he's our banker here, I'm not sure what his title is.

Q. It's a letter to Mr. Powers, the CEO of Berry GP, right?

A. Yes, sir.

Q. It says, "The Berry GP, Inc., currently has a line of credit with our bank in the amount of $50,000,000. The line of credit has a maturity date of March 31, 2023." Have I read that so far correctly?

A. Yes, sir.

Q. "This letter evidences our commitment to renew

this line of credit to Berry GP, Inc., in the amount much $50,000,000." Did I read that correctly?

A. Yes, sir.

Q. It says "that it's subject to receipt and final review of the audit by RSM US LLP." Do you see that?

A. Yes, sir.

Q. Okay. So even after, even after IBC Bank got the notes from Dennis and Marty, it was after that date when IBC confirmed their commitment to renew the line of credit, right?

A. Yes, sir.

Q. And if you look at Exhibit 10, is that another letter from Gus Barrera to IBC Bank?

MR. BOYD: Doug, can you extend it?

A. Doug, you're going to have to blow that up, please.

MR. REASONER: He's trying to look at it from over there.

MR. ALLISON: Okay. Is that better?

MR. REASONER: Can you see it, sir?

Q. (BY MR. ALLISON) Can you see it, Lawrence?

A. Yes, sir.

Q. Okay. By the way, for Gus Barrera, it does say he's president and CEO of the bank; is that right?

A. Yes, sir.

Q. And on January 27, 2022, it says, "This letter," on the second line, "evidences our commitment to renew this line of credit to Berry GP, Inc., in the amount of $50,000,000." Do you see that?

A. Yes, sir.

Q. Okay. So in January and February, and February date after IBC's receipt of the letters --

MR. ALLISON: Okay, that's supposed to be January 27, 2023, or is this is the old one?

(Counsel conferring at counsel table out of court reporter's hearing.)

Q. (BY MR. ALLISON) But clearly, after the bank received the letters, if you look at Exhibit No. 11, after the bank received the letters, the loan notes from Marty and Dennis, IBC after that date, renewed the $50,000,000 line of credit, right?

A. But they didn't.

Q. They made their commitment to do it --

A. But they didn't.

Q. -- even though they had -- in other words, earlier you said that the fact that Marty and Dennis had put money into the company, made those loans, you said that's what caused the blow up with IBC, right?

A. I think, yes, absolutely, because Jim Klein said he spent it.

Q. But what we see when we look at the actual documentary evidence is that IBC Bank had the notes, and then after that date, wrote the letter renewing the line of credit, right?

A. It says, "They have the commitment to renew this line of credit."

Q. Right.

A. "Subject to audit."

Q. And we've gone over this, this is Exhibit No. 12, it's already into evidence so I'm not going to go through it again. This is the March 3 invitation for a meeting sometime during the week of March 13, right?

A. Yes, sir.

Q. And then we have the email string between Gus Barrera and I believe Rob; do you see that?

A. Yes, sir.

Q. And it looks like there's an older one in there, it looks like they must text each other, maybe, but from the one March 13th says, "Good morning, I'm picking up Mr. Nixon at the airport, assuming no delays, see you at 10:00 a.m., thanks." Do you see that?

MR. REASONER: Excuse me, could we get an exhibit number on that?

MR. ALLISON: Yeah, this is 15.

A. Yes, sir.

Q. (BY MR. ALLISON) And Rob says, "There are no board members here. They all had to go out of town on urgent business. I am here and happy to meet with him." Did I read that correctly?

A. Yes, sir. But reading it looks to me like there was a meeting.

Q. Pardon?

A. Reading that it looks like there's a meeting scheduled to me.

Q. Well, it looks like he said, "We landed, I'm picking him up and we're headed your way." Right?

A. Yes, sir, and he gives him a response, like there's a meeting.

Q. Okay. When you say -- it says what it says; fair enough?

A. Are you saying m-e-e-t?

Q. Pardon?

A. "I am here and happy to meet." There must have been one scheduled.

Q. Yeah, I mean, what do you want him to say, sorry, don't come over?

A. All I know is I'm a board member and Dennis is hoping to see him, I wasn't invited.

Q. And you don't know if Marty or Dennis were, or what the plan was, do you?

A. I couldn't say.

Q. Pardon?

A. I couldn't say.

Q. That's right. What --

A. I would have been there, though.

Q. Yeah. Okay. And do you know why it is that Rob didn't respond to the invitation for a meeting?

A. I can't imagine.

Q. Do you know why it is that Gus didn't follow up with another email that gave a specific date?

A. I wouldn't -- I don't -- I don't know any of that.

Q. Yeah. Do you know why, for example, Gus didn't write and say, we need to meet on March 15th at 10 a.m.? Do you know why he didn't do that?

A. Because the ball was in Rob's court.

Q. Pardon?

A. The ball was in Rob's court.

Q. Instead, obviously, Mr. Nixon thought there was a meeting and he came, and you know that to be true, right?

A. I know there was a meeting scheduled and he showed up and we weren't -- there was no Berrys there, I do know that for sure, I'm certain.

Q. Well, in fairness, what you told us earlier,

you don't know if there was a meeting actually scheduled, you just know there was --

A. There had to be a meeting scheduled, Dennis came in for it.

Q. Okay. In Dennis's mind there was a meeting scheduled?

A. Well, it says meet up there, and here's a request to Rob so.

Q. And then we know on that same day we have a text exchange where it's Robert. I assume that's Rob. "Just had a bad meeting with IBC Dennis Nixon. He came in attacking and cursing me and Jim, didn't end well." Do you see that?

A. Yeah. Whose this to?

MR. BOYD: Doug, what exhibit is this?

MR. BALDREE: What exhibit is this?

MR. ALLISON: 14.

A. And who are the parties?

Q. (BY MR. ALLISON) Pardon me?

A. Who are the parties?

Q. It's -- I'm going to speculate it's between Robert and somebody, okay?

A. Okay.

Q. We'll let him address that. He'll know better than you, right?

A. It says meeting there again, had meeting.

Q. But, I mean, confirm for us again, I think you told us, right, you don't know --

A. I couldn't say one way or the other, no, sir.

Q. You don't have any document or anything that confirms a date and a time of a meeting, right? You just know Mr. Nixon came in?

A. It says "meet" right there on your production.

Q. After the time, this was after the fact?

A. Okay. I've got -- there's a whole bunch of things. No, I couldn't say one way or the other, but there sure was a meeting.

Q. There was a meeting. He did -- Mr. Nixon came in and Rob met with him, right? And then the next or the same day they sent a letter of default, right?

A. Hell of a coincidence, isn't it?

Q. Pardon?

A. I said it's quite the coincidence, isn't it?

Q. Well, do you think Mr. Nixon, from this email, do you think he was -- it says he was attacking and cursing; do you think he was angry?

A. I'm sure Dennis was -- Mr. Nixon was disappointed that there was nobody there.

Q. Well, so cursing and angry would be disappointed and not angry?

A. I would say he -- I will say --

MR. BOYD: I would object, Judge, speculation.

A. -- that Mr. Nixon was --

THE COURT: Sustained.

A. -- was probably disappointed. I couldn't say what he was thinking.

THE COURT: Sustained.

Q. (BY MR. ALLISON) And do you think that it was more of an emotional or a knee-jerk response by Mr. Nixon?

MR. BOYD: Objection.

THE COURT: Sustained.

A. I couldn't say.

MR. REASONER: Sir -- sorry -- just wait when the Judge sustains.

Q. (BY MR. ALLISON) After all this happened with IBC Bank, what did you do?

A. What did I do? Start trying to get together packages to find a new lender.

Q. Yeah.

A. Called on everybody, the guys that we had teed up two years before to take it, tried to get all of them to come in.

Q. And namely, your bank up in Houston that you

went to?

A. I banked everywhere, but we had Regions approached a couple of years ago and went down that road for a while, Bank of America as well for the ABL line, the asset-based lending line.

Q. Didn't you go to Cadence Bank and try to set up a meeting for $100,000,000 line of credit?

A. Yeah, I went to every bank in Houston probably.

Q. Okay. So you were out trying to find a suitable line of credit if things continued to fall apart with IBC, right?

A. Yes, sir.

Q. You made an effort on behalf of the company?

A. Absolutely.

Q. And you know that Marty did the same with Frost Bank, right?

A. I believe so, yes, sir.

Q. And ultimately, you-all have consummated an agreement with Frost Bank, correct?

A. Yes, sir.

Q. And the terms of that Frost Bank agreement include a better interest rate than IBC's interest rate, right?

A. I couldn't say. I didn't get the terms.

Q. And also encumber less real property; you know

that, right?

A. Yes, sir.

Q. Because the IBC rate, or excuse me, the IBC loan encumbered all real property, including the ranches, for example, right?

A. Yes, sir.

Q. And the Frost Bank encumbers less of the Berry companies' real property, correct?

A. Yes, sir.

Q. And has the Frost Bank has also a more favorable interest rate, doesn't it?

MR. BOYD: Objection, asked and answered.

THE COURT: I'll allow it.

A. Yes, sir.

Q. (BY MR. ALLISON) Okay. And so, actually, even though there was this whatever happened with Mr. Nixon on March 13th that made whatever happen -- actually, the Berry companies and Berry GP have a more advantageous line of credit with Frost than they did with IBC, right?

A. If you want to look at one, just through one lens, you could say that. What about the impact over with all the vendors for this period when we wrote them, like it will take forever to get the pricing back competitive.

Q. And in that same time frame, you wanted -- you

actually contacted Gallagher, the attorney, right?

A. Mike Gallagher, sure.

Q. Yes. And you basically asked Mike Gallagher to call Tony Sanchez, right?

A. Yes, sir.

Q. And Tony, of course, is one of the founders of IBC Bank, right?

A. Yes, sir.

Q. And I believe the phrase is, "to rattle the sword a little bit," in other words, to be aggressive with IBC, right?

A. I don't think that's the case at all, see what was -- see if there was any movement we could get.

Q. Okay. So you hired a plaintiff's lawyer --

A. I didn't hire anybody.

Q. Well, you had a plaintiff's lawyer call on your behalf to the founder of IBC to put leverage?

A. I had one of my friends trying to help me and us.

Q. Okay. Is Gallagher a pretty well-known plaintiff's lawyer?

A. I believe Fisher Gallagher represented us in our -- in the company's biggest loss to date in the courthouse.

Q. They do commercial litigation, right?

A. Yeah. Well, Mike's a plaintiff attorney, but Fisher Gallagher was a big firm in Houston at one time.

Q. Yeah. They would be the kind of law firm that would sue IBC, if you wanted them to?

A. Yes, sir, could very well be the case.

Q. Okay.

A. I think Mike didn't call him. Mike called a friend of his to try and help us, not the other thing, not to sue anybody.

MR. ALLISON: That's all I have. Thank you, sir.

THE COURT: Whose up?

MR. HUSEMAN: Oh, I am.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. HUSEMAN:

Q. Mr. Berry, what I'm going to do is I'm going to take a few minutes with you, and I'm not going to hopefully spend too long on this, but I'm going to break into little bites and I'm going to tell you in advance what we're going to be talking about, okay?

A. Yes, sir.

Q. And the first thing, you understand that I represent Mike, don't you?

A. Yes, sir.

Q. I did until Mr. Reasoner graciously complied with my request to dismiss Mr. Rickett earlier this week, and I represented him as well?

A. Yes, sir.

Q. And so I want to talk to you a little bit about Mike Hummell and his position in this lawsuit. First of all -- and maybe we can agree on all of these things -- would you agree with me that Mike Hummell does not own any part of any of the Berry entities?

A. Yes, sir.

Q. He doesn't own Berry GP, none of them; he does not have a financial stake in the businesses we're talking about?

A. No, sir, not that I'm aware of.

Q. All right. He is not on the board of directors?

A. No, sir.

Q. He doesn't have a vote at the shareholders meeting?

A. No, sir.

Q. His compensation comes by way of a salary, I presume?

A. Yes, sir.

Q. And his job is the general counsel for Berry, isn't it?

A.   Yes, sir.

Q.   That means he's Berry's lawyer?

A.   Yes, sir.

Q.   I mean, when you have legal work to do, he's the guy you go to?

A.   If it's contracts and it's corporate, yes, sir.

Q.   All right.  And can you point to anything that Mike did or didn't do in relation to all of the things we're talking about here that was something about him personally as opposed to being a lawyer in the deal?

A.   Yeah, he didn't pick up the phone and call me and tell me this stuff was going on.

Q.   Okay.  How did that affect him financially?

A.   I couldn't say.

Q.   Yeah.  And the point I'm making on this, and I don't know that you disagree on it, but this is not Mike's company, he doesn't make the business decisions, he doesn't vote on it or any of that.  He's -- he's the lawyer, isn't he?

A.   Yes, sir.

Q.   Okay.  And the things that he did in this that regard you, it made -- in your pleadings, you had complaints about Mike did this, and Mike did that.  All of those were consistent with him being a lawyer, basically, representing the other side from you, right?

A.   He was partisan, yes, sir.

Q.   Right.  But he was an advocate, I guess that would be the lawyer way of saying it, he was an advocate for his clients, wasn't he?

A.   Some of them.  Are you saying with regards to the loans?

Q.   No.  With regard to the work that he did that you complained about it in the petition.  Can you point to any instance in which Mike was not acting as an attorney for the Berry entities?  In other words, would it point to something where you were working for Mike Hummell's financial interest, or something like that, anything other than being a lawyer?

A.   Not specifically, no, sir.

Q.   Okay.  All right.  I want to change topics here a little bit.  I want to talk to you a little bit about the bank loan.  I've been involved in banking personally for a long time, so this is of interest to me.

Is it your position that the loans that were made by your brothers to the company were insufficiently favorable to the company and should not have been entered into?

A.   No.  It is my position they should have been disclosed and I should have had the opportunity to participate.

Q.   Okay.  So you're not fussing about the terms of what was done, you're complaining about the fact that you didn't know about it; is that basically it?

A.   Yes, sir, but also, you'd have to say I'm not sure about the interest rate, I'm not even sure what the interest rate was originally.

Q.   Okay.  What is the interest rate on it?

A.   Prime, but some -- it's in the exhibits.

Q.   A quarter of a percent?

A.   Yes, sir.

Q.   And do you know anything -- do you know enough about financing?  Apparently, they do it at banks all the time.  Is prime plus a quarter percent a good rate or a bad rate?

A.   They say it could be -- yeah, it could be a good rate.

Q.   Yeah.

A.   It could be.

Q.   I mean, I can tell you our bank, if they offered corporate loans like that, there would be some questions asked.

MR. BOYD:  Objection, sidebar.

THE COURT:  Sustained.

Q.   (BY MR. HUSEMAN)  So if it's not a problem with the interest rate as far as the payment terms of the

loan, is there anything wrong with the terms of repayment?

A.   Absolutely.

Q.   Okay.  What is wrong with that?

A.   Well, you -- we -- they put in a bunch of money, didn't tell me about it, now there's a maturity date that's coming up, okay?  And on top of that, the numbers keep changing.  You can see from in here, and it just, A, it's poorly executed, it is, and it wasn't papered up properly at a contracting company.

Q.   Okay.  And you think the loans should have been payable at a different date?

A.   I'm saying that there's no -- this is not -- this is violating pretty much every business thing you would do.  And, by the way, I didn't have knowledge of it, Van.

Q.   If you don't mind, stick to what I'm asking you.  I know you want to tell your story.  But is there anything wrong with the due date on the note when it matures?

A.   Yes, sir, I don't know how we're going to pay it back.

Q.   Okay.  Is that a technical problem with the note, or is that simply a business decision?

A.   No, I'd say it's a technical problem with the

note. You would expect that.

Q. All right. And if you had been negotiating this note, what would you have set for the date?

A. I couldn't say.

Q. All right. Okay. And Doug touched on this a little bit. Can you name any piece of Berry property, real property or personal property, or anything else the value of Berry's that is secured as collateral for the loans that your brothers made?

A. Okay, one more time.

Q. Sure. You know what collateral is, don't you?

A. Yes, sir.

Q. And I'm encompassing all the collateral you can dream up: real estate, backhoes, whatever, money in the bank. Can you name one bit of collateral that your brothers got for the $75,000,000 of loan?

A. Well, I guess it would be everything that's not -- that's not -- that's not pledged to Frost.

Q. Have you seen any documents showing a security interest being granted to your brothers?

A. No, sir, but at the end of the day, if the company has the obligation and it's booked, then they have access to everything else that's left over that hasn't been pledged to a bank --

Q. Okay. And that would be --

A. -- including the operating entity in total, everything.

Q. That would be after a judgment, perhaps, a default, right, where they'd have a judgment against the company? I'm talking about the security interest, collateral what we're talking about?

A. No, sir.

Q. Would you agree there was one?

A. No, sir, I've not.

Q. Pardon?

A. No, sir, I've not seen anything.

Q. All right. Okay. And we have the issue about the subordination we talked about before. You've gotten the papers from this loan since this lawsuit got moving, haven't you? You've seen the papers?

A. Yes, sir, we've seen -- yes, sir, there's been some produced documents.

Q. They've been produced to you. It was produced to you, for example, the loan papers, the subordination agreements, the correspondence with the bank about the loan. You've seen that stuff, haven't you?

A. Yes, sir.

Q. All right. Now I want to change gears here a little bit with you. If I understood what you were saying before lunch under the guidance of your lawyer,

you talked about your sister-in-law not having adequate knowledge to act appropriately as the director; do you remember that?

A. Yes, sir, I said she didn't know.

Q. And then -- and I'm going to characterize this as being more shocking. And you then said your brother Marty was a liar, and basically, had committed perjury; is that also what you said?

A. Yes, sir.

Q. Okay. Let's take that and break it into pieces. First of all, you said in the affidavit where you said the loan had not been repaid, is it your position that the loan has been repaid and that the debt has been satisfied?

A. No, but it's moved, the numbers are different on the sheets.

Q. Okay. We'll come to that. But is it your position -- and maybe you can answer this with a yes or no. Is it your position that the loan has been repaid or not?

A. Looking at the balance sheet, a portion of it has, yes, sir.

Q. Okay. So the loan has not been fully paid, has it?

A. No, sir.

Q. All right.

A. Partially.

Q. Okay. Now let's change gears here a little bit. Since you had these documents involving this loan that is obviously is of some importance to you, I'm sure you read through the documents, didn't you?

A. Yes, sir, tried to.

Q. All right.

A. I did.

Q. Do you remember -- and I'm referring to the Bates stamp number 13 produced to our opposition here, which is a subrogation agreement signed by brother Marty. You've read that, I presume, didn't you?

A. I think I have, yes, sir, if you're talking about the one with Frost.

Q. Uh-huh, I am. That's the thirteenth document produced to you. And would it surprise you, Mr. Berry, to learn that the subordination agreement that was given to Frost talks about a note dated July 8th, 2022, which is the one you're talking about in regard to Marty, right? That's the note date?

A. I'm not sure about the dates.

Q. I think it is.

A. Okay.

Q. And in the original -- and I'm going to read

this to you.

MR. HUSEMAN: Maybe if I can approach?

THE COURT: You may.

Q. (BY MR. HUSEMAN) I'm going let you read this for everybody in the courtroom, and this is -- what's the Bates number down there?

A. 13.

Q. Okay. And this is subordination agreement and it's signed by whom?

A. Marvin G. Berry, Marty.

Q. That's Marty. And it talks about the note dated July 8, 2022, right?

A. Yes, sir.

Q. Now read to the Judge what the following words say?

A. "In the original principal amount including 45,000,000 with a current principal balance of 35,000,000."

Q. Right. And so, any deception about what was owed or something, certainly, the bank knew about it, and it was in the paperwork of the company, wasn't it?

A. Well, that's what it says there.

Q. Right. And so when you go call your brother Marty a liar and a perjurer, accusing him of all these things, it might be useful to ask you, did you ever talk

to Marty about this, this particular issue?

A. No, because he never called me to talk about any of this back in the day.

Q. Did you send him an email?

A. No, sir, I haven't.

Q. A written note, anything, to find out what was going on with that $10,000,000?

A. Just found out about it --

Q. Yeah.

A. -- after we filed the suit.

Q. So you didn't know at that time that he had given all of the money he had, including money reserved for taxes, and had an arrangement that he can get the money back to pay his taxes? Did you notice the date -- the date of that $10,000,000 debit?

A. No, sir, I did not.

Q. It was April. Does that have a significance to you in terms of finances?

A. I would assume it was a tax payment.

Q. Okay.

MR. HUSEMAN: Pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. STEELY:

Q. Mr. Berry, how are you? Clay Steely, on behalf of Rob Powers. I'm going to touch on about four to

maybe five topics, and I'm going to try to be brief, okay?

A. Yes, sir.

Q. First of all, there's been these terms that's been thrown around: owner, shareholder, all these kind of things. I want to clear the record up. Number one, you personally, individually, are not a shareholder of Berry GP, correct?

A. We'd have to take and unwind all that. Like I said, you'd need a flow chart to figure out how this works.

Q. Well, I got one, but answer my question if you can. Do you have a stock certificate where you are the shareholder of Berry GP?

A. I got stock certificates in my office, but I couldn't say. I don't recall right now. I couldn't say.

Q. Are you familiar with an entity called LDMA?

A. Yes, sir.

Q. LDMA is a partnership; is that true?

A. Like this is getting into accounting things, but yes, sir, I believe it is.

Q. Okay. And LDMA has a general partner and limited partners; is that true?

A. I don't recall, but probably should have, it's

a partnership.

Q. Well, partnerships don't have stockholders, do they? They've got partners, right?

A. Okay. If you say so. I know I own a third of this and I used to have shares so.

Q. But my question's a little more subtle.

A. Okay.

Q. LDMA is a partnership; agreed?

A. Yes, sir.

Q. And as a partnership, there are not stockholders, correct?

A. That is correct, I believe so.

Q. And matter of fact, the one-third you keep talking about is you have an interest in an entity called Becon, Inc.; is that true?

A. I'd have to have the flow chart.

Q. All right.

MR. STEELY: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. STEELY) Let me show you what was attached to your original petition.

MR. STEELY: And I only got a couple of copies, but you-all are familiar with this, you-all are the ones that sent it.

MR. BOYD: Let me see. It may be what I

have right here.

MR. STEELY: That's exactly what you got in front of you.

Q. (BY MR. STEELY) Let me show you what we're going to mark as Powers Exhibit No. 2. Are you familiar with that diagram, sir? Pardon me if I have to look over your shoulder, I don't have very many copies. Seen that before?

A. It looks like one of those Peat Marwick and Main messes, yes, sir.

Q. When you approved the original petition that was filed in this case, this was attached. Did you approve that to be attached?

A. I assume I did.

Q. Are you familiar with that document?

A. I don't remember it specifically, but I get what it says.

Q. You'll agree with me that it shows at the top there is a partnership, LDMA, correct?

A. Yes, sir.

Q. And you'd also agree with me that there's a general partner named Becon, Inc., correct?

A. Oh, okay, yeah. Yes, sir.

Q. And that is the entity, Becon, Inc., is the entity, that according to this document, that you have a

one-third interest in; agreed?

A. I got a one-third interest in everything at 1414.

Q. Okay. But I'm asking you about what the document is that you-all filed down in Harris County shows?

A. Yes, sir, that's what it shows.

Q. Thank you. Now, this same LDMA limited partnership agreement.

MR. STEELY: May I have this?

Q. (BY MR. STEELY) Have you read the partnership agreement, sir?

A. I'm sure I've looked at it at some point in time.

Q. Do you have a copy of it?

A. No, sir, I do not.

Q. Can you cite for me the provision of the partnership agreement that gives you the authority to file a lawsuit on behalf of Berry GP?

A. No, sir.

Q. Let's shift gears. This idea about information exchange. There was this list that you-all pointed to on Plaintiff's Exhibit No. 12, let me see, let me see. If you have it up there, I don't need to approach. But this is the April 18th request from information from

Lawrence Berry to Robert Powers. Do you remember that --

A. Yes, sir.

Q. -- discussion?

A. Yes, sir.

Q. Now, this happened about the third Tuesday of April; agreed?

A. Yes, sir.

Q. You never took this list to the next shareholders meeting, did you?

A. Everybody was copied.

Q. That's not my question, sir. When you didn't get the answers to your question in April, did you take this to the next meeting, the May meeting and say, "Where's my information?"

A. I've asked in open forum numerous times, so yes, I don't know if I had it with me or not, but I did ask about it.

Q. Okay. Did you do it at the June meeting?

A. I've been asking for this information, both of which I haven't received all the way to now.

Q. Okay. But this is the only written piece that has been presented by your side where you're asking for this information; you'd agree with me? Where's all the other emails? Don't have them, do you?

A. No, sir, not handy.

Q. All right. Berry loans, I'm going to be brief about this. Do you want to unwind those loans?

A. Do I want to unwind the loans that --

Q. Yes, sir.

A. I don't even know where the money was spent.

Q. That's not my question, sir. If you had a magic wand and you say everybody else is an interested director, I'm the guy that gets to make the decision, you want to say, give the money back, we got to give the money back?

A. Absolutely.

Q. That's what you want to have happen?

A. If it didn't impact the company, of course. We're back flush like we were before IBC, yeah, that's all I could ask.

Q. The flush part aside, I'm trying to find out what you want to have happen to these loans. That's what I'm trying to find out. Do you want the company to have to --

A. I'd like see --

Q. -- their money back?

A. -- to see them paid back, absolutely.

Q. You'd like to see the brothers --

A. Without impacting the business.

Q. I apologize. Your brother's estate, you'd like to see that money paid back and wipe it clean?

A. Yeah, absolutely.

Q. To shift gears on you a little bit, Van touched on this a little bit. For the IBC or the Frost loans, if I asked you questions about interest rate, collateral, subordination and guarantees, you're just not in a position to give me all those details, correct?

A. No, sir.

Q. And you haven't done any independent analysis that when those instruments were entered into at that time frame, whether those were good deals or bad deals; agreed?

A. I think we didn't have enough options to -- yes, I agree with that, yes.

Q. I haven't seen that you-all have identified an expert in this case that says, I'm the guy that keeps up with the T bills, I think that's the example that you used, and says, these were good loans and they were bad loans. That's just not what you do and you don't have anybody here to say anything about that today, correct?

A. That is correct.

Q. You know something interesting, are you familiar with the bylaws -- I'm shifting gears -- the bylaws of Berry GP; have you read them?

A. Yes, sir.

Q. They're attached to your petition that was filed over in Houston; do you remember that?

A. Yes, sir, I'm familiar with the -- with the --

Q. You'd agree with me that there's nothing in these bylaws that prohibits Rob Powers, my client, from taking the actions that he took that you've complained about as he gets to manage and operate --

A. I don't agree with that at all.

Q. -- a $100 million company day to day?

A. I don't agree with that statement at all.

Q. Tell me what provision --

A. Okay. I think whenever my banker sends a message says that, hey, I want to see the owners in a meeting and it's not conveyed to me, that's a breach, man.

Q. Not conveyed or otherwise. You've already testified you don't know if a meeting was ever scheduled or not scheduled; you'd agree with me? Somebody sending a meeting request --

A. There's a meeting. If Dennis Nixon flies into town on his jet to come see us, there's a meeting, dude.

Q. Well, then shame on Dennis Nixon --

A. Yeah, unfortunately, we -- we needed him, unfortunately.

Q. I mean, maybe it was a miscommunication on both sides. What do you think?

A. Could be.

Q. Could be. But you don't know?

A. I know I was excluded.

Q. All right. But besides that, these other things that we've been talking about, the entering of the loans, the things like that, just as a day-to-day business matter, is there anything in the bylaws you can point me to that says the president and the CEO doesn't have those powers?

A. Yeah, but he's got to disclose them to his directors.

Q. Okay. Let's put disclosure aside for now because we've had a lot -- I'm not going to go back through --

A. Well, here, we've never let employees make the decisions on the banking or the assets.

Q. So is it --

A. Okay.

Q. Is it your testimony that every time a banking relationship is entered into, that the board is the one that makes that decision versus the president and CEO?

A. Yeah, it's pretty much say so. It's only happened two or three times.

Q. The last thing I want to touch on is concept of not being invited to participate in the Berry loans. If someone else takes the stand and says that's absolutely not true, you were told that and you were invited, is that person a liar?

A. Absolutely.

MR. STEELY: I think that's all I've got for now.

MR. BOYD: Redirect, Your Honor?

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. BOYD:

Q. Mr. Berry, do you have Exhibit 7 available, please?

A. Yes, sir.

Q. All right. I want to go back to what Mr. Allison was talking to you about on why the bank canceled or noticed the default, the IBC default of the Berry; do you recall that?

A. Yes, sir.

Q. Okay. We talked about this briefly, but clearly, counsel for IBC in Exhibit PTX7 in the paragraph that starts, "For reasons unknown to us," they are very concerned that the meeting was unilaterally canceled, correct?

A.   Yes, sir.

Q.   And so this lawyer for IBC is clearly putting in a letter that there was a meeting, correct?

A.   Yes, sir.

Q.   All right.  What conclusion did IBC draw from the failure of the board of directors to show up at the meeting?

MR. ALLISON:  Your Honor --

Q.   (BY MR. BOYD) It's in the next sentence?

MR. ALLISON:  -- I'd object to speculation.

THE COURT:  I mean, he can read from a document certainly.

MR. BOYD:  And that's what I'm asking.

A.   "Timely reporting of" --

MR. BOYD:  Hang on.

THE COURT:  No, that's fine, he can read from a document, otherwise, it's speculation.  But if it's in the document and it's a piece of evidence, he can certainly read from it.

Q.   (BY MR. BOYD) From the second sentence, "We are left."

A.   "We are left to believe that the financial condition of the borrowers has gotten even worse as my client has yet to receive the required financial statements for the quarter ending January 31st of 2023,

or the detailed financial information requested by Mr. Barrera.  Timely reporting of accurate financial information has been a recurring problem."

Q.   Okay.  So clearly, the failure to meet, the failure to provide information that they requested is being highlighted here as the problem?

A.   Yes, sir.

Q.   All right.  As it relates to the what we call the Berry loans, the first time that you were invited to participate was after this lawsuit was filed?

A.   Yes, they wanted a do-over.

Q.   All right.  I'm going to go back to questions that Mr. Steely asked you.  He showed you the detailed list that you sent to Rob Powers requesting information?

A.   Yes, sir.

Q.   Do you remember that?

A.   Yes, sir.

Q.   And then he questioned you were there any other emails?

A.   There are.

Q.   Because he hadn't seen them; do you remember that?

A.   Yes, sir.

Q.   All right.  And there are emails and I'm going the show these to you, PTX20, 21, 22, and 23 (sic).

COURT REPORTER:  Mr. Boyd, I think you already have an Exhibit 23.

MR. BOYD:  Thank you.  They just pointed that out.

Q.   (BY MR. BOYD) Here's 20, 21, 22.

A.   Yes, sir.

Q.   And I'm going to ask you to review all three of those while I give those to counsel.

MR. STEELY:  Are those 21, 22, 23?

MR. ABSMEIER:  Yeah.  20 is -- the one that's marked Exhibit J is 20.  Exhibit K is 21.

MR. STEELY:  Hold on, hold on.

MR. ABSMEIER:  Exhibit K is 21 and L is 22.  These were attached to one of our motions a few weeks ago.

MR. STEELY:  Okay.  There's only two of them?

MR. ABSMEIER:  Should be three, J, K and L.

MR. STEELY:  J, K and L.

MR. BALDREE:  K may be behind the J.

MR. STEELY:  K is?

MR. ABSMEIER:  K is 21.

MR. BOYD:  Let me know when you guys are ready.  Are you ready?

MR. ALLISON:  Yeah.  We can follow up and

you'll get us some redacted copies, I guess?

MR. BOYD:  We can talk about that later, but yes.  Right now, they're redacted.

MR. ALLISON:  And I just want to make sure in terms of, they showed up with some new things this morning.  I think the only new thing we have are the stock certificates for Berry GP.  I just want to make sure what the goose gander rule is in effect or however you want to handle that.

MR. BOYD:  I'm sorry, what rule?

MR. ALLISON:  The goose gander.  You don't hang out with old lawyers?

MR. ABSMEIER:  Your Honor, these were filed about two weeks ago when we had the hearing on our motion for protective order.  These were attachments to it.

MR. ALLISON:  There's been some new stuff, but that's, I think it was earlier, too.  I'm just inquiring, are we -- we're not objecting to timeliness, right, with the TI hearing?

MR. BOYD:  I'm not making any agreements related to geese and ganders and such, but I'm sure they'll be some quid pro quos as we go along.

MR. REASONER:  We do not object to anything that you have offered so far as we've been able to see

206

it on your computer.

MR. HUSEMAN: You may not be goosing and gandering, but you are ducking, right?

MR. STEELY: And I don't know if there's an outstanding discovery request anyway. So you get to use whatever --

THE COURT: I usually use that goose and gander thing when there's drug testing involved in a case, whether it's a family law, or a criminal case. Usually family law, right, when it's like both sides -- one side asks for a drug test, and then I say, all right, goose and gander, and they both get the drug test.

MR. ALLISON: All I learned is when they start doing it, you got to call goose gander then, because you wait, then all of a sudden, the rule changes.

THE COURT: Well, I mean you know, a judge calls balls and strikes, but if nobody objects, then none -- the judge does nothing.

All right. So where are we?

MR. BOYD: Your Honor, I'm on Exhibit 20.

THE COURT: 20.

Q. (BY MR. BOYD) Mr. Berry, have you had a chance to review this?

A. Yes, sir.

Q. All right. Is this indeed an email from you to Mr. Klein and Mr. Powers requesting information?

A. Yes, sir.

Q. All right. I'm going to go to 21. Well, first off, on 20, the date of that is June 14th of 2023?

A. Yes, sir.

Q. All right. If you'll go to 21, please, sir?

A. Yes, sir.

Q. Is that another information request that you sent to Mr. Powers, Marty Berry, and Dennis Berry?

A. Yes, sir.

Q. And the date is what?

A. July 7th.

Q. Of 2023?

A. Yes, sir.

Q. Okay. And we go to 22. Is this yet another information request that you sent this time to Rob Powers?

A. Yes, sir.

Q. And the date of this is?

A. July 21st.

Q. 2023?

A. Yes, sir.

Q. All right.

MR. BOYD: At this time, plaintiffs would offer PTX20, 21 and 22.

THE COURT: No objection?

MR. ALLISON: Your Honor, we'd just object because they're incomplete, and I just really, I don't know they've blacked out things. And if you look at it, usually, the response email is above the, so I just --

THE COURT: So what's your objection, legal objection?

MR. ALLISON: That it's an incomplete document and therefore -- so the easy low hanging fruit is that it's hearsay probably, but.

THE COURT: Well, it is hearsay.

MR. ALLISON: Yeah, but the --

MR. BOYD: I have several responses, if I may?

THE COURT: I'm listening.

MR. BOYD: Okay. Number one, they're redacted because that's what's important to us, so it's attorney-client.

Number two, as to your hearsay objection, he opened the door, right, in the direct examination.

And number three, it begs the question, why haven't you-all produced this?

THE COURT: Well, I mean, honestly, we

don't address one another.

MR. BOYD: I'm sorry.

THE COURT: Okay. But -- so you say he opened the door so -- okay. Sorry, do you want to make another?

MR. BOYD: No, I've made my argument.

THE COURT: Okay. Well, as to that it's -- it's over --

MR. BOYD: I'm sorry.

THE COURT: Well, it sounds like your co-counsel is whispering something --

MR. ABSMEIER: Your Honor, I think it's not hearsay because it's a request for information, it's a verbal act which takes it out of the hearsay -- out of the hearsay rule. It's also admissible for notice to the -- to the defendant that he was requesting this information which is exactly what's at issue.

MR. BOYD: And it's also admissible because he opened the door by impeaching him --

THE COURT: Well, look -- okay, look, I mean, if it -- I'll allow it in only for the purposes of rebutting his questioning, so, I guess, yeah.

MR. BOYD: Thank you.

COURT REPORTER: For clarification, what is the --

THE COURT: For clarification, 22, 21 and 20 are admitted for the purposes of, I guess, rebutting his cross-examination.

What else?

MR. BOYD: Very few things, Your Honor.

Q. (BY MR. BOYD) Lawrence, you remember the affidavit that Martin signed --

A. Yes, sir.

Q. -- that we talked about? It mentioned the company being strapped for cash?

A. Yes, sir.

Q. Were you ever consulted about Marty taking $10,000,000 of the company's cash out of the company?

A. No, sir, I was not.

MR. BOYD: Pass the witness.

THE COURT: Recross? Mr. Allison, I mean you're up.

MR. ALLISON: I understand.

MR. HUSEMAN: Could we have five minutes?

THE COURT: Yeah, we can take a short break.

MR. STEELY: If we take a Court break, how is the Court's preference looking?

THE COURT: We end at 5.

MR. STEELY: Thank you very much.

THE COURT: It doesn't look like we're finishing today. That being the case, maybe we should coordinate with my court manager before she sneaks out and we happen to be in here at 5:00. She may or may not be there. Don't you think?

MR. REASONER: Good idea, Your Honor.

(Recess.)

THE COURT: Are you ready?

MR. ALLISON: We're ready.

MR. REASONER: We're ready.

THE COURT: Okay. Well, are we done with Mr. Berry?

MR. ALLISON: We gave them the heads up, we'll pass on the record. I was going to give you heads up before the jury came in.

MR. HUSEMAN: I have one exhibit which is titled H1, it's sitting there right in front of you.

THE COURT: Oh, yeah, yeah.

MR. HUSEMAN: And the other side has a couple of copies of it, and I've given your court reporter a copy. They've agreed, I think, to allow it to be admitted.

THE COURT: Okay.

MR. BALDREE: Do you-all have objections to H1?

MR. REASONER: No objection.

THE COURT: Okay.

MR. ABSMEIER: No objection.

THE COURT: Well, it's admitted.

MR. STEELY: And we're going to do H2, 3 and 4, that's these two Rule 11 Agreements and that one page we talked about, instead of questioning over and over. I'm all for that.

THE COURT: Anybody --

MR. BALDREE: No objections.

THE COURT: All right. They're admitted.

(Brief recess.)

MR. ABSMEIER: Can you read those into the record?

MR. STEELY: Yeah, so Hummell 2 is going to be Bay 1511. Hummell 3 is going to be Bay 1754 through 1755. And then I guess this is Hummell, 1, 2, 3, 4. It's Bay 1535 through 1536.

MR. ABSMEIER: Agreed, no objection.

THE COURT: Okay. Then they're admitted.

Okay. So Mr. Berry is off the stand. I guess, call your next witness. Let's get as much work done as we can.

MR. REASONER: We would like to call Marty Berry as an adverse witness, please.

MR. ALLISON: And just while we're on the record, yes, we pass in terms of further questions of Lawrence. I know he's going to be here and be available. I don't anticipate recalling, but we pass just to facilitate the timing.

THE COURT: Okay. Come forward.

(Oath administered.)

THE COURT: All right. You may proceed.

MR REASONER: Thank you, Your Honor.

MARVIN BERRY,
called as an adverse witness, having been first duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. REASONER:

Q. Good afternoon, Mr. Berry.

A. Howdy.

Q. And I'm going to -- since we've never met, I'm going to call you Mr. Berry, but when I say Mr. Berry, I'm referring to you; fair enough?

A. That be fine.

Q. Bay is a family company, is that a fair statement, sir?

A. I'd say it's fair to say.

Q. And as I understand the history, the predecessor of Bay was founded by your father and

another gentleman around the early '50s, is that a fair --

A. 1953.

Q. '53, yes, sir. And as I understand, his vision -- I never had the pleasure of meeting the man, but his vision was that his sons would run the company after his death; is that a fair statement?

A. No, sir.

Q. All right. So what was his vision for who would run the company, in your view, sir?

A. His wife would run the company.

Q. All right.

A. He left it to her.

Q. Okay. And did she run it for a time?

A. Yes, she did.

Q. How many years did she run it for?

A. I couldn't recall that.

Q. Two, twenty, forty? Just no idea?

A. Could be 10, I'm not sure exactly how many.

Q. All right. So for the -- but the last 20 years, plus, it's been you, Dennis and Lawrence; is that correct?

A. And Ms. Berry.

Q. And your mom has stayed involved?

A. Yes, she has.

Q. Is she still active now?

A. She's still -- she's somewhat active, but not in the same capacity.

Q. My understanding is she's in her 90s but still sharp as a tack; is that a fair statement?

A. That would be true.

Q. I want to cut right to it, sir. As I understand it, you and your brother Dennis loaned a substantial sum of money each to Bay in the early part of July of 2022; is that correct, sir?

A. I'm not a hundred percent on the date, but that be true.

Q. And what was the reason for that -- those loans being made?

A. Financial stress on the company.

Q. All right. I think you had indicated in an affidavit that the company's need for cash was so extreme that you and your brother made these loans; is that right?

A. I can't speak for my brother.

Q. Okay. Well, you didn't pick up on what his motivations were at that time?

A. I didn't, I didn't make the loan at the same time.

Q. Oh, well, that would be a good thing to

clarify. What was the delta in time between your loan and your brother's loan?

A. Could have been 24 hours, could have been a week, I'm not sure about that.

Q. You just don't have any idea?

A. I -- I don't have a recollection of that at this time, but I know it wasn't at the same time.

Q. Okay. And you and Dennis discussed it?

A. I didn't discuss it with Dennis till he brought it up to me.

Q. Okay. So Dennis was the one who raised the issue with you of putting the money in?

A. No, sir, I didn't state that.

Q. State what happened. How did the loans come about?

A. By being at the office every day, I understood how complex the situation would get and we had more and more vendors calling, things were getting later and later, and we needed to shore up our company so it was time to put some money in. I walked in and offered money to Mr. Powers, the CEO, and he took it quite quickly.

Q. Okay. And that, and independently, your brother also walked in and offered money?

A. Yes, I guess he did it independently.

Q. Because you didn't discuss it with him?

A. I did discuss it with him.

Q. Before or after you did it?

A. Well, I'm talking -- let's talk about -- are you talking about my loan or his loan?

Q. Well, both. I guess, if you could just tell the Court your discussions with Dennis about the loans before they were made.

A. Dennis came to me and said, "I think we need to put some money in the company." I said, "I just did it." He goes, "Well, I'm going to do the same, I think I'm going to put 20." I said, "Put more." And that was pretty much it.

Q. All right. Okay. And, sir, if you -- I'm going to hand you what's been previously marked as December 4 -- Defendant's 4. You guys have copies, too. Do you have Defendant's 4?

A. I believe I do.

Q. These are copies of your loan and your brother's loans; is that correct?

A. No. I'm sorry.

Q. Maybe you don't have it?

A. It says Defendant's Exhibit Hummell 4.

Q. Oh, not -- that's not it.

A. Not it.

Q. I'm going to mark a new exhibit, sir, just to keep it clear of what I'm talking about. By the time we're done we'll have a lot of copies of these promissory notes.

MR. REASONER: Plaintiff's Exhibit 27.

THE COURT: Is this one for me?

MR. REASONER: Yes, Your Honor.

THE COURT: Okay.

MR. REASONER: Plaintiff's Exhibit 28.

Q. (BY MR. REASONER) All right. Sir, Plaintiff's Exhibit 27 is a promissory note is between you and the company; is that right?

A. That's correct.

Q. And as I understand what was said during opening argument, this was prepared many months later, maybe February of the following year; is that right?

A. I'm not sure on your date, but that's correct.

Q. It's consistent with your recollection that it was many months later?

A. Correct.

Q. And so at the time it was just a handshake between you and Mr. Powers, or how did it work?

A. That's it.

Q. All right. And the amount that you loaned was $45,000,000 at that time; is that correct?

A. I believe that's correct.

Q. And in looking at it, if we could look at Plaintiff's Exhibit 27, it says that under Terms of Payment down about three-quarters of the way down, "Interest shall be accrued monthly beginning July 31, 2022, and payable upon maturity. The note is due and payable in full December 31, 2024." Do you see that, sir?

A. Yes, I do.

Q. And that -- and as I understand it, that indicates that no payments were going to be due at all till the end; is that what you understood?

A. Yes, I did. Didn't want the stress of the company anymore.

Q. And was this that was memorialized many months later, was this consistent with the terms that you and Rob Powers agreed to in his office orally?

A. It's consistent with it, yes, it is.

Q. So when you-all first talked about it, you agreed that nothing would be owed under it until the end of December 2024, correct?

A. Actually, the end date probably we did later. I can't recall that.

Q. All right. But at some point --

A. I planned on putting the money in as long we

needed, that was the deal.

Q. Okay. And you indicated that the company wouldn't have to pay anything on it until some point down the road?

A. Absolutely.

Q. And you understood, sir, during your experience in business, that this was a loan from an insider and that you were a board member, right?

A. It was a loan from an owner, absolutely.

Q. And you knew that that's not something you could negotiate the terms of with yourself, right?

A. I didn't.

Q. Okay. Because you were -- in fact, you were on -- you had interest on both sides of that transaction, right?

A. Well, if you think this is the super money making note, you might have to do some -- go into finances a little bit. It's not. This wasn't made to be advantageous for the guy loaning the money, which was me and my wife. This loan was made to help our company survive.

Q. Okay, sir. And that wasn't my question, and we can talk about that in a minute. But my question was, you understood that you were involved on both sides, that is, you are a director of the Bay Company and

subsidiaries, right?

A. Uh-huh, that's correct.

Q. Yes? And that however generous you might have felt you were being, you -- this was an obligation for the company to pay you money, correct?

A. That would be true.

Q. All right. And the rate on the note, if we go down about three-quarters of the way down, it was prime -- JP Morgan prime plus a quarter, correct?

A. That's correct.

Q. All right. And do you follow the prime rate? Do you read the *Wall Street Journal*, keep up with things like that?

A. I'm not.

Q. Okay.

A. This is probably equal to 5 point something.

Q. All right, sir. Well, let's see. And would it be consistent with your recollection that in say July of -- July 28, 2022, that the JP Morgan prime rate was 5.5 percent; does that sound about right to you?

A. It sounds fair enough, yes.

Q. Okay. And so adding .25 to that it would be 5.75; is that right?

A. Sounds correct.

Q. Okay. And just for comparative purposes

looking at -- all right. So if you put your money now, for example, in a two-year treasury, you'd only get 4.2 percent; does that sound right to you?

A. I haven't looked at one.

Q. Okay. Do you invest in treasuries?

A. I do not. I invest in our company.

Q. All right. Would it surprise you to know, based on your investment experience, that prime plus a quarter percent is better than what you can get on a two-year treasury?

A. It wouldn't surprise me either way. I know it's a better deal. This is a better deal than IBC had with us.

Q. Okay.

A. For the company.

Q. Before revolver banker?

A. Yeah.

Q. Yes, sir.

A. Uh-huh.

Q. Okay. And we'll talk about that.

And then looking at Exhibit -- Plaintiff's Exhibit 28, sir, which I think is before you, that's -- as we talked about, that's your brother Dennis's loan, correct?

A. Looks to be, yes.

Q. And these loans were not approved at any board meeting, were they, sir?

A. Not that I'm aware of.

Q. And you would be -- as a member of the board, you would be if they were approved at a board meeting, correct?

A. Missed one -- missed one meeting since we started.

Q. And you have no reason to believe that it was at that meeting that you missed that these were approved?

A. No, sir, I do not.

Q. Okay. And is it your position that sometime around the time these loans were made that you discussed them with your brother Lawrence?

A. I -- no, I didn't discuss it. I didn't discuss them with Lawrence, I didn't discuss them with Dennis. I thought this was a private deal. If they wanted to go invest, they knew the condition of the company, and Dennis did come forth and talk to me, I told you that already.

Q. All right, sir. But for your part, you personally did not ever discuss these loans with your brother Lawrence?

A. No.

Q. All right, sir. Let me ask you now. So look at what has been previously marked as Plaintiff's Exhibit 2. And I hope that's before you in the stack.

MR. REASONER: May I approach, Your Honor?

THE COURT: Yeah, go ahead.

Q. (BY MR. REASONER) Sorry, we've made a bit of a mess of it over the course of the day here. If you'll give me just a second. There we are.

All right, sir. Do you have Plaintiff's Exhibit 2 before you?

A. Yes, I do.

Q. And if we look at the second page of the document and you see that that's the first email is from Tonja Fulghum to Mr. Klein, Jim Klein?

A. First one's from Klein to Tonja.

MR. REASONER: Oh, and I apologize. I'm starting out slowly on admission of documents. I'd offer Plaintiff's Exhibit 27 and 28, please.

THE COURT: Anybody over here object?

MR. ALLISON: Are they the ones up there?

MR. REASONER: They're the ones that I already talked about, the two notes.

MR. ALLISON: That's fine.

THE COURT: All right. Hearing no objection, they're admitted.

Q. (BY MR. REASONER) Back to Plaintiff's Exhibit 2, sir. I apologize for the interruption. But did you indicate that you could see on the second page, there was a email to Tonja Fulgham to Jim Klein on December 21, 2022?

A. I don't know how you know that, but I'll take your word for it.

Q. Okay. Well, do you see the -- and it -- it's a sad statement on my life that I've looked at many of these. But if you look at the bottom of the front page, do you see it at the bottom there it says, "From Tonja Fulghum"?

A. Oh, okay, yeah, I didn't see the bottom. I got it. It's two pages.

Q. Yes, sir.

A. Okay.

Q. And that it appears to be sent September 21 of 2022, correct?

A. I'm sure that's correct, yeah.

Q. All right.

A. Yes, sir.

Q. And if we go the second page where it carries over, it's going to Mr. Klein and Mr. Powers with a copy to Lawrence Berry. Are you with me there?

A. Uh-huh.

Q. Yeah, I'm sorry, she can't -- we can communicate, "uh-huh" --

A. Yes, sir.

Q. -- but she can't take that down. Thank you.

You see there that Ms. Fulghum asked for a copy of the current P&L and balance sheet and financial information; do you see that inquiry?

A. Yes, I do. Yes.

Q. And then, if we go to the front, you see that Mr. Klein sends that along on the same day?

A. Yes.

Q. Okay. And then if we go to the third page of the document about three-quarters of the way down, do you see that you can -- that the reader can see an entry there, "Notes payable related party 75,590,920." Do you see that? I'm sorry, it's about three-quarters of the way down it's under "Liabilities and Equity" along the Combined and Consolidated Balance Sheet for the period ending July 31, 2022; are you with me there?

A. Yes, I am.

Q. And do you see, as we go down under Liabilities and Equity, maybe about 10 entries down, "Notes payable - related party 75 plus million." Do you see that?

A. Yes, I see that note. Yes, I see that note.

Q. Okay. And as a reader -- I take it you're a

reader of your company's balance sheets, with some regularity, aren't you?

A. From time to time.

Q. Yes, sir. And that entry was a reference to the loans from you and Dennis Berry to the company; true?

A. I'd have to assume that.

Q. All right. And "related party," you and -- that's a notation that you and Dennis Berry were both board members, correct?

A. I'd have to assume, yes.

Q. Okay. And the 590,000, was that interest that had accrued or what was -- do you know what that --

A. I do not know.

Q. And then let me ask you, sir, to look at Plaintiff's Exhibit 1, and I can help if it's not easily identifiable in your stacks there.

A. One page?

Q. It's a one-pager, yes.

A. Got it.

Q. And this is one that's cut off on over two pages so we're going to start at the bottom again. Do you see that Mr. Powers sends a -- sends an email on January 11, 2023 to Lawrence Berry saying, "Is this what you're looking for?" Do you see that, sir?

A. Yes, I found that.

Q. All right. And if we go up to the -- the front page, and we're one up from the bottom on January 16, do you see that Lawrence Berry responds, "No, the paperwork for the $75,000,000 related party receivable on the Berry GP books." Do you see that?

A. Yes, I do.

Q. And Mr. Powers' response there above, "Okay, that is not executed yet to my knowledge. I will follow up and see if it's signed yet." Do you see that?

A. Yes, I do.

Q. And, in fact, that was accurate, nothing had been signed up as of that time, right, to your knowledge?

A. I believe that's probably correct.

Q. And when we saw that they were ultimately signed, he was the signatory on behalf of the company, right?

A. Yes, he was.

Q. Because you couldn't sign and it wouldn't be much of a promissory note if you signed in both your capacity as a director of the company and as a lender, right?

A. I believe that answers itself, yes.

Q. All right. Okay. And then, you see that in

response about the middle of that first page, Mr. Berry says, "I know nothing about any of this." Do you see that?

A. Now -- now, earlier you told me I was Mr. Berry, so now you're talking about Lawrence?

Q. Fair.

A. I'm confused.

Q. Fair. I'm going to blame it on the hour of the day.

Now, you --

A. Yes, I see that.

Q. Okay. So let me ask a clean non-Berry ambiguous question. This is an email from Lawrence Berry in the middle of the page to Mr. Powers and he says, "I know nothing about any of this." Do you see that?

A. Yes, I do.

Q. And to your knowledge at that time, that was true that Lawrence Berry didn't because you hadn't had any discussions with him about it, correct?

A. To my knowledge, at that time, I wouldn't know one way or the other if he hadn't, if he talked to somebody else.

Q. All right.

A. We make company loans -- we make loans without

the board's knowledge, so that while he would even have to find out that way or know if he's got financials, he'd find out. There's other loans in the company, you-all haven't even talk about them here, with other institutions today.

Q. Okay. But this is a biggie from two of the directors, right, they're big loans?

A. They're all big, yes, sir.

Q. Okay. When you say they're all big, you're talking about the loans from banks and things?

A. Of course.

Q. All right. But you didn't feel like there was any need for you to notify a fellow director that you had personally made a substantial loan to the company, correct?

A. No, I did not.

Q. All right. But looking at the top of the page, do you see that Mr. Klein says to Mr. Powers, "It would be a payable. I would think Marty or Dennis would have mentioned the loans." Do you see that?

A. I do see it.

Q. Okay. But for your part, you have not?

A. I have not.

Q. Okay. And just -- sorry, sir, to close that loop there on, if you'd get Exhibit 1 in your hands

again, Plaintiff's Exhibit 1, just at that top exchange between Mr. Klein and Mr. Powers, we don't have any response from Mr. Powers saying, oh, I told Lawrence, or anything like that, do we?

A. I don't see any on this paper.

Q. Okay. Sir, I'm going to hand you a new document here and ask you about the relationship with IBC.

MR. REASONER: May I approach, Your Honor?

THE COURT: Yes, sir.

MR. REASONER: Plaintiff's Exhibit 29, PTX29.

THE COURT: All right.

Q. (BY MR. REASONER) Sir, I've handed you what's been marked Plaintiff's Exhibit 29; do you see that this is a February 24 letter from IBC's Gustavo Barrera to Rob Powers; is that correct?

A. That's correct.

MR. REASONER: I'll offer Exhibit 29, Plaintiff's Exhibit 29 into evidence.

MR. ALLISON: No objections, Your Honor.

THE COURT: Okay. Hearing no objection, it's admitted.

Q. (BY MR. REASONER) And just so we're clear, I've heard reference -- do you know Mr. Barrera and Dennis

Nixon?

A. Yes, I do.

Q. Okay. And I see Mr. Barrera here is president and CEO and he's in Corpus, and then, Mr. Nixon was in Laredo; is that right?

A. That's correct.

Q. What was the hierarchical relationship with -- who was up the chain between the two, how'd that work?

A. Well, I believe the largest stockholder is Mr. Nixon and he's also chairman of the board. And then, this would be his local representative. I think they probably have a lot of presidents and CEOs at the different banks.

Q. So he was the president of the Corpus --

A. Gustavo was, yes.

Q. Yes, okay, fair enough. And as I understand it, Bay had had a relationship, a banking relationship over some 25 years with IBC Bank; is that right?

A. That is correct.

Q. And then looking at this letter that we have before you now, Plaintiff's Exhibit 29, you see that in that first paragraph there is a commitment to renew the line of credit; is that right?

A. That's correct.

Q. And it does say, "Subject to our receipt and

review of the final audited financials," right?

A. That's correct.

Q. Which would have for the period ending October 31, 2022, correct?

A. That is correct.

MR. REASONER: May I, Your Honor?

THE COURT: Absolutely.

Q. (BY MR. REASONER) I'm handing you Plaintiff's Exhibit 30. Looking at Plaintiff's Exhibit 30, can you take a moment to orient yourself, sir, and see that this contains the audited financials for the period ending October 31, 2022?

A. I believe that to be true.

Q. All right. And we see as we go to -- and I'm just going by these Bates numbers at the bottom, about the fourth page the Bates number ends in 603. You see that it's signed by RSM out of San Antonio, correct?

A. I'm not sure that's a signature, but yes, whatever that is.

Q. Whatever that is. It's their stamp or whatever?

A. Yes, sir.

Q. All right. And they were your auditors, correct?

A. That's correct.

Q. And this is the day after the letter that we just saw in Plaintiff's Exhibit 29 from IBC; is that correct? Did you compare the dates?

A. I'm going to do that if I can find it. I can take your word for it.

Q. Well, no, no.

A. I mean, how do you do that?

Q. Let's walk through it. If we go, first, to orient us, do you still have Plaintiff's Exhibit 29 handy?

A. Right here.

Q. Yes, sir. And that's February 24 --

A. 24th, right.

Q. Okay. And then the stamp or the audit letter accompanying the financials from RSM is dated February 25, the day after?

A. All right. On the last page, yes, that's correct.

Q. All right. And then if we go, please, sir, to the page Bates number Bay 620, 000620. And tell me, when you're with me there, sir.

A. I'm there.

Q. All right. And if we go about three-quarters of the way down the page you see it says, "Two unsecured notes payable to related parties with monthly interest

payments at New York prime rate plus 0.25%, maturing December 2024, $75,000,000." Do you see that, sir? It's probably easiest if you just look at the numbers on the right-hand column and find 75,000,000, then you see the text to the left of it?

A. Yes, I see it.

Q. And that's -- those related party notes are, again, your and Mr. Dennis Berry's loans, correct?

A. Seems to be, yes.

Q. And then, if you could, look at Plaintiff's Exhibit 5 which should still be in front of you.

MR. REASONER: Oh, and I'm sorry, Your Honor. If I could offer into evidence the financials, PTX30?

MR. ALLISON: No objection.

THE COURT: All right. Hearing none, it's admitted.

Q. (BY MR. REASONER) And we're back to PTX5.

A. I have it. Thank you.

Q. Oh, good. And you've heard folks -- and you've been in -- by the way, you've obviously been in the courtroom while Lawrence Berry was testifying, right?

A. Uh-huh.

Q. Yes, sir?

A. Yes, sir.

Q. Okay. And you see here that this is what was talked about earlier, which is an email from Gustavo Barrera to Mr. Powers on March 3rd, 2023, indicating that his boss Dennis Nixon would like to set up a meeting with the board in the week of March 13. Do you see that?

A. Yes, I do.

Q. And do you recall this being shared with you, sir?

A. This email, no, sir.

Q. Okay. Let me ask, do you recall Mr. Powers or anyone sharing with you the fact that the head of IBC wanted to meet we the directors of Bay?

A. Yes, I do.

Q. Okay. And how does -- who told you that?

A. Mr. Powers, CEO.

Q. And how did you respond?

A. I said that's not good.

Q. Okay.

A. He's only been here, you know, great relationship, 20 something years, but he only came down one time, so I assumed it wouldn't be good.

Q. So you'd not never had any meetings prior to this March of 2023 time frame, Mr. Nixon had never come?

A. No -- yes, one time.

Q. Oh, I'm sorry, he had come one time before?

A. Yes, 1997.

Q. Okay. And what was --

A. Good on keeping up with customers.

Q. What was the purpose of that visit?

A. To tell us to sell all these assets and how to run our company.

Q. All right. And was that -- was that issue -- I take it from your tone, I take it you didn't agree with that advice?

A. No, he's a very egotistical man. It was -- I -- did we take his advice? We did not take his advice.

Q. Yes, sir. And so, but I take it that given that the relationship continued long after 1997, I gathered that you-all got past the fact that you didn't want to follow his advice?

A. It -- he's not in the construction business so. But we -- obviously, it was kind of as long as he stayed away, everything was great. We had Mr. Shockley down here locally, he was a fantastic banker and we had a good relationship.

Q. Okay. And then, so my point is that the 1997 meeting did not lead to a break up or fracture in the relationship?

A. Not at all.

Q. Okay. And so when you said it was not good, did you discuss with Mr. Powers dates in which you would be available to meet with Mr. Nixon?

A. I did not.

Q. Why is that?

A. It didn't come up.

Q. So he -- well, I guess I'm trying to understand that, in light of what you said earlier, which is that Mr. Powers conveyed that Mr. Nixon wanted to meet with the Bay directors; is that right?

A. Mr. Powers' exact words was "Dennis Dixon wants to come down and have a meeting," and I said, "That's not good," that's all, just it was my opinion.

Q. Okay.

A. And that was it.

Q. Okay. And so Mr. Powers didn't say, When are you available, or can -- will you meet with him or --

A. Not that I recall.

Q. Okay. So -- well --

A. Normally, if you were going to have a meeting with the board of directors, it will be on the board of directors meeting, that's when we've done it always before, so if anybody was coming to meet with us, that's when we meet.

Q. Did you suggest that Mr. Powers, that why don't

we have --

A. Of course not, he's CEO.

Q. Okay. Sorry, sir. I know it's late in the day, but for the court reporter's benefit, and so we can hear and understand each other, if you'd make sure I'm finished with my question.

A. Sure.

Q. I'll make sure you're finished with your answer.

My point was, when you heard from Mr. Powers that Mr. Nixon wanted to meet, did you suggest inviting him to a board meeting?

A. No.

Q. Did you suggest anything to facilitate a meeting with him?

A. No.

Q. Okay. Just said, that's not good, right?

A. That was it.

Q. Okay. Did you have any conversation with Lawrence Berry about the request that Mr. Nixon had made for a meeting?

A. I had a conversation with no one else.

Q. All right.

A. No one else.

Q. All right. And then, if we look, sir, it's

already been marked as Defendant's Exhibit 15, it's a text exchange. I can come help you if it's not handy.

MR. REASONER: May I, Your Honor?

THE COURT: Yeah, come on up.

MR. REASONER: You'd think a text message would stand out there.

THE COURT: Plaintiff's Exhibit 15?

MR. REASONER: Defendant's 15.

THE COURT: All right.

MR. ABSMEIER: I have copies.

MR. REASONER: That might quickest if you've got a copy, Mike, you can hand the witness and we can.

MR. ABSMEIER: Bay 1819. I've written Defendant's 15 on it.

Your Honor, do you have a copy of that? It doesn't have a sticker.

THE COURT: It doesn't look familiar, but I'll -- I'll put Defendant's 15.

MR. REASONER: That might have been the one that was only on the screen.

MR. BALDREE: It was just on the screen.

THE COURT: Yeah. Okay. All right.

MR. REASONER: Doug, we're going to put a hard copy in for you.

MR. ALLISON: Thank you.

MR. REASONER: So Defendant's Exhibit 15.

THE COURT: So you're moving to introduce this?

MR. REASONER: He already did but --

THE COURT: What's your exhibit number and I'll just write it down here for my demonstrative?

MR. ALLISON: I think it's 15. It's one I --

THE COURT: Oh, okay.

MR. REASONER: I don't have a hard copy.

THE COURT: Oh, okay.

MR. REASONER: Defendant's Exhibit 15 and it was previously admitted.

MR. ABSMEIER: They're going to provide a stickered copy later, Your Honor.

THE COURT: Cool.

MR. REASONER: And I'm sorry, you-all produced it. Was this -- Doug, was this from Ron Powers' phone? That's my assumption.

MR. ALLISON: I believe that's my assumption as well. I'll bet you he can help you there. I know Rob can, you can try with him.

MR. REASONER: Oh, I know, but I'm asking you produced it, I thought you'd know.

MR. ALLISON: I got the document probably the same day you did so.

MR. REASONER: Okay.

Q. (BY MR. REASONER) I'm going to represent to you that there is a loose assumption that this is from Rob Powers' phone, but he has not testified so we'll find that out. But do you see that it's an exchange with Gus Barrera, the bottom half of the page being March 13; do you see that?

A. Yes, I do.

Q. And looking at this, you see that he says, "I'm picking up," on the morning of March 13, "I'm picking up Mr. Nixon at the airport. Assuming no delays, see you at 10 a.m. Thanks." Do you see that?

A. Yes, I do.

Q. And then it says, "Okay, there are no board members here, they all had to go out of town on urgent business. I am here and happy to meet with him." Do you see that?

A. Yes, I do.

Q. All right. And were you -- on the 13th of March, were you out of town on urgent business?

A. I was in -- I guess I was out of town.

Q. On urgent business?

A. I was looking at a job in Galveston.

Q. Okay. And did you know that Mr. Nixon was coming to town?

A. I did not.

Q. Had no information about that?

A. Never, never scheduled.

Q. All right. Did you call Mr. Nixon to figure out what the mix up or confusion was?

A. No, I did not.

Q. Did you attempt to go see him in Laredo?

A. Did not.

Q. Okay. Did you do anything to try to address the fact that the chairman had flown in from Laredo where apparently he thought there was a meeting and was apparently angry that none of the directors was there?

A. So, I'm sorry, could you restate your question?

Q. Yes, sir. I asked, we know that Mr. Nixon showed up thinking there was a meeting of the directors, with the directors, right?

A. Yes.

Q. We know from Mr. Powers that he was upset that no directors were on hand, right?

A. Yes.

Q. And we know that you had not told Lawrence Berry that Mr. Nixon had requested a meeting as you heard from Mr. Powers, right?

A. That's correct, nor anybody else.

Q. Meaning, nor did you tell anyone else?

A. That's what I testified to earlier, yes.

Q. Okay. So you didn't tell Dennis Berry either?

A. No.

Q. Okay. And I'm asking, you said you didn't call Mr. Nixon, didn't try to go to Laredo, you didn't do anything to try to repair whatever damage was done to that relationship at that time, right?

A. No.

Q. All right, sir. And then let me ask you to look at --

A. Can I ask you a question? Did you hear my answer to that question?

Q. You said no?

A. You said I didn't do anything is what you said, right? So I said no.

Q. Ah, well I --

A. That's what you said. I just want to make sure you understand.

Q. Yeah. Well, no, that's fair and I appreciate it. So we were in sort of a double negative mode is the point.

A. Uh-huh.

Q. And I appreciate that. So let me ask a better

question.

What did you do, if anything, to try to repair the relationship with Mr. Nixon?

A. I tried to talk him off the cliff but he couldn't stop getting over the fact that his man that worked for him all those years, the CEO and president here locally didn't tell him the truth that he didn't have a meeting, and he just kept screaming about the meeting. And finally, I told him I had to get off the phone.

Q. Okay. So you said you hadn't called him, so this was him calling you?

A. About a minute after he walked out of the meeting.

Q. Okay. And he was very upset and you were trying to tell him that his guy had screwed up and not actually scheduled a meeting?

A. I was trying to tell him a lot of things. It was very confusing when he called me because I didn't know why the heck he was calling me. I took the call immediately, I said, here's Mr. Nixon calling, let's see what he wants and I took the call. But all he could talk about is you didn't show up to the meeting. I said, we didn't have a meeting, and never heard of a meeting, nothing was ever said. But he was plenty upset

216

and I finally told him, I'm sorry, I'm driving and I can't, you know. And he started wanting to go over the financials and all the things that were wrong, and you know, I just had that letter of the 24th that you showed as one of the exhibits here, so I was -- I was confident we were going to have a line, but I knew when we hung up the phone his little feelings were hurt and I figured it was over with at that moment because he was plenty upset.

Q. And he was kind of chewing you out about some of the issues with the financials and otherwise?

A. Mostly just not showing up to his meeting.

Q. Well, you indicated he started going into the financials?

A. Then he went into the financials.

Q. Okay. And he had some concerns about some of those issues; is that correct?

A. That's correct, just --

Q. Did you have any other conversations or make any other efforts to try to address that fracture in the relationship?

A. I did not.

Q. Let me ask you to look at Plaintiff's Exhibit No. 6, please, sir.

A. Have we talked about it yet?

Q. It's been marked. You and I have not talked about it, sir.

A. Okay. I'm just making sure it's in this pile.

Q. It should be PX6. I do not have that, see that there?

THE COURT: I've got one is this what you're talking about?

MR. REASONER: Yes, yes, exactly.

THE COURT: Do you want to borrow that?

MR. REASONER: Oh, I hate to take yours, Your Honor.

THE COURT: That's all right.

MR. REASONER: Appreciate it, Your Honor.

Q. (BY MR. REASONER) And, sir, I've handed you the Judge's copy actually of Plaintiff's Exhibit 6. Do you see that this is a letter from a law firm representing IBC?

A. Yes.

Q. And you recall receiving that?

A. I don't recall receiving it, but I've seen it, yes.

Q. Okay. And that -- this was a notice of default that was fairly sent out by certified mail the same day of the meeting; is that correct?

A. It seems I was right, wasn't I?

Q. What were you right about, sir?

A. About the fact that I figured that it was going to be the end of our relationship.

Q. Yeah, it sounds like you were correct, sir.

And -- but do you recall there was back and forth that took place in order to try to extend the line of credit in time so that you could find another lending source?

A. Absolutely.

Q. Okay. And were you kept abreast of those discussions?

A. Yes, somewhat, I made myself.

Q. I'm going to hand you what has been marked as Plaintiff's Exhibit 31. If I can take 6 back from you and we need to replace the court reporter's as 6. We'll find it. And here's 31, Your Honor.

THE COURT: Okay.

MR. REASONER: Sorry. Plaintiff's Exhibit 31.

Q. (BY MR. REASONER) In these negotiations, sir, about the possibility of extending for six months -- well, let's -- Exhibit 31, do you recall seeing this? This is from IBC's lawyer dated March 28th, 2023, and it lays out there at the middle of the page, "Subject to the following revised framework, we now propose an

extension of the reference loan for six months to October 1, 2023 in order to allow your client to secure alternative financing." Do you see that, sir?

A. Yes, I do.

Q. And do you recall looking at this list of conditions that they laid out?

A. I'm sure if I read it closely I'd recall every one of them but.

Q. Okay. So you say you think you had a familiarity with what they were requesting?

A. I felt like I have, yeah.

Q. Okay.

A. Yes, sir.

Q. Can we go to 7 on the list, please, sir, which is on page Bay 119. Do you see that it says, "All shareholder debt (including the $75,000,000 debt owing to Berry family members) must be subordinated to all indebtedness now or hereafter owing to the Lender by any of the Borrowers, and no payment whatsoever may be made on that subordinated debt until such indebtedness has been fully satisfied." Do you see that, sir?

A. I did.

Q. All right. So as I read that, they were demanding that it be subordinated and that there be no payments made the company on the loans to you and Dennis

Berry; is that correct?

A. I believe that's true.

MR. REASONER: Your Honor, I'd like to offer Plaintiff's Exhibit 31 into evidence, please.

MR. ALLISON: No objection.

THE COURT: Okay. Hearing no objection, it's admitted.

MR. REASONER: If I can quickly get through these two last exhibits, I'll be at a stopping point, Court's indulgence.

THE COURT: Okay.

MR. REASONER: Plaintiff's Exhibit 32.

MR. ALLISON: 32?

MR. REASONER: 32.

MR. ALLISON: If he's offering it, no objection.

MR. REASONER: I would like to offer it.

THE COURT: All right. Then it's admitted.

Q. (BY MR. REASONER) Sir, and this is a letter from Mr. Simank. I may be mispronouncing it.

THE COURT: Simank.

MR. ALLISON: Simank.

Q. (BY MR. REASONER) Oh, Simank. I apologize. I haven't met the gentleman. He was Bay's lawyer, right?

A. I believe, yes.

Q. I'm sorry?

A. Yes, that's true.

Q. And he sends a letter here on March 30 responding to IBC's lawyer; true?

A. Yes, that sounds correct.

Q. All right. Let's look, on the second page you see he responds to the item by item list, correct?

A. Correct.

Q. And on item No. 7, which is the request that it be subordinated and no payments be made, do you see the answer is "Response - Berry rejects the condition." Do you see that?

A. Yes.

Q. And is that consistent with your recollection that Bay rejected that condition? It actually says --

A. I really don't remember that we rejected it, but I'm looking at it here. I have to assume that we did.

Q. Okay. You don't have any reason to disagree?

A. Nah, no reason to disagree.

Q. And ultimately that, as you've alluded to that, 25-year relationship was not reparable; is that correct? Well, it did not -- let me ask a better question. You didn't come to an agreement on an extension, didn't you, or did you?

A. I believe we did come to an agreement on an extension.

Q. Okay. But it was just an extension so you could find someone else --

A. I don't know banking laws, and you're talking about an extension, and I don't think you do either, but when people get told, you got a loan, and then the next day they tell you, you don't have a loan, they weren't not going to give us the extension. It didn't make a difference. We also said we wouldn't personal guarantee. And there were a lot of things we rejected here. That a bank with the upper hand would have told you, okay, we're not making the loan. Oh, no, problem. They did extend it. Of course they extended it. They didn't have a choice but not to extend it.

Q. All right. But when we say -- just so we're speaking the same language -- they extended it for a limited period of time so that you can find some other company to borrow from, correct?

A. Absolutely.

Q. And let me ask you to look now, sir, at --

MR. REASONER: Actually, this is a good stopping point, Your Honor.

THE COURT: Yeah, it's about time. Okay. We've got a time to come back. We'll see you-all then.

MR. ALLISON: Thank you, Your Honor.

MR. BOYD: Thank you, Your Honor.

MR. REASONER: Are we reconvening on March the 8th?

THE COURT: On the 8th, that's it.

MR. REASONER: At 9 a.m. or?

THE COURT: Yeah, 9 a.m., same kind of thing.

(Proceedings adjourned.)

THE STATE OF TEXAS          *

COUNTY OF NUECES            *

I, Sara E. Rivera, Official Court Reporter, in and for the 94th District Court of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof, or offered into evidence.

WITNESS MY OFFICIAL HAND, this the 21st day of February, 2024.


/s/ Sara E. Rivera
SARA E. RIVERA, Texas CSR 4626
Expiration date:  04/30/2024
Official Court Reporter
94th District Court
901 Leopard Street, Room 901.01
Corpus Christi, Texas 78401
361-888-0658
Email:  sara.rivera@nuecescountytx.gov

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rosa Brennan on behalf of Barrett Reasoner
Bar No. 16641980
rbrennan@gibbsbruns.com
Envelope ID: 94874370
Filing Code Description: Answer/Response
Filing Description: Defendants Response to Motion to Remand, Dismiss, or Transfer Venue
Status as of 12/3/2024 2:15 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |
| Douglas Allison | 1083500 | doug@dallisonlaw.com | 12/3/2024 11:47:08 AM | SENT |
| Alistair Dawson | 5596100 | adawson@beckredden.com | 12/3/2024 11:47:08 AM | SENT |
| Michael Hummell | 10271100 | hummellm@bayltd.com | 12/3/2024 11:47:08 AM | SENT |
| Michael McClellan | 24109525 | jmcclellan@beckredden.com | 12/3/2024 11:47:08 AM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |
| Madeline Gay | | mgay@beckredden.com | 12/3/2024 11:47:08 AM | SENT |
| Business Court 11A | | BCDivision11A@txcourts.gov | 12/3/2024 11:47:08 AM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 12/3/2024 11:47:08 AM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 12/3/2024 11:47:08 AM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 12/3/2024 11:47:08 AM | SENT |

# EXHIBIT 7

E-filed in the Office of the Clerk
for the Business Court of Texas
12/3/2024 11:55 AM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                    )        IN THE DISTRICT COURT
Individually and                   )
Derivatively on behalf             )
of BERRY GP, INC.                  )
                                   )
    Plaintiff                      )
                                   )
BERRY GP, INC.,                    )        94TH JUDICIAL DISTRICT
    Normal Plaintiff               )
                                   )
VS.                                )
                                   )
MARTY BERRY, ROBERT RICKETT;       )
ROBERT POWERS;                     )
MICHAEL HUMMELL;                   )
BERRY GP, INC.; BERRY              )
OPERATING COMPANY, LLC;            )
and BERRY CONTRACTING, LOP         )        NUECES COUNTY, TEXAS

_____

TEMPORARY INJUNCTION HEARING

(March 22, 2024)

_____

---

INDEX TO WITNESSES

MARCH 22, 2024                                               PAGE

MARTIN MARVIN BERRY (Continued - Adverse)
    Cross-examination (cont) by Mr. Reasoner......   13
    Direct examination by Mr. Allison.............   61
    Cross-examination by Mr. Huseman..............  126
    Recross-examination by Mr. Reasoner...........  139
    Redirect examination by Mr. Allison...........  150

JAMES A. KLEIN
    Direct examination by Mr. Boyd................  202
    Voir dire examination by Mr. Allison..........  245
    Direct examination (cont) by Mr. Boyd.........  246
    Cross-examination by Mr. Allison..............  257
    Redirect examination by Mr. Boyd..............  262
    Recross-examination by Mr. Allison............  262

TONJA FULGHUM
    Direct examination by Absmeier................  264

* * * * * * * * * * * * * * * * * * * * * * * * *

---

APPEARANCES:

MR. BARRETT REASONER
SBOT NO. 16441980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDTREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
Houston, Texas
Telephone: (713) 650-8805

    AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas  77002
Telephone: (713) 589-8744

    AND

MR. DOUGLAS A. ALLISON
SBOT NO. 01083500
Law Office of Douglas Allison
403 North Tancahua Street
Corpus Christi, Texas  78401
Telephone: (361) 888-6002

    AND

MR. VAN HUSEMAN
Huseman Law Firm
615 North Upper Broadway, Suite 2000
Corpus Christi, Texas 78401
Telephone: (361) 883-3563

    AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas  78411
Telephone: (361) 887-4700

* * * * * * * * * * * * * * * * * * * * * * * * *

---

P R O C E E D I N G S
March 22, 2024

            (The following transcription is a
            continuation of proceedings held on
            February 16, 2024)

        THE COURT:  Okay.  We're back.

        MR. ALLISON:  Good morning, Your Honor.

        MR. REASONER:  Good morning.

        THE COURT:  All right.  Part two.

        MR. ALLISON:  Your Honor, I don't know how you would like to proceed.  I think the things that are set today, we filed a motion to dismiss, you remember we had some issues about defective parties, so we filed what we think is the appropriate motion to dismiss and got that set for hearing.  They filed a response, we filed a reply.

        THE COURT:  All right.

        MR. ALLISON:  And then we also have a notice for today, the continuation of the --

        THE COURT:  Of what we already started.

        MR. ALLISON:  Of whatever we started, the TRO.

        THE COURT:  The TRO.

        MR. ALLISON:  And -- and the reason I say whatever is left of it, I think when we talk about the

motion to dismiss you'll hear, at least me, talk about how they really abandoned a lot of their positions, and so I think we need to really understand what we're here about today. However, and -- and all of that is, I think, good prelude to whatever we do today, Your Honor.

THE COURT: Okay.

MR. REASONER: Okay. Your Honor, from our perspective we're happy to argue anything, any time the Court wants to hear it. As the Court will recall, we're in the middle of a witness now, we'd like to continue with that. Frankly, their motion - not to dive into the merits of it at this moment - but is basically saying we think we win. We think for these evidentiary --

THE COURT: I mean, it's -- it's almost --

MR. REASONER: -- reasons --

THE COURT: -- almost the same thing.

MR. REASONER: So we think closing, you know, after both parties put on their evidence, we should argue that and we're happy to do it, but interrupting, you know, our presentation of witnesses, we don't think is justified.

THE COURT: No, I agree. We'll finish with that. I mean, it's almost -- it's -- it's part and parcel of the same thing.

MR. ALLISON: And I don't -- I -- I hear

that the -- on some issues yes, and on some issues, no. And the thing I want to be real careful of and however you want to proceed I'm going to listen, the thing I want to be real careful of is remember that the original -- we're not just here on a application for TRO or for TI, we are here because we went up to Houston and we entered into what -- what we thought was a much shorter agreement, much more limited agreement. I understand Your Honor said, "No, you're going to live by it," we've been living by it, okay.

THE COURT: Fair.

MR. ALLISON: But we've got this agreement issue out there, which means everything that's in that original TI - which now they've amended it, they've abandoned most of it - and everything that's in the -- their motion to modify the TI, most of which they've abandoned, all of those things, we have an agreement that we need you to rule on those to release us from --

THE COURT: Well, I hope we finish today.

MR. ALLISON: Yeah. Well --

THE COURT: I mean, I hope.

MR. REASONER: We're ready.

THE COURT: Look, I don't have anything else today.

MR. ALLISON: Okay.

THE COURT: This is it, all day long.

MR. ALLISON: Yeah.

THE COURT: Okay, so I hope we finish today.

MR. ALLISON: You're getting my point. We need a ruling, not just on -- on what we're here on --

THE COURT: I'll give you a ruling.

MR. ALLISON: -- now.

MR. REASONER: Not just for the TI, Your Honor.

THE COURT: No. I --

MR. REASONER: So, we're ready.

THE COURT: I intend to -- I intend to put this piece of the case to bed today.

MR. ALLISON: Okay.

THE COURT: Okay? That's my plan.

MR. ALLISON: Got you.

THE COURT: We don't have anything else.

MR. ALLISON: Okay.

THE COURT: I don't have a plea, I don't have anything else all day long.

MR. ALLISON: Okay.

THE COURT: Okay? So, you know, I mean, I will say this: After the last -- after -- after the last hearing, well, I guess it's the same hearing, but

after we recessed I went through, because it seems to me that your -- your position is that you want two things: You want -- you want me to restrain them from removing Mr. Berry from the board, that's one; and then two, you want this notice before you sell property, or before property is sold, so that he gets two weeks' notice. Now, as I read through the bylaws, and then there was the addendum, I saw that there is a procedure for removing a board member, okay? So, I will tell you, I'm un-inclined to interfere in that procedure that's already written.

I will also say that I saw, and I may have missed it, okay? I may have missed it, but I saw that there is a procedure for acquiring property; in the bylaws, there is a procedure written. I did not see a procedure for selling property. Now, I may have missed it, I may have missed it. And if there is such a procedure, well, then you guys point it out to me. I don't know, okay? And so to that effect, you know, I mean, I'll listen to what you've got to say about it because, you know, you -- you filed your motion, we're having a hearing, but I'm just telling you that I'm un-inclined to interfere with something that has a procedure written in the bylaws. I'm not saying "No," I'm just saying I'm very un-inclined.

MR. REASONER: And, Your Honor, I -- I hear the Court loud and clear. I think we believe that it is appropriate here, within the Court's equitable power, in a situation where we have -- we've started to show and we'll continue to show the Court what's been done here to freeze Lawrence Berry, you know, an effective one-third owner of the operation from all information and that there is inside --

THE COURT: Yes.

MR. REASONER: -- so that keeping him within the Court's equitable power is ordering that he at least be kept on the board, so he has that level of information, that that is warranted here and will avoid irreparable --

THE COURT: I --

MR. REASONER: -- harm to Mr. Berry.

THE COURT: I will listen. I'm just -- I'm just giving you my thoughts.

MR. REASONER: Understood, Your Honor.

THE COURT: As I've heard already a lot of testimony at some -- at this point. I've already heard testimony and I've looked through the bylaws and then the addendum.

So, with that, I guess let's continue on and then after we're done with that, we will take up

your motion to dismiss. But it's, you know --

MR. REASONER: All right.

MR. ALLISON: Because we --

MR. REASONER: We had Mr. Marty Berry on the stand. Sorry.

MR. ALLISON: Yes, Your Honor. We -- we do think, just in direct response, what they're asking for now is totally different than what they originally asked for, with regard to sell real estate. They -- originally they said -- their pleading was, and which is where we made our agreement, that their pleading was we can't sell real estate unless Lawrence, a one-third person, approves it. So, they wanted minority rule. They've now changed that completely. The first time that changed, now they're -- now, you're right, now they're saying they don't want that -- that veto power, they don't want to require approval, they want two weeks' notice.

THE COURT: That's what I thought.

MR. ALLISON: That's what they're saying now.

THE COURT: That's what they're saying, right?

MR. ALLISON: That's what they're saying now.

MR. REASONER: Well, before the last TI hearing, Your Honor, that's not changed, Your Honor.

MR. ALLISON: That's what they're saying now. And the point is they've completely changed the relief. They've gone from, we want a minority rule, we want the Judge to order that I have -- that Lawrence has to approve it; now they're saying they want notice. And we've -- we've responded -- I mean, there's nothing to --

THE COURT: I mean, I -- I'm going to get there.

MR. ALLISON: Yeah, we'll get there when we get there.

THE COURT: We'll get there.

MR. REASONER: Okay. And, Your Honor, just to be clear, that -- that was the same relief before this TI hearing, when it began.

THE COURT: Got you.

MR. REASONER: We have -- we have narrowed it from our TRO days because we're trying to put something in place that is protective but least invasive so -- till we try this case, and I think there is more than abundant justification for it.

THE COURT: I'm listening.

MR. REASONER: All right. Thank you.

THE COURT: So I guess, Mr. Berry, come on back. Get back on the stand. You're still under oath.

COURT BAILIFF: Please make sure your phone is on vibrate.

THE COURT: And watch your step.

COURT BAILIFF: And watch your step right there, sir.

THE COURT: We don't want anybody falling.

MR. REASONER: And, Your Honor, we'd like to invoke the rule, please.

THE COURT: Okay. All right, the -- the rule is invoked. Obviously the parties are -- are excluded, their spouses. Is there anybody else here that's a witness? I mean --

MR. HUSEMAN: He's a party.

THE COURT: He's a party.

MR. HUSEMAN: Yes.

MR. ALLISON: Yeah, Mr. Klein is here and he is represented -- he is a representative for one of the entities, Your Honor. I know that that's -- I forget which one.

THE COURT: Okay.

MR. HUSEMAN: GP.

MR. BOYD: For which one?

MR. ALLISON: For Berry GP.

THE COURT: Okay. Well, then I guess he gets to stay there too, but if there are any other witnesses that --

MR. REASONER: I'll take your word for that.

THE COURT: -- that happen to walk in --

MR. ALLISON: Yes, Your Honor.

THE COURT: -- the rule is invoked.

All right. So go ahead, continuation.

MARVIN MARTY BERRY
having been previously duly sworn, called as an adverse witness, testified as follows:

CROSS-EXAMINATION
(Continued)

BY MR. REASONER:

Q. Good morning, Mr. Berry.

A. Good morning.

Q. If we could look, sir, at Exhibit 10, Plaintiff's Exhibit 10, it should be among the exhibits that have already been introduced there in front of you. Do you have that before you, sir?

A. Yes, I do.

Q. Thank you. This is an excerpt, as I understand it, from the general ledger of Berry GP that was produced by your counsel. Do you recognize that format, sir?

A. I don't, but it -- if that's what it is.

Q. Okay. You have no reason to doubt that's what it is?

A. Not at all.

Q. And do you see that this document shows that on April 11th, a principal payment on the loan from you to the company - that we've talked about - was made to you in the amount of ten million dollars?

A. Yes, I do.

Q. And that's consistent with your recollection that you received ten million dollars around this time, April 11th --

A. Yes --

Q. -- 2023?

A. -- it is.

Q. All right. And if we could -- if we could get back in our rhythm of making sure we're not talking over each other, for the Court reporters's benefit.

And if we look back for a moment, sir, if you could look at 32, Plaintiff's Exhibit 32. That was the letter, just to orient you, that was the -- the letter from the Berry entities' lawyer in the negotiation with IBC that we saw on March 30, 2023. Are you with me there, sir?

A. Yes, I am.

Q. Okay. And to refresh on that, we looked at page 2, item 7, and that was where the Berrys' lawyer indicated that you were rejecting the bank's condition that Mr. Berry -- that Mr. -- that your loan and Dennis Berry's loan be subordinated to the IBC loan and no payments be made until IBC is paid off. Do you recall that?

A. I don't, but that -- that sounds reasonable, you're in negotiations.

Q. Okay. And you said it was not inconsistent with your recollection, that you-all had rejected that at one point in the negotiations?

A. That's correct. There is a lot of things we rejected that were unacceptable.

Q. Yes, sir. And that was about - just so we orient ourselves on the time line here - it looks like it was 11 days, about, after that letter that -- that you then got this ten million dollar payment; is that correct?

A. I --

Q. So, that's just --

A. It seems close, yes.

Q. -- March 30 and then April 11th; is that right?

A. That's correct.

Q. And there was not any board approval of the ten

million dollars being paid to you, was there, sir?

A. There doesn't have to be.

Q. And I had a different question, sir. Your counsel is here, will be able to ask you --

A. Sure, sure.

Q. -- whatever you want to go into.

A. Sure.

Q. My question was, there was not any board approval of the payment of ten million dollars, was there?

A. Not that I'm aware of.

Q. And you did not discuss the repayment of ten million dollars, to you, with Mr. Lawrence Berry, did you, sir?

A. No, I did not.

Q. And if we look at Plaintiff Exhibit 27, sir, that was a copy of the note, of your note that we looked at, sir. Do you recall that, sir?

A. Yes, I do.

Q. And in looking at the terms of payment there, about three quarters of the way down the page, we saw that no payments were due until the end of the note, which was December 31, 2024; is that right, sir?

A. Yes.

Q. And so, the ten million dollars that was paid

to you was not required to be paid under the terms of the note, was it?

A. And you have to understand this note was made way after our original agreement. I had an agreement with the CEO that I had to pay taxes on this money. I was willing to leave it there, but I had to take money out for taxes. If you look at the date of April, you'll find that's right before tax-paying time, and he knew he had that little bit of money that he was going to have to pay me back, to pay taxes. So, I got that money back from him. That's not a loan repayment, that's a -- that's getting money to pay my taxes. I said, "You want it all, or do you just want part of it? I'll do whatever. We're -- we're needing cash flow in this company."

Q. Okay.

A. "So, what do you want?" And he told me, "Let me have it all. I'll pay you back when your tax time comes." I said, "No problem. I just want my tax money, and we'll leave it, and let it ride."

Q. Okay. And let's break that down, if we could, sir. So, the little bit of money you're talking about is the ten million dollars?

A. That's correct.

Q. All right. And we agree that in the written

note there is no provision for a payment of ten million dollars, along the way to you; is that right?

A. That's correct.

Q. Okay. But the point you're making is, in the handshake deal that you had with Mr. Powers to loan money, you had talked about a ten million dollar payment being made for tax purposes; is that correct?

A. I told him it would probably be around ten million dollars, yes, I did.

Q. Okay. And -- and again, just so we're clear, that -- that loan was not anything that went before the board or was discussed with Lawrence Berry; correct?

A. It was not.

Q. Okay. And do you recall, sir, swearing out an affidavit, when this case was initially pending in Harris County, Texas?

A. Yes, I do.

Q. Can you go -- can you look with me at Plaintiff's Exhibit 9 in your stack, please, sir. Are you with me there, sir?

A. Yes, I am.

Q. All right. And that is an affidavit that you swore to, looking at the date here on page 3, December 7, 2023; correct?

A. Yes, that's correct.

Q. All right. And if we go to the -- the front page of that document, near the bottom of the page, you see it says: We have not been repaid for our loans and are unlikely to recover our loan any time soon.

You see that, sir?

A. Absolutely.

Q. All right. And was that --

A. Do you think it's different than that?

Q. Sir, let me --

A. You think it's different than that?

Q. Let me get a question out for you, if I could.

A. Okay.

Q. Do you believe that was an entirely accurate statement, sir?

A. I think it's totally accurate. When you get repaid for your loan, you have no loan. I was not repaid for my loan.

Q. All right. Would it -- would it have been more accurate, sir, to perhaps say that it has not been entirely repaid?

A. It could probably be more accurately stated a number of ways.

Q. Okay.

A. But, you know, it wasn't made to deceive anybody.

Q. All right.

A. The fact is, no loan repayment had been made.

Q. Okay.

A. I have not been repaid of my loan.

Q. Well, hold on. "No loan repayment had been made." Partially, right, ten million bucks?

A. I'm not great with English maybe, but repayment, to me, is when you pay it.

Q. Full repayment.

A. And I haven't been paid.

Q. Okay.

A. So, you know, we can jostle words back and forth, but the fact was, I believe I stand exactly by this, and so far I'm a hundred percent correct, I haven't been repaid.

Q. All right, sir. Well, and just so we're -- just so we're clear, you could get 30 million bucks and you wouldn't have been repaid, under your analysis; right?

A. I wouldn't have been repaid, that's correct.

Q. Okay.

A. You're getting good at math, that's correct.

Q. Well, no that's -- that's something I'm fairly not for, sir, so I'll -- I'll take that one. But at any rate, your -- if I read this affidavit, I would not know

you'd gotten a substantial payment on the loan, right?

A. I guess in your interpretation, that would be true, yes.

Q. Would you be able to tell, from reading it that way?

A. Would I be able to tell?

Q. Would you be able --

A. Of course I'd be able to tell.

Q. Well, could you know --

A. I'm the one that wrote the affidavit.

Q. Well, how about somebody reading it who doesn't have the benefit of that? How about somebody who doesn't know how much money you'd gotten?

A. I don't -- I don't know if they'd know the exact numbers, you're probably correct, that doesn't say anything about how much interest you got or anything else.

Q. And it doesn't say you'd gotten any money back, right?

A. That's right.

Q. All right.

A. If that's what you if that's -- no repayment, I'll just say it's no repayment.

Q. Okay. I'll leave the subject, sir, but it doesn't say you'd gotten any money back here, does it?

A. It doesn't say -- it says what it says.

Q. Does it say you'd gotten any money back? Just so we close the subject.

A. No, it doesn't.

Q. Okay. And then let me ask you to look, sir, at the top of this page, the top of the affidavit, and this is -- this is on behalf -- this is an affidavit you and your brother Dennis Berry did; correct?

A. That's correct.

Q. Okay. And so when it says "we" it's talking with the two of you-all, I guess?

A. That's correct.

Q. Yeah. In the second sentence you say: We are shareholders and directors of Berry GP, Inc., and multiple related entities. Do you see that?

A. Yes.

Q. And was that -- was that statement accurate, when you swore to it?

A. It was probably accurate in my mind at the time, but it's probably not accurate. I mean, you need a flow chart to look at this, to understand the companies. You know, LDMA is a -- is the top of it and that's -- that's a -- that's the partnership, so I missed that.

Q. Okay. Well, so and if you say it was accurate

in your mind, I guess it was accurate in your mind because you-all are, in effect, beneficial shareholders of Berry GP, Inc.; is that right?

MR. ALLISON: Objection, Your Honor, I think he is asking for really a legal conclusion.

MR. REASONER: I'm asking why he swore to this, Your Honor.

THE COURT: Well, then ask that.

A. Well --

MR. ALLISON: I think he needs to rephrase his question.

Q. (By Mr. Reasoner) Well, sir --

MR. REASONER: Your Honor, may I ask that question?

THE COURT: Yes, ask the question.

MR. REASONER: Okay, thank you.

Q. (By Mr. Reasoner) My question, sir, did you believe that you and your brother were beneficial shareholders of Berry GP, Inc., because you owned shares through another entity?

A. What do you -- what do you mean by "beneficial"? I've never heard of that.

Q. You never heard that, beneficial --

A. Never heard --

Q. -- ownership?

A. -- beneficial. No, I haven't.

Q. Okay.

A. You mean shareholders?

Q. All right. Well, let's just say, in your own words, why did you swear that you were a shareholder of Berry GP, Inc.?

A. It was just a -- it was a -- it was a mistake. It was a mistake. We own -- there's only three owners in all these companies, no matter how -- we own companies that own companies, so there is only three people involved, and three other entities involved in all these companies; that's it, there's nobody else. So, if I'm swearing that we're shareholders and in fact it's owned by a company that owns this company, it was a mistake, just like you made a mistake in your pleadings when you started this case.

Q. Okay.

A. So it's easily done, when you don't have a chart. You have to look at it.

Q. Sir, believe me Mr. Allison is chomping at the bit to let you argue with me, but if you'll just focus on my questions right now, we'll get through this a lot more quickly.

MR. ALLISON: Objection, sidebar, but I'll move on.

THE COURT: Sustained.

Q. (By Mr. Reasoner) Now, sir, the -- as you alluded to, the Berry GP shares are actually directly owned by the LDMA entity; correct?

A. That's correct.

Q. And you have a one-third ownership interest in LDMA; is that right?

MR. ALLISON: Objection. Well --

A. I do -- I do not think so.

Q. (By Mr. Reasoner) Okay. How much do you believe you own, either directly or indirectly, of LDMA?

A. I believe it's in the 20 percentile, but I could be wrong on that, but I think that's about it.

Q. Okay. And who owns the rest of it, in your view?

A. A trust.

Q. Okay. And why I said indirectly or directly, is it the case that in terms of personal ownership and trusts, for the benefit of you or your immediate family, that you would own a third of LDMA?

A. Yes, I guess that would be correct. With -- with them together, I think I do own a third; yes, that's correct.

Q. Yes, sir. And --

A. But they're separate, they're completely

different.

Q. Who is completely different, sir?

A. The trusts are different than an entity. It's an entity, it's not me, but personally I own 20 something percent.

Q. Understood, understood. And with the same description, sir, about either personally or through a trust benefiting them or their immediate family, would Lawrence and Dennis Berry, settling out his estate, each also own a third of LDMA?

A. Yes, I believe that's true.

Q. And help me with the pronunciation, is it Becon?

A. Becon.

Q. Becon, okay. Does Becon -- that's the GP of LDMA; is that correct?

A. I believe that's correct.

Q. And again, you own a third of Becon; is that right?

A. That would be correct.

Q. And similarly --

A. Well, once again, it's -- do I own a third of it? I own 20 something percent.

Q. Okay.

MR. ALLISON: And, Your Honor, can I just

have a running objection to call for a legal conclusion, but I understand he's acting in a nonlegal sense.

THE COURT: I'm -- yeah. I mean, I -- I think it's a fair question to ask what you own and what you don't.

MR. ALLISON: I -- and I'm -- I just don't want it to be interpreted later as though he is claiming to be a legal expert, saying that's what really is --

THE COURT: No, I get that.

MR. ALLISON: All right.

THE COURT: But I think, I mean, I think it's a fair question to ask what percentage of this company you own and what you don't.

MR. ALLISON: That's why I said, I just wanted -- I didn't want to keep --

THE COURT: All right.

MR. ALLISON: -- interrupting. I just -- whether it's a running objection, I just wanted to --

THE COURT: All right.

MR. ALLISON: -- understand to make sure --

THE COURT: Fair enough.

MR. ALLISON: -- we were understanding he is answering it in his capacity -- in his capacity at this time.

THE COURT: To the best of his ability.

MR. ALLISON: To the best of his ability, right.

THE COURT: All right.

Q. (By Mr. Reasoner) All right. Mr. Berry, just going back, I think you said you do own a third of Becon, but it might be partly through a trust?

A. That's correct. It might be partly through my trust, I control a third of it.

Q. And with that same caveat, that it might be partly through trust, do Lawrence Berry and now the estate of the Dennis Berry also own a third of Becon?

A. As long as their trust is in their control I believe that's true, yes, I believe that to be a true statement.

Q. And so I want to ask you about the decision to -- to market for sale the Berry dock and adjacent property for a moment, and to orient us, can you look at Plaintiff's Exhibit 11, please, sir.

A. Got it.

Q. Are you with me there, sir?

A. Yes.

Q. And do you see that this is a letter to the then CEO of the Port of Corpus Christi from Robert Rickett of Berry GP?

A. Yes, I do.

Q. And the date on this one is May 30, 2023; is that right?

A. Correct.

Q. And as I understood it Mr. Rickett, on behalf of Bay, was -- was letting the Port know that the Berry dock and adjacent property was being offered for sale; is that right?

A. That's correct.

Q. And I take it you were a part of the decision to sell it?

A. The whole board was.

Q. The whole board was, all right. When -- when was the board meeting at which that decision was taken?

A. There's been a lot of board meetings. We have one every -- I would say since this is in May, I think it was February of that same year that we talked about offering it to Valero, offering it to our neighbors, offering it to the Port.

Q. All right.

A. Unanimously, I might add.

Q. And your -- your belief is that took place in February of 2023?

A. I could be wrong on that part, the exact date, but yes, that's my belief.

Q. In your view, obviously sometime before May 30,

2023; correct?

A. Yes.

Q. Have you seen, sir, any documentation, any board presentation, board minutes, or any other sort of document indicating board knowledge or approval of this offer for sale?

A. We weren't -- at that time before the lawsuit, our company was probably too laxed, and I would ask you the same thing, there is no -- there is no documentation.

Q. Uh-huh.

A. We had our meeting, we talked about it, and the CEO was supposed to go forward and go look for offers.

Q. Well, my --

A. And that's what we did. So, do we have any documents? We don't have any documents to say one way or the other, that I'd be willing to bet.

Q. Well, and let ask you this, though, sir: Back in those days, though, correct me if I'm wrong, but I believe I have seen PowerPoints, presentations, that would be made on issues that were going to be considered by the board at a particular meeting; is that consistent with your recollection?

A. That would be consistent. But on a piece of property that would have been around our whole life, you

probably wouldn't have to have a map to show us where it's at.

Q. All right. Let me -- let me get a question out and then you take your position, sir.

My question was: Do you recall seeing, in any PowerPoint, a indication or presentation about the sale of the dock and adjacent property, in that time frame?

A. No PowerPoints.

Q. Okay. And what was the rationale, sir, behind offering the dock and adjacent property for sale, in your view?

A. It tied up capital that doesn't justify the income we're getting for it.

Q. I'm sorry, I couldn't hear. It doesn't --

A. Capital tied up in a property that -- that doesn't justify the income for it. You look at the income you have coming in every year over the past ten years and you evaluate it, is it worth this or worth that. And if you got an offer for something much greater, then, you know, you take your money and reinvest it in something that would produce more money.

Q. And it's your position that -- that Lawrence Berry was aware of this and was in favor of it; correct, sir?

A. A hundred percent.

Q. All right. But you don't have any documents you could point to, to show us that; is that correct?

A. No, I don't.

Q. Okay. So looking at our -- our time line here, just so we have it, we looked at that letter on -- on March 30, 2023, that letter, that was PTX32, the letter from the lawyer rejecting the -- the subordination and no payments issue that IBC was asking for; do you remember that?

A. Uh-huh.

Q. Yes?

A. Yes, that's correct.

Q. So, that's March 23. And then we go a little bit further, we saw on April 11, 2023, in PTX10, that's when you get the -- the ten million dollar payment, right?

A. Correct.

Q. We saw that. And then we just now looked at PTX11, that's May 30, the dock being offered up for sale; is that right?

A. That's correct.

Q. Okay. Let's look at one other document that we saw last time, and that is a Defendant's exhibit, Defendant's Exhibit 5. Can you see if you have that near you, sir. Defendant's Exhibit 5. Is that there,

sir? Or if it's not, I'll -- I'll go hunt it down for you.

A. Can you tell me what it is? All these just say "Exhibit" or "Defendant's Exhibit". It doesn't say a number.

MR. REASONER: May I approach, Your Honor?

THE COURT: Yeah.

A. There is no numbers.

Q. (By Mr. Reasoner) Sorry, sir. This is what it looks like. It's a series of bank documents. Do we -- oh, here we go, Defendant's Exhibits. May I, sir?

A. Yeah, sure. Same thing this one says.

Q. Here we go.

A. Okay.

Q. I'll just keep this Defendant's stack right over there. All right, sir. Are you with me on Defendant's Exhibit 5?

A. Yes.

Q. And looking at this, you see this is a collection of bank documents?

A. Yes.

Q. And if we go to page, Bay 13, those Bates numbers in the lower right hand corner, it's the -- the subordination agreement.

A. Yes, that's what I'm looking at.

Q. Okay. You'll see that this is your -- this is your subord -- personal subordination agreement with Frost; is that correct?

A. Oh, I'm sorry. You got another one you're looking at?

Q. No, no. It's Defendant's Exhibit 5. Right --

MR. REASONER: Sorry, Your Honor, may I?

THE COURT: Yeah, yeah, go ahead.

Q. (By Mr. Reasoner) Okay, here we go, sir. For me, it's the third page of the document. Let me see. Well, we've got a Bay 11, let's go to Bay -- oh, these are single-sided, that's the difference. Yeah, Bay 13. There we go. You with me there, sir?

A. Yes.

Q. And --

A. But I can't tell this is Frost, without reading it.

Q. Take -- take a moment. It's -- it's in the first couple of lines.

A. Okay.

Q. You see that's the agreement between you personally and Frost Bank; correct?

A. Correct.

Q. And it's a subordination agreement. And if you look down in paragraph number 2 there, it's got the

expected limitations on anything being paid on your loan before Frost is paid off. Do you see that?

A. Yes.

Q. And this -- if you look at the top, this is effective August 1, 2023; correct?

A. Correct.

Q. So, am I right, sir, that between May 30, at least when we see that the Port was offered the -- the dock and adjacent property, and August 1 of 2023, there would have been no prohibition on proceeds from the sale of the dock and adjacent property being used to pay off the loan from you and Dennis Berry; is that true?

A. I'm not sure if that's true or not because this is the property that holds -- I thought this property, or I believe this property is in the Frost line, so I'm not sure on that date. I can't -- I don't know.

Q. Well, was there a subordination agreement that you had before August 1 of 2023?

A. I don't recall.

Q. Okay. So you don't know of any prohibition before this?

A. I don't recall.

Q. Changing subjects, sir, do you own a company, along with your wife, called Western Gulf Equipment, LLC; is that right?

A. Yes, I do.

Q. And let me ask you to look at Plaintiff's Exhibit 18, which is already in evidence. It should be in your stack there. You with me there, sir?

A. Yes.

Q. And the first page is a certificate of formation of limited liability company and the filing date on that is February 7 of 2019, it's in the upper right hand corner. Did you see that, sir?

A. I didn't hear your question. Yeah.

Q. Oh, I'm sorry, well, just let me know.

A. I'm looking at it.

Q. Let me know when you don't. I was just going to say, sir, do you see in the upper right hand corner that the filing date on this was February 7, 2019?

A. Yes, I do.

Q. Okay. And was that -- was that the first time that Western Gulf was formed, or was this just another iteration of a previously existing company?

A. From my recollection, this is the first time it was formed.

Q. Okay. And it shows you at this point in the initial filing as the manager, correct?

A. That's correct.

Q. And then if we turn to the second document in

your stack here, do you see that there is a document entitled -- again, we're in -- still in this Plaintiff's Exhibit 18. The second document, "Statement of change of registered office or agent". Do you see that, sir?

A. Yes.

Q. And the filing date on that is in the upper right hand corner again, February 4, 2020; true?

A. True.

Q. It shows Mike Hummell had become the registered agent for Western Gulf Equipment; is that right?

A. That's correct.

Q. And then if we look at the last three documents here, they are all Texas franchise public information reports for 2021, 2022, and 2023; is that right?

A. That's correct.

Q. And that -- those show you and your wife as the managers; true?

A. True.

Q. And as we talk about ownership, as we have been earlier, do you and your wife directly own Western Gulf Equipment, LLC?

A. Yes, we do.

Q. And was that -- was Western Gulf Equipment originally set up to make a joint purchase between you and Bay of a crane?

A. No.

Q. Okay. Well, let me -- let ask a broader question. Was there a time when you personally went in on buying a crane with Bay or another Berry company?

A. You're going to have to define "Berry company" for me.

Q. Well, and I don't want to miss you just by not being precise.

A. Because you're not precise enough, I'm just telling you.

Q. Well, that's one of my crosses to bear, sir, but I guess my question is, broad as you want to make it, did you ever personally buy a crane, along with any Berry-related entity?

A. No.

Q. Okay. Oh, well, yeah, that's -- my co-counsel is more awake than I am, I said "personally". Did -- did Western Gulf ever buy a crane, along with any Berry entity?

A. No.

Q. Did you ever buy -- did Western Gulf ever buy part of a crane?

A. Yes.

Q. Along with whom?

A. With Bay Canada, a group out of Canada.

Q. Ah, okay. We're on to it, we're on to it now. Is Bay Canada -- was the reason you didn't include that in your previous answers is because Bay Canada is not a related entity to the Berry companies?

A. It's just owned by the brothers. So I don't -- I don't -- it's not part of the LDMA.

Q. Okay, fair enough. Well, we got there eventually.

A. You did.

Q. Was it -- you made me work at it, though.

A. Well --

Q. So, let's see where we are now. So, Western Gulf bought part of a crane, along with Bay Canada, which was owned by the Berry brothers; is that right?

A. Correct.

Q. Correct, okay. And when was that, sir, if you remember?

A. February or March of 2019.

Q. Okay. And were there any other -- after that one crane, were there any other joint purchases of that kind?

A. No.

Q. Now, did -- on its own, did Western Gulf Equipment subsequently buy additional cranes?

A. Yes.

Q. How many, over time?

A. I believe six.

Q. And has Western Gulf Equipment rented -- rented those cranes back to -- to Bay?

A. Yes, they have.

Q. Let me ask you to look, please, sir, at Plaintiff's Exhibit 17, previously admitted. And -- and as I understand it and forgive the -- the fine print here, but is this part of a document that shows payments, ledger sheets showing payments by Bay?

A. I believe it to be true.

Q. Okay. And then if we look, about a third of the way down the page, do you see that Western Gulf Equipment, your company, is listed as a payee there in the left hand column?

A. Yes.

Q. And am I right, sir, in looking at this, this appears to cover a three-month period, is that right, July, August, and September of 2023?

A. I'm not sure how you know that, but I'll take your word for it.

Q. Well, I'm just looking at the -- if you go with me, under the Western Gulf section, do you see that it's July 1, 2023, and it's entered that way seven times; and then August 1, 2023, seven times; and then September 1,

2023, seven times. Do you see that?

A. No, sir, I do not.

MR. REASONER: May I?

A. I see --

THE COURT: You may.

A. -- I see October. If you look with your glasses a little closer, you'll see it's July -- I mean, it's July, August, and October.

Q. (By Mr. Reasoner) I thought September was the 9th month.

A. Well, mine says "10" on it. I don't -- show me where you're looking at.

THE COURT: Why don't you show him.

MR. REASONER: May I?

THE COURT: Yeah, yeah, yeah.

Q. (By Mr. Reasoner) I could probably upgrade these glasses, sir, in your defense, that's true.

A. I'm looking here. I see this, 7, 8 and 10.

Q. Okay. So we're looking at different columns. I'm looking here.

A. Okay.

Q. 7, 8 and 9; do you see that?

A. Yeah. I can see that now, yeah.

Q. Okay. And perhaps it's --

A. Which column means what?

Q. Well, I'm -- I'm talking to one of the owners of the company, that's what -- maybe we can get to the bottom of it. Do you -- do you know which column reflects what on this?

A. I do not. The man back there in the back probably does real well, though.

Q. Okay. Well, we'll hear from him. But looking at this, sir, as you would read it, and I understand that -- that you're not the CFO, but does it appear that in total, at least over this period of time, there was 1.347 million paid, from Bay, to your Western Gulf Equipment Company?

A. Without having any titles on this or anything else, I would assume that's what the -- that's the -- the number it adds to.

Q. All right. And as the owner of Western Gulf, does that -- does that income, over a period of -- of a few months, does that sound consistent with what you've been seeing over the years?

A. Not at all.

Q. Okay. Is it high, low?

A. We go months without any pay, and then we go months where you make a payment up and it might be 7 or $800,000. So, to say it's consistent with what I'm seeing, no, it's not.

Q. Okay. So this is just one slice of the payment?

A. Yeah. It's just a -- it's just a slice, where they're actually paying.

Q. Okay. And so when they don't pay, I guess that becomes debt that Bay owes to your company, Western Gulf Equipment; is that right?

A. That's correct.

Q. And let's look, please, at Exhibit 33.

MR. REASONER: May I approach, Your Honor?

THE COURT: You may.

MR. REASONER: Thank you, Your Honor.

THE COURT: Thank you.

Q. (By Mr. Reasoner) Plaintiff's Exhibit 33, sir, is a -- is from a spreadsheet produced by the company here, a cash requirements report, and this is just an excerpt from it. Is that -- is the cash requirements report, is that the type of document you've seen before?

A. I have not.

Q. You are aware that the company keeps such a report, aren't you?

A. Of course.

Q. And looking at -- you see here that there are -- there is additional periods of time where amounts owed to Western Gulf Equipment are tracked; is that

correct?

A. Yes.

Q. And then looking at the -- the second page on the total for this period of time, you see that it shows here 4.321 million dollars?

A. Yes.

Q. Yes, all right. And is that -- and it looks like if we -- if we look here over this period, it's -- there is some entries from late 2023 and then March 2024; you see that, sir?

A. Yes, I did.

Q. And is this -- what -- does the 4.3 million, does that reflect an amount owed to your company?

A. I can't answer that with accuracy because I know it's a large number that's been owed because they haven't paid since, I think, June or July of last year, so it's quite a bit of money.

Q. Haven't paid you anything since June or July of 2023?

A. That's what I recall, yeah, yes, sir.

Q. But that -- that debt is being tracked and growing, correct?

A. Absolutely.

Q. And let me ask you, sir, the period when -- prior to this lawsuit when you were renting -- well,

when Western Gulf Equipment was renting cranes to Bay, was that something that was ever approved by the Berry board?

A. Which time period are you referring to?

Q. Well, let's -- well, we're looking at mid 2023. Was that -- were those rental -- was the fact that you owned a company that was renting cranes to Bay, was that something that was raised with and approved by the board of Berry?

A. Not required to be approved and it wasn't.

Q. Okay. And that's a -- you touched on my question there at the end. Did you -- was it ever approved by the board?

A. No.

Q. And you had not discussed, during that time, with Lawrence Berry, the fact that Western Gulf Equipment was renting cranes to Bay, had you?

A. He was very aware of it.

Q. Well, let's -- let's break that down. Had you discussed it with Lawrence Berry?

A. Probably not, probably I didn't. It was probably through Barry Peterson.

Q. You what, through Barry Peterson?

A. It was probably through our equipment director.

Q. Okay. So you're -- what you're saying is,

first, you didn't discuss it with Lawrence Berry, right?

A. That's 2019, I can't recall that. So, I don't -- I --

Q. And to the best of your ability you don't remember discussing it?

A. I just said I don't -- don't recall it, that's correct.

Q. But what you're telling us is that you believe that because the Bay equipment manager, Barry Peterson knew, that Lawrence Berry must have known; is that right?

A. Well, we own a company together and I do a deal with that company. I own a third of it, Lawrence owns a third of it, and Dennis, my brother who is passed now, owned a third of it.

Q. Which company?

A. That's -- that's the Canada company.

Q. For that one crane?

A. So -- so we made a deal with that crane, so they would have to know that I'm leasing because there was a written agreement how it would work, and it's their fiduciary duty to know, so --

Q. Could it be yours to tell them?

A. It -- it's -- I don't believe it is mine to tell them. I kept up with everything in the company.

Q. Fair enough.

A. I'm keeping up with the finances in the company. It's your fiduciary duty as a director of the company to know what's going on. If you don't want to ask for the documents to get them, that's -- that's fine. He's produced his -- our CFO produces a lot of stuff that my brothers frankly never -- never asked for. It's just -- it's just part of it, but they knew about this, this was something that went through because it took -- it took everybody to put it together.

Q. And to be clear, sir, what you're talking about is the purchase of the one crane with Bay Canada; right?

A. Well, you -- do you recall your question? You asked me if he knew about the cranes and if Western Gulf had leased to the company. I had that crane leased to the company. And so --

Q. And we're talking --

A. And I've -- and I've answered your question exactly the way you asked it.

Q. And I think we have a singular versus plural problem.

A. Okay.

Q. Your point is certainly Lawrence Berry knew one crane had been purchased by Western Gulf and Bay together, Bay -- Bay Canada; right?

A. Correct.

Q. And I'm asking you about the additional six.

A. Okay, that's a different question. I don't know if he knew, I have no clue.

Q. Okay. Well, I'm -- I appreciate you clarifying what you were trying to answer. So, you don't have any clue if Lawrence Berry knew about the additional six cranes that Western Gulf Equipment bought and leased to Bay?

A. That's correct.

Q. Okay. And Bay, sir, has a subsidiary called Basic Equipment; is that right?

A. I believe that's correct, a wholly owned subsidiary, yes.

Q. Okay. And that's -- in fact, that's an entity, as I understand it, how you and your brothers first got into the business, is that -- is that right, by acquiring that entity?

A. It could be reasonably thought so, yes.

Q. And Basic Equipment owns cranes too; right?

A. They could.

Q. Well, I guess just to be more precise, have they -- to your -- to your knowledge, has Basic Equipment owned cranes in the past?

A. Yes.

Q. And has Basic Equipment rented out cranes in the past?

A. Yes.

Q. All right. So they -- so, Basic Equipment was doing similar things to what Western Gulf Equipment was doing; right?

A. In what time frame?

Q. At -- at some point.

A. Ten years apart, yes.

Q. Okay. Now, sir, in -- in recent months after this lawsuit was filed, the board and shareholders have taken certain actions with regard to purportedly ratifying some prior acts; is that right?

A. That's correct.

Q. And let me ask you to look at Plaintiff's Exhibit 16, please, sir. Are you with me there, sir? Looking at "Berry GP, Inc., Resolution - Special Meeting of Directors, December 7, 2023."

A. Yes, sir, I see it.

Q. And it says, in the second paragraph there: Be it resolved that the loans made to Berry GP by Dennis Berry and Marty Berry in July 2022 are recognized as fair, and in the best interests of Berry GP, and are ratifying.

Do you see that, sir?

A. Yes, I do.

Q. And you and Dennis Berry both voted in favor of this resolution; correct?

A. Yes; yes, we did.

Q. And Lawrence Berry did not vote in favor of that, did he?

A. He didn't sign this, obviously.

Q. Okay. And it's consistent with your memory that he did not vote in favor of it?

A. That would be true.

Q. Now, Lawrence was the only one, of the three of you, who was not involved in the loans; correct?

A. That's correct.

Q. Now, let's look at Exhibit 34, please, sir.

MR. REASONER: May I, Your Honor?

THE COURT: Yes.

MR. REASONER: Your Honor, we would -- we would offer this collection of resolutions of special meeting of shareholders for Berry GP, Inc., from February of 2024 into evidence as Exhibit 34.

MR. ALLISON: No objection.

THE COURT: No objection, Mr. Van Huseman?

MR. HUSEMAN: No.

THE COURT: Admitted.

MR. HUSEMAN: We like it.

THE COURT: All right.

MR. REASONER: And, Your Honor, for housekeeping purposes, I'm reminded that I did not formally offer Exhibit 33, Plaintiff's Exhibit 33.

THE COURT: 33?

MR. REASONER: The excerpt from that spreadsheet.

MR. ALLISON: No objection.

THE COURT: All right. That's also admitted.

MR. REASONER:

THE COURT: Although challenging to read.

MR. REASONER: That it is, Your Honor.

Q. (By Mr. Reasoner) Now, sir, here, as I think I just mentioned, these are resolutions from a special meeting of shareholders, February 13 of 2024; is that right?

A. Correct.

Q. And as we talked about this, this was an attempt to ratify some things that had happened in the past, right?

A. I don't believe it was an attempt, I think it ratified things that happened in the past.

Q. Well, and you're not -- as your counsel has pointed out repeatedly, you're not here to tell us the

legal impact of what you did, are you?

A. No, but if I throw it out there, it's just all it is. I just -- it is just what I was thinking. We ratified it, yes.

Q. Fair enough, sir. And let's look at 2141, which is there at the bottom of the second page, the Bates number at the bottom. You see that that says - that is again on the loans - and it says: Be it resolved that the loans are recognized as fair and in the best interests of Berry GP.

Do you see that?

A. Yes.

Q. And there, you voted in favor, correct?

A. Yes.

Q. And Bonnie Berry, who was voting, tragically after her husband's death, she votes "Yes" as well; correct?

A. Correct.

Q. And Lawrence Berry votes "No." Right?

A. Correct.

Q. And again here, Lawrence Berry is the only one who has nothing to do -- no relationship to the loans; is that correct?

A. Well, he owns part of the company that the loans were from, but I guess in your -- just looking

at this, that would be correct, he didn't make any loans.

Q. Okay. So he's impacted by them, but he -- he was not a lender?

A. He would be benefited by them, absolutely.

Q. Well, potentially, we'll see. That's a -- obviously, there is uncertainty --

A. That's a financial question, but you do get the chance.

Q. Right. When a -- when a company borrows money that can be a good or a bad thing, depending on how things play out, right, sir?

A. That's correct.

Q. All right. But here, so, Lawrence Berry votes "No" but in the -- written above here it says "Passed". Is that correct?

A. That's correct.

Q. And then if we look, sir, at 2145, if you go to that page with me. This is a resolution that says: Be it resolved that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that equipment to any Berry company for performing work of that Berry company, is approved. To the extent such conduct has occurred in the past, it is ratified.

Do you see that?

A. Yes, I do.

Q. All right. And you vote "Yes". You, as we've discussed, you're -- you're on both sides of this transaction; right?

A. I'm also a shareholder, too; that's correct.

Q. That's one -- well, you're a shareholder of Berry, and you own Western Gulf Equipment; right?

A. That's correct.

Q. Okay.

A. I own part of it, yes.

Q. With your wife, right?

A. That's correct.

Q. All right. And so the -- but the two folks who have no involvement in Western Gulf Equipment, one votes "Yes," Bonnie Berry; and Lawrence Berry votes "No," right?

A. That's correct.

Q. Okay. But written at the top here, it nevertheless, is "Passed". Is that correct?

A. Nevertheless passed, yes. It's passed, yes. It passed.

Q. In your view, I understand, sir. It's written up there "Passed," right?

A. "Passed."

MR. REASONER: Pardon me, Your Honor.

THE COURT: Yes.

Q. (By Mr. Reasoner) And was there -- was there a discussion of that, sir - if we can just stay on 2145 for a minute - it says there at the bottom: To the extent that such conduct has occurred in the past.

Do you see that?

A. Uh-huh.

Q. Yes?

A. Yes, I do.

Q. All right. Was there a discussion at that meeting, to -- to what extent this leasing of cranes had occurred in the past?

A. No, not that I recall.

Q. Now, sir, I understand that -- and I do not want to go into any specifics about the gentleman's condition but -- but I understand that tragically the CEO, Mr. Powers, suffered from a stroke a few weeks ago; is that correct?

A. That's correct.

Q. And -- and I know everyone in this courtroom wishes him a speedy recovery. Sir, has the board appointed an interim CEO for the company?

A. No; not that I'm aware.

Q. Well, you would be, wouldn't you, as a member?

A. If I showed up at the meeting, that would be correct. So, yeah, I believe at this time there hasn't been one appointed.

Q. Well, is it -- is it fair to say that at a recent meeting Lawrence Berry proposed that the former president, Ken Luhan, serve on an interim basis, while Mr. Powers recovers?

A. I believe he said that, yes.

Q. Okay. And you were opposed to that; is that correct?

A. That's correct.

Q. And you have not --

A. Let me change that, I never had a chance to be opposed to it.

Q. All right. Why do you say that, sir? I thought that was a -- that was a motion made by --

A. Well --

Q. Sorry. Go ahead, sir.

A. So, when you run a meeting by *Robert's Rules of Order* and somebody makes a motion to do something, if there is not a second, then there is nothing to vote on.

Q. But you could have seconded it, couldn't you, sir?

A. But that didn't tell you how I was going to vote. I may change my mind after discussing it, but I

didn't second it, you're correct, and neither did the other own of the company, did they second it. So, you had one guy, one Indian standing alone, and it failed.

Q. Okay. Well, let's just break it down. You could have seconded the motion to make Mr. Luhan an interim CEO or president of the company; correct?

A. I could have done a lot of things, but I did not.

Q. You did not do that?

A. I did not do that, you're correct.

Q. And your point is even if you had seconded it, that would not have obligated you to vote, to appoint Mr. Luhan as an interim CEO or president; true?

A. That's correct.

Q. And you did not propose anyone else to serve as president or CEO while Mr. Powers recovers; true?

A. That's true.

Q. And who is running the company in that -- in that capacity?

A. No one, today.

Q. So, there is just no one at the helm?

A. As the CEO of the company today, no one is running the company as a CEO today. Each individual -- it's status quo throughout the company, people are handling their business.

Q. Okay. There is just no one that they report to at the top of the pyramid?

A. That's correct.

Q. Okay. Did you -- when -- when Mr. Powers suffered the -- the tragic stroke, did you notify Lawrence Berry about that?

A. I did not.

Q. Let me ask you, sir, to look at PTX1 that we saw before in your stack there. Do you remember, sir, this was an email exchange we looked at, PX-1, that was in January 16 of 2023?

A. Yes.

Q. Okay. And in looking at the bottom we saw that Lawrence Berry there, at the very bottom, on January 16, 2023, clarifies that what he is asking about is the paperwork for the 75 million dollar related-party receivable on the books; do you see that?

A. Yes, I do.

Q. And there is a response from Mr. Powers: Okay. That is not executed to my knowledge, I will follow-up and see if it's signed.

Do you see that?

A. Yes, I do.

Q. And then Mr. Berry above writes, "I know nothing about any of this."

Do you see that?

A. Yes, I see it.

Q. Okay. But -- and we didn't see, on this document, a -- any further response from Mr. Powers to Lawrence Berry about this -- in this document, PTX1; true?

A. I believe that's correct, yes.

Q. Okay. Let's look at a new exhibit, Exhibit 35, please.

MR. REASONER: May I, Your Honor?

THE COURT: You may.

MR. REASONER: Sorry.

Q. (By Mr. Reasoner) All right, sir. I've handed you an email exchange marked as Plaintiff's Exhibit 35, ALB -- Bates number ALB 843 through 845.

MR. REASONER: I'd like to offer that into evidence.

THE COURT: Any objection?

MR. ALLISON: No objection, Your Honor.

MR. HUSEMAN: (Moving head side to side.)

THE COURT: All right. Then hearing no objection, it's admitted.

Q. (By Mr. Reasoner) And, sir, if you flip to the second page of this document, do you see that there is the same exchange between Mr. Powers and Lawrence Berry

that we saw in PTX1, the clarification. And then the "I will follow-up," and "I know nothing of this," do you see those same things on the second page?

A. Yes.

Q. And then if we go to the front page, do you see that there is a response from Mr. Powers?

A. Yes.

Q. And he says, in the first paragraph, "Sorry for the delay. Marty made loan of 45 million and Dennis made loan of 30 million late last year. This money was used to pay all past due receivables and pay down loans. Paperwork has not been completed but will be to finalize audit."

Do you see that, sir?

A. Yes.

Q. And then in the next paragraph he says, "I did not bring up in board meeting because owner children in room. Mrs. Berry has made a number of loans as well."

Do you see that?

A. I do.

Q. And is that consistent -- I believe you testified to that, but just to be clear, is that consistent with your recollection, that the loans had not been brought up at a board meeting as of that time?

A. That would be correct.

Q. And Mr. Powers does not say in this email to Lawrence Berry, "I already told you about this," or "You know about this," or "We talked about this," does he?

A. I don't see anything to that.

Q. Okay.

MR. REASONER: I'll pass the witness. Thank you.

THE COURT: All right.

MR. ALLISON: Thank you, Your Honor.

THE COURT: Direct?

DIRECT EXAMINATION

BY MR. ALLISON:

Q. I'm going to, you know, follow-up on some of his things and then kind of shift gears in a little bit, but I'm going to follow-up on some of his things.

How long have you and your brothers been, just generally speaking, owners?

A. 2000; in the beginning of 2000, I guess.

Q. Twenty years, roughly?

A. Yes, at least.

Q. And how long has Rob Powers been CEO?

A. Four, five years.

Q. Who was CEO before him?

A. Mr. Ackley was, for a short period of time.

Q. And before him?

A. Ed Martin.

Q. How long was Ed Martin the CEO?

A. Twenty-five years or so.

Q. Yeah.

A. A long time.

Q. Was he the CEO before you and your brothers became owners?

A. Total owners or partial owners?

Q. Fair enough. I think you've answered my question. I'll leave that there.

A. He was, though.

Q. Okay. Was Ed Martin, how would you describe him as a CEO?

A. Stern.

Q. Did he --

A. Cold.

Q. Pardon?

A. Stern, cold.

Q. Yeah.

A. Tough.

Q. Was the way that the Berry companies -- according to the bylaws and according to just the way it's gone for the last 20 years, is this CEO position a strong position?

A. Super strong position.

Q. Yeah.

A. Runs the company.

Q. Yeah. Do any of the owners, the way it's structured and has been structured for decades, do any of the owners have -- do they -- are they supposed to be running the company, day-to-day?

A. No, they're not.

Q. Are they supposed to be telling who -- which director over at -- whether it's Peterson over at Equipment, or whether it's somebody down at the dock, are they supposed to be down there telling them how to do their job?

A. No.

Q. Who is supposed to be running the company?

A. The CEO.

Q. Are the brothers or any of them supposed to be getting into signing contracts for the company?

A. No.

Q. Who signs the contracts for the company?

A. CEO and Lynn Wittington.

Q. Okay. And if you look at --

A. Actually, let me correct that, CEO or designee, that's what it says.

Q. Okay. And, for example, for -- for decades, has the company -- has Berry, whichever entity it went

through, I think it's Berry GP, but have -- have the Berry companies had an operating line of credit?

A. Yes, they have.

Q. For how many years has that been with IBC, roughly?

A. Thirty plus.

Q. Okay. And did -- did -- who would sign those -- those loan agreements, those operating line of credit agreements with IBC?

A. Well, normally they'd be the CEO, and they also ask for board members. Each one is kind of different, but sometimes you don't have to have owners.

Q. Okay. Okay. But -- but is the -- is the CEO typically who signs on behalf of the entity?

A. Yes, sir, that's correct.

Q. And are there just years' worth of documents that show that CEO has that power to borrow money?

A. Absolutely.

Q. Are there years' worth of practices where the CEO, for example with your mother and father maybe, but you correct me if I need to be corrected, would loan money to the company and the CEO would do that?

A. Since the formation of the company it's been that way.

Q. And has there been a history of your mother or

236

father, or both of them, loaning money for many years back?

A. Absolutely. It continues to this day.

Q. And I think, was there one as recent as March of 2022, where your mother loaned I think a couple of million dollars?

A. That's correct.

Q. And did she come to you beforehand and say, "Is this okay" or did you-all -- let ask you, did you-all vote on it at a board meeting?

A. No, we did not.

Q. Does the CEO, did he have authority to sign a loan document with your mother in March of 2022?

A. Yes, he did.

Q. Did he do that, in fact?

A. Yes, he did.

Q. And did --

A. Well, I never saw it, okay? I understand he did.

Q. It's been produced in this litigation.

A. Okay.

Q. Okay. Have you ever heard Lawrence say, "You know, the CEO doesn't have authority to sign that document with mom"?

A. No, I haven't.

Q. Have you ever heard Lawrence complain that "Look, mom is self-dealing"?

A. No, I haven't.

Q. And have you ever heard Lawrence say, "Hey, this is hurting the company, for mom to loan money to the company when the company needs it"?

A. I have never heard that.

Q. We're talking about a 2 million dollar loan in the early 2022 time frame, obviously yours and Dennis' loans were also in the 2022 time frame; correct?

A. That's correct.

Q. Were on the back side of coming out of Covid, right? Sir?

A. That's a yes.

Q. Tell -- just to give the jury -- just the give the Judge an idea, did -- during Covid, were you guys -- a lot of the -- a lot of your business, I believe, fair to say, is providing manpower, labor to different businesses?

A. That's correct.

MR. REASONER: Your Honor, and if we could just proceed question/answer, the objection is leading.

THE COURT: All right. Don't lead.

MR. ALLISON: Okay.

THE COURT: Sustained.

Q. (By Mr. Allison) For example, the -- and I know I'm going to say the name a little bit wrong, is it Venture Global, that's a current job?

A. Yes.

Q. How many employees of Bay, and I know Berry is a lot, but just in range, generally, how many employees of Bay have been working out on that Global Venture, Venture Global job?

A. Global Venture job, up to 3500, approximately.

Q. Okay. Now, back in the Covid days, for example, was Formosa a client?

A. Yes, they were.

Q. Were there other clients of Berry, where you would provide manpower?

A. Many others, yes.

Q. During Covid, were they saying "Bring your employees over here, keep sending them"?

A. Just the opposite of that.

Q. Yeah.

A. They sent 1000 people home in one day.

Q. That put a squeeze on business?

A. Huge squeeze.

Q. And so with that, having -- was that a problem for a day, or a week, or for an extended period of time?

A. It compounds and it turns into -- it turned

into an extended period of time.

Q. Is --

A. Revenues dropped.

Q. So coming out of Covid, let me ask you this: Your mother, she -- she is still very much with it?

A. Yes, she is.

Q. Yes. In March of 2022, you think she knew what she was doing?

A. Yes, she did.

Q. Do you think -- do you believe, knowing what you know of that time frame, do you have an opinion on whether or not the company was in serious need of cash?

A. I look at the cash reports weekly, they're sent to me, our standing, and I knew we were in terrible shape. We were in terrible shape.

Q. Were you in a position to go up to market, for example, do you think, and get somebody, some bank to commit 75 million dollars worth of loans?

A. I'll leave that up to the CFO, but in my opinion, absolutely not.

Q. All right.

A. Not anything with a reasonable rate. I mean, it would've been 18 percent or something crazy.

Q. Were you keenly aware of that circumstance, in the 2022 time frame?

A. Yes.

Q. Do you believe Dennis was keenly aware, based on your conversations with him?

A. A hundred percent aware.

Q. Do you believe your mother was keenly aware?

A. Yes, she was.

Q. Did you-all -- when you -- when you made those loans, okay, let me just talk for you specifically, did you ever imagine, when you loaned money to the company, that somebody would claim you were hurting the company?

A. Never in my wildest dreams.

Q. Did your mother ever come to you, for example, and say "Why did you do that, you're hurting the company"?

A. No. She knew why we did it.

Q. Was she supportive of it?

A. Absolutely.

Q. Has she continued, to this day, to be supportive of it?

A. Yes, she has.

Q. Did anybody, to your knowledge ever go to Dennis and say, "Dennis, why did you loan that -- why did you loan our company money, you're hurting it"?

A. Lawrence may have, but no one, that I'm aware of.

Q. Did you ever go to Dennis and say, "Why did you put your 30 million dollars in, I mean, you're hurting the company here"?

A. I did just the opposite. When he told me he was going to put about 20, and I said, "That's not enough." I told him to put more.

Q. And why was that money needed for the company? Where were -- we're coming out of the Covid time frame. Give us some context.

A. We were building up for a huge job that was going to take double the amount of lines we had at the bank at the time. And we had -- we were -- did not have the cash flow. We had vendors calling all the time, it disrupts your business. We needed the money to come in and pay off -- pay off our vendors and get us back up so we could look good. We needed to go and get a bigger line, we needed a bigger line. Our line was not enough. We knew going in on the Venture Global job we needed a hundred million dollar line.

Q. And let's walk through that a little bit with the Court. Why is -- when -- when your employees go and they work for -- I don't know what you pay, do you pay every two weeks, twice a month? How do you pay them?

A. Weekly.

Q. Huh?

A. Weekly.

Q. Okay. At the end of a week, do you get paid by Global Venture? Global Venture/Venture Global?

A. Venture Global.

Q. Venture Global. Do you get paid by Venture Global every week?

A. No, we do not.

Q. And so, do you get to say to your employees, "Hey, we -- we're not going to pay now you, we're not going to pay you until Global Venture comes through with their paycheck"?

A. It would be nice, but we don't get to do that.

Q. Who floats it?

A. We got to go to the bank and come up with the money.

Q. Okay. So, is it fair to say one of the Berry companies floats it?

A. Absolutely.

Q. Using a line of credit?

A. Yes, that's correct.

Q. Okay. And so, I mean, does Venture Global, do they say, you know, "Don't worry, don't -- you know, you -- we'll pay you ahead of time, to make sure you're making payroll week-to-week, with all these people you're carrying"?

A. No, they don't. We -- we push any customer we can to get paid as quick as we can.

Q. Okay. And so, do you have to have -- what are -- what do you need to have, in order to take a job like Venture Global?

A. Well, you need to have the -- you need to have the line at the bank so when you bring in those -- it's a revolving line of credit, where we take invoices, they immediately discount those by a percentage, and then you have to have enough line to cover all of the things that would happen up until you're going to get paid the next time. And so when you have 3500 employees, that's just there, that was just on that one job; it adds up quite rapidly, if you just do the math in your head. And they're not $10 an hour, they're not $20 an hour, they're 30 plusers; it's a lot.

Q. Do you -- do you have a belief as to whether or not yours -- your loan to the company, your mother's loan to the company, Dennis' loan to the company, were those needed or not, in terms of being able to be successful, with a job like Venture Global?

A. I'm confident in saying that we would have failed. Without having those loans, we could never have done the Venture Global job, impossible.

Q. And that Venture Global job, just to give us

some kind of book ends, and I don't know if you know these numbers off the top of your head, do you know, for example, what total revenue was for the company during Covid years?

A. Covid years were around 400 million, a little over that.

Q. And for 2023, where -- now that Venture Global has come on board, and what does that move to?

A. 700 and something.

Q. 700 and something million per year in revenue?

A. Uh-huh.

Q. Sir?

A. Yes, that is correct.

Q. So, do you think that that has been helpful or harmful to the company?

A. Well, it's a double-edged sword. We're here in the courtroom, maybe it's been harmful, but no, I think it's been very helpful. It's really good times.

Q. Now, in terms of the CEO's powers, what does he do, day-to-day? Can you just give us a general description?

A. Day-to-day, he runs the company. Any -- any hot spots, anything that kicks up, if it's hiring, or you know, or reviewing -- reviewing financials, looking ahead. Anything that -- you know, keeping the Indians

in line.

THE COURT: Hey, let's do this, let's take a break and then we'll continue on.

COURT BAILIFF: All rise, please.

(Brief recess.)

THE COURT: Mr. Berry, you're back on the stand. And when you're ready, we may proceed.

MR. ALLISON: Thank you.

DIRECT EXAMINATION
(Continued)
BY MR. ALLISON:

Q. When -- and it may depend on the type of information, but when you ask for or want information from one of the companies, one of the Berry-related company, who do you go to?

A. I go to the CEO.

Q. And do you go to like, a different department head and different people, or do you try to channel it? How do you do that?

A. I only go to the CEO. I don't want to get involved in the chain, he'll go down the ladder. And same thing if I deliver information to him, I just go to him and let him handle it.

Q. And when you -- how do you normally get information about what's going on with the company?

A. Well, it depends on what -- you know, financial

information?

Q. Let me ask you this, let me narrow my question a little bit: Do the different Berry companies have regular meetings?

A. Usually yearly shareholder meetings is what it would be.

Q. So the shareholder meetings are usually annual?

A. Annual.

Q. Yeah. And how about Berry GP, if I understand it, what's its relationship to operation of the Berry entities?

A. It's the top of the operating.

Q. And does Berry GP have meetings?

A. Yes, it does.

Q. How often?

A. I would say once a month.

Q. Has that been, more or less, the rule for years?

A. Since we've been going to board meetings.

Q. For decades?

A. Decades.

Q. Okay. And what role, if any, do those meetings of Berry GP play, for you to get information?

A. It updates you on big projects, safety in our company, which is the biggest thing, updates on safety,

maybe making us aware of purchases or things that are going to be coming up that are going to require cash, general meetings. Most of that I would already know it, from being in the office every day.

Q. And let's go ahead and cover that, because what's your habit, in terms of going in to the office?

A. Every day it's needed, every day of the week.

Q. Do you go most -- do you sometimes go two or three weeks without going into the office?

A. Never.

Q. Generally speaking, on a weekly basis, are you there one day a week or five days a week?

A. Five days a week.

Q. What was Dennis' practice, before he passed?

A. Before he got cancer he was there most of the time. And then he -- before he announced he had cancer he came in one day and said he was no longer going to be signing checks and he passed that to me, and he said he was going to be taking -- he was going to see the country a little bit, start moving around.

Q. Okay.

A. He would be over there, over-watching, oversee the -- the highway bids, when they came through.

Q. And in terms of signing checks, after Dennis did what you just said, who took over the responsibility

to sign checks?

A. I did.

Q. How many checks did you sign in a week?

A. It depends, but it could be as many as a thousand. It's maybe more. It's a lot.

Q. Okay.

A. Every vendor, anybody that gets money from our company, there is only probably one percent that I don't sign.

Q. Let's say for the last five years, has -- has -- let's not go five years because we're really talking about 2022 and 2023, the last couple of years, or three, let's say three years; for the last three years, has it been Lawrence's practice to be there every day?

A. Lawrence lives in Houston, so he is not in our company every day.

Q. Is there anything that keeps him from being there every day? I mean, if he wanted to be there every day would he be able to be there every day?

A. Absolutely.

Q. If he -- does he have an office there?

A. No, I don't think he has an office there.

Q. If he wanted an office there, can he have an office there?

A. Absolutely.

Q. Yeah. Does he have a parking place there?

A. I'm not sure I do either but --

Q. Okay.

A. -- if I have one, if he would want it.

Q. Okay. But what was his -- for the last, say, three years, what was Lawrence's habit, in terms of coming into the office and, you know, learning what's going on?

A. Well, coming into the office at our board meetings.

Q. Once a month?

A. Uh-huh. Yes, once a month.

Q. Okay. I'm just cuing you because that nice lady next to you, when you nod your head --

THE COURT: We understand your nod, but --

THE WITNESS: I forget.

THE COURT: -- it's got -- it's got to go down.

THE WITNESS: I forget. I'll get there.

Q. (By Mr. Allison) And is there -- when you have these monthly board meetings, is there any limited -- in other words, I mean, if -- if you, as a director, you're having those board meetings, does it happen where somebody says "Hey, I got a question" and Rob says "No,

I'm not going to tell you that"?

A. That's never happened. We have questions all the time.

Q. And from what you said a moment ago, and I know we've seen all the agendas and all the parties have them, it looks like there is generally a -- and I know it varies, but generally, do you always talk about finances?

A. I'd say yes, generally.

Q. Generally, do you always talk about safety?

A. A hundred percent, every time.

Q. I think it's always first on the agenda?

A. Absolutely. We have no business without being safe, so we talk about it first. Your Plaintiff attorneys took care of that.

Q. Now, generally, do you get updates on work in progress, what they call work in progress?

A. Sometimes, on the bigger jobs. Usually only if you're going to talk about jobs, you'd be talking about the ones in trouble.

Q. Fair. Generally, do you sometimes talk about equipment?

A. Yes, we do.

Q. Do you sometimes talk about real property?

A. Yes, we do.

Q. Do you sometimes -- I mean, as needed; fair enough?

A. Yes.

Q. Do you sometimes -- for example, during this time frame when, and we've heard some information about what happened with IBC and then the transition to Frost, during that period of time, were you talking about lines of credit every time?

A. That was -- we had emergency meetings I believe, in fact, just to talk about that, yes.

Q. And at all of those meetings would Lawrence participate?

A. I believe so, yes.

Q. Yeah. Some of them were emergency, by telephone?

A. Yes. There was still meetings, still our board meetings, yes.

Q. And I think there is some strings, we'll get into them a little bit, but were you used to seeing those strings of texts from Rob, and have you and Dennis and Lawrence on the string?

A. Yes.

Q. And was Rob keeping you guys informed, with regard to the line of credit with IBC, after the blowup?

A. Yes.

Q. And was he keeping you informed with the line of credit discussions? How was he keeping you informed of --

MR. REASONER: Your Honor, objection. If we could just go to question and answer. I object to leading.

MR. ALLISON: I'll rephrase.

THE COURT: Okay.

Q. (By Mr. Allison) Were there text messages with regard to Frost Bank?

A. Yes.

Q. Are there text messages with -- and by "text messages" I want to ask you about ones with you, and Lawrence, and Dennis, and Rob on the string, okay?

A. Okay. Then you better ask that other one again.

Q. Pardon?

A. Frost, I don't believe there is a string. I can't remember if there is a string for Frost.

Q. Okay. We're getting there. Well, let me ask you this: Have you seen any of them, where Lawrence is talking about his negotiating with Cadence Bank?

A. Yes.

Q. Have you seen him where -- where -- well, one of them, did you send a text to -- do you remember the

text you sent, right after the notice of default draft, to Lawrence?

A. Yes. I sent Lawrence that, I think the day after I got it or something, yes.

Q. You notified Lawrence?

A. I did, and Dennis.

Q. And again, just thinking to this time frame where we're talking about board meetings, where at even 2022, after the -- you made the loan, and Dennis made the loan, and your mom made the loan, in 2022 and 2023, up until he filed the lawsuit in November of 2023 did Lawrence ever, for example, bring up a complaint that he wanted to change the bylaws, with regard to the sale of real estate?

A. No.

Q. Or ever bring up anything, that he wanted to change the bylaws with regard to the purchasing of real estate?

A. No.

Q. Did Lawrence, during that time frame, ever say that he wanted to, for example, have some sort of approval where a single -- a single director could kill a proposed purchase of real estate?

A. No.

Q. Did he ever bring it up in any of those board

meetings for that period of time, where Lawrence said that he wanted to kind of change the bylaws where directors could not be removed?

A. No.

Q. Did he ever, during that period of time, say he wanted to change the bylaws where directors could not be added?

A. No.

Q. Did he ever make any complaints about the bylaws or wanting to change the bylaws for that year-and-a-half period of time, roughly, that we're talking about?

A. Never; nothing.

Q. Did he ever make a motion to do it?

A. No.

Q. We know, and I think even in the opening statement, Mr. Reasoner said that Lawrence, he refers to it, I think in the September of 2022 time frame, where financials were given to Lawrence which revealed or indicated the loans that you and Dennis had made; are you familiar with that document?

A. I think we looked at it, yes.

Q. Okay. And during that, from September of 2022 until November of 2023, did Lawrence -- let me take 2022 for -- for starters.

For September, October, November or December of 2022, did Lawrence ever come and say "Hey, I want to know more about these loans," did he ever come to you and say that?

A. Never.

Q. Did he ever bring it up in a board meeting and say "I want more information on this," during a board meeting?

A. No.

Q. For, let's say, the first half of 2023, after -- and we have the emails where, clearly, he is writing emails in January of 2023 about the loans; correct?

A. Correct.

Q. So, from January, February, March, April, May, June - I'm just doing that as a half year - in 2023, did Lawrence ever come to you and say "Hey, I want to talk to you about these loans"?

A. No.

Q. Did he ever bring it up in a board meeting?

A. No.

Q. Did he ever, ever ask, in a board meeting, to get more information about the loans?

A. No. Well, same time frame? Same time frame you're talking about?

Q. Yes.

A. Yeah.

Q. I'm still --

A. No.

Q. -- going in pieces. And you're about to make a point that, for example, this last February meeting, were you aware that he asked Jim to come bring a lot of information?

A. Yes.

Q. Jim Klein, who is he?

A. He is our -- he is our chief financial officer.

Q. And what did Jim Klein do, in response to Lawrence's request to receive that information?

A. Provided all the information to the board at a -- on a PowerPoint.

Q. Yeah. And is that how it works?

A. Excuse me?

Q. If you ask for information from Jim Klein, what -- what normally happens?

A. Normally, if the owners ask for information from anybody they'll get it.

Q. Is that true for Lawrence?

A. Yes. For Lawrence, yes.

Q. Is that true for you?

A. Yes, it is.

Q. When -- when Lawrence -- obviously there is this email. Let's go ahead and move kind of more specifically. Do you have PX-35 up there?

A. Yes, I do.

Q. By the way, had you ever seen Robert Powers's response before?

A. I haven't.

Q. Yeah. But let's go ahead and go back.

MR. ALLISON: Your Honor, at this time we'd offer, I think when you combine it with Plaintiff's Exhibit No. 35, I think there is some things maybe not on here, that are on our Exhibit No. 106, and we'd offer that at this time. I can give you the Bates numbers, if you want them.

(Court reporter speaking.)

MR. REASONER: And you say it is our exhibit but there is more?

MR. ALLISON: Yeah. I think -- and I think you actually said that when you brought it up. You said there is -- you had an exhibit that added to some earlier emails.

THE COURT: Well, I guess show it to him.

MR. ALLISON: That's what I'm finding.

THE COURT: Okay.

Q. (By Mr. Allison) Go ahead and look at Exhibit

No. -- we'll just go with Exhibit No. 35, PX; do you have that in front of you?

A. I do.

Q. Have you seen the rest of that string?

A. Well, I'm kind of looking up there at it. Is that the screen you have up there on -- on the show? It is.

MR. BALDTREE: Doug, is that PTX35 up there? What are we looking at?

MR. ALLISON: No, that is not. You had, I think, PTX35 with you up there.

Q. (By Mr. Allison) You have that?

A. Yes, I do.

Q. And is that the January string that you were asked questions about, by Mr. Reasoner?

A. Yes, it is.

Q. And do you see in the beginning of that string, is there a confusion about it being a reference to the Orca note?

A. I see that under the subject, "Orca note."

Q. Yes. What is the Orca note?

A. That's a -- that's a payable from Lawrence to the company.

Q. Okay. And originally when Lawrence asked for information about a note, Jim responded with what?

A. With the Orca note, because he asks about payable, I mean, a receivable, not payable.

Q. And with that Orca note, is that the same note the other day you were in the courtroom when Lawrence Berry was asked about Orca; correct?

A. Yes.

Q. Is that a note where he owes the company, I think the way we said it with him on the stand, was tens of millions of dollars?

MR. REASONER: Objection, leading.

THE COURT: All right. Sustained. Ask it a different way.

Q. (By Mr. Allison) Were you here for his testimony, with regard to what he owed on the Orca note?

A. Yes.

Q. And how was it characterized by his testimony? What's your recollection about that?

A. Tens of millions of dollars.

Q. And do you agree that -- that he owes the company, just on Orca alone, tens of millions of dollars?

A. Yes, I do.

Q. And is he in -- is that a performing note?

A. No.

Q. Is it in default?

A. It's in default, yes.

Q. During these years, same years, how long has that been a note, where money was owed by Lawrence, tens of millions of dollars was owed by Lawrence to the company?

A. I'd say ten plus years.

Q. And, for example, throughout Covid, during this time of cash crunch, when your mother was loaning money and you were loaning money, was it -- was that note, where Lawrence owed money to the company, there?

A. Yes.

Q. And even to this day -- do you remember when the maturity date was?

A. I do not.

Q. Do you remember what year, when it came due?

A. I do not.

Q. Do you remember when it went into default?

A. I believe it was this past summer when the -- there was not a payment made.

Q. And has Lawrence paid it?

A. No.

Q. Now, in terms of kind of self-dealing, okay, if somebody has taken from the company, likes Lawrence in other words, taken money from the company and not paying it back, does that help Lawrence?

A. A hundred percent.

Q. Now, when you need money at the company and somebody like Lawrence has taken money from the company and not paying it back, is that helping the company?

A. Absolutely not.

Q. In your mind, is there a difference between where Lawrence has taken tens of millions from the company and in default and not paying it back, is there a difference between that and what your mother, and you, and Dennis had done?

A. Huge difference.

Q. Okay. When you are giving money or loaning money to the company in the quantities that we're talking about, why did you do that?

A. I'm an owner of the company, it needs shoring up. It was obvious to me, by looking at the financials; very simple.

Q. Now, we talked a moment ago about Lawrence not coming to a board meeting, not asking questions about these loans from you, and Dennis, and your mother, we talked about that. At some point in time, have you had conversations more recent with Lawrence with regard to your loan and Dennis' loan?

A. Yes.

Q. Have there been any conversations with Lawrence

where you've said, "Hey, do you think" -- again, what -- what have you done with Lawrence in those conversations?

A. Well, there in different board meetings and shareholders meetings where he was offered a chance to take over our loans, equal our loans, participate in our loans in any way, and he continually said he didn't have enough information. But then we delivered notes, we delivered everything through counsel and to Lawrence again, and again, and again; no interest.

Q. Okay. So, how many times do you think you, yourself, face-to-face with Lawrence, have said, "Hey, if you want to step in my shoes, so to speak, for some or all of this loan you can do it," how many times have you told him that?

A. Five, six, or seven times.

Q. And has he ever taken you up on that offer?

A. Never.

Q. If it's such a great deal, has he ever -- and you understand by making a self-dealing allegation he is acting like you're -- you're doing yourself a big favor, not the company; you understand that, right?

A. Yes, I do.

Q. Has he ever explained to you why he thinks it's so, oh, it's a great deal for you Marty, but I don't want any of it, has he ever explained that to you?

A. No, he has not.

Q. Has he ever offered any explanation on -- on how he thinks maybe you're taking an advantage of the company, by having done this a couple year -- a year or so ago?

A. No. He said, over and over, that we've taken advantage of the company.

Q. Yeah. Has he ever explained it to you in a way that makes sense to you?

A. None whatsoever, no.

Q. In PX, Exhibit No. 35, towards the end of it, in the part you hadn't seen, the email piece from Robert Powers, do you see that?

A. I did, yes.

Q. You got it?

A. Yes.

Q. It says: Marty made loan of 45 million and Dennis made loan of 30 million last -- late last year. This money was used to pay all past due receivables and pay down loans.

Did I read that correctly?

A. That's correct.

Q. If the money was used to pay receivables, do you think that's a benefit to the company?

A. Yes.

Q. If the money is used to pay down loans, do you think that's a benefit or a detriment to the company?

A. Definitely a benefit.

Q. Do you have a belief, whether or not what's stated there by Mr. Powers is true? In other words, was the money used to pay down receivables and pay down loans?

A. A hundred percent I have knowledge of that exactly, yes.

Q. Yeah. And was that important to do, with big jobs coming up, like Venture Global?

A. Absolutely.

Q. I think -- let me just refresh or go -- go here. Same with PX, Exhibit No. 35, it says: Paperwork has not been completed but will be to finalize audit.

Do you see that?

A. Yes.

Q. So before this January 16, 2023 date on the email, had you signed the actual note?

A. I don't believe so, no.

Q. But did the actual note need to be signed as part of the audit process?

A. Yes. The auditors required it.

Q. Prior to that, I know that using Mr. Reasoner's statement or characterization you sort of had a

handshake or an agreement, I guess with Rob, that you were going to make these loans or make your loan; right?

A. Correct; my loan, yes.

Q. At that point in time, because he sort of said you're on -- you know, he tried to characterize it as you being on both sides. Let me just ask you, at that point in time when you had this agreement with Rob, did you -- did you have a specific discussion, where there was an agreement about an interest rate?

A. I did not.

Q. Did you --

A. I had -- I had a discussion with him. I said, "Treat me fair" is what I told him; that was it.

Q. Okay. When you left that discussion, did you know what percentage interest rate was going to be put in the note?

A. I did not. I was on the -- obviously, I'd have a chance to look at that before I signed anything, okay?

Q. Fair enough. Who was it that picked the prime, plus .25? Was that you?

A. No.

Q. Do you know -- did anyone ever tell you, "Rob did it" or "Jim Klein did it" or anything like that?

A. No. No one told me that.

Q. Back at the time?

A. At the time.

Q. Have you learned since?

A. I believe Jim Klein, that's what I believe. I haven't ever asked him exactly, but I believe it was Jim Klein.

Q. And when you were presented with a note at prime, plus .25, did you sign it?

A. Yes, I did.

Q. When you signed it, did you think, "Oh, my gosh, I've got that hog here, this is -- this is a -- I've gone to town on this interest rate"?

A. I don't think anybody would have thought that. No, I didn't think that.

Q. Were you doing it because the interest rate was prime, plus .25, as opposed to prime, as opposed to 6 percent? I mean, were you -- was the focus on the interest rate?

A. I was doing it because the company had to have an injection of capital to continue on.

Q. Did you ever, in any way, shape or form, try to leverage, use your power, use authority, try to ever influence the terms of the loan with either Rob or Jim Klein?

A. No.

Q. Back in the same time frame, early 2023, you

were aware -- obviously we've heard about May 13, 2023 is when Mr. Nixon came to town, right?

A. Correct.

Q. Okay. So up until that point in time, how many times do you think that the IB -- is that generally the time of year that the IBC notes were being renewed?

A. That's correct.

Q. During that period of time, when the IBC's notes are being renewed, let's say early year, maybe late the previous year, but early 2023, had there been a renewal process? I mean, who takes care of renewing the notes? Who does the day-to-day on that?

A. CFO, and in coordination with your -- your CEO.

Q. And the CFO is Jim Klein?

A. Jim Klein.

Q. And is that something, where you would have been involved in sort of the day-to-day communications for renewal of a note with IBC?

A. No.

Q. For -- for how many years had that note been renewed on an annual basis?

A. Probably 30 or something.

Q. Okay. And would it be in any way, shape or form typical for you, or Lawrence, or Dennis to be involved in that day-to-day exchanges of information for

the renewal of the line of credit?

A. It would not be, no.

Q. So when we look, for example, then at January, February and March of 2023 emails, before the blowup with Nixon, should we expect to see a whole lot of communication with you about, you know, day-to-day what's going on over there?

A. No.

Q. When does it rise to the level -- in this case when did it rise to the level of all of a sudden hey, we need to be more -- you know, it can't -- when did it reach the owner level?

A. When Mr. Nixon showed up in town unannounced, came to our offices.

Q. Before that, and I know there is emails, I don't know if you've seen them so much, before that, there are emails where the notes, yours and Dennis' notes, were provided to IBC; do you understand what I'm telling you?

A. Yes.

Q. I don't know, have you seen those emails?

A. I haven't seen those emails, but I knew they were provided to all of our banks.

Q. Okay. But you knew they were provided, I'll ask it that way. Did you ever, knowing that they had

been provided before the Dennis Nixon blowup, did you ever, before Dennis Nixon, ever hear anybody say "Hey, IBC's concerned that you loaned the company money, that's a bad thing"?

A. Never heard that from anyone.

Q. Did you ever hear any complaint by IBC that you and Dennis and your mother had loaned money?

A. Never mentioned it.

Q. Was it ever mentioned, that there needed to be more explanation, or more detail, or you had to come forward and give a statement or sign an affidavit, anything like that?

A. Nothing.

Q. Were you ever asked for a justification or an explanation, before the Dennis Nixon blowup?

A. No.

Q. Up until the Dennis Nixon blowup, did you think you were sort of - for lack of a better term - business as usual, with IBC?

A. Absolutely. They sent us a letter to that effect.

Q. Are you aware of the letters they sent?

A. Yes, I am.

Q. And what did they make a commitment to do, before Dennis got in town and got upset?

A. To extend the loan, waive the covenants that were broke, and loans of financials didn't have material changes, and they didn't.

Q. Okay. And by "material changes" in the loans, that means they've got to complete the audit and deliver it?

A. Material changes in the financials that -- it wasn't just delivering those, but just -- if they hit out with the audit, everything would be great.

Q. Okay. Are you aware, for example, before Dennis came to town, is there an actual written letter from Gus?

A. Yes.

Q. About agreeing to renew the loan?

A. Yes, there is.

Q. Okay. And agreeing to waive the covenants?

A. Yes.

Q. Okay.

A. Any violated covenants, yes.

Q. And I think those are in evidence, so I'm not going to go through them with you right now.

In that process, did you become aware of - I know you were asked a few questions - of the requests to subordinate your loans to the Frost loan? Well, really IBC and then the Frost loan.

A. During that -- before the Dennis Nixon blowup or after?

Q. Well, before, let's start there.

A. No, nothing before.

Q. Okay. Afterwards, was there a discussion about subordinating those loans?

A. Yes, I believe there was.

Q. I believe you characterized, you said a little while -- when Mr. Reasoner was asking you questions you said, "Yeah, that's kind of negotiating"?

A. Absolutely.

Q. Yeah. Tell me -- tell the Judge what you meant by that.

A. Well, at the same time we'd never had to sign personally, that was another thing they put on the list, and that was a killer for the board; no one wanted to have to sign personally. So, you had all these -- they made 30 something requests, I believe, and change because of the Dennis Nixon blowup. So, all --

Q. And -- and --

A. -- these changes that we never would have had to make, if he hadn't gotten all excited.

Q. Let's -- let's go through that in a little bit more detail because you're talking specifically about IBC right now; right?

A. That's correct.

Q. Okay. After the Dennis Nixon blowup, there is that letter where there is just a long list of things that they want you to agree to?

A. Correct.

Q. Were you, and Lawrence, and Dennis agreed on your responses to those demands from IBC?

A. Did we sit down and -- I know we sat down and talked about personal guarantees. I'm not sure we went through every line item there, no.

Q. On personal guarantees, was -- were you -- were you agreeable to give them a personal guarantee?

A. No.

Q. Was Lawrence?

A. No.

Q. Was Dennis?

A. No.

Q. So you-all weren't united on this idea? Because IBC now is demanding things after the blowup, that they hadn't demanded before?

A. That's correct.

Q. Okay. And was that a negotiating point?

A. Yes.

Q. Similarly, was this whole discussion about subordination a negotiating point?

A. All of it was. Yes, it was.

Q. Okay. And was that information that you're talking about, on negotiating points like that, and I understand what you said a moment ago, you don't remember going line by line, but are you aware whether or not you, and Dennis, and Lawrence were all kept in the loop by Mr. Powers?

A. I put myself in the loop, I can't speak for the other ones.

Q. Okay. Did you ultimately -- by the way, then -- then with Frost, was there a point in time when Frost had a request for personal guarantees?

A. Yes.

Q. What did they want, originally?

A. They wanted personal guarantees from all of us.

Q. Was that another negotiation?

A. Absolutely it was.

Q. Did anybody want to give -- any of the three brothers want to give personal guarantees?

A. It was getting ugly at that point, but no.

Q. Okay. And did you-all stand your ground together?

A. Yes.

Q. And did -- ultimately did Frost require a personal guarantee?

A. No, they did not.

Q. How did that happen?

A. I hate to get into all the details, but it happened by standing your ground.

Q. During this period of time when, you know, for example, are you familiar with Lawrence's letter that he wrote to Dennis Nixon?

A. I heard about it. I never read it.

Q. Okay. I'll use that -- I'll do that differently then. But during this period of time where were -- we saw the email, you remember the other testimony the other day, where Lawrence asked -- answered some questions about Mr. Gallagher, the lawyer?

A. Yes.

Q. I mean, in that period of time, which I think is March or April, it's April 2023, in that period of time, I mean, was Lawrence blaming you about IBC, or was he ready to go sue IBC?

A. He was ready to go sue them. I had never been blamed at that time.

Q. And who -- do you know who Mr. Gallagher is?

A. He is a Plaintiff attorney.

Q. Yeah. And was there any doubt about why Lawrence was reaching out to the Plaintiff lawyer with regard to put pressure on IBC?

A. There wasn't.

Q. Did that end up happening, where the company is brought in, in a lawsuit against IBC?

A. No. We never brought a lawsuit against IBC.

Q. Instead, was the -- was the loan extended, to allow the transition with Frost?

A. Yes, it was.

Q. I think you told Mr. Reasoner, a moment ago, that kind of -- that you -- I don't want to use the word "mistake," maybe you did, but that it's -- are you a shareholder of Berry GP?

A. I think LDMA is the owner of L -- of Berry GP.

Q. Yeah. The LDMA is --

A. The partnership.

Q. Are they -- is LDMA, to your knowledge, the sole shareholder of Berry GP?

A. I believe that's correct, yes.

Q. And if you've said differently in the past, is that incorrect?

A. If I've said it differently in the past, it was just a mistake.

Q. Okay. I think you used the word "mistake" earlier.

Since -- I don't know, some more awareness about that corporate structure. He -- he showed you, I

246

think, the board meetings with Berry GP or meetings with Berry GP. In more recent -- in more recent times, have there been a shareholder meeting with Becon, Inc., and LDMA?

A. Yes, I believe that's correct.

Q. Do you remember, was it a March meeting?

A. I believe, yes. I think that's probably correct.

Q. And during that March meeting, was there a -- any vote with regard to -- do you know if it's Becon, Inc., general partner of LDMA, limited partnership that decides who are the directors of Berry GP?

A. That is correct.

Q. And was that brought up at the shareholder -- the correct Becon, Inc., shareholder level?

A. Brought up as?

Q. Was it brought up at the March meeting to appoint a new director?

A. It may have been on the list, but we didn't do that.

Q. Well --

A. Oh, no, we did it in March. I think we did it in March, yes, we did.

Q. Was Bonnie's name --

A. Yes.

Q. Was she -- was she confirmed --

A. Yes.

Q. -- as a director?

A. That's correct, yes.

Q. Okay. By Becon, Inc.?

A. That's correct.

Q. Okay. By the shareholders?

A. By the shareholders.

Q. And did Lawrence vote for that or against it?

A. He voted for it.

Q. So and, of course Bonnie, is she voting Dennis' shares?

A. She is voting her shares.

Q. Point well taken. Did -- so, was the vote 2/1, 1/2, or unanimous, in -- in favor of Bonnie being a director?

A. Unanimous.

Q. And was there also a vote at that same shareholder meeting with regard to ratification of your loan?

A. Yes.

Q. And ratification of Dennis' loan?

A. Yes.

Q. Because nobody ratified mother's loan, did they?

A. They didn't.

Q. Okay. And at the shareholder level was there a vote to ratify the loan we've been talking about, that you made to Berry GP?

A. Yes.

Q. And what happened on that vote?

A. Two to one, Bonnie voted for it, I voted for it, Lawrence didn't. I think he abstained. I'd have to look at the document, but he didn't vote for it.

Q. Okay. You were asked questions about the Berry document, let's switch to that. You said that around February of 2023, it was brought up at that meeting?

A. At a board meeting, yes.

Q. Okay. And do you have any doubt in your mind about that?

A. No. Well, the date may not be perfect. A lot of water has gone under the bridge since then, but I know it happened before anybody was talking about doing anything with the dock.

Q. Okay. And let's go back and make sure, though. Does the CEO, for example, does -- does he need -- if he wants to sell a piece of real estate, does he need a vote from his directors?

A. A hundred percent. If he -- if he is going to sell a piece of real estate, it has to come to the board

to be sold; always has been, always will.

Q. How long has that been the status quo or the rule at Berry GP?

A. From the beginning.

Q. For you, from the beginning?

A. Yes.

Q. Okay. Does he need permission to market a piece of real estate?

A. No, he doesn't.

Q. Okay. So, it was brought up at a meeting, you're telling us, right, and more or less in February of 2023, but could he - and I'm not saying he would or not saying he did - but could he have, if he wanted to, market it or kind of test the market? Could he do that, as CEO? Did he have that authority?

A. That's what he was instructed to do, was to go test the waters. He wasn't -- he wasn't -- that was it, go test the waters.

Q. By the way, and there's been some complaint now, and the petition hasn't been heard much about here, was there also a complaint by Lawrence in a petition that you're selling the airplane and that he didn't want you to sell the airplane; do you remember that?

A. Yes, I do.

Q. Has that also been part of the discussions?

A. I don't know if we brought up that at a board meeting or not, but it didn't have to be. But when you said, "I want to sell the planes" or "You're selling planes," it would not be me, that would be the company, they own the planes. They bought the planes. It would be under the CEO to make a decision, and he really doesn't have to come to us, if he sells them.

Q. Yeah, that's what I was going to ask you.

A. He could be jeopardizing his job, but he doesn't have to come to us.

Q. Fair enough. Yeah, does the CEO need permission to market the planes?

A. Absolutely not.

Q. Does the CEO need permission, per your bylaws, to sell the airplanes?

A. No, he does not.

Q. Okay. In this February or so time frame of 2023, can -- what can you tell us -- can you give us any information about -- or any more information about what was said about selling the dock? What was that conversation?

A. At the board meeting?

Q. Yes, sir.

A. You're talking about the board meeting? Just talked about the dock as a lazy asset that's not

producing, and we ought to look at the value of it and see if we could get somebody that would offer a value that would make it good to get rid of it. We'd always keep the access to go across for the stuff from our company, like vessels we build and stuff, because there is a roll-on, roll-off aspect to that dock that they could -- you could always use, and you'd have to continue that, put that in the sale, but that was -- that was pretty much a known deal.

Q. To really understand that, please explain to the Court, what is it that Berry companies use the dock for?

A. We use the dock, our company uses the dock to -- the stuff that we produce at our main yard on Valero Way, there at Corn Products and 37, we produce modules, and we produce AS10 pressure vessels for refineries alone, which you see standing up. We have to have a place to load them, and that's where we load them. We go down there to our heavy lift dock, take them down to Up River Road and then go down to our dock road, and they load straightaway.

Q. And do you do that every day, or once a week, or once a month? How often are you using the dock for that purpose?

A. Probably four or five months.

Q. Four or five months out of the year?

A. No, every -- one day out of -- maybe two days out of every -- about every four or five months, you know, in that time frame. It could be five vessels leaving for the same customer and it takes a week to do it, but then it might be six months we do nothing. It could be a year we do nothing.

Q. Okay.

A. But you've got to have some access.

Q. And I think probably most of them, but what are most of those docks down there -- what are most of those docks down there using in the Port inner harbor?

A. They're all petroleum docks.

Q. Yeah, it's all liquids and --

A. Liquids.

Q. Yeah. And how often are they generally -- how many -- are they using those daily, generally?

A. They're using them. Every time there is an opening they bring another ship in.

Q. Yeah. And if you're using a dock, if you're a -- if you're moving crude, for example, and you're using the dock every day, and you're pumping a million barrels into a ship every two or three days and it's coming in and out, if you're having that frequency of the use of the dock, is that a more valuable use than

using it every -- a week in six months?

MR. REASONER: And I've just got to, again, object.

THE COURT: Leading?

MR. REASONER: Yes.

THE COURT: Sustained.

MR. ALLISON: Yes.

Q. (By Mr. Allison) Do you have an opinion about whether or not using it once a month, or for a week every six months, is that getting the -- getting value out of that dock?

A. That's exactly why we want to go market it, go test the waters, because we weren't utilizing the dock.

Q. Okay.

A. Utilization was low.

Q. And are there other better uses of the dock? When you look to your left in the ship channel, and you look to the right in your ship channel, are there other better uses for the dock?

A. Absolutely. I understand we do have barges that come in there and load liquids, but it's pennies, compared to what -- if you add it up, it's -- it's not justification of what we're doing or could be doing with that money.

Q. And you said something a moment ago about

reserving use on the dock. What did you mean by that? If you sold it, you reserve use or something like that.

A. You'd reserve an easement so I could load out those vessels I talked about. You -- you would never sell that dock without having your -- and I said this in a board meeting recently too, the same thing. You would -- you have to -- we'd have to reserve the right to load. We'd never cut our throats. We don't just sell the dock and now we can't use the main yard to build vessels because we can't get them out and get them on the water. You've got to hold it, that's just common sense. No one ever talked about getting rid of the dock and all access to it, that's never happened.

THE COURT: Your plan is to retain use of the dock, when you need it?

THE WITNESS: Access, yes, sir.

THE COURT: Right.

THE WITNESS: Yes, sir.

THE COURT: Sell it, but when you need it.

THE WITNESS: We'd pay a fee for that.

THE COURT: Yes.

THE WITNESS: Yeah.

Q. (By Mr. Allison) You could negotiate that into the deal?

A. If somebody wants it, that's going to have to

be negotiated into the deal.

Q. Okay. Now, we've heard about the letter to the Port of Corpus Christi; you remember that?

A. Yes.

Q. Are you aware of any negotiations where the Port has engaged with a process to maybe buy the dock?

A. I'm aware of negotiations. I know they did a lot of footwork, yes.

Q. Okay. Did they ever make an offer to anybody?

A. No.

Q. Did the Port ever make an offer?

A. No.

Q. So it's been on the market now, I guess not quite a year, but are you aware of any offer from the Port of Corpus Christi?

A. No, nothing from the Port of Corpus Christi.

Q. You mentioned Valero a moment ago as being somebody that maybe to pre-market it to, or market it to; has -- has Valero ever made an offer on the dock?

A. Not that I'm aware.

Q. I think there is also -- there is an exhibit, are you aware of whether or not Buckeye expressed some interest, maybe?

A. Yes.

Q. And as -- do you know whether or not that

resulted in an MDA being started?

A. I believe they -- it did, yes.

Q. And did Buckeye, are they interested in purchasing the Berry dock?

A. No.

Q. Have they expressed some -- there 16 acres that goes with the dock; right?

A. Yes.

Q. What do you-all call that?

A. Sixteen acres.

Q. Okay. Had Buckeye expressed some interest maybe in the 16 acres?

A. Yes, they have.

Q. And did it make sense to sell them the 16 acres and strand your dock?

A. No, it does not.

Q. Are you-all interested in making that deal with Citgo?

A. With Citgo?

Q. I'm sorry, are you-all interested in making a deal with Buckeye, where you sell them the 16 acres and not sell them the dock?

A. I would vote "No" on that. So, no, I would not.

Q. And that's a good point; everybody gets a vote,

right?

A. That's the way it works.

Q. How long has it been the way it works, where a majority of the three of you control whether there is a sale or not a sale?

A. Ever since the three of us had the right to vote.

THE COURT: That's the tradition?

THE WITNESS: Yes, sir.

Q. (By Mr. Allison) Well, and to -- to that point, are you aware that the bylaws talk about a requirement for a vote, in order to acquire property?

A. Yes.

Q. Okay. And do you think the rule is any different for -- for you? Do you think the rule is any different for you to, as far as selling property?

A. Absolutely not. I think it's the same.

Q. Okay.

A. And we've never exhibited it; if we had done any different than that, we've always gone before the board.

Q. In fact, has there been any -- and we understand that ever since I guess, the lawsuit, the application for temporary injunction that was done back in November of 2023 and amended, I guess about a week

ago, are you aware generally of that?

A. Yes, I am.

Q. And, of course, all of those documents are -- well, they're asking for what they're asking for, right?

A. Yes.

Q. Okay. And you know some of those requests have to do with sale of real property, right?

A. Yes.

Q. And do you understand, for example, whether or not Lawrence is asking for some sort of injunctive relief where you -- you can't sell the property at this point, he wants you to not be able to sell it without two weeks' notice and notice of the date; right?

A. Yes.

Q. Okay. Did you recently have a board meeting where you sold property, real property?

A. Yes.

Q. When was that?

A. I think that's our very last board meeting, it was probably the first of this month.

Q. Okay.

A. March.

Q. Okay. And during this last board meeting, whenever that was, when you sold property, what real property got sold?

A. A piece of property, part of a piece of property outside of Sinton, Texas.

Q. Okay. And who did it get sold to?

A. Texas Department of Transportation, TXdot.

Q. And did you receive formal notice of a meeting where that would get voted on?

A. As formal a notice as we do in our company, yes.

Q. And -- and --

A. I think it was an agenda item or something like that.

Q. Okay. And when did you receive that agenda item, so that you could get this notice, formal or not?

A. Two or three days before the meeting.

Q. And did you have the meeting?

A. Yes, we did.

Q. And did the property -- was there a vote on whether or not Berry GP would sell that real property?

A. Yes, there was.

Q. And what was that vote?

A. Unanimous vote of all three of the directors.

Q. You, Bonnie, and Lawrence?

A. That's correct.

Q. And during that meeting, did Lawrence complain, "Hey, we can't sell this because I need two weeks'

advance notice before I can vote on this"?

A. No.

Q. Did he say anything, like in his current request right now, he says he wants all the details of the sale two weeks ahead of time, did he saying like "Well, I need more details about the transaction before I can consider it"?

A. No, he did not.

Q. Did he -- do you remember anything -- was there a discussion about it?

A. Hell of a good deal, that was the discussion.

Q. Are you in -- you understand right now, and I want to make sure, you understand that originally he'd asked that he alone would have to approve a sale of real estate for it to happen?

A. Did I understand that is what he asked for? Yes, I understand that.

Q. You understand now that he is not saying that anymore, that he doesn't -- that I think now he is willing to abide by a 2/1 vote, if that's what the vote is on the sale of the dock or real estate? I think that's his pleading now.

A. Okay. Well, I thought it was --

MR. REASONER: Excuse me. If we could just do question and answer, Your Honor. Objection, leading.

MR. ALLISON: I just need to lay the predicate it for -- for the question, but I'll move on.

THE COURT: Don't lead.

Q. (By Mr. Allison) If the current pleading says "I, Lawrence, want two weeks' notice," is that agreeable to you?

A. Absolutely not; no, it's not.

Q. Why?

A. Well, why would you just have one board or director get singled out and he gets two-weeks' notice? How about come to the -- change the bylaws and make it where everybody gets two weeks' notice; I can vote for that. I'm not going to single out anybody. No one has -- needs to be anything special. It's a -- it's a business. It's run -- run it like a business. Let's just use our bylaws and go to the bylaws and change them. If it's something that will be changed, it will get changed. If it makes sense, we'll change it.

Q. And let me ask you then, focus on with what you just said and talking about the two weeks. If you're going to have some sort of notice period, whether it's a week, or ten days, or two weeks, whatever the three of you or two out of the three might agree to, if you're going to have something like that, what if the deal came up and you-all had to make -- make a decision in three

days?

A. That was the deal that came up.

Q. Tell me what you mean.

A. The TXdot deal was exactly that. They came up and they offered a large sum of money but if we didn't have an answer I think in five days, they were going to condemnation. It was a great deal. It had to be acted on. I mean, it was just a great deal. You should be able to -- you know, if you pass the deal, where you got two weeks' notice you put in there, or you could waive notice and you can vote. I mean, there is ways to do this, for the bylaws, if you wanted to do this.

Q. Okay. And do you think that that -- well, with -- I'm trying to figure out how to ask it. With respect, do you think that that's a matter to be addressed in the bylaws?

A. Absolutely.

Q. Okay. At the beginning, do you remember whether or not Mr. Lawrence Berry's request was to not allow any sale or encumbrance or mortgaging on any property?

A. I do remember that.

Q. And was that -- how did that -- this is at a period of time, because now we're talking about November of '23, December '23, January '24, was that at a period

of time -- what was happening with Frost Bank?

A. We were signing notes and stuff, which basically gave Lawrence the ability to turn down anything, without the say-so of the majority.

Q. Did that -- did that TRO or the injunctive relief sought, did it become an issue, in your discussions with Frost?

A. Absolutely.

Q. In a good way or a bad way?

A. Bad way.

Q. How so?

A. Well, you've got a owner of the company going for a TRO, and you're trying to negotiate a loan with a company that shows instability, it's never good.

Q. And specifically, was the dock part of the collateral with the Frost loan?

A. Yes, it was.

Q. Had it, for years, and years, and years been part of the collateral with the IBC loan?

A. Yes, it had.

Q. In your word "negotiations," were there negotiations then, where that was pulled out of the -- in other words, there was an exception made, so that the pledges could be made and I guess they -- Lawrence agreed, ultimately? Fair enough?

A. That's -- that's correct.

Q. Okay. Sorry. Right now, is there any sale of the dock pending?

A. Nothing that I'm aware of.

Q. Is there any offer that you're aware of?

A. No.

Q. If there were an offer made -- first of all, let me ask you, if it's a low ball offer, does the CEO even have to bring it to the board?

A. No. He doesn't have to bring it to the board at all.

Q. If there is a serious offer, would you expect the CEO to bring it to the board?

A. Yes. I would kind of expect to hear about it, yes.

Q. Okay. And so whether it's from the Port, or from Valero, or Buckeye, or somebody else, or anybody else, are you aware of any offer, let's say in the last month, that's come to your attention in any way, shape or form, that was serious?

A. None, whatsoever; none.

Q. Have there been any serious offers at all? I'm assuming there's just been some talk. Have there been any serious offers at all, since it was marketed, beginning around May?

A. None at all.

Q. Do you expect -- do you think the sale of the dock is in any way, shape or form imminent?

A. No.

Q. Do you think that you would have the best interests of the company, on voting whether to sell or not sell, if there was a serious offer?

A. Yes.

Q. Do you think Bonnie would have the best interests of the company at heart, if she were considering to sell or not sell, if there were a serious offer?

A. Yes, I do.

Q. And I understand you and Lawrence have disagreed about the sale of the dock at times, right?

A. There's never been a pending sale. We haven't disagreed about the sale of the dock.

Q. Fair enough. There hasn't been -- there hasn't been an offer, so there is nothing?

A. Nothing.

Q. Okay. But -- but let me ask it this way: Whatever his perspective is, do you think he would vote what he thought was right? Whatever that is, do you think Lawrence would at least vote for what he thought was right?

A.   I thought that before he filed that lawsuit, but I just don't know anymore.

Q.   Do you think that -- and do you -- if -- if there were a sale of the dock right now, is the dock pledged as collateral?

A.   Yes.

Q.   To -- to who?

A.   To Frost.

Q.   And so if there were a sale, what does Frost have to right to do?

A.   They take all the proceeds.

Q.   And pay back their line of credit?

A.   Absolutely, first -- first and foremost, that's where it goes.

Q.   So, by signing subordination agreements, have you assured them of that?

A.   Well, through the fact that it's collateralized with that loan, we've assured them of that there in the subordination agreement.  It just lets them know we're not going to be in the way.

Q.   And your point is really well-taken, there is really two different reasons.  They get first?

A.   Yes.

THE COURT:  Anything else?

MR. ALLISON:  We'll pass at this time.

THE COURT:  All right.  How about you?

MR. HUSEMAN:  I have just a few minutes. Of course, it's right before lunch.

THE COURT:  That's fine.

MR. HUSEMAN:  So I'll try to get it wrapped up before then, Your Honor.

THE COURT:  I'm listening.

MR. HUSEMAN:  All right.

CROSS-EXAMINATION

BY MR. HUSEMAN:

Q.   Mr. Berry, you've been the focus of very skilled interrogation by Mr. Reasoner and Mr. Allison and it's very complicated, lots of documents and things. And will you assist me in perhaps trying to simplify the issues that are being presented here.

A.   To me, I think what's trying to be presented here is that --

MR. REASONER:  Your Honor, I don't think there's a question pending.

MR. HUSEMAN:  Well, there was.

THE COURT:  There was.

MR. REASONER:  I object, vague, vague.

MR. HUSEMAN:  Well --

THE COURT:  I mean, I think it's a "Yes" or "No" question.

MR. HUSEMAN:  Yeah.

Q.   (By Mr. Huseman)  Marty, would you help me simplify this thing for the Court a little bit?

A.   Yes.

Q.   Okay, there we go.  That will satisfy Mr. Reasoner's objection as well.

So, it strikes me that there is basically three birds under the blanket for your brother, at least as expressed by his lawyers.  One is the loan situation, where you and your brother Dennis, and maybe your mother, Laura, have lent money to the company; the other one, the second thing is the business about the cranes being bought and leased back to the company; and the third one is about the company being able to sell certain assets, land, airplanes, but those three grass burrs are what I want to address with you.

To summarize the issue on the loan, the loan, if I heard you correctly, was obtained from you and from Dennis in order to provide adequate operating capital for the company?

A.   Yes, sir.

Q.   You-all needed to meet current obligations, you -- had to pay back loans, things of that sort, and that's what the email in the Plaintiff's Exhibit 35 talks about?

A.   That's correct.

Q.   All right.  And if we dig into that just a little bit, there are a number of ways in which a company can increase its operating capital, it could, for example, sell ownership in the company, which would imply that if you gave them, say, 40 million bucks, that you get 40 million bucks for the ownership in return for it; that would be one way to raise capital, wouldn't it?

A.   Correct.

Q.   But that, of course, would diminish your brother Lawrence's share in the company, if you did that; right?

A.   It would.

Q.   And you had the capability to do that, if you wanted to, but you didn't?

A.   Did not.

Q.   All right.  Another thing that you could do, which I'm going to suggest would be a stupid financial move, you could just give him the company, right?  Just write him a check and say here you go, Merry Christmas?

A.   That's correct.

Q.   The other way you could do it, and this is what's done commonly by companies, is they go to financial markets, get a note, because you-all couldn't do that because you were already tapped out on your line

of credit with IBC, weren't you?

A. And all of our collateral was tied up, correct.

Q. Everything was tied up, so there wasn't any lending. And so, of course, you chose the thing that they're complaining about, is what you did, is you made a loan to the company of millions of dollars of your money?

A. Yes.

Q. You did it for an interest rate, which was less than the going commercial rate at the time the loan was made, the interest rate that was suggested by the borrower --

A. Yes.

Q. -- right?

A. Yes.

Q. And you did it with no collateral?

A. Yes.

Q. You took a back seat, by the way, with that subordination agreement to the other lenders, in other words, you --

A. Yes.

Q. -- you took the back seat of the bus. And you gave them actually more than you could afford to give, but you actually gave them your tax reserve as part of a way to keep the company afloat and going; right?

A. That's correct.

MR. REASONER: Your Honor, I'm just going to have to respectfully object. We move from summary, to the leading and argument.

MR. HUSEMAN: Well, he's not my client, for one thing, Your Honor.

MR. REASONER: But I don't -- I don't believe he can lead this witness. He is --

MR. HUSEMAN: Why can't I?

MR. REASONER: -- a friendly witness.

MR. HUSEMAN: Why can't I?

MR. REASONER: Because he's not an adverse witness.

THE COURT: I think he is -- he is a witness associated with your side of the bar.

MR. REASONER: He is not an adverse witness.

THE COURT: I'll sustain.

MR. HUSEMAN: I guess it's whether he says "Yes" or not, Judge, I guess.

MR. REASONER: He may not be need --

THE COURT: I mean, I'm sure you're skillful enough to do it in a non-leading way and get your question.

MR. HUSEMAN: Oh, I'll give it a try, for a

change.

Q. (By Mr. Huseman) Was the loan that you made, which was the last choice in terms of raising capital for the Berry entities, was that a good deal for you?

A. No.

Q. Was it a good deal for Berry?

A. Well, it's not -- not a good deal for me if I didn't believe in the company, but I own that company, so it was a good deal to sur -- to keep the company on survival. Yes, it was.

Q. Did that --

A. Personally, no.

Q. Did that play off, in relation to the bank? Did you tell the bank what you were doing?

A. I did not.

Q. Did they learn about it?

A. Of course. Our CFO informed them immediately.

Q. Okay. And did you get good or bad feedback on that?

A. I don't think there was any feedback, that I heard.

Q. Okay. So anyway, you -- you took the last choice that you had, in terms of getting more operating capital in. And as -- as Mr. Allison had you point out a minute ago, you offered the same thing to your

brother, any, all, or a piece, whatever, and he wasn't interested in doing that to help the company, was he?

A. He hasn't been, no.

Q. All right. So that's the first grass burr. The second thing about the cranes, tell the Judge, just in your own words, what sort of cranes we're talking about here.

A. These are ex -- the largest hydraulic cranes they make, they are 1200 tons. There is some different ones that aren't as big, but four of them are like that, they're huge cranes. They're made for putting up wind generation in west Texas, that's what you'd use them for, that's what we are using them for. Our director of the Heide (phon) Haul, our rigging group, we hired a man that was only from the wind farms, he said he needed these types of cranes to perform out there, and we started with one, and then we added one in about six, seven months, and then we added another one. And then we even added another one, and another one, and another one. It -- it was for a business unit that has -- has really done quite well.

THE COURT: These -- these are these big windmills that --

THE WITNESS: Yes.

THE COURT: -- that you see here also.

THE WITNESS: Wind generation, yes, sir.

THE COURT: And -- and -- okay.

Q. (By Mr. Huseman) So, the -- so, did the Berry companies, first of all, did they have the cranes that it would take to do these wind -- windmill farms?

A. No, sir, had none.

Q. Okay. And did you-all have the money to go buy the cranes or get the cranes to do that?

A. No, sir. But the first one, we -- we came together with some money with the company that the three brothers owned, they -- they took half of it, and then I took the --

Q. Rigging outfit?

A. Yes. And then I --

Q. Was it a rigging outfit?

A. Yes. And then I took the other half, and then so I own 60 something percent of it.

Q. Uh-huh.

A. And then the company in our written agree -- and it was a loosely written agreement. The agreement was they're going to pay me for the first 12 months, $70,000, they're going to pay me half of that back, and they were going to own that half of the crane, and it would go to Bay Canada.

Q. Uh-huh.

A. They never made all the payments, couldn't make the payments. They couldn't buy the crane, couldn't even make the payments.

Q. Okay.

A. But that didn't stop me from wanting to go on with more cranes because it was a huge production of capital. Just because they weren't paying, and in all fairness, not paying me, I told the people in accounting, "Don't pay me, I got vendors that need to be paid."

Q. Okay.

A. "You pay our vendors."

Q. Okay, let's slow down.

A. Okay.

Q. I want to --

A. Okay.

Q. I want to dissect it because you crammed a lot into one answer. The company didn't have money to buy the cranes; right?

A. That's correct.

Q. You-all wanted to get in the windmill business, which you weren't in, and you didn't have the capital to do it?

A. That's correct.

Q. And so you, through your company, were

instrumental in getting these cranes into Berry's hands, for getting in the windmill business?

A. Yes, sir.

Q. And it had a deal where they were going to pay you a lease rate on them, and then were going to eventually own them?

A. They never did.

Q. Buy -- buy you out on it?

A. They were going to -- they were going to basically own them after a year. They would take -- half the payment would apply to the crane --

Q. Uh-huh.

A. -- and they would end up buying the crane and owning it.

Q. And then you'd be out of it?

A. I'd be out of it.

Q. Okay. Well, there was a problem with that, wasn't there?

A. Money.

Q. Okay. Did -- are they -- is Berry companies -- were they making -- I presume they're making money off the cranes, even as we sit here?

A. Yes, they are.

Q. When is the last time they made a payment to you for any of these lease payments?

A. I testified to that earlier, I believe it was June or July of last year.

Q. Okay. So about eight, nine months ago was the last time you received a payment on this deal?

A. That is correct.

Q. Okay. And if they were -- wanted to buy the cranes, per their original deal, would you be good with that?

A. I'd be good with that, up to a point. We'd like to get some payments first.

Q. Okay. All righty. And you've invested what? I'm told by post-it-note you've maybe invested as much as 25 million on these cranes?

A. It's -- it's a lot. Those first cranes were about 4 million a piece.

Q. And the crane -- and the company is making millions off of using them, as we speak?

A. Absolutely.

Q. And you -- and you're not getting paid a darn thing?

A. At this time, no, I'm not.

Q. All right. Okay. Let's go to the third grass burr to get done before -- get that -- get this blanket cleaned up here.

About the land sales and sales of the airplane

and all this, this stuff has all been handled in accordance with a set policy by the company for years, hasn't it? That's what you told the Judge minutes ago?

A. That's correct.

Q. There's not ever been threatened and there's not going to be any sale done, which Lawrence Berry does not have a say in?

A. That's correct.

Q. Okay. And do you see what the theme is between these three complaints, what the motivating problem is in all of these?

A. Do I see it? Yes, I do.

Q. Okay. I want to suggest to you that the problem is that this is -- complaints are being made and complaints involving things where you're trying raise capital for the company, sell off an asset so you can use it elsewhere. You know, you buy the cranes so the company can use them to make money because the company doesn't have to offer any capital goods. Making a loan to the company you, your mom, your deceased brother, all making loans for operating capital. All of these things have to do with the capital structure of the company, don't they?

A. They do.

Q. And so what's being asked here in court by

these folks over here is that the Judge step in and substitute his judgment for the judgment of the business's management and this board; right?

MR. REASONER: Objection, leading, arguing.

THE COURT: Sustained.

Q. (By Mr. Huseman) Yeah. The problem here is that Mr. --

THE COURT: Look. I -- I get your point.

MR. HUSEMAN: Okay.

THE COURT: I get your point.

MR. HUSEMAN: All right.

Q. (By Mr. Huseman) And so, it's just that simple, isn't it? It's -- it's a capital issue?

MR. REASONER: Objection.

THE COURT: Sustained, but I get your point.

MR. HUSEMAN: Okay, good. I'm talking too much anyway, Judge.

THE COURT: Well, I got the point.

MR. HUSEMAN: Okay.

THE COURT: I get the point you're trying to get across.

MR. HUSEMAN: Okay.

THE COURT: Anything else, Mr. Huseman?

MR. HUSEMAN: No.

THE COURT: All right. Well, then I guess we'll take it for lunch, and we'll come back at 1:30 and we'll continue on then.

(Noon recess.)

THE COURT: Okay. So, recross? No?

MR. REASONER: Please, Your Honor. I won't be -- I won't be long.

THE COURT: All right.

MR. REASONER: Are you ready, ma'am?

(Court reporter responding.)

RECROSS-EXAMINATION

BY MR. REASONER:

Q. Good afternoon, Mr. Berry. One of the things you testified to at some length with opposing counsel was how important a CEO is to the company; is that right?

A. That's correct.

Q. And the -- a critical position that is with a lot of power; is that right?

A. That's correct.

Q. And yet, sir, we are in a situation where unfortunately the current CEO is incapacitated, for --

MR. ALLISON: Your Honor, just -- we --

Q. (By Mr. Reasoner) -- what could be some period of time; is that right?

MR. ALLISON: Your Honor, we just object to relevance. I mean, I don't see how this has anything to do with the specific relief sought. I don't mind them letting you know and obviously, we do have a situation where it's -- it's delicate for the company, but I just don't see any relevance to it.

MR. HUSEMAN: We do agree.

THE COURT: I mean, I haven't heard a question yet.

MR. REASONER: And -- and, Your Honor, at -- at the risk of previewing why I'm going into this, this is a situation where they do not have anyone in place.

THE COURT: Yeah, I got that.

MR. REASONER: This emphasizes the -- the critical --

THE COURT: There is no CEO.

MR. REASONER: Correct.

THE COURT: There is a CFO, I guess.

MR. REASONER: Correct. So, I just have a brief follow-up on that --

THE COURT: Okay.

MR. REASONER: -- based on the questions --

THE COURT: All right.

MR. REASONER: -- of opposing counsel.

THE COURT: Go ahead.

Q. (By Mr. Reasoner) And -- and, sir, in spite of that level -- well, we are in a situation, unfortunately, where it appears the current CEO may be incapacitated for some extended period; is that right, sir?

A. Could be.

Q. I mean, that's -- that's certainly -- again, I don't want to delve into the gentleman's condition here but you -- that's certainly a possibility, that it could be an extended period?

A. Or he could be back in two or three days.

Q. Oh, is that -- okay.

A. I communicated with him last night, so it's just a matter of time.

Q. All right, sir. But do you have any -- because you're getting into that, do you have any understanding of when he will be clear to take over his role?

A. No, I do not.

THE COURT: He's not clear today, we got that but --

THE WITNESS: Yes, sir.

THE COURT: But -- but, okay.

Q. (By Mr. Reasoner) And it was a -- a stroke was what took place?

A. That's correct.

Q. And you have not, up to this point, voted in favor of, or proposed an interim person, whether within the company or from without, to take that position in the interim?

A. I haven't. That's a simple question, no, I haven't.

Q. All right. And in fact, you did not support the -- the idea of Mr. Luhan, who was there for 30 years --

MR. ALLISON: Your Honor, asked and answered.

THE COURT: Sustained.

Q. (By Mr. Reasoner) Are you aware that the bylaws require that when the president or CEO office is vacant, that the board is to -- to put someone in it?

A. Absolutely. It doesn't say you jump in and put the wrong person in there. It says you've got to put somebody in it, and I think that process is going.

Q. Okay. And so Mr. -- Mr. Luhan is the wrong person, in your view?

A. Mr. Luhan has been with the company for 25 or 30 years, and he was made the president of one of those companies. He's never been in a CEO position of a company this size.

Q. All right. And have you proposed someone else who has that experience to do this?

A. No. I'm still researching it. I haven't proposed anybody. I only had one board meeting that that was brought up and I haven't -- I haven't proposed anyone.

Q. And have you involved Lawrence Berry in the process of trying to find someone who would be, in your view, suitable for that position, for an -- on an interim basis?

A. I hadn't involved any of the other directors, no one.

Q. Just yourself?

A. Just myself.

Q. You talked about attendance at the office. You're aware that Berry's executive office in Houston was over at the Riverway Building; is that correct?

A. That is correct.

Q. And that was for many years, up until a month ago, when Mr. Powers closed that office; is that correct?

A. Well, let's go back. What do you mean by "executive offices"?

Q. Well, you knew Lawrence Berry, among others, worked there at the Bay office in Houston; correct?

A. That's correct.

Q. And he held executive positions in the company; correct?

A. That's correct.

Q. And did you go to the Houston office regularly?

A. No.

Q. Okay. Do you have any doubt that Mr. Lawrence Berry went to the Houston office regularly?

A. I think he went to the Houston office. I don't know how regularly.

Q. Okay. You don't have information about it?

A. No.

Q. All right. So, when you were talking to opposing counsel about him no-showing at the office, you're talking about the Corpus office; right?

A. Where all the action takes place is in Corpus Christi, our main office.

Q. Well --

A. That's what I was talking about.

Q. Okay. Well, you don't know -- I guess it sounds like you didn't much go to Houston, so you can't tell us much about the action that was going on there, can you?

A. If it dealt with our company, I could tell you about it.

Q. All right. You're aware a lot of transactions took place from that office; correct?

A. I'm not aware of that.

Q. Okay. So that -- when you learned about that, about transactions that were involved -- involved in that office, that would be news to you?

A. No, I know about some, but I'm not aware of all the things that --

Q. Okay.

A. -- have transpired --

Q. You can't --

A. -- in that office.

Q. All right, fair enough; that's fair. You talked about getting things, like weekly cash reports and regular information. Do you know what information was regularly provided to Lawrence Berry?

A. I don't know what he asked for. I have no clue.

Q. And my question was a little different. You don't know what he asked for, you don't know what he was given either, do you?

A. No, I do not.

Q. And looking, for example, at PTX12 that we saw earlier, if you can pull that from your stack.

A. Yes, I have it.

Q. All right. And if you look at the second page of that you see that that is a -- in April of 2023, a request for some extensive information; do you see that, sir?

A. Yes, I do.

Q. All right. And do you know whether any of that information was provided?

A. I do not know.

Q. All right. And you weren't involved in trying to make sure that Lawrence Berry received requested information of that kind, were you?

A. No, I was not.

Q. All right. And let me ask you, you talked with opposing counsel about Orca, the Orca note. My understanding is that that transaction involved, at one point, a conversion of the company's loan interest to equity, and then there was a mark to market, and my question is, were you personally involved for the company in how that Orca transaction was structured?

A. I was in the board meeting when it was approved.

Q. Okay. But when folks came and talked to Mr. Berry about converting the company's position, were you involved in that discussion?

A. No, I was not.

Q. Were you involved in gathering information to see, in light of that restructuring, what Lawrence Berry should owe and what should be paid?

A. No.

Q. You talked about offering Lawrence Berry the opportunity to participate in the 75 million dollar loan; do you recall that testimony?

A. Yes, sir, I do.

Q. And just so the record is clear, that offer was not made until after this lawsuit was filed; is that correct?

A. That's correct.

Q. All right. And -- and your testimony is unchanged, that at the time the loan was made you never talked to Lawrence Berry about it; correct?

A. Correct.

Q. You mentioned, sir, *Robert's Rules of Order* as -- as something that the -- that you think about, in terms of - I can't remember - you talking about a board meeting; is that right?

A. That's correct.

Q. All right. Let me ask you, I just printed something off here.

MR. REASONER: May I approach, Your Honor?

THE COURT: Yes.

Q. (By Mr. Reasoner) I marked as Exhibit 60 -- Plaintiff's Exhibit 65, sir. If you could have a look at that. Do you see that that is *Robert's Rules of Order*, 12th edition?

A. Yes.

Q. In looking at that, if we go to the next page you see that 45:4 says: Abstaining from voting on a question of direct personal interest.

Do you see that?

A. Yes.

Q. No member should vote on a question in which he has a direct personal or pecuniary interest not common to other members of the organization.

Do you see that, sir?

A. Yes, I do.

Q. And certainly as to, for example, Western Gulf Equipment, you had a pecuniary interest or personal interest not common to the other directors; true?

A. That may be true.

Q. All right. I mean, you know it's true, right?

A. I believe that, yes.

Q. Okay. And you never abstained from voting on the subsequent ratification of the Western Gulf Equipment transactions, did you?

A. No, I did not.

Q. Okay. And the loans to the company that you made, those were ones in which you had a direct personal interest; correct?

A. Yes.

Q. And you never abstained from voting to ratify those loans after the fact, did you?

A. No, I did not.

Q. Sir, on the -- on the issue of the discussion you had with Mr. Huseman about the various means that a company could be -- that money could be injected into the company; do you recall that, sir?

A. Yes, I do.

Q. And one of the things you mentioned was that a capital - or I guess it was Mr. Huseman that mentioned it, you agreed - that a capital contribution would dilute Lawrence Berry's position; correct?

A. Yes. At the right time, yes.

Q. All right. And but one of the things, and I'm not asking you whether this is something that you have advocated, but one of the things that could happen in a situation where a majority of directors have loaned money to the company and a minority have not, the majority could vote to convert the loan into equity; true?

A. I'm not sure about that. I just don't know.

Q. You don't know whether they could or couldn't?

A. I don't know.

Q. Okay. But that's obviously a complication of someone being involved in both sides of a transaction that would need to be considered; true?

A. I guess that would be correct.

MR. REASONER: I pass the witness, Your Honor.

THE COURT: Okay. Is there redirect?

MR. ALLISON: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. ALLISON:

Q. Where does the -- where is the home office of the Berry entities?

A. 1414 Valero Way, Corpus Christi.

Q. How long has the home office or main office been in Corpus Christi?

A. It was built in about '50; '53, the company was started, the original company. And it's been -- once it was off of McBride Lane and then it moved to Corn Products, probably in the 60s.

Q. How many acres are owned over there, that are sort of the -- you guys have got about a four-story building over there?

A. That's correct.

Q. And --

A. Two hundred and something.

Q. How many square feet?

A. Oh, the building? I couldn't tell you.

Q. And how many acres are around that?

A. Probably -- there is 54, and we added a hundred and something, so I'm not -- I can't give you the exact number; 175 to 200 acres around there.

Q. And the place where the office building is, where Lawrence maybe goes --

A. Uh-huh.

Q. -- is that owned by the Berry companies?

A. Yes, it is.

Q. The building is?

A. Yes, yes.

Q. Okay. And is there -- what other property is owned by the Berries, up in Houston?

A. Almeda Road. We have an office out on Almeda Road that we own.

Q. Okay. But back to the Corpus -- for the Corpus location --

A. That's different than what they're talking about. Almeda is different than the other property that they're talking about.

Q. Okay. And, oh, do you have some docks up in

Houston?

A. No.

Q. So this super valuable dock that Lawrence is worried about is the only dock you have here in Corpus?

A. No, we got a dock in Ingleside too.

Q. Okay, fair. And the CEO, where is his office?

A. It's in 1414 Valero Way.

Q. And the CFO, where does he office?

A. Same office building, here in Corpus.

Q. And when mother comes to the office, where does she go?

A. Same place.

Q. Okay.

A. 1414 Valero Way.

Q. And where do you have the meetings?

A. Fourth th floor, 1414 Valero Way.

Q. All right. Is there any doubt in -- whatever amount time Lawrence spends in the Houston office, is there any doubt where the main office is?

A. None, whatsoever.

Q. Okay. Any doubt where -- by the way, the yard, how big is the yard here in Corpus? Is that 170 something?

A. That yard is about 65 acres right now, and it's surrounded by unimproved property.

Q. Is that where the actual production, I guess, or fabrication occurs?

A. Some of the -- some of the fabrication takes place there, yes, that's what we've been talking about.

Q. Okay. Again, any doubt, with all those things considered, I mean, when you have the meetings, when you have your fabrication, when you're loading onto docks and barges and the things he's concerned about, is all of that here in Corpus?

A. Yes, it is.

Q. Okay.

MR. ALLISON: May I approach, Your Honor?

THE COURT: Yes.

MR. ALLISON: We've been working during the break on exhibits. I'm going to try to do this.

THE COURT: Okay.

MR. REASONER: Doug, while you're doing that, I forgot to offer Exhibit 65.

MR. ALLISON: I'm sorry, you cannot do that. We have no problem with it.

THE COURT: All right, 65 is admitted.

MR. REASONER: Thank you.

MR. ALLISON: Oh, wait, is that *Robert's Rules*?

MR. REASONER: Yes.

MR. ALLISON: Do you really want it in? By that, I mean, I don't think it's --

MR. REASONER: How about to make it part of the record for the Judge to take judicial notice of?

MR. ALLISON: Sure.

THE COURT: Okay.

MR. ALLISON: You know what I meant, yeah.

MR. REASONER: I know where you're going.

MR. ALLISON: It's a little different animal.

Q. (By Mr. Allison) I'm going to walk you just through some documents here. These are under the subject of the loans or the advances. And I'm going to have you look at Exhibit No. 117. Do you recognize that?

A. Yes, I do.

Q. Can you tell us what that is?

A. It's a shareholder meeting of Berry GP. And we --

Q. Excuse me, let me direct you up here. "Shareholder meeting or directors meeting of" who?

A. Okay. Where it says: Resolution of special meeting of directors of Becon, Inc., as general partner of LDMA limited partnership (the latter to be acting in its capacity of sole shareholders of Berry GP.)

Q. And does it show that you and Bonnie voted in favor of something?

A. Yes, we did. We voted in favor of ratifying the loans.

MR. ALLISON: And that's Exhibit 117, we'd offer that, Your Honor.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) So another one, it's Exhibit 118. Can you tell us what that is?

A. Yes. It's a resolution of the special meeting of the shareholders of Becon, Inc., as a general partner of LDMA limited partnership and (the latter to be acting in its capacity of sole shareholder of Berry GP.)

Q. Again, approving the loans?

A. Approving the loans.

MR. ALLISON: We'd offer Exhibit 118.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Exhibit No. 202 there, can you tell us what that is?

A. Looks like from Gustavo Barrera at IBC, to Robert Powers, an email.

Q. Yes, sir. And it looks like, was it also from Powers to --

A. Powers back, yeah, he responded back to him.

Q. Okay. And he is providing a -- what's he -- what's that generally look like, to you?

A. He is giving us our -- showing him what we're doing, going to do with the board, evidently.

Q. Yeah. It's an agenda?

A. Uh-huh.

Q. Is that a "Yes"?

A. Yes, agenda of the board.

Q. Okay. And I think, though, during the break did you also -- this one actually has on it assets, sales equipment, additional cost cutting, property sales sitting in Three Rivers. Do you see that?

A. Yes, I do.

Q. Is it typical for you to discuss property sales if -- even if it's real property sales, if you're actually going to sell them?

A. They could sell them or purchase them, yes.

Q. Okay. In a board meeting?

A. Yes.

Q. Okay. And do you think this is a true and correct copy of Exhibit No. 202?

A. Yes, I do.

MR. ALLISON: Offer it, Your Honor.

MR. REASONER: Your Honor, my coun -- my

colleague knows this.

MR. ALLISON: You're ganging up on me, but I have problem. Go ahead.

MR. ABSMEIER: Just because we were --

MR. ALLISON: It's the one page.

MR. ABSMEIER: It's just the one page, 819, Bay 819?

MR. ALLISON: Correct.

MR. ABSMEIER: No objection.

THE COURT: All right. No objections, it's admitted.

Q. (By Mr. Allison) And during the break did you check, are there -- are there several different agendas where property sales are talked about, just generically?

A. Numbers, yes.

Q. Generically, it's on the agenda?

A. Yes.

Q. Often?

A. Yes.

Q. Okay. Some of those board meetings, Exhibit No. 204, is that the form that you get them in, sometimes --

A. Exactly --

Q. -- where they're --

A. -- a packet, uh-huh.

Q. This one, for example, talks about loan path forward; is that right?

A. Correct.

Q. Is that talking about the line of credit we've been talking about?

A. Yes.

Q. On the agenda for what date?

A. May 9, 2023.

MR. ALLISON: And that's Exhibit 204, we'd offer it at this time.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Same thing for June, June of 2003, was the financial line of credit discussion and path forward also on the agenda?

A. Yes, it was.

Q. It says: Operating line, path forward, board discussion. Do you see that?

A. Yes, I do.

Q. Is that the way that the -- that Rob Powers would, every month, keep -- keep the owners, keep the directors, keep the three of you up to speed?

A. Yes.

MR. ALLISON: I'm not sure if I offered that one; that's Exhibit 205.

MR. REASONER: No objection.

THE COURT: Okay. It's admitted.

Q. (By Mr. Allison) Exhibit No. 206 is the same thing for July; is that right?

A. July the 12th, 2023, correct.

Q. And again, what is it? What's on the discussion list?

A. Work force, financial review, operating line, path forward, project highlights, other business.

Q. Yeah. And by the way if there had been a -- a sale -- because then I think we're through. Let me go ahead and admit this one into evidence first.

MR. ALLISON: Your Honor, we would offer Exhibit 206.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) And as far as -- so far with 206, I guess we're through. July here, if there had been a substantial offer on something like the dock, would that probably be on an agenda to talk about, if you-all were going to consider it?

A. Yes.

Q. Okay. The fact that it's not there, does that -- is that in keeping consistent with your testimony, that there's been no serious offers?

A. Exactly, yes.

Q. I'll show you Exhibit No. 405, ask you to review that.

A. Okay.

Q. Again, we've been talking about the property just right then, the Berry dock. Do you see that exchange by text with -- between Lawrence Berry and Rob?

A. Yes, I do.

Q. And do you think it's true, where it says here that there's -- as of October 2023, that there is no negotiations that he is aware of, Buckeye is interested, but no real discussion?

A. Yes, I believe that to be true.

Q. Do you think that -- that email, excuse me, that text message represents the truth about what was going on in that time frame?

A. A hundred percent.

Q. And is it also indicative, again, just like we see all the board meetings where Lawrence has had an opportunity to get the information, is that another example of how Lawrence would get information, by text with Rob?

A. Yes, that's one way.

Q. Okay.

MR. ALLISON: We'd offer Exhibit No. 405.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Here's Exhibit No. 406. I'm not sure this one did or did not get in. We just -- this is what date?

A. December 7, 2023.

Q. And it's a resolution relating to what?

A. It's about the docks and advertising for them. You want me to read it?

Q. Sure.

A. Okay. "Be resolved that all action previously taken by any director of Berry GP., Inc., or any employee of Bay, Limited to promote, advertise, or seek offers for sale of the Berry dock is hereby ratified. The board further determines that the Berry dock and adjacent property is to remain listed for sale and that no sale shall take place pending the resolution of the TRO currently in place in Harris County."

Q. Okay. And was that signed by you?

A. Yes, it was.

Q. And was that signed by Dennis Berry?

A. Yes, it was.

Q. And is it clear that a majority, as of this date, still December 7th, 2023, that at least a majority, as of that date, were still in favor of

keeping the dock on the market?

A. Yes.

Q. Okay. And obviously that happened at a board meeting and whatever was talked about, Lawrence would have been there too?

A. Yes.

Q. Okay.

MR. ALLISON: You're Honor, we'd offer Exhibit 406.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Exhibit 408, can you tell us what that is, sir?

A. Yes. This is a resolution of a special meeting of the directors of Becon, Inc., as general partners of LDMA, limited partnership (the latter to be acting in its capacity of sole shareholder of Berry GP.

And this is a -- it says: Be it resolved that all action previously taken by any director of Berry GP, Inc., or any employees of Bay Limited to promote, advertise or seek offers for the sale of the Berry dock is hereby ratified.

It is further resolved that the board further determines that the Berry dock and adjacent property is to remain listed for sale and that -- and that no sale

shall take place pending the resolution of the TRO currently in place in Nueces County, Texas is hereby ratified.

Q. Okay. And this is a resolution for the directors of Becon, Inc.?

A. Yes.

Q. And the date on that is what?

A. It's the 13th of March, 2024.

Q. So, by then your brother had passed?

A. And Bonnie --

Q. And Bonnie --

A. Bonnie --

Q. -- is --

A. -- is on the board and she signed it too, yeah.

Q. She and you both signed it?

A. That's right.

Q. Okay.

MR. ALLISON: Your Honor, we'd offer Exhibit 408.

MR. REASONER: No objection, Your Honor.

THE COURT: It's admitted.

Q. (By Mr. Allison) In terms of further defining the time line with Frost and with IBC discussions that have been talked about, I'm going to make you strain your eyes a little bit.

A. Okay.

Q. I'm going to ask you look at Exhibit No. 708.

A. Okay.

Q. And I highlighted certain ones, just to help you, because it's small and a lot of text messages; right?

A. Uh-huh.

Q. Correct?

A. Yes.

Q. Do you see, are these text messages from Rob to you, and to Lawrence and to Dennis?

A. That's correct.

Q. And so, was that a way that also -- I mean, in other words, did you have to have a formal board meeting in order to get information from Rob?

A. No.

Q. Was information shared by text pretty frequently, whatever that means, from time to time?

A. But understand something, I'm five feet from his door, so I got texts too. I don't know how much they got, okay?

Q. Okay. But this, the string we have here, though, has all of you on it, right?

A. That's correct, yeah.

Q. Okay. And just to give some dates here, it

looks like --

A. Monday, April --

Q. Go ahead.

A. Monday, April the 3rd, 9:51 in the morning.

Q. And what does he say? What is Rob saying?

A. "I'm scheduling an emergency board meeting for 2 p.m. tomorrow. There will be a call in number. This meeting is to discuss current banking path forward."

Q. And does Lawrence respond?

A. He says, "Okay. I'll be available."

Q. Okay. Gets a thumbs up back from Rob, it looks like, or from somebody?

A. Yeah.

Q. And then two days later?

A. "Gents. IBC accepted our proposal. IRS latter today," I think it should have been letter, "today for another 6 million" or 5 million, "6 million, and elevators are working."

Q. Okay. Now, is this Rob keeping all three of the brothers advised?

A. Yes, it is.

Q. During April of 2023?

A. Yes, it is.

Q. Then this one on April, excuse me, this one is May 15?

A. "Gents. Banks are all requiring personal guarantees. Please let me know your position on this so I can plan cash flow accordingly."

Q. Okay. Again, is that Rob keeping everybody informed, like you told us earlier?

A. Yes, it is.

MR. ALLISON: And Exhibit No. 708, Your Honor, we would offer.

THE COURT: Okay.

MR. REASONER: No objection.

THE COURT: All right. No objection, hearing no objection, it's admitted.

Q. (By Mr. Allison) I'm going to show you Exhibit No. 716.

A. Okay.

(Court reporter speaking.)

MR. ALLISON: Yes, 708, thank you.

Q. (By Mr. Allison) What's the date of this email we're looking at on 716?

A. July 8, 2023.

Q. Okay. And it's from who?

A. It's from Robert Powers.

Q. To who?

A. Lawrence.

Q. And?

A. Myself and -- and Dennis.

Q. Yeah. And by the way, so there is no confusion later, it says -- you're Captain Berry?

A. Uh-huh.

Q. Is that a "Yes"?

A. Yes, that's correct.

Q. And Dennis is?

A. Damenice; Damenice1957.

Q. Okay. And --

A. Like 'Dennis the Menace'. Remember?

Q. I understand.

A. Okay.

Q. But these are, this is from Powers to you and both the other brothers, and what's he -- what's the reference?

A. It says: Lawrence, loan docs as requested. This is the first step of three. Next week, we should get the revolver documents to increase to 30 million. After that, we will get the documents that attaches the Berry building which will take the revolver to 50 million. I will send board presentation on Monday. Rob."

Q. Okay. Is that an example of how he kept you informed?

A. Yes, that's correct.

Q. And if you look at it, I think it has the attachment, it has, at least, draft loan documents?

A. Uh-huh, yes.

MR. ALLISON: Exhibit No. 716, we'd offer.

MR. REASONER: No objection.

THE COURT: All right. It's admitted.

Q. (By Mr. Allison) I show you Exhibit No. 717. Is that more of these text messages where you and your two brothers are on a string and getting information from Rob?

A. Yes, it is.

Q. Go ahead. This is Rob's text right here. Well, that one we've read before with "gents". By the way, we didn't have the response a moment ago. This is the one that said, from Rob: Gents, IBC has accepted our proposal. Something latter today for another 6 million and elevators are working. Right?

A. That's correct.

Q. And Lawrence says?

A. "Cool. I'm en route to CC for meetings, hopefully see you around office."

Q. Have you seen any text so far where Lawrence says "You're not giving me information, you're not keeping me informed"?

A. I have not.

Q. Have you seen anywhere he is, you know, angry and screaming about the sale of the dock?

A. I have not.

Q. Okay. Have you seen anywhere he is saying, "Hey, don't vote me off the board and there is some sort of tension going on"?

A. I have not.

Q. Yeah. Was he cooperating during this time frame, in order to -- and on your side and on Dennis' side, when it came to the dispute with Nixon?

A. He was on the side of our company, yes.

Q. Yeah. Then on May 3rd, what does it say?

A. It says: Today's meeting should be brief. Two topics: Green hydrogen and IBC transaction -- transition. We have a regular board meeting next week.

Q. Again, more examples of how he would keep you informed?

A. That's correct.

Q. Over here, it looks now like we're jumping to this one, this is how the page is put together. July 8, what does it say?

A. I just e-mailed the loan docs for the 20 million. These are all we have at this time.

Q. So, again, so that's Rob letting the three brothers know that he's e-mailed you the loan docs and

that's all of the information, sort of, right now, that's the update?

A. That was the update. And then he says: Gents, I have sent tomorrow's presentation to your email.

Q. And that's him sending the agenda packet with -- so that you know what you're talking about?

A. For the board meeting, correct.

Q. Okay.

MR. ALLISON: We'd offer Exhibit 717.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) I think this is probably what he's referring to, this is Exhibit No. 718. What's that?

A. "Please find the present" -- it's from Rob Powers to all of us. Please -- the records. "Please find attached presentation for tomorrow's meeting. Rob."

Q. Okay.

MR. ALLISON: And we'd offer 718.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Exhibit No. 722, is that an email?

A. It is.

Q. Dated?

A. Date July 21st, 2023.

Q. From?

A. From Rob Powers to Lawrence, Allen Lawrence Berry.

Q. Yeah, when you see "ALB" in these, some of us know this, but his real name is Allen Lawrence Berry; right?

A. That's correct.

Q. So what, "ALB" is Lawrence?

A. Uh-huh.

Q. Okay. And what's he -- what's Rob -- on July 21st, what's Rob sending to Lawrence?

A. "Lawrence. I sent you all the docks I have last week. We have not received any additional documents since then. We are expecting the documents early next week and I will send them to you. We expect to close on the 30 million line by the end of next week. We are no longer talking to Amegy, as they stated we needed more financials and likely couldn't do anything until next year. In addition, we are no longer talking to Plains but do use American Bank for miscellaneous loans such as insurance payments. That's all I have for an update."

Q. And is that an update from Rob, in response to

Lawrence's email request?

A. Yes, it is.

Q. Okay. Again, typical?

A. Very typical.

Q. Looking at Exhibit 725, is that another email?

A. Yes, it is.

Q. Dated?

A. Dated, this one is dated July 25th, 2023.

Q. And by -- by now when we see the name Troy Bethel, we're a little later in time. So, Troy is with who?

A. Frost Bank.

Q. And so Troy has sent something and then it looks like Rob is forwarding it; is that right?

A. That looks exactly right to me.

Q. And then who is it to? Who is Rob forwarding all this information to?

A. ALB, Marty Berry, and Dennis Berry.

Q. And if you look at the reference line on attachments, go ahead and read that for the record.

A. It says: Two arbitration and notice of final agreements, two certification (sic) of corporate resolutions, two loan agreements, two pledge and security agreements, two promissory notes, two security agreements, two subordination agreements, two

subordination agreements.

Q. Is that an example -- the subordination agreements, by the way, are the ones that you signed and Dennis signed, subordinating your loans to Frost; right?

A. That's correct.

Q. All right. And so if --

MR. ALLISON: And we'd offer Exhibit 725.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) We go to 734 now. Now we're in a little later time frame, December 7, 2023, do you see that?

A. Yes.

Q. We talked -- you talked or gave testimony earlier about how there were some problems, some issues, some wrinkles that had to -- or hurdles that had to be cleared with Frost, especially complicated by the -- by the litigation, the TRO?

A. Correct.

Q. And was this an effort that, in time, helped to solve that?

A. Absolutely.

Q. And what was this letter?

A. This is December 7, 2023: I approve Berry GP moving forward with any documents needed to secure the

50 million credit line with Frost Bank as long as it does not involve the sale of real property.

Q. Okay. So, and Lawrence by that time had agreed they could be pledged as collateral and just not sold, I think is the distinction he was trying to make.

A. That -- that's how he voted, yes.

Q. Okay. And this is drafted by Mr. Hummell, or do you know?

A. I don't know.

Q. Okay.

MR. ALLISON: We'd offer Exhibit 734.

MR. REASONER: No objection.

THE COURT: It is admitted.

Q. (By Mr. Allison) Going to Exhibit 740. These are some more text messages?

A. Apparently.

Q. Sorry, they're small.

A. Yes. You want me to read them?

Q. Let her finish her note-taking.

A. Oh.

Q. That's okay. When her fingers come off the keyboard we stop talking.

A. I'm trying to talk slow. Sorry.

Q. It's okay. Okay. We're looking now in this time frame actually earlier, on this particular set of

text exchanges here. We're back to March 15, two days after the draft notice of default; right?

A. Uh-huh.

Q. Correct?

A. That's correct.

Q. And go ahead and read that one for us. It's a text from Lawrence, again, to -- copy to you, copy to Dennis and to Rob; right?

A. Yes.

Q. Go ahead and read that one.

A. "Tonja and I just hung up with Walter Beard at Cadence Bank. We have a meeting scheduled to discuss the revolving line of credit for receivables on Friday at 10 a.m. Invitations have already gone out. We asked for 100 million dollars line, which is within their limits. We have been banking there for around 15 years."

Q. So Lawrence, within two days of the draft notice of default, Lawrence has already contacted Cadence Bank and is already trying to put together a deal up there with a revolving line of credit?

A. That's correct.

Q. Again, and then you had contacted, I think in that same time frame or soon thereafter, maybe very much same time frame, Frost; is that right?

A. I think Mike initiated the contact.

Q. I believe you're correct. And was that an all-call, where all of you were working together?

A. I think everybody in the -- yes, everybody in the company that had some kind of contact was working on it at that time.

Q. Okay. Then if you move on. And is that -- is that an example or does that demonstrate the communication that is typical for the organization?

A. Yes.

MR. REASONER: And, Your Honor, I just have to object to the leading narrative on the exhibit.

THE COURT: Sustained.

MR. ALLISON: Okay.

Q. (By Mr. Allison) Here is an entry for March 29 from -- from Rob; what does that one say?

A. "Mike Hummell has e-mailed you guys the IBC letter with our comments. Please review as soon as possible so that we can send it back to them. Thanks."

Q. Now, we talked earlier, I think, about that negotiation that occurred, where they were asking for personal financial, or personal guarantees, or you remember that whole line of discussion?

A. Yes, I do.

Q. Is that what's going on here, where we're in

negotiations?

A. Absolutely.

Q. Okay. And would you say that -- how would you characterize it, in terms of, what information is Rob trying to make sure all the brothers have?

A. To know what the restrictions are going to be on each one of us, what we're going to have to sign up for, that's what he's doing.

Q. And then the next one is March 31. Things were moving obviously a little bit further on there. What does that one say, from March?

A. "Gents. We received the 25 million this morning. We are depositing in Frost. We have another 13 million coming today from VG."

Q. Okay. And does Lawrence respond?

A. "Let's go to Vegas."

Q. Okay. Did you take his, Lawrence's offer, to let's go Vegas as being unhappy or thinking that he was not getting good communication during that time?

A. I did not take it as that.

Q. Okay. Do you think that was meant as a "we're doing good, kind of keep spirits up"?

A. Absolutely. I think it was exactly that.

Q. And Rob responds, by the way? What does he say?

A. "Next year."

Q. Two thumbs up?

A. Yeah.

Q. Okay. Then on April 3rd?

A. "I am scheduling emergency board meeting for 2 p.m. today -- tomorrow. There will be a call-in number. This meeting is to discuss current banking path forward."

Q. I think we have read that one, so I'll go on.

MR. ALLISON: Exhibit 740, we'd offer at this time.

MR. REASONER: No objection.

THE COURT: It's admitted.

MR. ABSMEIER: What exhibit is that?

MR. ALLISON: 740, sorry. Okay.

PARALEGAL GONZALES: You missed one.

MR. ALLISON: Okay. 722?

PARALEGAL GONZALES: You didn't offer it.

MR. ALLISON: Your Honor, I'd offer 722 at this time.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Let's go to Exhibit 823. Is that an email?

A. Yes, it is.

Q. Dated?

A. March 3rd, 2023.

Q. Now, this goes to the -- this here goes to -- Who is Dennis Nixon? He is mentioned in there.

A. He is the IBC CEO.

Q. Okay. And does --

A. Or chairman of the board, rather.

Q. Yeah. Go ahead -- go ahead and read this March 3, 2023 email.

A. "Rob, hello. My boss, Dennis Nixon, would like to set up a meeting with the board of directors for Berry the week of March 13th. Please let me know what date would work best for the meeting."

Q. Now, you --

A. "Thank you for your help."

Q. And that's from who?

A. Gus Barrera.

Q. Okay.

A. President and CEO of IBC.

Q. Now, did he say we're going to meet on the 13th, or did he say let's maybe meet on the week of March 13th?

A. The week of the 13th.

Q. Okay.

MR. ALLISON: Your Honor, we'd offer

Exhibit No. 823.

MR. REASONER: No objection.

THE COURT: All right. It's admitted.

Q. (By Mr. Allison) Exhibit No. 824, is that one of the calendar business records of your business?

A. I guess. I've never seen this before.

Q. It's kind of small type; is that right?

A. It is very small type, and I can't read it.

Q. And when it's a --

A. I see it.

Q. You see it's a --

A. Yeah.

Q. -- series of emails?

A. Yeah, yeah, absolutely, I see a whole bunch of them. With a magnifying glass I can read them. Can you read them?

Q. It's okay, it's okay.

MR. ALLISON: You know what, I can -- you want to bring them up on that, on my computer? I'll blow them up for him.

Q. (By Mr. Allison) I'll go ahead and go to the next one for the moment.

A. They're about the same.

Q. It's 824.

MR. ALLISON: Thank you.

Q. (By Mr. Allison) Okay. I'm going to show it to you on the screen so we can blow it up.

A. Okay.

Q. First of all, make sure 824, is that same document? Appear to be?

A. Yes, it is.

Q. Now I'm going to blow it up for you.

A. Okay.

Q. The ones I've highlighted --

A. Uh-huh.

Q. -- right here.

A. That's the one he said at the meeting, uh-huh.

Q. Okay. That's the one you read a moment ago that's dated March -- that refers -- it's dated March 3rd, and it says: Let's maybe set up a meeting for the week of March 14th -- the 13th; correct?

A. Uh-huh, correct.

Q. Now, if you look at his -- this, Rob's subsequent emails on the system, there is more that are here for March 7th; do you see that one?

A. I do.

Q. And March 13th?

A. Yes.

MR. REASONER: Your Honor, I just need to object to counsel leading the gentleman through a

document he is not familiar with.

MR. ALLISON: And I'll just say it's preliminary. All I'm doing is pointing out dates, so he can see it. I'll rephrase it the right -- or phrase it correctly, I think. I hear that he is about to object again, so I'll do it.

Q. (By Mr. Allison) When you look at -- let me -- are there emails that are captured here that relate to IBC Bank?

A. All of these, yes.

Q. For dates after March 3rd?

A. Yes.

Q. And before?

A. And before.

Q. Okay. Are there any additional emails that are recorded in Rob's computer, the company computer, where Gus ever followed up to say what day, on the week of March 13th?

A. None.

Q. Okay. And do you think that this is a -- well, are the computer records your business records, for the company?

A. Yes.

Q. Okay.

MR. ALLISON: And we would offer Exhibit

No. 824.

MR. REASONER: Your Honor, the only objection to this one is hearsay. It's a lawyer-created document --

THE COURT: Can I see it?

MR. REASONER: -- with hearsay statements.

MR. ALLISON: Yes, sir. I'm going to give it to you here, if you want, because you can see it better.

THE COURT: Okay. Can you pop it up there?

MR. ALLISON: I can do that.

MR. REASONER: In addition to hearsay, Your Honor, lack of personal knowledge as to Mr. Powers' email.

THE COURT: Okay.

MR. ALLISON: It's just having to load this off first.

THE COURT: Okay.

MR. ALLISON: But it's working, it's happening. If you give me 15 more seconds, I kind of think it will do it.

THE COURT: Okay.

MR. ALLISON: And if the Court please, I think I can run through the particulars of a business records' exception, but I don't think they're making

that technical objection right now.

MR. REASONER: It's hearsay.

THE COURT: I guess they are, because they're saying hearsay.

MR. ALLISON: Okay.

THE COURT: And I guess it's hearsay.

MR. REASONER: Your Honor, first of all, I mean, this is -- Your Honor, there is lawyer commentary on the right here. I mean, this is a lawyer-created document.

MR. ALLISON: There it is, Your Honor.

THE COURT: Okay.

MR. ALLISON: May I do a series of -- I can address the objection, I believe, Your Honor.

THE COURT: Okay.

MR. REASONER: May I approach, Your Honor? You can look at our hard copy of it.

THE COURT: Okay. This is -- this is it?

MR. ALLISON: Yes, sir.

THE COURT: Okay.

MR. ALLISON: And, Your Honor, we would offer, with the redaction of the comment in the right hand column.

MR. REASONER: I'm sorry, the offer --

THE COURT: They are -- they're offer --

they want to offer it, but redacting this piece right here.

MR. REASONER: With that, Your Honor, we won't object.

THE COURT: Okay. John, will you cut this part off?

COURT BAILIFF: Which part, Judge?

THE COURT: I guess, we need to move just this piece here. See this little piece here?

MR. BAILIFF: Just cut it off?

THE COURT: Yeah, just cut it off.

MR. ALLISON: Your Honor, we'd offer 824, with that redaction.

MR. REASONER: No objection with that redaction, Your Honor.

THE COURT: Okay.

MR. ALLISON: Admitted?

THE COURT: It's admitted, yes.

MR. ALLISON: Okay. I didn't -- I didn't know.

THE COURT: We've got to get John to cut another piece off.

MR. BOYD: Perhaps Doug can give us that copy, since ours is getting cut up.

MR. ALLISON: Yeah, that's fair.

THE COURT: Oh, yeah, I guess so, right?

MR. ALLISON: I missed it somehow, Judge. I'm sorry, I'm looking here. May I continue?

THE COURT: Sure.

MR. ALLISON: Okay.

THE COURT: So, I guess this -- this will become the -- this will become the exhibit, because it's redacted.

Q. (By Mr. Allison) Exhibit No. 827, is that a text message you received?

A. Pardon me?

Q. Yes, sir. Sorry. That's okay.

A. Yes, it's a text message I received from Rob Powers.

Q. On the day that Nixon showed up?

A. On the -- on the famous -- infamous Nixon meeting day.

Q. Okay.

MR. ALLISON: We'd offer 827, Your Honor.

THE COURT: 827. Gentlemen?

MR. REASONER: I apologize, Your Honor, we were looking at a different document. No ob -- if it's just the text message, no objection.

THE COURT: It's admitted.

MR. ALLISON: Sorry, I should have told you

I skipped.

Q. (By Mr. Allison) Go ahead and read your text, or the text from Rob and then your response.

A. Rob said, "Just had a bad meeting with IBC Dennis Nixon. He came in attacking and cursing me and Jim. Didn't end well."

Q. And your response?

A. "Yes, I know. Time to change, I believe."

Q. Okay. And you said "I know" because I guess you'd already had a phone call?

A. He called me before they ever got a chance to call me.

Q. Okay. Now, we're at an email, it says 833. It looks like -- what do we have there?

A. It says: Meeting with Shanna, and the subject is "IBC Bank - attorney letter."

Q. All right. And it looks like we're on -- let's start down at the bottom.

A. The 15th? Okay, the bottom. March 13th.

Q. And that March 13 one is from Gus at the bank?

A. That's right.

Q. To you?

A. That's correct.

Q. Copying Dennis?

A. Uh-huh, correct.

Q. And is that the one that -- do you remember what's attached to that one?

A. I think that's like 20 pages of problems or something. I can't remember, to be honest.

Q. Okay. And who did you send it to?

A. I sent it to Lawrence Berry, on the 15th.

Q. Two days later?

A. Two days later; that's when I read it.

Q. Okay. You hadn't opened it before that?

A. Huh-huh.

Q. Exhibit 836, tell us what that is. Email?

A. This is another email from Mike Hummell to Lawrence or from -- down here, starting off, from Lawrence to Mike Hummell. It says: You can feel free to mark this up. At this time, I'm not currently planning to send it and anything until we have collectively decided on a proper methodology and able to execute. It says: Draft letter to Dennis Nixon.

Q. Okay. So, to make sure we're understanding, you're reading that kind of quick there.

A. I know.

Q. This is an email that has attached Lawrence's draft letter to Nixon?

A. That's correct.

Q. He is sending it to Mike?

A. He is sending it to Mike Hummell.

Q. And as part of 836, the next page, what is the date of that letter?

A. March 17, 2023.

Q. Okay. And just read the first line.

A. "We are in receipt of your recent communications to our executive team related to our revolver."

Q. Keep going.

A. "At IBC."

Q. And?

A. "And we are shocked and disappointed at the tenor of that message and the content."

Q. Okay. So, this is Lawrence, writing a letter to Nixon; right?

A. That's -- that's correct.

Q. Was there, in any way, shape or form, any hint in that letter that you - and you can look at it - that Lawrence is saying, "Hey, I've been kept in the dark, no one has been sharing information with me," anything like that?

A. No, there is not.

Q. In fact, he tells Dennis Nixon that Lawrence says he, Dennis --

A. That's right.

Q. -- "He," meaning Lawrence, is shocked and disappointed in Mr. Nixon; right?

A. Yes, he does.

Q. Okay. Again, did -- at this point in time has everybody been sharing information?

A. Yes, they have.

Q. And is that how it's always done?

A. That's -- that's the way it's done.

Q. Okay.

MR. ALLISON: Your Honor, we'd offer Exhibit 836.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Going a little bit later in time now, we're March 29th, and this is Exhibit 839. What is that?

A. I guess this is a text --

Q. Yes, sir.

A. -- to Lawrence, Marty, and somebody else.

"I heard back from Marty, and he approved the response to the IBC bullet points. We won't make any progress on finalization (sic) of our extension on our credit line until the response (sic) to their proposal."

Q. So, you're obviously doing some of the texting here, right?

A. Evidently yes.

Q. And Lawrence is doing some of the texting?

A. That's correct.

Q. And Lawrence says, "Will do, I just got service"?

A. Exactly.

Q. And we're talking about bullet points with IBC. Is that the list of demands, where they wanted you to do your own guarantees and all those things?

A. Yes.

Q. So, was that information being communicated, real time, with Lawrence?

A. Yes.

Q. Okay. And -- and followed up on by text?

A. Obviously, yes.

Q. Okay.

MR. ALLISON: We offer Exhibit 839.

MR. REASONER: No objection, Your Honor.

THE COURT: It's admitted.

Q. (By Mr. Allison) Exhibit No. 840, it's an email; correct?

A. Yes.

Q. Give us a date.

A. This is March 29th, 2023, from Mike Hummell to Dennis and Lawrence, myself, where they're copying Rob

Powers and James Klein, Jim Klein.

Q. More sharing of information in advance?

A. About IBC, yeah. "Attached is the list of demands from IBC for continuing our loans."

Q. Okay.

MR. ALLISON: And we'd offer Exhibit 840.

MR. REASONER: No objection, Your Honor.

THE COURT: It's admitted.

Q. (By Mr. Allison) And Exhibit 841?

A. Yes.

Q. More information about the loans, sharing information, texts?

A. Absolutely. Dennis, Lawrence, and myself.

MR. ALLISON: Exhibit No. 841, we'd offer.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Exhibit No. 843, is that an email?

A. That's an email.

Q. What it's got attached?

A. Attorney's negotiations with IBC, it looks like.

Q. Yeah. It says from Simank, that's you-all lawyer, right?

A. That's correct.

Q. Date on it?

A. March 30th, 2023.

Q. And who is it being shared with, so that everybody has --

A. It's being --

Q. -- it?

A. -- shared with Robert Powers, Marty Berry, Lawrence and Dennis.

MR. ALLISON: Exhibit No. 843, we'd offer.

MR. REASONER: No objection, Your Honor.

THE COURT: It's admitted.

Q. (By Mr. Allison) Then Exhibit 846, are you familiar with that one?

A. Yeah, this is to -- to Robert Powers.

Q. Text message first?

A. Text message, yes.

Q. What date?

A. April 1st, and Lawrence is talking about contacting Mike Gallagher, to look over the documents between us and IBC.

Q. And what is he saying that Mike -- that Mike Gallagher is doing for you?

A. He's offered to rattle his saber for us by calling Tony Sanchez, so I accepted.

Q. Okay. And so rattling the sword or rattling

the saber at Tony Sanchez, who is Tony Sanchez?

A. Tony Sanchez is a lot of things, I guess. He is an oil and gas man, he is -- he is part owner, but not the majority owner of IBC, but he is a part owner of IBC.

Q. Yeah. Was he --

THE COURT: Formerly running for Governor.

MR. ALLISON: Yes.

THE WITNESS: Yeah, Governor candidate. There is a lot of things.

MR. ALLISON: He is a lot of things.

THE WITNESS: A lot of things. Land guy.

MR. ALLISON: I'm not sure I offered that one, that is Exhibit 846. Offered at this time, Your Honor.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Now we're looking at another email dated, or excuse me, Exhibit 853; correct?

A. That's correct.

Q. What's the date?

A. April 13th, from Mike Hummell to -- in 2023, from Mike Hummell to Lawrence Berry.

Q. And what does Mike Hummell say?

A. "Did you get everything you need? The deal

tracks the discussion from the meeting. We are going to send the signed paperwork back to them later today."

Q. And what time was that sent?

A. That was sent at 3:21 p.m.

Q. And on the same date did he get a response at 3:26 p.m.?

A. Yes, he did. "Got it, thanks," from Lawrence.

Q. Okay. So that's Lawrence saying "Thank you" to Mike Hummell; right?

A. Correct.

MR. ALLISON: Your Honor, we'd offer Exhibit --

MR. REASONER: Your Honor, that one just didn't happen to be in our binder. Can we take a quick look?

THE COURT: Yeah.

MR. ALLISON: It's 853.

MR. ABSMEIER: Yeah. It's -- we don't have it. Our book is missing it, for some reason.

MR. ALLISON: Sorry.

MR. ABSMEIER: I think it is misprinted.

MR. ALLISON: Okay.

MR. ABSMEIER: Thank you.

MR. REASONER: No objection, Your Honor.

THE COURT: All right, it's admitted.

MR. ALLISON: I'm told out of an abundance of caution - hold on - that I need to offer Exhibit 827. We read it in the record. It's the one where he says he came in attacking the person.

MR. REASONER: To 853, no objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) Exhibit No. 859, would you take a look at that, sir.

A. Yes. This is -- this is a resolution of a special meeting of the directors of Berry, GP, December 7th, 2023.

The board of directors met in a special-called meeting on the 7th day of December. All directors were present and waived notice of the call and the purpose of the meeting. Be it resolved that the employee contract for CEO Robert Powers has been approved.

Q. Who signed it?

A. Dennis, Marty, and Lawrence.

Q. So, all three of the brothers re-upped or approved Rob Powers' -- Rob Powers' contract as of December, 2023?

A. That's correct.

Q. Do you remember there being a discussion during that board meeting about Lawrence being mad that Rob hadn't kept him informed?

A. No; no discussion.

Q. Exhibit No. 864, can you tell us what that is?

A. "Resolution of special meeting of shareholders of Becon, Inc., as general partner of LDMA, limited partnership, the latter to be acting in its capacity as the sole shareholder of Berry GP, Inc. The shareholders met in a special meeting called this 13th day of March, 2024. All shareholders were present. Be it resolved that all actions taken by the shareholder/director of Berry GP, Inc., or any employee of Bay Limited, including Robert Powers and Mike Hummell, in furtherance of discontinuing the banking relationships between Berry GP, Inc., and the International Bank -- Bank of Commerce is hereby ratified."

Q. Who signed that one?

A. I signed it, and Bonnie Berry signed it, and Lawrence abstained.

MR. ALLISON: And we'll offer Exhibit No. 864 at this time.

MR. REASONER: No objection.

THE COURT: It's admitted.

MR. ALLISON: Do I need to go back one?

PARALEGAL GONZALES: Yes.

MR. ALLISON: What number was it?

PARALEGAL GONZALES: 859.

MR. ALLISON: Your Honor, we'd offer 859, that's the December 7th one we just looked at.

MR. REASONER: No objection.

THE COURT: It's admitted.

Q. (By Mr. Allison) I think -- I think going through the different documents we purposefully, right, tried to focus on your understanding -- you understand the kind of time frame that this lawsuit is about?

A. Yes.

Q. Okay. And at kind of a real critical juncture, was IBC sort of a critical transition?

A. Yes, it was.

Q. And the Berry dock, that's an -- is that an important asset for the company?

A. It was. It's not as much today.

Q. Yeah.

A. Obviously the access is important.

Q. Yeah. And was it common, sort of through all of 2023, common for Bob, and you, and the brothers to be texting each other?

A. Yes.

Q. If you -- if wanted information, do you feel like it's available to you?

A. Yes, I do.

Q. Did you see some emails in there, where

Lawrence would request information and have it sent to him?

A. Yes, I did.

Q. Did you see emails in there where he says, "Hey, I'm mad, I'm not getting the stuff fast enough"?

A. Did not see those.

Q. Did you see times when the Frost Bank documents were sent to him?

A. Yes, I did.

Q. Did you see places where the IBC notice of default were sent by you directly to Lawrence?

A. Yes, I did.

Q. Did you see where he's participating with -- with Mike Hummell on the March 17th letter that he drafted?

A. Yes.

MR. REASONER: Objection, leading.

THE COURT: Leading, sustained.

Q. (By Mr. Allison) Let me ask you, did you see any signs of -- how would you -- how would you characterize the communication?

A. Open, very open communication, all the way around.

Q. Just recently, I think you guys had a board meeting in -- in March; do you remember that?

A. Yes, I do.

Q. Do you remember whether or not Lawrence asked for Jim to be there?

A. He asked to have the financials presented by Jim, yes, I believe. I don't know what the request exactly was, but it was to Jim to show up with certain financials, and he did.

Q. Yeah. Was it -- and how would you characterize the review? Was it a one-pager or extensive?

A. It wasn't a one-pager, it was much more extensive.

Q. Okay. And if Lawrence wants that, can Lawrence ask for it?

A. Yes, he can.

Q. Okay.

A. He did; he did.

Q. Okay.

THE COURT: Anything else for the witness?

MR. ALLISON: Just one other item, Your Honor.

Q. (By Mr. Allison) They asked you some questions about *Robert's Rules of Order*, do you remember that?

A. Yes, I do.

Q. Have you -- I'm not going to make you a lawyer; are you familiar generally with whether or not

shareholders, if they agree, can run their company?

A. I'm generally familiar with that, yes.

Q. I mean, we went through a lot of documents where the shareholders ratified conduct; do you remember that?

A. Yes, I do.

Q. And what's your understanding, as an owner, of the significance of having shareholders/owners ratify acts or ratify conduct?

A. Mistake or no mistake, you're just saying, "Hey, this is what we all agreed to. This is what we did, and it's fine." That's what it means, layman terms.

Q. And whether you violated a rule of Robert's order, and I don't know if you did or not, but we're not -- are we here on that?

A. I'm not.

Q. Okay.

MR. ALLISON: Nothing further, Your Honor.

MR. REASONER: I don't have anything else for him.

THE COURT: All right. You may stand down. We'll take a break. You got another witness coming up?

MR. REASONER: We do, Your Honor.

THE COURT: Okay. Well, let's take a few.

COURT BAILIFF: All rise.

(Brief recess.)

THE COURT: You-all can be seated. Call your next witness.

MR. BOYD: Your Honor, at this time the Plaintiff would call James Klein.

THE COURT: Okay. Come forward.

COURT BAILIFF: Raise your right hand, sir.

(Oath was administered.)

COURT BAILIFF: Watch your step.

THE COURT: Watch your step. All right.

JAMES A. KLEIN

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BOYD:

Q. Good afternoon, Mr. Klein. Would you please state your full name for the record.

A. I'm James A. Klein.

Q. And how are you employed, sir?

A. I'm CFO at Bay.

Q. And how long have you held that position?

A. A couple of years; two years.

Q. Okay. You and I just met for the first time just a few minutes ago, right?

A. Yes, sir.

Q. Okay. And I appreciate you coming down here and talking with us about a few of the financial aspects that are at issue in this case. And we heard testimony from Mr. Berry about Rob Powers' unfortunate health incident. Is that who, up until that point in time, you directly reported to?

A. Correct.

Q. All right. Who do you directly report to presently?

A. Now we -- there is quite a few vice-presidents, there's maybe 8, I'm guessing. And we -- we speak amongst ourselves and kind of settle things out right now.

Q. Okay. Has it always -- was it that way prior to Mr. Powers?

A. No. It was more through Mr. Powers.

Q. Okay. Do you have any information about the search for somebody to fill in --

A. No.

Q. -- on an interim basis?

A. I haven't done -- seen anything there.

Q. All right. Mr. Berry, when I say "Mr. Berry" I'm talking about Marty Berry.

A. Sure.

Q. Mr. Berry testified under cross-examination of

Mr. Reasoner that he received some weekly financial reports. You were present during this testimony, right?

A. Yeah.

Q. Okay. Do you provide Mr. Berry with weekly financial reports, or your office?

A. Perhaps, not -- I don't know of any like regular weekly reports like that, that he did.

Q. How about a cash position report, is there such a --

A. Cash requirements --

Q. Oh, and I --

A. -- is what I think he had shown up here earlier, yeah.

Q. Okay. I think --

A. That's more like on a request basis.

Q. Okay.

A. If somebody wants it.

Q. So, who has access to request that kind of information? Is it just the owners or can the EVPs get that?

A. Perhaps. If there is a reason why they want it, I provide it to them, but I probably won't provide it if they just -- if a vice-president just asks for it.

Q. Okay. So in the past, that would have gone through Mr. Powers?

A. Correct.

Q. All right. And presently if - hypothetically - a vice-president asks you for a cash requirements report, who would you go to, to get authority to deliver that report?

A. I'd talk amongst, perhaps a couple of other vice-presidents.

Q. Okay. Which ones in particular?

A. Perhaps Hummell, Chrissy Hino -- how do you say her last name?

MR. HUMMELL: Hinojosa.

A. Hinojosa.

Q. (By Mr. Boyd) Okay. And what's her position?

A. She is vice-president, kind of administratively.

Q. Okay.

A. She's also --

Q. Would you also at times go to Mr. Berry, to get authority for such a request?

A. I might ask him, if he's -- if he's available.

Q. Presently we heard -- when we heard testimony from Mr. Berry about several of the jobs that are ongoing, do you have information relative to the financial position, as it relates to different projects that the company is engaged in?

A. Sure.

Q. Okay. For example, how much money the company may be owed by a particular client?

A. Yes.

Q. Okay. What is the current position with Venture Global?

A. I always kind of look at it, it's revenues versus billings, you know. In projects, cost drives revenue. So, right now we're upside down with them about 60 million, I believe.

Q. And over what period, or how late is that 60 million?

A. It's not really late. This is relative to billings, you know, so we haven't billed it yet because there is pending change orders.

Q. When is the last time that you billed Venture Global?

A. We bill them monthly.

Q. So, currently the receivable balance is approximately 60 million dollars?

A. No. I -- I answered that differently. The receivable balance right now is probably 35.

Q. Okay. What does the 60 million represent?

A. Where revenue has been recognized above billings.

Q. Okay. Has there been any reduction in force on that particular job?

A. Yes.

Q. And to what extent? How many employees have been laid off that job?

A. 2500. It's -- it's moving down, you know.

Q. Is that a function of the progress of the project or --

A. Yes.

Q. What is the completion estimate for that project?

A. Time frame or --

Q. Yes.

A. Essentially it's a couple of weeks away.

Q. And how many Bay personnel or Bay/Berry personnel are still working on that?

A. It's about a thousand.

THE COURT: Objection?

MR. ALLISON: I just have an objection on relevance, Your Honor.

THE COURT: Yeah, sustained. I think we're way off base here.

Q. (By Mr. Boyd) How about TESLA, how much is owed on that?

THE COURT: Okay. I'm not -- I'm not going

down this route. I mean, look, I mean, this is -- you're talking about a company here. We're talking about a temporary injunction hearing. What's the relevance of all this?

MR. BOYD: Fair enough, I'll move on.

THE COURT: All right.

Q. (By Mr. Boyd) All right. I'm going to ask you to take a look at PTX33, that should be in front of you.

A. Okay.

Q. Do you have it in front of you?

A. Yeah.

Q. Do you recognize that this is a portion of a much larger Excel spreadsheet?

A. Yeah.

Q. Is this generated out of your department?

A. Yep.

Q. Okay. Can you tell us what exactly this is?

A. This says that we owe Western Gulf this -- these amounts.

Q. Okay. Is this the -- or at least a portion of the cash requirements report that we were talking about just a little bit ago?

A. Yes.

Q. Okay. Is this the type of report that you might provide to Mr. Berry on a weekly basis?

A. Generally, no. I mean, it's -- this is way -- a lot more detailed than I would -- I would give to him. And I don't -- like I said, I really don't give him anything on a weekly basis at all, like nothing regularly.

Q. Okay. So, there's nothing that's just automatic, you're going to send to it Mr. Berry?

A. No.

Q. Or somebody else? Okay. And what this is saying is presently, or at least as of the date this report was generated, that there was 4.3 million dollars due to Western Gulf Equipment; correct?

A. Yep.

Q. Okay. Do you know what the present balance is of this account is?

A. I don't think we've paid him anything, so -- and I believe we're incurring about 450,000 a month. Looks like this is through October. No, there it is. This is probably pretty close, because it's through March 1st.

Q. Okay. So presently, you're accruing about 450,000 in lease obligations per month?

A. Approximately, yeah.

Q. Okay. And how many cranes does that cover, do you know?

A. I'm not certain, but I think he said six earlier; that sounds reasonable.

Q. Okay. And do you have the lease agreements for each of those cranes?

A. I believe we do.

Q. Would that be kept in your department?

A. I'm not sure, but I usually have copies of those. I don't know if that's where it's kind of officially kept, but I haven't seen them. I haven't looked for them.

Q. Have you ever reviewed them?

A. No.

Q. Okay. Is that anything pertinent to what you're trying to accomplish, relative to this --

A. No.

Q. -- account payable?

A. Not unless something -- a reason -- a reason would come up for me to look at it, I haven't looked at it.

Q. Okay, fair enough.

MR. BOYD: May I approach, Your Honor?

THE COURT: Yes, sir.

MR. ALLISON: Thank you.

Q. (By Mr. Boyd) I'm going to hand you, sir, what is marked as PTX50 and ask you to take a look at that,

please.

A. Okay.

Q. Do you recognize this email chain and the attachments?

A. I don't recall the email chain, but I recognize the attachments.

Q. Okay. And it's -- the first page is an email from you to Tonja Fulghum; correct?

A. Yeah.

Q. Who is -- who is Ms. Fulghum?

A. She works for Lawrence.

Q. Okay. Did she, up until recently, work for Bay/Berry?

A. Yes.

Q. Okay. And what was her position with Bay/Berry?

A. I'm not really sure.

Q. How long had she worked there?

A. I don't know that either.

Q. As an aside, how long have you worked there?

A. Two years.

Q. And if you can turn over to the last page, which is ALB 000881.

A. Yep.

Q. Are you with me?

A. Yes.

Q. All right. Do you see the -- if you come down to the liabilities and equity, long-term debt, excluding current installments?

A. Yep.

Q. What -- and out to the right is the number 100 million, 227; right?

A. Yep.

Q. And what is -- what makes up that hundred million?

A. I think probably the brother loans at that time.

Q. The 75 million?

A. Oh, yeah; yep. And then --

Q. Okay.

A. -- about 35 million or so from Wells Fargo.

Q. Oh, on the equipment line of credit?

A. Yeah.

Q. Okay. So that would be lumped in here with this as well?

A. Yep.

Q. What about on the revolver with -- with Frost or IBC? That would have probably been IBC at this point in time.

A. But that's the -- well, that seems too high.

Q. Or would that be above it, the revolving line?

A. Wells Fargo would be above it.

Q. Okay.

A. It's changed now, so that's what this means.

Q. Okay.

A. So, that's Wells Fargo and IBC, the line above it.

Q. Okay. So, do we know what makes up the excess above the 75 million dollar related party, what we've been calling the Berry loans?

A. You know, I should know, but I -- I don't know what it was back then.

Q. Okay.

A. There were other loans back then. That was before we had cleared the IBC debt.

Q. Okay. But sitting here today, you don't know --

A. No, sir.

Q. -- to whom those loans were payable?

A. Well, they were -- they were payable to IBC. There is one for -- for American Bank, or other long term loans --

Q. Okay.

A. -- that we had.

Q. So above it, the revolving lines of credit, you

feel, would be the equipment line of credit and the --

A. IBC loan.

Q. -- IBC. Okay.

MR. ALLISON: We just object to relevance, Your Honor.

MR. BOYD: It's extremely relevant. It strikes to the Berry loans and how they're booking these numbers, and I'm going to be --

THE COURT: I think this is more relevant than what you were getting into before, I agree with that, but --

Q. (By Mr. Body) I'm going to hand you now, sir --

MR. BOYD: If I may approach?

THE COURT: Yes, sir.

Q. (By Mr. Boyd) -- PTX37. I'm going to ask you to review that, please.

A. Yes.

Q. All right. Do you recognize this email chain?

A. Yes.

Q. Okay. And this is -- at least if we start at the top and work our way back down to the opposite of probably the chronology, there is an email from you to who?

A. Bill Schrauff from -- I believe he is from Bank

of America.

Q. Yeah, and I think if you turn over to the second page of this exhibit, that would confirm what you just said; right?

A. Yeah.

Q. All right. Tell me what was going on with Bank of America at this point in time. Was this relative to try to secure a new loan?

A. Yes.

Q. Okay. And so, you were forwarding certain information to Bank of America?

A. Yeah.

Q. Okay. Well, let's turn over -- but first, before we do, Mr. Schrauff, at the bottom of PTX37, he says he is meeting you via this email. Had you ever met him before?

A. I'm not sure of the timing of this email, but it was right around that time that I met him.

Q. Okay. And then he mentions Lawrence's name --

A. Yeah.

Q. -- in introduction?

A. That's how we met.

Q. Okay. So, Mr. Lawrence Berry set up this meeting?

A. Yes.

Q. Okay. In an effort to try to facilitate the company's securing of a new line of credit?

A. Yes.

Q. All right. If you'll turn over to ALB 506 (sic), which is a combined and consolidated balance sheet. Are you with me?

A. Yeah.

Q. All right. On this, under the liabilities, we have a notes payable, related party; that would be the Berry loans, right?

A. Yeah.

Q. And what is the amount that's booked at this point in time?

A. 76,403,687.

Q. Okay. And then if you come up, you see the long-term debt, excluding current installments?

A. Yep.

Q. What is that amount?

A. 24,090,686.

Q. All right. Is that -- is it possible that that was what was lumped in with --

A. It is.

Q. Okay. Do you know who that is payable to?

A. It's quite a few of them, quite a few; IBC. The -- the reason why I combined them during that time,

when I prepared this, the audit had not been done, and RSM combined them on -- on the audit report, so I was just following their -- their tactic.

Q. Okay, fair enough.

MR. BOYD: May I approach, Your Honor.

THE COURT: Yes, sir.

Q. (By Mr. Boyd) I'm going to hand you what's been marked as PTX58.

MR. BOYD: And, Your Honor, just to clean up, we would offer PTX37 and PTX50.

THE COURT: All right. Any objection?

MR. ALLISON: No objection.

THE COURT: All right. Hearing none, they're admitted.

Q. (By Mr. Boyd) All right. PTX58, have you had a chance to look that over?

A. Okay.

Q. Again, this is the first page of an exhibit, an email from you to Ms. Fulghum; is that right?

A. Yeah.

Q. Okay. And is she -- what's the purpose of you sending this to her?

A. She asked for it.

Q. Okay. And was she one of the folks on the approved list to receive certain financial information?

A. I saw her as an agent of Lawrence. I pretty much sent her what she asked for.

Q. Okay, fair enough. If we turn over to the second to last page, which is actually the last sheet, but it's double-sided.

A. Right.

Q. What is the date of this combined and consolidated balance sheet, please, sir?

A. April 30th, '23.

Q. All right. And so this is just one month after what we just looked at, at PTX50; correct?

A. Yep.

Q. And what is the amount booked for the long-term notes payable, related parties, which is the Berry loans?

A. 68,061,301.

Q. Okay. And what caused that to drop some 18 -- well, some --

A. 10.

Q. -- 10, yeah, about 10,000; 10 million?

A. Yeah.

Q. What caused that?

A. We paid Marty 10 million dollars for his taxes.

Q. Okay. We heard Mr. Berry talk about that tax payment that he needed to make.

A. Right.

Q. Did you have anything in writing at this point in time, either, number one, related to the Berry loans?

A. Yes.

Q. Okay. What did you have at this time?

A. A note that I -- I made up.

Q. Did you have anything that was related to the ten million dollar payment, in writing?

A. Where we made it.

Q. Did -- did you have anything in writing saying that was part of the arrangement when the --

A. Not in writing.

Q. -- when the arrangement was made?

A. Not in writing.

Q. Who instructed you, and I assume it was you who made the ten million dollar payment?

A. Yes.

Q. Who instructed you to do that?

A. Perhaps Rob, but actually when we got the money from Marty and Dennis, Marty told me at the time, "I'm going to want ten million or so back to pay those taxes."

Q. All right.

A. So, it was known for the longest time. And I also told the banks, all the banks, that this was part

of the arrangement, so that it wouldn't surprise them.

Q. Which banks were those?

A. It would have been Wells Fargo and IBC at the time.

Q. Did you tell them that in writing, or how did you convey that?

A. I probably talked to them. I don't -- I don't really know, but I probably just talked to them. I had regular phone conversations with them regularly.

Q. Okay. If we look at PTX37, the amount there is 76,463 (sic), right?

A. Let me see. I'm sorry, 37?

Q. Yes, sir. The --

A. Is 37 the one we looked at previously?

Q. Yeah, it was the February 28th.

A. Yeah. I'm sorry, go ahead.

Q. Okay. So it's 76,403; right?

A. Right.

Q. And this balance, on April 30th is 68, so it's not quite ten million, it's a little less than ten million; is that because of interest accrual?

A. Correct.

MR. BOYD: May I approach, Your Honor?

Q. (By Mr. Boyd) Okay. I'm going to hand you what I've marked as PTX46.

A. Okay.

Q. And just ask you to look at this.

A. I'm kind of messing these up. Is that going to matter? Okay.

Q. All right. The note payable to Berry loans is now at what number?

A. 71,401,884.

Q. Okay. Again, is this up to -- related to interest accrual on the books?

A. Yes.

MR. BOYD: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Boyd) Mr. Klein, I'm going to hand you PTX45. And this is dated October 31st, 2023; correct?

A. Yep.

Q. All right. And what is the balance on the Berry loan?

A. 71,871,130.

Q. Okay. So in that month period, from Exhibit 46 to Exhibit 45, it only ticked up a small amount; right?

A. Yeah.

Q. Can you explain why that's such a small amount over that 30-day period?

A. I think he had an error in the previous one, the -- my accountant that had done that.

Q. Okay. Who is that?

A. John Gibson.

Q. All right. And how would that error be documented?

A. More corrected. Where we corrected it, I guess we could probably see it there.

Q. And how was that error detected?

A. I believe this would have been just from -- I don't know if it was noticed during the audit, when they came back down to -- I think he just -- he found it himself.

Q. Okay.

A. I didn't find it.

Q. Is there a reconciliation somewhere that corrects it, or how is that --

A. There is an entry.

Q. Okay.

MR. BOYD: At this time we would offer PTX45.

MR. ALLISON: No objection, Your Honor.

THE COURT: It's admitted.

MR. BOYD: PTX46.

MR. ALLISON: No objection.

THE COURT: Admitted.

MR. BOYD: And PTX58.

MR. ALLISON: No objection.

THE COURT: It's admitted.

MR. BOYD: And then if I may approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Boyd) I'm looking for PTX27.

A. I'm not sure.

Q. It's -- have you seen that document before?

A. Yes.

Q. Can you identify it for me?

A. This is the promissory note for Marty Berry.

Q. Okay. In -- and you'd seen that promissory note?

A. Yes.

Q. Okay. When did you first see that note, do you remember?

A. Probably December of 2022.

Q. Okay. In January of 2023, Rob Powers sent an email to Lawrence stating that the paperwork hadn't been drawn up; is it possible it was in January?

A. Yes.

Q. Was it a result of the auditor's requesting --

A. Yes.

Q. -- that?

A. Well, yes. I mean, we needed to do it anyway,

but yes.

Q. Had you ever done such a large transaction, where you didn't paper it, contemporaneous with the funds changing hands?

A. No.

Q. And you'd agree with me that that note does not require any payments of principal or interest until maturity; correct?

A. Yeah.

Q. Do you agree with that?

A. That's what the note says.

Q. Okay. And if you can find in that stack I was just thumbing through, PTX2, please, sir.

A. 2?

Q. Yes. First off, do you recognize that?

A. Yes.

Q. Again, this is financial information that you're sending to Ms. Fulghum, right?

A. Yeah.

Q. Okay. If we go over to the third page of the exhibit, which is the consolidated balance sheet for July 31st, 2022.

A. Yep.

Q. All right. And if you look back at Exhibit 27, what is the date of the promissory note?

A. July - I'm sorry - 8th.

Q. Okay. And so this is, I don't know, what, 23 days later?

A. Uh-huh.

Q. Okay. And so you-all, at this point in time, had already booked the Berry loans onto the balance sheet; correct?

A. Yeah.

Q. And what is the amount of the Berry loans at this point in time?

A. 75,590,920.

Q. Okay. And same question I'd asked earlier, initially on July 8th, it was a 75 million dollar transaction; correct?

A. Yes.

Q. And so, would that be the interest that had accumulated up till July 31st?

A. Yes.

Q. 2022?

A. Yes.

Q. All right. Do you have an I-Phone with you?

A. Yes.

Q. Is it there?

A. Yeah.

Q. Okay. Do you mind doing some calculations for

me?

A. I'm not supposed to do math in front of people.

Q. I'm sorry?

MR. BOYD: May I approach, Your Honor?

THE COURT: Yes.

A. Actually, I don't even know where the calculator is.

Q. (By Mr. Boyd) You don't?

A. I'm just an accountant. I never look at that, though.

Q. You don't?

A. Here it is.

Q. Did you find it?

A. Yeah.

Q. Okay. So, I want you to, sir - for me - take 590 -- 590,920; and then I would like you to divide that by 23 days and tell me what you get, please, sir.

A. $25,692.

Q. Okay. And then I want you to multiply that by 365 days, please, sir.

A. 9 million -- did I do that right? 9,377,643.

Q. Then I want you to divide that 9,377,643 by 75 million.

A. 12.5.

Q. 12.5 percent?

A. Yeah.

Q. Okay. So in July of 2022, when you were accruing the interest payable on the Berry notes, you were accruing it at 12-and-a-half percent; correct?

A. That's what it appears.

Q. Okay.

MR. BOYD: May I approach?

THE COURT: Yes.

Q. (By Mr. Boyd) While you're reviewing that.

MR. BOYD: I'm going to mark this as Plaintiff's 66, and offer it as a summary of the witness' testimony.

THE COURT: Any objection?

MR. HUSEMAN: No.

MR. ALLISON: No, Your Honor.

THE COURT: Okay. Hearing none, then it's admitted.

Q. (By Mr. Boyd) Mr. Klein, would you look at Plaintiff's Exhibit 57.

A. Yeah.

Q. And do you recognize this document?

A. Yes.

Q. And what is this document?

A. It's just a schedule of all the debt.

Q. Okay. All the debt of what?

A. Of Bay/Berry.

Q. Okay.

A. Bay and Berry.

Q. As we work our way down to the Berry GP, Inc., column, do you see the note payable to Mr. Berry?

A. Yes.

Q. All right. And out to the right of that it has "TBD", Correct?

A. Yes.

Q. And that means "to be determined," correct?

A. Right.

Q. All right. And above it we see American Bank, variable, it's got an interest rate of 4.5; correct?

A. I'm not sure that's accurate, the 4.5.

Q. But it reflects an interest rate, correct?

A. At -- at some time.

Q. Okay. And then below that there is one, and it's hard for me to read, I believe it says 5.25.

A. Yes.

Q. Okay.

A. But again, I think it's at a time, it's not necessarily at this time.

Q. Okay.

A. I think those are titles, and he is not necessarily changing that.

Q. Who is "He"?

A. Juan Sotelo would do this.

Q. Okay. We got his name down in the lower right hand corner; right?

A. Correct.

Q. And he works for you?

A. Yes.

Q. All right. If we come down to the Bay Limited debt, are you with me?

A. Yeah.

Q. We have a note payable to Laura Berry; do you see that?

A. Yes.

Q. And it's fixed at 3.75 percent; right?

A. Yes.

Q. And are you familiar with her promissory note?

A. Yes.

Q. And it was at 3.75 percent; right?

A. It appears to be.

Q. Okay. So as of the date of this maturity schedule we have the correct interest amount for her note; and for Mr. Berry's note it's to be determined, correct?

A. Yes.

MR. BOYD: Plaintiff would offer

Plaintiff's 57.

MR. ALLISON: No objection.

THE COURT: It's admitted.

MR. BOYD: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Boyd) Mr. Klein, I'm going to hand you Plaintiff's Exhibit 38 and ask you to review that.

A. Okay.

Q. What is the subject matter of this email exchange? And again, is this with Ms. Fulghum?

A. I think it's where they're -- she's trying to wrap up the crane with Canadian -- Canadian CPH. I can't remember what -- she is trying to wrap up a crane that we own with -- or that we are renting, it's that one crane with CPH and it's --

Q. I think you're exactly right, actually.

A. Yeah, I'm not explaining it.

Q. So, you heard Mr. Berry testify about the first crane that was bought?

A. Yes.

Q. In conjunction with Gulf Western and Bay Canada; correct?

A. Yeah.

Q. And there were some, I guess, lingering tax issues?

A. Yes.

Q. Okay. And you were working through those with Mr. Fulghum?

A. Yes.

Q. Okay. Did that tax situation get resolved?

A. No.

Q. It's still pending?

A. Yes.

MR. BOYD: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Boyd) I'm going to hand you PTX40.

A. Okay.

Q. All right. Do you recognize this email?

A. I don't remember it.

Q. Do you remember March 31st, 2023? It was about the time that you-all were in this -- having this issue with IBC and the line of credit.

A. Yes.

Q. And apparently the 31st was a deadline of some sort?

A. Yeah.

Q. What was that deadline?

A. I believe it was the deadline to come up with a plan to continue it for extensions.

Q. Continue extensions?

A. Continuing extensions for the -- the line.

Q. Okay. And at this point in time, are you-all active in trying to secure a different lender for your revolver?

A. Yes, but it's towards the beginning. I mean, it's --

Q. And it takes time?

A. Yes.

Q. Okay. We know that Mr. Nixon, the chairman of the board of IBC, showed up at the Bay/Berry office; correct?

A. Yes.

Q. Did you meet with him?

A. Yes.

Q. All right. And was he indeed very angry, as we saw in an earlier exhibit?

A. Yes.

Q. Okay. And why was he angry? Did he express why he was angry?

A. Yes.

Q. What was that about?

A. Primarily that none of the brothers were there.

Q. Okay. And do you know why the brothers weren't there?

A. There wasn't really a meeting set. I was

called up that morning to meet with him, like no plan.

Q. Okay. How long did that meeting last?

A. It was really pretty quick.

Q. Okay.

A. I'd say 20 minutes, maybe.

Q. All right. Certainly Mr. Nixon believed there to be a meeting and flew all the way --

MR. ALLISON: Objection, Your Honor, he's asking for speculation.

Q. (By Mr. Boyd) Well, did he tell you he thought there was a meeting?

THE COURT: All right, sustained then.

MR. ALLISON: Hearsay.

THE COURT: Sustained.

Q. (By Mr. Boyd) But he showed up at your office and had a meeting with you and Mr. Powers?

A. He showed at our office.

MR. BOYD: I'd offer Plaintiff's Exhibit 40.

THE COURT: Any objection?

MR. ALLISON: No objections.

THE COURT: All right. Hearing none, it's admitted.

MR. BOYD: And also Plaintiff's Exhibit 38.

THE COURT: All right, any objection?

MR. ALLISON: No objection, Your Honor.

THE COURT: All right. It's admitted.

MR. BOYD: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Boyd) Mr. Klein, I'm going to hand you Plaintiff's Exhibit No. 41. Have you had a chance to review that, Mr. Klein?

A. Yeah.

Q. Do you recognize that?

A. Yes.

Q. If you go to the second page of PTX41, which is the letter that you see there?

A. Yeah.

Q. Okay. There are some handwritten notes out beside each of the IBC requirements.

A. Yes.

Q. Were you involved in formulating these responses to IBC for these requirements?

A. I don't recall, but I agree with them, I think.

Q. Okay. Were there any meetings that you attended, where this document was analyzed by anybody in management at Bay/Berry?

A. Not that I recall, but there probably were.

Q. Was it circulated to various people? I mean, obviously we --

A. Not widely. That's -- not widely.

Q. Okay.

A. It probably was just Hummell, and Rob and I, and perhaps Marty; I'm not sure.

Q. Okay, fair enough.

MR. BOYD: Offer Plaintiff's Exhibit 41.

THE COURT: Okay.

MR. ALLISON: No objection.

THE COURT: It's admitted.

MR. BOYD: May I approach?

THE COURT: Yes.

Q. (By Mr. Boyd) I'm going to show you, Mr. Klein, Plaintiff's Exhibit 43, I think. Maybe we can share mine, if that's all right.

A. Sure.

Q. Do you recognize this document?

A. I know what it is.

Q. Okay. And what is it?

A. It's sent in to Lawrence, what I sent to Frost, probably as a package.

Q. Okay. So, this is information that you were providing to Frost, to facilitate securing a new line?

A. Yes.

Q. All right. I want to go over to page 23 of the -- of the RSM independent auditor's report.

A. Okay.

Q. And that is your auditor?

A. Yes.

Q. Okay. If we go to page 23, if you can read that paragraph right there.

A. The whole paragraph?

Q. Yes, sir.

A. "The related party notes are collateralized by certain oil and gas leases, life insurance policies, and interest in part, real property. Management believes that there is no -- there is a reasonable possibility that the notes maturing in 2023 will be amended to extend the maturity date to a subsequent period. Accordingly, the notes have not been classified as current assets."

Q. Okay, fair enough. And that was because management conveyed to the auditors that they anticipated that that note would be extended?

A. Likely.

Q. Okay. And it indeed was not, right?

A. Is that the -- the Orca note?

Q. Yeah.

A. Correct.

Q. Correct, it was not extended?

A. Correct.

Q. And that came up after this lawsuit was filed; correct?

A. It came up?

Q. Yeah.

A. Well, it just did not get extended.

Q. But it was -- I'm sorry.

A. I believe it -- I thought it had matured in June or July. It was October?

Q. Yeah, okay.

A. My bad.

Q. And what I'm talking about, just so we're on the same page, and then I'll get away from you.

A. You won't.

Q. Are you feeling all right?

A. (Moving head up and down.)

Q. Okay. The -- when Mr. Hummell declared the default was after we had filed the lawsuit; correct?

A. Yes.

Q. Okay.

MR. BOYD: The Plaintiff would offer Exhibit No. 43.

THE COURT: Okay, 43?

MR. ALLISON: No objection, Your Honor.

THE COURT: It's admitted.

(Court reporter talking.)

MR. BOYD: I'm going to have to switch out. Maybe if Mr. Allison would be so kind.

MR. ALLISON: To do what? What are you doing?

MR. BOYD: Let me borrow your clean copy.

THE COURT: Here, you can take this one.

MR. BOYD: I got it from the Judge.

MR. ALLISON: We've got an extra over here.

MR. BOYD: May I approach?

THE COURT: Yes, sir.

Q. (By Mr. Boyd) I'm going to hand you Plaintiff's Exhibit 44. I'm going to ask you to review it please, sir.

A. Okay.

Q. Can you tell us what this relates to?

A. This looks like I'm trying to give Lawrence the Wells Fargo loan.

Q. Is this the equipment line of credit that we had talked about earlier?

A. Yes, yes.

Q. And this Iron Tracks appraisal report?

A. That was Wells Fargo's appraisal.

Q. And you're familiar with Iron Tracks?

A. Yes, they're the appraisal firm that they hired.

Q. Okay. And the appraisal is of collateral for the equipment revolver?

A. Right.

Q. Okay. And what they're evaluating here is equipment owned by?

A. Bay.

Q. Okay.

A. Basically.

Q. All right. So, this wouldn't include any of the cranes that are owned by Mr. Berry and his wife?

A. No.

MR. BOYD: We offer Plaintiff's Exhibit 44.

MR. ALLISON: Objection, relevance.

THE COURT: Well --

MR. ALLISON: This is Wells Fargo equipment.

MR. BOYD: I didn't -- I'm sorry, I didn't hear his objection.

MR. ALLISON: Relevance.

THE COURT: He is asking for relevance.

MR. BOYD: The relevance is that they're using their equipment to secure lines of credit. Mr. Berry talked about how cash is very important, but yet we have cranes that are off the books and are not being included.

THE COURT: All right. I'll -- I'll allow it, it's admitted.

Anything else?

MR. BOYD: Yes, but I am nearing the end.

Q. (By Mr. Boyd) Earlier when Mr. Berry was testifying, he said that it was you that came up with the interest rate for his promissory note; do you recall that?

A. Yes.

Q. Okay. And how did you -- did you come up with it?

A. Yes.

Q. Okay. Did you consult with anybody, in coming up with it?

A. Well, I probably asked Rob and I think he said, "Be fair" is what Marty had said. And I used the IBC rate, which is prime, plus a quarter.

Q. Okay. Why did you pick that rate, versus the rate where Berry's note was positioned at?

A. Because it's the market, it's what we would have been able to pay, if we were lucky.

Q. And so Mrs. Berry's note was in the below market rates?

A. I'm not sure. The interest rates went up a lot during that time. I'm not certain. I'm not certain how

Mrs. Berry's rate was set.

Q. Okay, fair enough. You weren't involved with that particular --

A. I may have been, but I just don't recall. It may have been set, this is what it was before, you know. It -- because she has -- she had loaned us money occasionally, and it might have been just taking that note from before and just changing it.

Q. You mean keeping the interest rate historically consistent?

A. Yeah. It may have been that. I'm not -- this is -- I'm not sure.

Q. Okay, fair enough. Since we -- I don't know if this is in evidence, but just out of an abundance of caution.

THE COURT: All right.

Q. (By Mr. Boyd) All right. I'm going to hand you Plaintiff's Exhibit 56, which is Ms. Berry's note. And indeed, that note confirms that her interest rate was at 3.75, right?

A. Yes.

MR. BOYD: Your Honor, we'd offer Plaintiff's Exhibit 56.

MR. ALLISON: No objection.

THE COURT: Admitted.

Q. (By Mr. Boyd) And you would agree that a note positioned at 3.75 percent is much more beneficial to the company than one at prime, plus a quarter; correct?

A. Yes.

Q. All right. Have you done any kind of analysis on prime, plus a quarter, compared to the rate of return on US treasuries, two-year US treasuries?

A. No.

Q. You're certainly capable of doing such an analysis, right?

A. Sure.

Q. Where do you look to determine what JP Morgan prime is?

A. Internet.

Q. The Internet?

A. Yeah.

MR. BOYD: If I may approach, Your Honor?

THE COURT: Yes.

Q. (By Mr. Boyd) I hand you Exhibit 59 and ask you to review it. Is this the type of source that you would rely on --

A. Yes.

Q. -- to determine JP Morgan prime --

A. Yes.

Q. -- over a period of time?

A. Yes.

Q. And this is something that you need to rely on, to figure out how to calculate the interest related to the Berry loans; correct?

A. Yes.

Q. And if you wanted to do the analysis that I just talked about, to determine how that note compares to the two-year treasuries, what would you rely on, to determine the two-year treasury?

A. Probably the Internet.

Q. Okay. Are you familiar with the FRED website?

A. No.

Q. Federal reserve?

A. I would find it, but no.

Q. What's that?

A. No. I don't know FRED.

Q. You don't know FRED?

A. No.

Q. Certainly the federal reserve would be an authoritative source for that; right?

A. Yeah, sure.

Q. Are you a CPA?

A. Yes.

Q. I'm sorry?

A. Yes.

Q. Okay.

A. Can't practice, but yes.

Q. And so, these would be the types of authoritative sources that you would rely upon to, number one, calculate the appropriate interest accrual on the Berry notes; right?

A. Yes.

Q. Okay.

MR. BOYD: Your Honor, I'd ask that you take judicial notice of Plaintiff's Exhibit 54 and 59.

THE COURT: Well, okay.

MR. ALLISON: Your Honor, I don't know that they are relevant, but can I take the witness on voir dire very briefly?

THE COURT: There is no relevance to what, the interest rate?

MR. ALLISON: To talking about T-Bills.

THE COURT: Well, maybe about T-Bills, but I think the interest prime rate is --

MR. ALLISON: Oh, no, the prime rate, I'm fine with him talking about that.

THE COURT: Okay. Well, I mean, I guess you can take the witness on voir dire, just make sure it's not cross.

MR. ALLISON: It will not be.

THE COURT: Fair enough. Okay.

VOIR DIRE EXAMINATION

BY MR. ALLISON:

Q. The note with IBC, was it based on prime?

A. Yes.

Q. The note with Frost, was it based on prime?

A. Yes.

Q. How long have you been aware of how banks normally use, or excuse me, loan money? How many years have you been around for that?

A. 20, 30.

Q. Okay. So, you do it based on prime?

A. Yes.

Q. You know, T-Bills, are they always a lower rate?

A. Yes.

Q. Do -- does that have anything to do with how you calculated interest or brought about interest?

A. No, I didn't -- I didn't look at the T-Bills.

Q. Do they have any relevance to you, for how you would come up with a fair interest rate?

A. No. I probably wouldn't invest in T-Bills.

MR. ALLISON: That's all, Your Honor.

THE COURT: Okay. Go ahead.

MR. BOYD: I'm sorry?

THE COURT: You're up.

MR. BOYD: Yeah. Your Honor, I'm asking the Court to take judicial notice of both the Treasury and JP Morgan prime, as it relates to fairness of the transaction.

MR. ALLISON: Your Honor, with regard to the prime we have no objection. With regard to T-Bills, there is no predicate for it.

THE COURT: Well, sustained. But with regards to the prime, I mean, the witness has testified he takes that into consideration so --

MR. BOYD: Well, the next exhibit doesn't just focus on prime, it also focus on treasuries, to show the comparison of the rate of return of each.

MR. ALLISON: Which the witness has said has no relevance, Your Honor.

THE COURT: Yeah, so I agree.

MR. BOYD: Okay.

DIRECT EXAMINATION
(Continued)

BY MR. BOYD:

Q. As I understand your testimony with Mr. Allison, you didn't consider the US Treasury rate of return?

A. No.

Q. But it's something that could be considered by

a professional evaluating the loans; right?

A. Someone could.

MR. BOYD: Your Honor, I don't think I offered Plaintiff's Exhibit 56, the Laura Berry promissory note.

MR. ALLISON: No objection.

THE COURT: Okay, it's admitted. Anything else?

Q. (By Mr. Boyd) Do you know what the prime rate was in July of 2022?

A. I can look; 5.5, or it looks like it was 4.7.

MR. BOYD: Your Honor, may I approach?

THE COURT: Oh, sure.

Q. (By Mr. Boyd) I'm going to hand you what is marked as Plaintiff's Exhibit 60. Have you had a chance to review Plaintiff's Exhibit 60?

A. Yes.

Q. Can you tell me what's going on in the back and forth with yourself, and Gretchen Reed, and Tonja Fulghum?

A. I think they're -- we're trying to get reconciled what Lawrence owes the company, just for services used and stuff.

Q. All right. And they had made, through the months ending in 2023, really for a long time, that's

2023 and into 2024, requests for certain information to try to reconcile the related party reconciliation --

A. Yes.

Q. -- that they were undertaking, right?

A. Yes.

Q. And this is related to the Orca ICI debt, in part?

A. Not really.

Q. How so?

A. This is -- all the brothers had this type of fund, where they would have services that they used on their ranches or such.

Q. Let me make sure I understand. So, the related part of reconciliation may be broader than only the Orca ICI, but it relates to all three brothers?

A. Each one has an account where they might use some manpower or something.

Q. Okay.

A. And we would -- we would charge them for it, and this is over years and years.

MR. ALLISON: Yeah, I'm just -- Your Honor, if he -- if that's it, I mean, I'm done, but if --

THE COURT: Okay.

MR. ALLISON: -- if he is going make -- I mean, we didn't even gone into this, this is a whole

other animal.

THE COURT: Well, I agree we hadn't gone into this but --

Q. (By Mr. Boyd) Well, I want to go back to what you said earlier, that this is not really related to the Orca ICI, okay?

A. Correct.

Q. If you'll turn over to ALB, three zeros, 902.

MR. ALLISON: And, Your Honor, we'd object. If it's not related to Orca, it's something we haven't entered at all. And what he is talking about is each of the brothers, for example, I think Lawrence has millions of dollars upside down with the company, in addition to the tens of millions that he owes to Orca, 30 million more owed here, but we haven't even gone there, nor do we need to, nor does it relate to any of the loans received from Marty, or from Dennis, or -- and it doesn't relate to real estate and it doesn't relate to him being a director, it doesn't relate to any of those.

MR. BOYD: I -- I haven't even asked him my question.

THE COURT: Yeah. Okay, I just wondered where --

MR. BOYD: It will be clear.

THE COURT: All right.

MR. BOYD: And if not, I know you'll shut me down.

THE COURT: Well, I might.

Q. (By Mr. Boyd) Are you with us?

A. Oops, sorry.

Q. So, on Wednesday, February 28, 2024, Tonja writes to you: Jim, good morning. Any update on the status of this request for more information. Lawrence is receiving demand letters from Mr. Hummell for payment. Right?

MR. ALLISON: Your Honor, that is on a completely unrelated, millions more that he owes, it's not part of any of this.

THE COURT: I mean, okay. I'm going to give you a little latitude but, I mean, does this -- does this have any part to do with this?

MR. BOYD: Yeah. It's totally related to the Orca ICI that they went into earlier in the day.

MR. ALLISON: The only --

THE COURT: He says it's not.

MR. ALLISON: He said it's not.

THE COURT: I mean, you take -- look, I'll let you clarify, but the witness has said it is not related to it. So unless the witness says it is related to it, I'm not going to let you go into it.

MR. BOYD: Fair enough.

Q. (By Mr. Boyd) Are you familiar with demand letters that Mr. Hummell sent, relative to the Orca ICI?

A. Yes, I saw it too.

Q. Okay. And that's what Tonja and Ms. Reed are requesting information for, they're trying to reconcile how much Mr. Berry made on that note; right?

A. This is on -- this is talking about the balance that we discussed just recently. I mean, it's for his services and stuff.

Q. I --

A. I don't see the ICI note on here, unless I'm missing it. I don't -- I could be. I don't see it, I'm sorry. This -- this is regard to where we're trying to reconcile to what his team says they owe us.

THE COURT: So -- so -- so, let me see if I get this straight.

THE WITNESS: Yeah.

THE COURT: There is -- there is the Orca note and then there is also -- each brother has his own --

THE WITNESS: Account.

THE COURT: -- account, right?

THE WITNESS: Yeah.

THE COURT: And this is dealing with the

account?

THE WITNESS: I believe this is dealing with the account.

THE COURT: Okay.

THE WITNESS: And I don't think it has ICI in it. It may have been a result -- I don't know if he sent a demand letter for this also, I'm not sure.

MR. BOYD: Well, if we go to page --

THE WITNESS: But he did send that.

MR. BOYD: -- 6, Your Honor.

THE COURT: Okay.

THE WITNESS: It may have been at the same time, but this is separate.

THE COURT: All right. So, let's go to page 6. Show the witness.

Q. (By Mr. Boyd) ALB 000906.

A. 906.

Q. Do you have water? Are you okay?

A. Yeah, I'm sorry. 906.

Q. Do you see at the top?

A. Yes.

Q. ALB, Orca properties, and they're trying to reconcile, to figure out if there are offsets to the Orca debt; correct?

A. I don't really know what -- what this is.

THE COURT: Look, let's do this --

A. I'm unfamiliar with this.

THE COURT: I'm going to take -- I'm going to take a break and maybe you-all could figure this out, and then when I'll come back we'll continue on.

MR. BOYD: Okay.

THE COURT: Okay?

MR. BOYD: Fair enough.

THE COURT: All right.

COURT BAILIFF: All rise, please.

(Brief recess.)

THE COURT: Okay. Next question?

Q. (By Mr. Boyd) Mr. Klein, let's go back to page 6. I just want to make sure I understand your testimony.

MR. ALLISON: We're on PX-60?

MR. BOYD: Yes, PTX60.

MR. ALLISON: Thank you.

Q. (By Mr. Boyd) There is a reference there to the worker properties but as I understand your testimony, you don't know what that relates to?

A. I've been -- I've just been told, but Orca Properties owns one of Lawrence's ranches.

Q. Well, why what does that --

A. I think that's what --

Q. -- have to do with what you-all were communicating about?

A. Well, they didn't -- the work that had been done may have been done on that ranch, it might have been included in this balance.

Q. Okay. Which ranch does Orca Properties own, do you know?

A. I don't know the ranches very well.

Q. Regardless, on PTX60 and, you know, we'll get clarification as -- as this goes along, but starting back in January there were requests for information; correct?

A. Yes.

Q. And there was some snafu within your department, somebody didn't do what they were tasked?

A. Yes. And this goes back, this balance goes back more than a decade. And there's holes in it from -- from that.

Q. Okay.

A. That's what she is -- is talking about in this, where she said we weren't able to gather up all the documents. We're trying to fill in those gaps from ten years ago, and it's just hard.

Q. All right.

A. But this is -- this is reconciled. Before I

got there, the CFO, it was reconciled yearly.

Q. This was -- this transaction was long before you started with the company?

MR. ALLISON: And, Your Honor --

A. No.

MR. ALLISON: -- and at this point in time I think he's talking about still the personal items.

THE COURT: What's your legal objection?

A. Yeah, this isn't -- this is --

MR. ALLISON: Relevance.

A. -- still not --

THE COURT: I mean, here -- here's the problem with -- with getting someone to talk about a document somebody else generated, he is not sure what they're talking about.

MR. BOYD: I understand, it was just a request to his department.

THE COURT: Right. And -- and maybe he knew, maybe he didn't, but I don't think he's really sure.

MR. BOYD: Well, and I think that's where I'm concluding.

Q. (By Mr. Boyd) Is that accurate, you don't know?

A. Yes. I -- I took this and I passed it on to somebody.

Q. Fair enough. I want to make sure I heard something and I don't want to belabor the point, but I asked you if you were a CPA, and you said "Yes," but you couldn't practice?

A. Yeah, I can't practice in Texas. I -- to be a --

Q. You're not licensed in Texas?

A. Right.

THE COURT: Okay.

A. I passed the CPA, but I'm a --

THE COURT: You don't have a Texas license that's active --

THE WITNESS: Right.

THE COURT: -- at this time?

THE WITNESS: Right, and it's not active in Iowa either, where I'm from.

THE COURT: Okay. You just let it -- you let the -- you let your license lapse?

THE WITNESS: Correct.

THE COURT: It's as if you're not paying the dues?

THE WITNESS: But I passed the test.

MR. BOYD: Well, you did better than I did,

I failed it.

MS. CANALES: Better than I did.

THE WITNESS: The first time, too.

THE COURT: Now you're showing off.

MR. ALLISON: Now he's showing off, Your Honor.

MR. BOYD: I pass the witness, Your Honor.

THE COURT: All right.

CROSS-EXAMINATION

BY MR. ALLISON:

Q. Real quickly, on the cranes I want to make sure we have kind of some kind of broad parameters on it. Apparently it's been months, many months since any payments have been made to Marty Berry; is that right?

A. Yes.

Q. How much do -- does the Berry companies make per month, direct or indirect, because of those cranes that Marty Berry leases to Berry companies?

A. I think it's -- it's about -- they cost about 450,000 total-ish. And the cranes themselves, we make about 700,000 of revenue. And then but because we have those cranes, we get jobs where we can charge labor and other equipment, so we probably get about over a million each month for -- for that.

Q. Okay. And so, I'm going to be real rough

numbers here, is -- are Berry companies profiting? And I understand if -- if you were paying Marty on time --

A. Yes.

Q. -- would you still be profiting --

A. Yes.

Q. -- 500,000 plus, per month?

A. It's hard to say how much the difference between the 700 and the million 1, million 2 is profit.

Q. Okay.

THE COURT: But let's say the 700.

THE WITNESS: But the 700, yes, that's pretty much profit.

Q. (By Mr. Allison) So --

THE COURT: Minus the cost of the rig?

THE WITNESS: The cost, yes.

Q. (By Mr. Allison) So the amount you're making --

A. We do probably have some maintenance and stuff that would go against it but --

Q. Let me do this: The cost to Berry companies, if you paid, and I understand you haven't been paying, but the cost to Berry companies, what you're carrying is money you owe to him, is hundreds of thousands of dollars less per month, than what you're making with him?

A. Yes.

Q. Okay. Do you perceive that as good for the companies right now?

A. Yes, especially with the payment terms.

Q. And why doesn't he get paid?

A. We're paying vendors. He had -- he had said "Pay vendors first" because we owed some.

Q. Okay. Now, and I know you've been clear, you're the one who set the interest rate for Marty Berry's and I guess Dennis Berry's note; is that right?

A. Yes.

Q. And do you intend to pay Marty Berry any more than that interest rate?

A. No.

Q. Do you --

A. Well, some day we'll hopefully pay him back the principal too.

Q. Okay. If you ever -- if the day comes where he gets to get paid back, according to the terms of the note, whether it's extended or extended again, whatever all that is, are you ever going to pay him more than the interest rate stated in the note?

A. No.

Q. And I think he pointed out some calculation errors, I guess, or some -- are you going to pay him

12-and-a-half percent, or whatever that number is on the board?

A. No. I think -- I'm sure at the time I just said do it -- he probably did it from the beginning of the month, and I don't know how he got to 12-and-a-half. I --

Q. Is -- are you --

A. I just wanted to see some interest there, and I -- I'm not sure how I got that.

Q. Is Marty back there calculating the interest?

A. I don't think Marty has a clue. He has probably never looked at it.

Q. Okay.

A. He has not asked for it, I don't think.

Q. Okay. Do you intend to ever pay more than the amount that's on the note?

A. No; well, the interest.

Q. And will that be reconciled, whenever you get to a point where you can, hopefully if that day comes and he gets paid for it?

A. Yes. And I'm also sure at 10/31 our year-end, during the audit, it got reconciled in and it is correct.

Q. So in fact --

A. In fact what he got may have been the

correction of July even, I mean.

Q. Okay. So you think it's already been corrected?

A. Yes.

Q. Okay. The terms, that the amount of interest rate that you applied, would -- do you believe that would have been available in the market place, that, or a better rate?

A. The rate might have been, but the terms, the lack of collateral, able to subrogate it, and that much, I don't -- I don't think so.

Q. In other words, you feel like you had a -- for that amount of need, did you feel like you had any other option --

A. No.

Q. -- to go shop it out on the market?

A. No.

Q. And if that had not gotten received or done for the company, what is your perception, as the CFO, in terms of where the company would have been, financially?

A. I know that earlier they said that we really needed it for the VG job and everything, but I think we needed it for survival. I mean, it was -- there are times when I'm like trying to make payroll, and payroll is key, you know. But we were behind on a lot of

vendors also. But with that, we also paid off a lot of other notes to -- for cranes, and to American Bank, and Wells Fargo, it's separate notes.

Q. So if Dennis and Marty had not stepped -- if Dennis and Marty had not stepped up, how dire was it?

A. It was getting pretty dire.

MR. ALLISON: That's all. Thank you, sir.

MR. BOYD: One quick question.

THE COURT: Wait, do you have anything?

MR. BOYD: Sorry.

MR. HUSEMAN: I wouldn't dare.

REDIRECT EXAMINATION

BY MR. BOYD:

Q. One quick followup. At the time when it was dire, you didn't go out and shop into the market, did you?

A. No.

MR. BOYD: Nothing further.

RECROSS-EXAMINATION

BY MR. ALLISON:

Q. What did you have to trade?

A. There is probably -- they've got a lot of property. There might have been something I could have used.

Q. The ranches already -- they were

collateralized?

A. No, not those. I don't know. I'd try to find something if I had to, but it would have been hard.

Q. But in candor, the ranches and all the property had already been pledged over at IBC; right?

A. Yes. Like -- well, most of it.

Q. Okay. Anything that you -- that you know of, that would have supported tens of millions?

A. Not that high; not -- not even close.

Q. Not even close, right?

A. No.

Q. Okay, thanks.

THE COURT: Then you may stand down. Call your next witness.

MR. ABSMEIER: Your Honor, the Plaintiffs call Tonja Fulgum -- Fulghum, I'm sorry. I think she is downstairs, so we may need a quick break.

THE COURT: Okay. Let me know when.

(Brief recess.)

COURT BAILIFF: Raise your right hand.

(Oath was administered.)

COURT BAILIFF: Watch your step.

THE COURT: Don't trip. All right. Let's see, whose witnesses is this?

MR. ABSMEIER: Mine, Your Honor.

THE COURT: All right. You're up.

TONJA FULGHUM

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ABSMEIER:

Q. All right. Ma'am, would you please state your name for the record.

A. Tonja Fulghum.

Q. Ms. Fulghum, who is your current employer?

A. Riverway Group.

Q. And who was your employer prior to February 1st of this year?

A. Berry Contracting.

Q. And how long did you work for Berry?

A. About 27 years.

Q. What happened, that caused your employment with Berry to end?

A. I'm not sure. I was told I was being transferred to Riverway Group. I think maybe reduction of force.

Q. And --

A. Maybe because of this lawsuit.

Q. Okay. So, what is Riverway Group?

A. A company that Lawrence owns, that is focused on pursuing large international and national engineering

construction projects, with the intent of pushing that work over to Bay, where it's construction.

Q. Is Riverway Group part of the Berry companies, Berry GP, Inc., group of companies?

A. No, sir.

Q. How is it that you could be transferred from Berry, to a company that is not owned by Berry?

A. I think that the young lady that called me in and described what was happening to me did not understand that.

Q. And who was the young lady that called you?

A. Chrissy Hinojosa.

Q. What's her position with Berry?

A. She's a vice-president.

Q. Did she ever explain to you what she meant by --

MR. ALLISON: Your Honor, we'll just object to relevance. I mean, her employment? I mean, at some point it was background, but it sounds like now we're getting into an employment case.

THE COURT: I mean, if this is just preliminary that's fine, but let's move on pretty quick.

MR. ABSMEIER: It is preliminary, Your Honor, but it also kind of shows that there was some retaliatory behavior towards her.

THE COURT: Well, I think -- I think Mr. Berry already testified about that, I think; I think.

MR. ALLISON: I think it is redundant, and I think it gets us into things that are --

THE COURT: But I'll give you a little bit of latitude.

MR. ABSMEIER: Okay. Thank you, Your Honor.

Q. (By Mr. Absmeier) In your current role with Riverway Group, do you still work on Berry GP projects?

A. I still work on projects associated with the Berries, yes.

Q. But you are no longer being paid by Berry GP?

A. No, sir.

Q. Okay. Do you know of any reason why Berry GP would have wanted to fire you or terminate your employment?

MR. ALLISON: Objection, Your Honor, speculation.

THE COURT: Sustained.

Q. (By Mr. Absmeier) Did you ever get a negative performance review, during your time period at Berry GP?

A. No, sir.

Q. Okay. I want to talk to you briefly about your 27-year career with Berry. Can you, just by way of

background, tell me what you -- what your role was when you first joined up with Berry and how you came to be employed by Berry?

A. Okay. Yes, so I was working for Coastal as a contracts administrator on a project that Berry was on. The project manager approached me for a job when the work was done, and I worked as an executive assistant at Berry GP for two years in Corpus Christi, and then I moved to Houston to open the Friendswood yard. I worked directly for Lawrence, from that point forward, on the same thing that I'm doing now, basically, development projects.

Q. Okay. And how long have you worked out of the Houston office of -- of Berry?

A. That's a good question. I would have to say, it's 20 -- since 2006; since 2006 --

Q. Okay.

A. -- maybe.

Q. Okay. And very generally can you tell us what your job duties were with Berry, over the past few years of your employment?

A. Okay. So, we worked on international project development, funding development on large projects. We did a large Canadian project. We did some other projects in -- like in Proman, Valenzuela, things of

that nature. Most recently we've been working on the Lone Star Ports project. It's been quite an ordeal, I don't know mind telling you. I did a lot of stuff directly for the trust, for Canada project holdings and for Berry Y & V. There is still a lot of wind-down stuff that I'm working on, related to that.

Q. Okay. And you said -- I think you said front end development, that means pursuing projects?

A. Yes, sir.

Q. And setting them up?

A. Yes, putting them together, the concepts, the relationships.

Q. Okay. Did you have supervisory responsibilities in the Houston office, for Berry GP?

A. Yes, I did; not for Berry GP so much, as I was -- unofficially had responsibility for Berry Y & V Fabricators and the personnel, and the office management of that. I liked to say, more or less, I'm air traffic control. So if it hits my desk, it's got a good chance of getting somewhere it's supposed to be.

Q. Did the employees in the Houston office report to you?

A. Yes, sir.

Q. And you reported directly to Lawrence Berry?

A. Yes.

Q. Okay. Have your duties changed since you've become employed with Riverway Group?

A. No, sir.

Q. Okay, new topic. I want to talk a little bit about the lines between Marty and Dennis Berry and Berry GP; are you familiar with those, generally?

A. I am, generally, yes.

Q. Okay. You should have before you a document labeled PTX2, Plaintiff's Exhibit 2.

A. Okay.

Q. Can you get that?

A. Yes.

MR. ABSMEIER: May I approach?

THE COURT: Yeah, yeah.

A. Here it is.

Q. (By Mr. Absmeier) Okay. PTX2 is an email from Jim Klein to you; do you see that, ma'am?

A. Yes, sir.

Q. And if you go to the second page, the bottom email in that chain, it starts with an email from you to Jim Klein, requesting a copy of the current P & L and BS, the balance sheet, I take it; right?

A. Yes, sir.

Q. For the combined companies, right?

A. Yes.

Q. Okay. As -- as part of your duties in the Houston office, did you often correspond with Berry GP management, in order to get financial information?

A. Yes, I did.

Q. Okay. Do you know, or do you recall why Lawrence was -- or you or Lawrence were requesting this information in September of '22?

A. I believe that this instance, we were requesting it, because of his covenants with his Capital Farm loan for one of the ranches. We have to provide financials for various entities on an annual basis.

Q. Yes, ma'am. If you'll look at the third page of the document, the combined and consolidated balance sheet for July 31st, '22; do you see that?

A. Yes.

Q. Was there anything that stood out to you on this balance sheet?

A. Yes, the related party note payable.

Q. Okay. And -- and what portion of the balance sheet does that appear in?

A. Liabilities and equity, yeah.

Q. Okay. And that's in the long term liability?

A. Long term liability section, sorry, yes.

Q. Did -- did you know what this entry was, when you reviewed this document?

A. No, sir, I did not.

Q. And did you have any concerns, when you saw this?

A. I did. I was concerned about what had been -- if he had given up equity or his portion of equity in the company in exchange for that note. I didn't know what it -- what supported it.

Q. Okay. What did you do, when you noticed this entry?

A. I asked him.

Q. You asked who?

A. Lawrence, sorry.

Q. Okay. And what did you ask him?

A. I asked him what -- what is this.

Q. And did Mr. Berry, did Lawrence have any knowledge of it?

A. No. He had a deer in the headlights look, whenever he looked at it.

Q. Okay. Are you aware of any efforts by your office to reach out to Rob Powers, or Jim Klein, or anybody from Berry GP, to get information about this related party note?

A. At that point Lawrence told me he was going to ask.

Q. Okay. Did -- did your office, to your

knowledge, ever receive any information about that related party note?

A. No, sir.

Q. Okay. When was the first time that you ever received information about that related party note?

A. I think it was after this suit was filed.

Q. Okay. So, and this suit was filed in November of 2023?

A. (Moving head up and down.)

Q. Okay.

THE COURT: Is that a "Yes"?

THE WITNESS: Yes, sir, sorry.

Q. (By Mr. Absmeier) You can set that aside.

MR. ABSMEIER: May I approach?

THE COURT: Yes, sir.

Q. (By Mr. Absmeier) I'm going to hand you what's been marked Exhibit 50.

THE COURT: Yes, sir.

Q. (By Mr. Absmeier) Ma'am, do you recognize Exhibit 50 as an email, another email from Jim Klein to you?

A. Yes.

Q. And this is a March 2023 balance sheet; is that right?

A. Yes, sir.

Q. Okay. I thought I had given you the wrong document.

A. It is March.

Q. Okay, yeah.

A. It's March 2023.

Q. Okay. And if you look at the last page of that document, does that "related party, note payable" appear as an individual line item on the balance sheet?

A. It is not described the same. It appears that it might be there as a 68 million dollar liability, but I'm -- it's hard to tell.

Q. Could you tell, in March of 2023, what the balance of that related party note was, from the information that you were receiving in the Houston office?

A. No, sir.

Q. Okay. Was that something that you were interested in, or that Lawrence was interested in you finding out?

A. It was something that Lawrence was certainly interested in, yes.

Q. Okay.

MR. ABSMEIER: Your Honor, I'd move for the admission of Exhibit 50.

THE COURT: Okay. Any objection?

MR. ALLISON: It's already in evidence, Your Honor.

THE COURT: It is?

MR. ALLISON: We already had it -- we already had it -- we already had it over here, from when they were handing us stuff.

THE COURT: Well, okay. If it's in evidence, then I guess that's -- it's already in then, I guess it's already in.

Q. (By Mr. Absmeier) I'm going to hand you Exhibit 58.

A. Okay.

MR. ABSMEIER: PTX58.

THE COURT: Okay.

(Court reporter speaking.)

MR. ABSMEIER: So this may already have been admitted, as to 58.

THE COURT: Let's make sure.

MR. ABSMEIER: I'll take that back. It is already in as 58, it's the same document.

THE COURT: Okay.

Q. (By Mr. Absmeier) Can you tell us what Exhibit 58 is, Ms. Fulghum?

A. It's an email from me, or a response from Jim Klein to me, where I was requesting, again, financials

for Capital Farm.

Q. And Mr. Klein did in fact provide some financials for the company, from April of '23?

A. He did, yes.

Q. Okay. And if you'll go to the second to last page. The first page is the balance sheet, do you see that?

A. Yes, sir.

Q. Okay. And then the long term notes payable, related parties has reappeared on the balance sheet a month later, right?

A. Yes, sir.

Q. Did you notice anything different about the balance, as of April 2023?

A. It's a little bit different, it looks like, yes.

Q. It's gone down, right?

A. It's gone -- yes; yes, sir.

Q. Okay. Was that something that you flagged, when you reviewed this document?

A. For my own purposes, yes, but I don't think I brought it to Lawrence's attention at the time.

Q. Okay. Could you tell at that point in time that some amount that had been repaid on the Berry loans?

A. I assumed something had been repaid.

Q. Could you tell how much was principal, versus how much was interest?

A. No, sir. There is no --

MR. ALLISON: We'll just object. We just got finished with a witness who has first-hand knowledge of this, and she's making assumptions. She doesn't have any foundation. Predicate, lack of predicate.

THE COURT: Lack of predicate. Response?

MR. ABSMEIER: Yes, Your Honor. She's testified that is the head of the Houston office and would request financial information from Mr. Klein and others, that she --

THE COURT: I mean, to the extent that she was requesting the information, I think it's getting repetitive because we've already heard it, but yeah, I mean --

MR. ABSMEIER: I'm -- I'm about to wrap this up.

THE COURT: She's -- I got you, she's the other half of the conversations that we've already heard about.

MR. ABSMEIER: That's exactly right. And then it just goes to the difficulty of getting the information and understanding the information of what

was submitted.

THE COURT: All right.

Q. (By Mr. Absmeier) All right. One more and then we'll switch topics.

Exhibit 51 is that -- has that been admitted already?

(Court reporter speaking.)

Q. (By Mr. Absmeier) I hand to the witness PTX51.

THE COURT: Thank you.

MR. ALLISON: 51?

THE COURT: 51.

MR. ALLISON: Thank you.

Q. (By Mr. Absmeier) This is now a balance sheet for September 2023; correct?

A. Yes, sir.

Q. And what is the balance of that note payable, as of September of '23?

A. 71,401,884.

Q. Okay. And so just to walk through that quickly, we looked at a series of balance sheets where the amount went from 75 million, down into the 60s, up into the low 70s, and is here at 71.4 million as of a year later; right?

A. Uh-huh.

Q. Okay. At any point during this period of time,

did you receive information setting out what portion of that note payable was principal, versus what was interest?

A. No, sir.

Q. Did you ever receive information about the terms of the note?

A. No, sir.

Q. When was the first time that you ever saw the promissory note?

A. I'm sorry, the first time I ever saw what?

Q. The actual promissory note.

A. It's been since this case started, or since this lawsuit was filed.

Q. Okay. New topic. Oh, I'm sorry.

MR. ABSMEIER: Your Honor, I offer for admission PTX51.

THE COURT: All right. Any objection?

MR. ALLISON: No objection.

THE COURT: It's admitted.

Q. (By Mr. Absmeier) I'll hand you what's been marked as PTX49.

THE COURT: Okay.

Q. (By Mr. Absmeier) Ms. Fulghum, are you familiar with a company called Western Gulf Equipment?

A. Yes.

Q. What is that company?

A. It is a company that I believe Marty owns, that is -- we used to do a crane transaction with a Canadian entity back in 2019.

Q. Can you generally explain that transaction?

A. Yes. So, we had some money sitting at Bay International Canada, Canadian money from a company that we have up there. Barry Peterson needed to buy a crane. We'd already done a transaction similar to this a couple of years previously, but Bay International Canada didn't have enough money to pay for the whole crane. The money -- the crane was coming from Ireland, so the Canadian money worked well for that. I believe Marty had the rest of the money, so he put that -- his half up, and Bay International Canada put the other half up to purchase that crane, with the agreement that both companies entered into a lease agreement with Bay. Bay International Canada's lease was deferred for a year, I believe, and Western Gulf's was going to be paid, and then at that point in time Bay would own that portion of the crane, and Bay International Canada would start to receive their rentals. The reason that that is fresh for me is because we've been trying repatriate that crane into the United States and get it out of the Canadian company, so that we can avoid the Canadian

revenue agency because there's been deferred rent that hasn't been paid. So, it's been fresh on my mind. I've been working with Jim Klein to try and get that moved back and get that cleaned up, so we stay out of trouble.

Q. Okay. I want to talk to you a little bit about that transaction that took place in 2019.

A. Okay.

Q. The email before you in Exhibit 49, at the bottom of the first page, somebody named Miguel Fuentes forwards you some documentation on the subject, Liebherr Crane invoices from BIC?

A. Yes, sir.

Q. Okay. Who is Miguel Fuentes?

A. He was the CFO at the Berry Y & V Fabricators.

Q. Okay. And if you'll skim down to the third page. At the top of the third page, there is an email from Miguel Fuentes to Diane DeCou. And who is Diane DeCou?

A. She was the CFO at Bay, previously.

Q. Okay. Mr. Fuentes says: Attached please find the purchased summary prepared by Berry and the lease contract due.

He also says: I'm also including as well a report with BIC/Bay intercompany accounts, right?

A. Uh-huh.

Q. And I want to look at just one of the attachments that he included, and that is at the very last page of Exhibit 49.

A. Okay.

Q. You see that the last page of Exhibit 49 is a summary of the transaction regarding this one crane?

A. Yes, sir.

Q. Okay. And can you read the second sentence there?

A. "After discussion with the board the purchase and funding will be structured as follows."

Q. Okay. So, did you understand that there had been board discussions about the way this one crane would be purchased?

A. Yes, sir.

Q. Okay. And if you skip down to the second and third bullet points, it indicates that Bay International Canada would fund half, and Western Gulf Equipment would fund the other half; right?

A. That's correct.

Q. And about five bullets down: After one year Bay Ltd will purchase 100 percent of the ownership held by WGE.

Is that correct?

A. That's true.

Q. You may have testified to this, but is it your understanding that Western Gulf Equipment is owned by Marty Berry?

A. Yes, sir.

Q. Mr. Lawrence Berry does not have an ownership in it --

A. No.

Q. -- right? Aside from this single crane purchase that Exhibit 49 indicates that the board had approved, were you aware of any other business that Berry GP was doing with Western Gulf Equipment?

A. No, sir.

Q. You should have in the stack before you a document labeled PTX --

MR. ABSMEIER: Oh, I'm sorry. And I offer for admission Exhibit 49, PTX49.

THE COURT: Okay.

MR. ALLISON: No objection.

THE COURT: It's admitted.

Q. (By Mr. Absmeier) You should before you, ma'am, a document labeled PTX17. Do you recognize PTX17?

A. I do.

Q. What is it?

A. It is an accounts payable report, a page from an accounts payable report.

Q. And was that something that your office requested from Mr. Klein?

A. Yes.

Q. And what did you notice in the accounts payable report of Western Gulf Equipment?

A. That it looks like there is multiple pieces of equipment, potentially, that Western Gulf Equipment owns that's owed money.

Q. Can you tell from Exhibit 17 how many pieces of equipment Western Gulf Equipment was providing to the Berry companies?

A. It looks like there might be seven different pieces but I can't -- it's not clear.

Q. Were you ever provided or your office ever provided any notice about the fact that Western Gulf Equipment would be leasing additional cranes to Berry GP?

A. No, not that I'm aware of, no, sir.

Q. Okay. And what did you infer from PTX17, when you saw it?

A. Well, I recognized the name right away because I had been working, like I said, with trying to get the -- the Canadian crane, or owned portion of the crane moved into the United States, so it was fresh in my mind.

Q. And what did you do when you saw the -- the accounts payable report?

A. I think Lawrence and I were looking at it together.

Q. Okay.

A. Okay.

Q. New topic, and perhaps the last topic. There's been some discussion today about requests for information that have been made to the company and about account balances going both ways between the company and Lawrence Berry or his companies. I want to talk with you a little bit about those accounts and your attempts to get information from the company.

A. Okay.

Q. So there's an entity, I understand, called Orca?

A. Yes, sir.

Q. Can you explain briefly what Orca is?

A. It was a company that Lawrence put together that was pursuing oil and gas leases in the Eagle Ford, originally.

Q. And did Orca originally have a loan agreement with Berry GP?

A. They did, yes.

Q. And at some point was that loan converted to

some kind of partnership equity arrangement?

A. Yes, sir.

Q. Okay. When did that occur?

A. This should be fresh in my mind, but I don't remember the exact date.

Q. Do you recall why that occurred?

A. So, I know that Ed and Jonna came to Houston. I think there may have been some other discussions previous to that, but our first awareness of it was they came to Houston and wanted to convert it to a partnership. I think they were trying to move some stuff around in the financials, in order to qualify for a highway bid or something.

Q. And by converting from a loan to Orca --

A. When they converted from the loan to the partnership they did a mark to market adjustment. I'm not an accountant, I don't pretend to be, but they did a mark to market adjustment that got Lawrence's accountants very excited and upset, that it inflated the value of the company - they felt like - falsely. Lawrence was agreeable because it was doing something to help Berry GP, so we -- we cooperated.

Q. Okay. So, let me back up and --

A. Okay.

Q. -- parse that a little bit. First you

mentioned Ed and Jonna, can you tell the Court who they are.

A. I'm sorry, yes. Ed Martin and Jonna Jones. Ed Martin was the CEO previously and Jonna Jones was the CFO.

Q. Okay. And you said that they were pursuing some highway work?

A. I -- from what I understood, yes, sir. I don't have the firsthand, but from what I understood from the conversations, yes.

Q. Okay. And did you have an understanding why converting a loan to an equity interest would help them with that highway work?

MR. ALLISON: We object on relevance. We are years --

THE COURT: I agree.

MR. ALLISON: -- we're years ago and things that --

THE COURT: Yeah, I agree.

MR. ALLISON: I brought up the --

THE COURT: Sustained. I mean --

MR. ABSMEIER: Your Honor, if I could respond.

THE COURT: I --

MR. ABSMEIER: Can I respond, before you

rule, please? They brought up this Orca issue repeatedly today, to imply that Lawrence is refusing to pay amounts due. There are genuine disputes as to the legitimacy of some of the amounts going back and forth between the companies, and that's all I'm trying to establish.

THE COURT: Okay. I mean, this is really -- I mean, I've heard a lot about Orca. This is the first time I've heard really anything substantive about Orca, right?

MR. REASONER: All you hear from him is tens of millions of dollars is owed, and to let that --

MR. ALLISON: Your Honor, that was --

MR. REASONER: Let me finish, let me finish.

MR. ALLISON: -- that was our witness.

MR. REASONER: Can I please finish?

MR. ALLISON: Sure.

MR. REASONER: Your Honor, I think we're entitled to briefly respond to the suggestion that it's undisputed that tens of millions of dollars is owed; that's the point of the testimony.

THE COURT: Okay.

Q. (By Mr. Absmeier) Ms. Fulghum, do you have an understanding as to what effect it would have for Berry

GP's balance sheet, if the loan to Orca was converted to equity and mark to market?

A. I do. I don't know what they were trying to achieve, except that they felt like it was something that was important. It was important enough that I got an email from Jonna.

MR. ALLISON: Now, she is saying why they --

THE COURT: So doesn't -- she doesn't know.

MR. ALLISON: She doesn't know.

THE COURT: Yeah, I hear you. I hear you.

A. But what I do know is that they -- they did the mark to market adjustment for about 6.9 million, 7 million dollars. And by converting the loan to a partnership, the revenue that came in from the oil and gas leases then became part of the company and then they mark --

THE COURT: Became part of what company?

THE WITNESS: From Orca. The partnership became Orca ICI, sorry.

THE COURT: Okay.

THE WITNESS: Yeah.

THE COURT: There is a lot of companies.

THE WITNESS: There is a lot, it is, it is, and it's just a spaghetti bowl.

THE COURT: Right.

THE WITNESS: Yes, sir. But it -- it did some things to the numbers that our accountants didn't agree with.

THE COURT: Okay.

THE WITNESS: But Lawrence assured us that it was some sort of an agreement that they had with the board, that that was all going to get taken care of, and so we proceeded with that understanding.

THE COURT: Okay. Next question.

MR. ABSMEIER: Okay.

Q. (By Mr. Absmeier) Thank you, ma'am. I'm going to hand you what has been marked as Exhibit 60.

THE COURT: All right. This is what?

MR. ABSMEIER: That's Exhibit 60, Your Honor.

THE COURT: Okay.

MR. ABSMEIER: PTX60.

MR. ALLISON: Six zero?

MR. ABSMEIER: Six zero.

THE COURT: All right. You're up.

MR. ABSMEIER: Is it in evidence?

MR. ALLISON: Yeah, it should be.

MR. ABSMEIER: Yeah?

MR. ALLISON: It is.

MR. HUSEMAN: Yeah.

MR. REASONER: Is it in?

MR. ABSMEIER: Yeah. Was it -- was it offered and admitted?

MR. ALLISON: It was one of the ones that was handed to us and I think -- I don't think I object to any of them.

MR. REASONER: I don't think -- I don't think -- once you offer it -- why don't you just offer it in.

MR. ABSMEIER: Your Honor, offer for admission Exhibit 60.

THE COURT: Okay. Any objection?

MR. ALLISON: No objection.

THE COURT: Look, that takes us to about the end of the day. I know you-all are coming back on Monday, and I'll give you the time I have. Well, I'm going to give you guys all the time you need on this case, so that's about all we got for today.

MR. REASONER: And, Your Honor, just to -- I think -- don't hold me to it, but I think at most we would have one other witness after Ms. Fulghum and then closing arguments.

THE COURT: No, that's fine. And -- but, I mean, you-all are going to need some time for closing

arguments after all that.

MR. REASONER: I don't know what they might have.

THE COURT: And he's got his motion to dismiss, and you've got a response and you've got a reply, so --

MR. ALLISON: We're all over the place, Your Honor.

THE COURT: All right.

MS. CANALES: Your Honor, it's 10:30 on Monday, correct?

THE COURT: 10:30 on Monday. I will do my best to be ready for you.

COURT MANAGER: If you want to be here at 10, that's fine.

THE COURT: If you want to be here at 10, and I get -- I got one 10:00, if it goes away, maybe I'll wipe it out quick, maybe we can get started a little early.

MS. CANALES: With that, may I be excused?

THE COURT: Yes, ma'am.

MS. CANALES: Thank you, Judge.

MR. REASONER: Thank you, Your Honor.

MR. HUSEMAN: Thank you.

MR. ABSMEIER: Thank you, Your Honor.

MR. ALLISON: Thank you.

MR. BALDTREE: Thank you, Judge.

(End of hearing.)

STATE OF TEXAS    *

COUNTY OF NUECES *


I, OLIVIA OBALLE-AGUILAR, official court reporter in and for the 117th District Court of Nueces County, Texas, certify that the above and foregoing contains a transcript of all portions of evidence and other proceedings requested by counsel for the parties to be transcribed.

WITNESS MY HAND, this the 27th day of April, 2024.


/s/ Olivia Oballe-Aguilar

_____

OLIVIA OBALLE-AGUILAR
Texas C.S.R. 2152
Expiration date: 12/31/25
117th District Court
Official court reporter
Nueces County, Texas
Corpus Christi, Texas  78401
Telephone: 361-888-0662

# EXHIBIT 8

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY, Individually and derivatively on behalf of BERRY GP, INC.,

   Plaintiff,

BERRY GP, INC.,

   Nominal Plaintiff

VS.

MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC, and BERRY CONTRACTING LOP

   Defendant

IN THE DISTRICT COURT

NUECES COUNTY, TEXAS

94TH JUDICIAL DISTRICT

--------------------------------
TEMPORARY INJUNCTION HEARING
(March 25, 2024)
--------------------------------

On the 25th day of March, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable BOBBY GALVAN, Judge presiding, held in Corpus Christi, Nueces, Texas;

Proceedings reported by machine shorthand.

APPEARANCES

FOR THE PLAINTIFF, LAWRENCE BERRY:
     MR. BARRETT REASONER
     SBOT NO. 16441980
     MR. MICHAEL ABSMEIER
     SBOT NO. 24050195
     MR. BRUCE BALDTREE
     SBOT NO. 24116064
     Gibbs & Bruns, LLP
     Houston, Texas
     Telephone: (713) 650-8805

AND

     MR. BUTCH BOYD
     SBOT NO. 00783694
     Butch Boyd Law Firm
     2905 Sackett Street
     Houston, Texas 77002
     Telephone: (713) 589-8744

AND

     MS. GABBIE S. CANALES
     SBOT NO. 24012376
     Law Office of Gabbie Canales
     5262 South Staples, Suite 100
     Corpus Christi, Texas 78411
     Telephone: (361) 887-4700

FOR THE DEFENDANTS, BERRY GP, BERRY OPERATING,
BERRY CONTRACTING, AND MARTY BERRY:
     MR. DOUGLAS A. ALLISON
     SBOT NO. 01083500
     Law Office of Douglas Allison
     403 North Tancahua Street
     Corpus Christi, Texas 78401
     Telephone: (361) 888-6002

AND

     MR. MICHAEL H. 'MIKE' HUMMELL, PRO SE
     SBOT NO. 10271100
     Berry Contracting LP
     1414 Corn Product Rd
     Corpus Christi, TX 78409-3020
     Telephone: (361) 693-2909

P R O C E E D I N G S

March 25, 2024

(In open court.)

THE COURT: Still under oath.

Okay. I don't know who was doing the questioning. I can't remember.

MR. ABSMEIER: I was, Your Honor.

THE COURT: All right. Then you're on.

MR. ABSMEIER: Thank you.

DIRECT EXAMINATION, CONTINUED

BY MR. ABSMEIER:

Q. Good morning, Ms. Fulghum.

A. Good morning.

Q. At the end of the day Friday we were finishing up our discussion of the Orca transaction and the amounts owed back and forth between Lawrence and the company; do you recall that?

A. Yes, sir.

Q. Okay. I want to quickly try to wrap that issue up. I'm gonna hand you what I'm marking 67.

MR. ABSMEIER: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Absmeier) This is 67.

A. Okay.

THE COURT: Yes, sir.

Q. (By Mr. Absmeier) Ms. Fulghum, do you recognize Exhibit 67 as an e-mail chain between you and Johnna Jones from

January of 2014?

A. Yes, sir.

Q. And the subject on that e-mail is "Update on Orca Promissory Note", correct?

A. Correct.

Q. Okay. If you go to the bottom e-mail Ms. Jones indicates that she had called you to see if you had an update in regards to the amount on the promissory note, right?

A. Yes.

Q. And you respond and indicate essentially that you hadn't spoken to Lawrence about it, right?

A. Yes.

Q. And you say, third sentence, "Have the financials been closed to accommodate the TxDOT bids", right?

A. Right.

Q. What was going on with the TxDOT bids at that point?

A. I think that they were trying to get --

MR. ALLISON: Your Honor, we just object to speculation. It sounds like she was not in the conversation.

THE COURT: Okay. All right.

MR. ABSMEIER: Your Honor, she's discussing the TxDOT bids in this e-mail.

THE COURT: Okay. Well, I guess you can rephrase the question in a way that it's not speculative.

MR. ABSMEIER: Okay.

Q. (By Mr. Absmeier) Ms. Fulghum, did you have an understanding as to what was going on with the TxDOT bids at that point in time?

A. What I understood was that they were pushing Lawrence to sign a document that converted a loan to a partnership agreement with some adjusted financials in support of getting bonding for TxDOT bids.

Q. Okay. And that is the conversion of the Orca entity from -- or the Orca transaction from a loan to a partnership where --

A. Yes, sir.

Q. Okay. That we talked about Friday, right?

A. Yes, sir.

Q. Okay. And was the point of that to enhance the Bay/Berry balance sheet to allow them to bid on this TxDOT work?

A. I assume that's what it was, yes.

Q. Okay. And you indicated there was some sort of mark to market component of that transaction?

A. That's right. They did a mark to market adjustment of the valuation of the leases of about 7 million dollars.

Q. And so at that point when the loan was converted to equity, was the equity valued the same as the loan amount or more?

A. More.

Q. Okay. So setting aside that conversion of the partnership and the mark to market adjustment you just explained, has Lawrence paid off the original loan amount plus interest?

A. Everything that Lawrence borrowed from the company has been paid, plus interest.

Q. Okay.

MR. ABSMEIER: Your Honor, move for the admission of Exhibit 67.

THE COURT: Okay.

MR. ALLISON: No objection.

THE COURT: It's admitted.

Q. (By Mr. Absmeier) After this lawsuit was filed, ma'am, did Berry begin -- Berry GP I'm talking about -- begin making demands for Lawrence to repay those amounts and other amounts due to the company?

A. Yes, sir.

Q. Okay. I want to talk with you briefly about some of your requests for information to the company on Lawrence's behalf. First, did you have a role in helping manage the balances, or track the balances that were owed back and forth between Lawrence and the company?

A. I had a role in helping to communicate the balances owed, yes.

Q. Okay. Did you periodically review the amounts that

you were tracking as due to the company and vise versa?

A. Yes, sir.

Q. Did Lawrence attempt to pay the items that you agreed were due?

A. Oh, yes, we did. We did clear some balances that were on the related party receivable schedule as we were able to confirm the amounts due, yes, sir.

Q. Did you find the times that the amounts charged were improper --

A. Yes.

Q. -- or things were being charged that weren't actually --

MR. ALLISON: Your Honor, we'll just object on relevance. It sounds like we're getting now into the -- there's this Orca thing, and there's the -- sometimes the partners would I think do something that was personal that would get charged to their account, which are personal accounts. And we haven't gone into that before and it just seems like once we go down that road --

THE COURT: I mean, look, it seems to me that the witness has testified that Lawrence paid back what was due. And I -- I allowed you to get into the Orca because they made a fuss about it. If what she's saying is he's paid back what's due then I think that's the end of it.

MR. ABSMEIER: Right. And, Your Honor, that's

fine. This is sort of a predicate for requests for information that are going unanswered. And it's a five-minute part of the direct. But I'm not gonna get into the amounts or fight about the numbers.

THE COURT: Okay. But I mean, if this is a discovery issue that's fine, but, I mean, we're here on a temporary injunction.

MR. ABSMEIER: Well, this is actually -- Your Honor, this goes to the point that Lawrence or his office requested information over and over again and doesn't get it.

THE COURT: Okay. Well, I'll give you a little bit of leeway on that point only.

MR. ABSMEIER: Okay.

Q. (By Mr. Absmeier) Do you have before you Exhibit 60? I guess you may recall this was the document that I had just put in front of you when we broke at the end of the day Friday; do you recall?

A. Yes.

MR. ABSMEIER: And, Your Honor, I offered this for admission at the end of the day. And there was no objection from Mr. Allison, but I don't -- in the transcript at least it doesn't reflect that it was admitted.

THE COURT: Okay. Well, then I guess it's admitted.

MR. ABSMEIER: Okay. Thank you, Your Honor.

Q. (By Mr. Absmeier) Ms. Fulghum, this is an e-mail from Lawrence Berry to Shanna Gohlke copying you, right?

A. Yes.

Q. And it's responding to an e-mail from Mr. Hummell with the subject, "Notice of Delinquent Account"; do you see that?

A. Yes, sir.

Q. Okay. And the e-mail that Lawrence sent attached a couple of documents. And, briefly, if you look at the last page there's a letter. And the letter in the second paragraph references an attached e-mail chain reflecting some conversations, right?

A. Yes.

Q. Okay. I want to look at that e-mail chain. If you start at the page base labeled ALB904. Do you see that that's a January 8th, 2024 e-mail from Gretchen Reed to Jim Klein Ccing you, right?

A. Yes, sir.

Q. And the subject's "Related Party Reconciliation"?

A. Yes.

Q. Who's Gretchen Reed by the way?

A. Lawrence's CPA.

Q. And does she report to you?

A. Yes, sir.

Q. Okay. And she says, "After an initial review of the

Berry Family Related Expense Excel analysis, we are sending the attached request lists", right?

A. Yes.

Q. And if you go down to the second paragraph she says, "We're also sending you a reconciliation of amounts that Bay owes to Lawrence", and then it talks about 1.7 million dollars in expenses that should be netted against Lawrence's balance, right?

A. Correct.

Q. Okay. And I won't belabor this, but if you kind of scan down the next two pages of that e-mail there are some spreadsheets embedded in the e-mail, right?

A. That's right.

Q. And those are the various expenses back and forth that are trying to be reconciled here?

A. Yes, sir.

Q. Okay. Go to page ALB903, please.

A. Okay.

Q. The page before the one we were just looking at. This is a February 3rd e-mail from Gretchen Reed to Jim Klein; you see that, ma'am?

A. Yes.

Q. Okay. And so that's almost a month after that initial request for reconciliation, right?

A. That's correct.

Q.   And Gretchen says, "Hi, Jim.  Following up on the below request as we would like to continue to move forward reviewing the balances but need additional information", right?

A.   Yes.

Q.   Okay.  And is it consistent with your recollection that no information -- that information that you had requested in early January still had not been provided as of early February?

A.   It's been difficult to get this information for years.

Q.   Okay.  If you go up to the e-mail above that, which starts at the bottom prior page, Monday, February 12th, Ms. Reed, again, Ccing you follows up yet again, right?

A.   Yes.

Q.   She says, "Following up again on our request for supporting information"?

A.   Right.

Q.   And at that point you still hadn't received the information?

A.   No, sir.

Q.   Okay.  If you go up to the e-mail above that, Mr. Klein says on February 13th, he apologizes.  He said, "This has been slowed by the lack of effort by an admin that was assigned to the project", right?

A.   (Moving head up and down.)

Q. And he says, "She's been replaced and the new admin should be getting this to you", right?

A. Yes.

Q. A couple weeks later you e-mail, right?

A. I did.

Q. This is February 28th now. And you say, "Jim, good morning. Any update on the status of this request for more information"; do you see that?

A. Yes, sir.

Q. At the top of 902?

A. Uh-huh.

Q. Following page -- or I'm sorry, the preceding page is ALB901; are you there?

A. Yes, sir.

Q. And this is February 29th. Mr. Klein says, "Tonja, they were attempting to gather up all the supporting documents to send with the detail. I told them to just send it with what they can get together quickly. Tomorrow they will send such", right?

A. Correct.

Q. And tomorrow as of February 29th would have been March 1 of '24?

A. Yes, sir.

Q. Did he send anything to you the next day?

A. I have not received anything.

Q.   Did he ever send anything to you?

A.   No, sir.

Q.   Okay.  So as you sit here today you still have not received any information from Mr. Klein?

A.   None of the supporting document, no.

Q.   Do you know if today exactly what, if anything, is logistically owed between the parties?

A.   I don't know what is owed between the parties.

Q.   You can set that aside, ma'am.  Are you aware of other information requests that you or Lawrence has made to the company that have not been responded to?

A.   I think in general there's a general lack of response of information.

Q.   And why is it important for you to receive information to know what's going on with the company?

A.   I mean, I received the information on Lawrence's request and give it to Lawrence so he can make decisions or understand what's happening with his company.

Q.   Is Lawrence pursuing new jobs for the Berry entity?

A.   Yes, he is.

Q.   And does that lack of information affect his ability to do that?

A.   It does.  The lack of information and the lack of collaboration with the team in Corpus does, in fact, impact that.

Q.   In the past year or two where have you and Lawrence gotten most of your information of about the company?

A.   The Board meetings.

Q.   And if Lawrence doesn't get updates of the monthly Board meetings, is there another way that you know of to get that information?

A.   I think then the information could only come from the field, which is not always accurate.

Q.   Okay.  And are your requests to company management being responded to?  Requests for information?

A.   In some instances, yes, and in most instances, no.

Q.   Okay.  I want to briefly talk to you about your interactions with the CEO at Berry GP over the years.

A.   Okay.

Q.   You testified you worked for Berry for 27 years before you were terminated; is that right?

A.   Yes, sir.

Q.   Okay.  In your job did you interact regularly with the various CEO's that have been in place at the entities?

A.   I did.

Q.   Okay.  What in your experience was the role of the CEO?

A.   Well, Mr. Martin I think was primarily involved in the financial wellbeing of the company, and they had a president Ken Luhan who oversaw the operations.

Q. Was that -- did you view that CEO role as an important role in the company?

A. Absolutely.

Q. Did Lawrence, to your knowledge, have any role in selecting or hiring the CEOs prior to the current CEO?

A. Yes.

Q. What was that role?

A. I think that they -- the brothers generally got along and talked and engaged in conversations about who they were going to put in that position.

Q. What has Lawrence's role been in the company just directly?

A. He mainly oversees the industrial division and large international projects.

Q. And I think you talked earlier in your testimony about front end development of projects?

A. Uh-huh.

Q. And by that do I understand correctly that Lawrence has pursued and obtained large projects on behalf of Berry GP?

A. Yes.

Q. Can you just give a couple of examples?

A. I mean, go back to CNRL Horizon project, there's some modular projects for Sunoco, Proman, Kazamba. I mean, I can go through a litany of projects that he's pursued; some that he got and some that didn't pan out.

Q.   What has Marty's role with the company been to your knowledge?

A.   That he's a director and he's primarily overseeing equipment from my understanding.

Q.   And that would be the equipment division of the company?

A.   Yes, sir.

Q.   What does the equipment division of the company do?

A.   It's the largest -- one of the largest heavy haul companies in the United States I believe.

Q.   And --

A.   Cranes, heavy haul equipment.

Q.   And the equipment division of the company, does that provide cranes to --

A.   Internal and -- it's inside sales and outside sales, yeah.  So it supports the industrial division and it also has its own business.

Q.   Okay.  And you understand now that Marty's running his own equipment company, Western Gulf Equipment, on the side?

A.   I don't know what that -- I understand that there is some cranes that belong to Western Gulf Equipment, yes.

Q.   Okay.  And if -- if there are cranes with Western Gulf Equipment running inside or outside leasing, that would be in direct competition with the equipment division of the company?

A.   We don't have any transparency into those lease agreements.  But it would sound like that would be the case, yes.

Q.   Okay.  Thank you.

MR. ABSMEIER:  I'll pass the witness.

THE COURT:  Cross.

MR. ALLISON:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. ALLISON:

Q.   You were asked some questions about, I guess, these personal expenses that the company says are owed by Lawrence but have not been paid back to the company?

A.   Yes, sir.

Q.   And that goes back for, what, about ten years?

A.   Even longer I believe.  There's --

Q.   15 years?

A.   Yeah.

Q.   Okay.

A.   Yeah.  I think that's probably true.

Q.   Right.  So it's been about 15 years since he squared up?

A.   It's been about that long, too, that we've been asking for the backup for the data for the charges.  So, to be fair we did make it a wholesale effort.

Q.   And those are personal charges?  Things that Lawrence

went out and charged that were personal expenses but got the company to pay?

A. I don't have any idea, because I don't have the backup.

Q. Okay. And the backup document would be those receipts whenever Lawrence got whatever he got, it would be those receipts related to that transaction?

A. I don't think it's receipts, sir.

Q. Pardon?

A. Respectfully, I don't believe it's receipts. What I believe it is is probably where he used equipment or labor resources.

Q. Okay. And has -- did Lawrence keep his personal records on those transactions?

A. I don't know that we even knew they were being charged to him, so how would we have the personal records.

Q. I mean, did Lawrence keep track for himself how much he's using company assets without permission? What do you know?

A. I don't know.

Q. Okay. Because one source to go to -- and Jim Klein, for example, doesn't have 'em back 15 years ago, the other person you should ask is the guy who actually was at Alamo Ranch using the equipment and maybe kept a document on how much time he was using something for, right?

A.    I would guess that would be okay.

Q.    Have you asked Lawrence for that information?

A.    Lawrence has --

Q.    Have you asked him?

A.    No, sir.

Q.    Okay.  And you talked a little bit about Rob and his role, right?

A.    I don't think I talked about Rob and his role.

Q.    You talked about the CEO?

A.    Yes, sir, the CEO.

Q.    Okay.  Now, and first of all it looks like from the e-mails you've been going through most of that happens is it fair to say at the staff level?

A.    Yes.

Q.    Most of the exchange of the --

A.    Sure, yes.

Q.    Okay.  And we have stacks of other e-mails where information has been provided.  Certainly you're not arguing those exchanges don't occur?

A.    Oh, absolutely not.

Q.    Right.  There's a lot of information that trades hands, financial and otherwise, with Lawrence?

A.    Yes.

Q.    And with you as his representative or agent there sometimes?

A.   Yes, sir.

Q.   And I think if I've been -- and I've kind of looked at it and summarized it, but I'm gonna give you a chance to just say some of it.  There are multiple people that you reach out to with the Berry companies that get you information, whether it's business or personal information for Lawrence, right?

A.   I would say that's true.

Q.   Jim Klein?

A.   Jim Klein.

Q.   Go ahead and go through the list with me here.  Who do you reach out to?  Who are your go-to people at the company?

A.   When it comes to financial information?

Q.   Start there, sure.

A.   Only Jim Klein.

Q.   Okay.

A.   Is the only one.  But prior to him it was Diane Decou if we needed personal information.  On the related party receivables we do reach out direct to John Gibson from time to time, because I think he's the keeper of the records.

Q.   Okay.

A.   Okay.

Q.   Are all those people good people?

A.   Are they good people?

Q.   Yes.

A.    Yes, of course.

Q.    Do you think they're trying to -- and I understand some of it's 15 years old, some of what documents they have, what they don't have.  Do you think there's -- I mean, I guess any compliant you're making is against those people; is that what you're saying?

A.    No, sir.

Q.    Okay.  And you know for example -- and I don't -- I guess maybe I want to make sure I didn't hear it incorrectly.  I don't think you're complaining about Rob Powers or his not providing information, correct?

A.     I am -- I don't know how to say I'm not complaining.  What I'm saying is that we have made repeated requests for the backup.  For instance, 20 -- 2002 might be difficult to produce.  2023 should be relatively easy with the push of a button, right?  And so we did -- I did go and sit in 2019, 2020, 2021 with Diane and Barry Peterson and go through documents, and we did find instances where Lawrence had been charged when he shouldn't have been charged.

Q.    Okay.

A.    So, it's fair that we're asking for the backup.

Q.    It's fair you're asking and it's fair they're doing their best to try to respond?

A.    Sure, sure.  But 2023 should be -- 2022, 2023 we should be able to see it.

Q.  And everything --

A.  We ask for it on a quarterly basis.

Q.  And everything we're talking about right now really is limited to personal expenses?

A.  That's correct.

Q.  Okay.  And because you know, too, in terms of Rob and him doing his role, that Lawrence just voted to sort of reup or extend his contract, right?

A.  Sure.

Q.  Okay.  So there's -- it's not that level of discord there at all obviously?

A.  I don't know where it gets stopped.

Q.  Okay.

A.  Okay.

Q.  Do you also have -- did you while you were working there for many of those 20-some-odd years -- I apologize.  I don't remember the exact number.

A.  Too many.

Q.  Okay.  For many of those years did you have your own key?

A.  My own key to what?

Q.  To access the building?

A.  No, sir.

Q.  To access files?

A.  I had my own key to the building in Houston.

Q.   To the building?

A.   In Houston.  But I do not have access to any of the files in Corpus Christi; electronic or physical.

Q.   Isn't there a file room there that you were given assess to?

A.   In Corpus Christi?

Q.   Yes.

A.   No, sir.

Q.   You never copied files in Corpus Christi?

A.   I've copied files with permission in Corpus Christi where somebody went and got them for me.

Q.   Hopefully it's always with permission, right?

A.   Always with permission.

Q.   You're not supposed to be stealing files, and I'm not saying you are.

A.   No, no.  I would not.  I would not.

Q.   Okay.  So, when you copied them it was always with permission?

A.   And always that somebody brought me the file that I requested.

Q.   Okay.  And that happened many, many times?

A.   No, it did not happen many, many times.

Q.   How many times?

A.   Recently it happened one time.  Before that I did not go into the files.  I always request from the person

responsible the information. I don't go into a file room. I don't have a key.

Q. So the practice was for you to make a request, they bring you the file, they do the copies?

A. Or they'd e-mail it to me, yes, sir.

Q. Okay. And that's been done whether by e-mail or otherwise --

A. Most of the information transferred to me has been done by e-mail.

Q. Okay.

A. Okay.

Q. But then some of it is I'll hand you the file and let you work on it?

A. One time that I can think of recently that -- where that happened, yes.

Q. And who was it that handed you that file?

A. I believe it was Mrs. Berry.

Q. Okay. Has Mr. Hummell also been involved?

A. Yes, Mr. Hummell came in and helped me find some things, yes.

Q. Okay.

A. And Georgie helped me find some things, yes.

Q. Okay. Because sometimes it's hard to find and it's good to get help from people?

A. I wouldn't even know where to begin to look there. I

haven't worked at that office in years, sir.

Q. Good to have help from them, and they provided it at times?

A. Yes.

Q. Okay. And it sounds like in this process of reconciliation on the personal items that there has been some progress made, and some things have been credited, and -- you've made some headway, just not enough headway like you'd like?

A. Sure. So -- and if you look at the request that's in front of me right here, there are some math issues that need to be reconciled as well.

Q. Okay.

A. So it's -- it's --

MR. ALLISON: Nothing further, Your Honor.

THE COURT: Okay.

MR. HUMMELL: Just a few questions, Judge.

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. HUMMELL:

Q. Good morning, Tonja.

A. Good morning, Mr. Hummell.

Q. Just to touch on --

MR. ABSMEIER: Your Honor.

THE COURT: Excuse me?

MR. ABSMEIER:  Mr. Hummell's a party.

THE COURT:  Yeah, well.

MR. ALLISON:  Just so you know, Mr. Huseman couldn't be here today, and Mr. Hummell is pro se today.

THE COURT:  Well, I don't think there's anything in the rules that prohibit him from representing himself.

MR. ABSMEIER:  No, sir.  I don't think they do, Your Honor.

THE COURT:  We all know the idiom, but you know.

MR. ALLISON:  I apologize.  I figured you saw he had a tie on today, and there was a reason for that.  I should have given you --

THE COURT:  All right.

MR. ALLISON:  Sorry about that.

THE COURT:  Go ahead.

Q.   (By Mr. Hummell)  Recognizing that I might have a fool for a client, I have a few questions for you, Tonja.

A.   Okay.

Q.   You mentioned earlier -- and I'm gonna stay focused on this stuff that you just covered this morning.  You mentioned earlier about the 2023 stuff should be easy to find?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes, sir.

Q.   Okay.  So can we agree that Lawrence should know if

he had company equipment, company labor doing something for him personally in the calendar year of 2023?

A. So, what we would do when we're given the backup information for what comprises that I think it's like close to 1.2 million dollars, and some of it is labor, right? And some of it is labor that we weren't expecting because that was supposedly on Bay, but that's okay. We can recognize that. But I -- we would take what is being invoiced and cross-check it with what we know that he has that's out there deployed.

Q. Did you understand my question?

A. Maybe I didn't.

Q. Okay. I understand why you, Lawrence, maybe other folks that work for Lawrence personally might need backup for company equipment, company labor charges that are on his personal account going back 10, 12, 14 years, however far back it goes. I get that. But I'm talking about 2023. And my question was, do you think he should be able to remember -- he should be able to know and you should be aware of the 2023 charges that were occurring in the past six or eight months?

A. We don't see what's being invoiced to him on a regular -- on a weekly basis, a monthly basis. It just gets applied somewhere in the accounting department. And so I don't think it's out of the realm of possibility that we could ask for a printed report of what's been charged.

Q. And you can't know?

A. I can't --

Q. Lawrence can't know?

A. I can't know.

Q. And Lawrence can't know?

A. I don't know that he would know. He's not out there wherever if the charges are being applied every day.

Q. And he doesn't know what he's asking to be done. Okay. I'll move on.

You testified earlier that Lawrence has paid back all of the money plus interest that -- I think you used the term that he has borrowed, right, on the Orca side?

A. On the Orca ICI, correct.

Q. Right. How much money was that?

A. There was -- I'd have to look at the spreadsheet, but it was 30,198,000 I think, or somewhere around there.

Q. Right around 30 million --

A. And he's paid all of that back.

Q. Paid all of it back?

A. Plus four million in interest.

Q. Okay. Are you familiar with the loan extensions that he was signing every year?

A. Yes, I am.

Q. Okay. And did he sign one last year, or two years ago that took him up to 2023?

A. I believe he did, yes.

Q.    Okay.  And that loan amount on the paper that he signed with the extension was 12.6 million more or less?

A.    Yes, sir.

Q.    All right.  And that loan was gonna mature in July?

A.    That's correct.

Q.    Of 2023?  And all that money was due and payable under that document last summer, right?

A.    Yes, sir.

Q.    And he didn't pay it; did he?

A.    No, he did not.

Q.    Okay.  Now, he didn't get an extension either like he had had for the past seven or eight years, right?

A.    Not to my knowledge.

Q.    All right.  So you say he's paid all the interest he owes.  He was paying around $250,000 twice a year in interest right up until July of '23, right?

A.    Yes.

Q.    Okay.  But you're saying he didn't owe any money. He's just paying a half million dollars in interest every year, but he doesn't owe the money, right?  Would you say?

A.    I am saying that.

Q.    Okay.  And he even made another interest payment just a few months ago?

A.    Yes, he did.

Q.    On money you say he doesn't owe?

A.   Yes, he did.

Q.   And you know that check wasn't cashed because the note's in default and we're not accepting the interest payments; we want the money, right?

A.   I did not know the check hadn't been cashed.  I'd have to ask Gretchen.

Q.   Okay.  All right.  I'm gonna change subjects now.  Talking about cooperation.  Every time you've ever asked me for anything I've gotten it for you; haven't I?

A.   Yes.  We have a good relationship.

Q.   Okay.  And Shanna and Georgie always try to help you with anything you want, and it's always for Lawrence, right?

A.   Yes.

Q.   Okay.  When you wanted to come down from Houston and get in the file room and, you know, pick this and pick that and get me this and get me that, we had people devoted to helping you make sure you got everything you were asking for, right?

A.   Yes, sir.

Q.   And there won't be an e-mail or a document or a single complaint that they can bring to the Court to show the Judge that you had any problems getting anything you wanted from us, right?

A.   No, I had no problems with that.  As a matter of fact we still work well together, Shanna.

Q.   All right.  I want to talk briefly about I -- think

you said something about the cranes and Marty's company, right, competing against --

A. What I believe I said was, "I don't have any transparency into what those agreements look like".

Q. Okay. Southern Comfort Equipment, you heard that?

A. I have.

Q. Is that Lawrence's equipment company?

A. It's a company that he set up that never -- it's not even open anymore. It never had one financial transaction in it.

Q. And you know you're saying that, but tell me about the transparency there. What have you given us that tells us what Southern Comfort Equipment was --

A. I don't even --

Q. Or what it did, or how much money it made?

A. It never made any money. I don't think he ever did anything with it. I'm not even sure I remember what it was for.

Q. How about Zilker Acquisitions? What's that?

A. A Shell company for buying oil and gas leases in the oil field.

Q. Okay. Is that a Lawrence company?

A. Yes.

Q. Okay. What about Three Rivers Pipe and Rental?

A. Yes.

Q. Is that a Lawrence company?

A. It was.

Q. Okay. What about Halcon Mineral Interests; is that a Lawrence company?

A. It was, yes, sir.

Q. Okay. It got merged into West 17th Resources, right?

A. It did.

Q. And West 17th Resources is the company that Lawrence uses to pay the interest on the money that you say he no longer owes, right?

A. Yes.

Q. Okay.

MR. HUMMELL: That's all I have. Thank you, Judge.

THE COURT: Okay. Anything else?

MR. ABSMEIER: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. ABSMEIER:

Q. Ms. Fulghum, can you just give a few examples of charges that you have seen that turned out to be incorrect?

A. They are charges mostly related to whenever the equipment division goes and picks up equipment at auctions or small tools consumables at auctions. Whenever they go do that they write on the ticket A-L Berry auction, and that gets invoiced in some cases to his personal account whenever it was

really for the benefit of Bay. So that's why we sat with Diane and Barry Peterson and went through all of the tickets to make sure that he was -- if it was Lawrence's stuff, it's Lawrence, and if it's Bay/Berry, it's Bay.

Q. And when you sat with Mr. Peterson and others, did you-all at least tentatively reconcile some of those charges?

A. We did. I'm not sure the credits were ever applied. That's one of those things that we haven't been able to get clarity on, but we did go through and reconcile for one year, a year and a half.

Q. Did anyone at the company explain to you why the credits never got applied?

A. No.

Q. Okay.

A. I think I have one e-mail from John Gibson that says it's upstairs.

Q. Okay. Are the amounts due on the Orca note entirely related to this mark to market transaction?

A. The 7 million dollars of it is related to the mark to market. The rest of it we'd have to get with the accounting to see what that is.

Q. Is that -- is the additional amount related to the conversion to a limited partnership?

A. Yes, sir.

MR. ABSMEIER: I have no further questions, Your

Honor.

THE COURT: All right. Anything else?

MR. ALLISON: Nothing further, Your Honor.

THE COURT: Anything else?

MR. HUMMELL: No, Your Honor.

THE COURT: You may stand down. You're free to go about your business.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MR. REASONER: Yes, Your Honor. We call Professor Doug Moll as an expert witness, please.

THE COURT: Okay. Come forward.

COURT BAILIFF: Raise your right hand, sir.

(Oath was administered.)

THE COURT: Be seated.

COURT BAILIFF: Watch your step, sir.

THE COURT: You may proceed.

DOUGLAS MOLL,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. REASONER:

Q. Sir, could you please state your name for the record?

A. Sure. Douglas Moll.

Q. And what is your occupation, Mr. Moll?

A. I am a law professor at the University of Houston Law

Center.

Q. And what is your specialization, if any, there as a professor at University of Houston law school?

A. My specialty is business organizations law and business law generally.

Q. And can you give the Court a flavor of what kind of courses do you typically teach?

A. Sure. I teach business organizations. I teach business torts. I teach a doing deals class. I teach some UCC classes. Secured financing.

Q. And can you tell us just prior to going into teaching, what academic degrees do you have, sir?

A. I got a Bachelor's of Science in Commerce from the University of Virginia, and then I went to law school at Harvard Law School and, you know, just got a J.D.

Q. And did you go right into teaching?

A. No. I spent a year clerking for Judge King on the Fifth Circuit Court of Appeals, and then I worked at what was called Fulbright & Jaworski at the time for approximately two years.

Q. And then how long have you been a professor at University of Houston?

A. So I've been at U of H since 1997. So I think it's 27. I think it's -- I always get confused if this is the start or end of my 27th year, but it's somewhere --

Q. In that range?

A. Yes, correct.

Q. All right. How would you define, sir, the phrase "corporate governance"?

A. So corporate governance is a term that's used a lot. I guess from the 20,000 foot view I would say that corporate governance is how a business organization operates. In other words, it involves the rights and the duties of the managers of the organization, as well as the rights and the duties of the owners of the organization. Corporate governance -- some people use corporate governance to refer to all forms of business organizations.

Maybe it's just me, that personally drives me crazy, just because there's LLC's, there's partnerships, there's --

THE COURT: Partnerships, sole proprietorships.

THE WITNESS: Indeed. So, I like to say, you know, organizational governance is probably for my picky self a slightly better term. But I think we just mean generally when we're talking about business organizations how that organization operates. What are the roles and duties of the managers? What are the roles and duties of the owners?

Q. Then to use your phrase "organizational governance", do you teach or lecture on that?

A. Yes. I mean, the -- I mean, I almost want to say the

entirety of the business organizations course, but certainly the bulk of the business organizations course is on the rights and duties of the managers of corporations, LLC's, partnerships, as well as the rights and duties of the owners of corporations, LLC's, partnerships, et cetera.

Q. And how long have you been teaching those type of courses?

A. I've taught business organizations since I got there, so, since 1997.

Q. And do you have any publications in the field of organizational governance, or corporate governance?

A. I mean, I would say every single one of my publications is on -- so, the answer's yes. And, I mean, that's what I write in. So everything I've done since I've been an academic has been in sort of that field of organizational governance as I defined.

Q. As a subset of this organizational governance concept, is there -- does the issue of related-party transactions, does that live within that subject matter?

A. Absolutely. I mean, problems related to conflicts of interest and the fiduciary duty of loyalty are many would argue perhaps one of the more important issues in organizational governance.

Q. So getting more specifics on your publications, have you published materials on the issue of related-party

transactions?

A. Yes. I have a treatise on closely held corporations where we have an entire section on the duty of loyalty in conflict of interest transactions. I have case books where we have entire, you know, large chapters on the duty of loyalty in conflict of interest transactions. I'm trying to think of any -- I mean, I certainly reference that material in some of my law review articles.

At the moment as I sit here I can't think of a, you know, law review article that was solely on that topic. But certainly the treatise and the case books have materials solely on that topic.

Q. Over the course of your, I think you said 27 years -- in the neighborhood of 27-year career, have you from time to time over that period of time served as an expert witness as you are today?

A. Yes.

Q. And have you given testimony -- well, why -- tell us kind of what context you have sort of testified in over the years?

A. I mean, sure. Again, if I was gonna generalize I would say most of the disputes where I've been asked to participate are in sort of a breach of duty, fiduciary duty or otherwise, whether someone has authority to do X or Y. So as I defined corporate or organizational governance earlier, I would

say with the exception of maybe one or two UCC cases, every case I've ever been retained on is in this organization governance, fiduciary duty space.

Q. And have some of those cases involved related-party transactions?

A. Absolutely. I mean, in terms of duty and loyalty issues, conflict of interest transactions, I would say many of them have.

Q. Have any -- you've talked about your publications. Have any of those been cited in judicial opinions, sir?

A. My publications? Yes.

MR. REASONER: May I have one moment, Your Honor?

THE COURT: Yes.

MR. REASONER: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Reasoner) Sir, I'm handing you what's been marked as Exhibit 68. Can you please identify that for us?

A. It looks like my CV.

Q. Okay. And can you take a moment to tell us if that appears to be a current -- current CV for you?

A. Sure. Yes. It does appear to have my latest law review article, so, yes. It looks -- it looks current.

Q. All right.

MR. REASONER: Your Honor, we offer Plaintiff's

Exhibit 68 into evidence, please.

MR. ALLISON:  No objection.

THE COURT:  Admitted.

Q.    (By Mr. Reasoner)  Now is it fair to say, sir, that you are still getting up the -- up to the learning curve in terms of the background of this matter that's now at an early stage?

A.    Yes.  I think that's very fair to say.

Q.    Well, I want to -- with that in mind I want to ask you a couple of assumption questions.  Sir, if you assume that directors of a corporation loaned money to that corporation, how would you characterize that transaction in general terms?

A.    I mean, that is definitively a conflict of interest transaction.  You have a fiduciary of the corporation who is loaning money personally to that corporation.

Q.    And what concerns, if any, does a transaction of that kind raise for a closely held company?

A.    Sure.  By the way, let me just point out, when I say conflict of interest transaction, and you heard Mr. Reasoner related-party transaction, and sometimes people call them self-interested transactions, these are all as far as I'm concerned the same idea.  The same concept.

And the reason they're the same concept and the concern that they raise is at the most simple level the fiduciary.  In your example, a director owes a fiduciary duty

to the company. That means they're supposed to be thinking about the interest of the company. If the company -- I think your example was is the borrower just to make things really easy, what would be the company's interest be; borrow for a low rate of interest or borrow for a high rate of interest? Obviously, it would be the borrow at the lower rate of interest.

But the concern is that the fiduciary is also the lender. And so we're worried that instead of thinking about the company's interest, borrow at a low rate of interest, the fiduciary is thinking about his interest as a lender, which would be loan at a high rate of interest. That's why it's a conflict. That's what we would call a conflict or related-party transaction.

Q. And does that concern exist whether or not the lender is benevolent, well-meaning, nefarious, I mean, whatever their intent are? Is there a concern from a corporate governance standpoint about a transaction regardless?

A. Yes. I mean, we're always concerned. I mean, again, some people would argue the number 1 concern of corporate governance is conflicts and conflict of interest transactions. So, the first question is is it a conflict transaction? The answer in your hypothetical question is definitively yes. Now what someone's intentions were, or motives were, or something else is sort of a second question.

But it doesn't change that the law is concerned any time a fiduciary -- we're worried that the fiduciary because of their bias, their conflict, we're worried that that transaction is not on the up and up.

Q. Let me ask you to assume another scenario. And that is -- and, again, I'm gonna use names here just to orient us on the record, but with the understanding that at this point you haven't done a deep dive into -- nor has anyone, frankly, to the facts here. But assume a company owned by Marty Berry, who is a director of Berry GP, is leasing cranes to Berry GP or another entity of which he is a fiduciary. How would you characterize that transaction?

A. Well, again, that's clearly a conflict of interest transaction.

MR. HUMMELL: Judge --

THE WITNESS: Because --

MR. HUMMELL: I hate to slow up the proceedings here, but it seems to me that Mr. Reasoner's trying to get a witness to instruct you on the law. I don't think that's proper. I think that the Court having heard the facts already, and being familiar with the corporation code can determine the extent to which any of these transactions were interested-party transactions. We need a hired lawyer from Houston to come tell you how to interpret the corporation code.

I object to a witness attempting to instruct the

Court on the law.

MR. REASONER: And, Your Honor, I'm not asking him to interpret the code. I have simply asked him about these types of transactions, and he has written extensively and work in the corporate governance area, and he simply talking about how one would categorize them. I've not put a statute --

THE COURT: I'll allow it.

THE WITNESS: I hate to say this, but I kind of forgot the question.

THE COURT: Yeah. Reask the question.

MR. REASONER: Okay.

Q. (By Mr. Reasoner) Sir, if you assume a company owned by Marty Berry, who is a director of Berry GP, is leasing cranes to Berry GP or another entity of which he is a fiduciary, how would you characterize that transaction?

A. Yeah. So, again, that's a classic conflict of interest transaction, because you have a director of the company who owes a fiduciary duty to that company and is supposed to be thinking about the best interest of that company. And if the company is leasing -- again, if just to make it easy, if you want to lease for a high price or lease for a lower price, if you're the company who's leasing you want to lease for a low price.

But what are we worried about? We're worried that the fiduciary who's supposed to be thinking about our

company's interest is also over here as the lessor. And as the lessor he's thinking, do I want to lease for a high price or lease for a low price? We are worried that as the lessor I want to lease for a high price. So you should be thinking about lease for a low price, because you're a fiduciary of the company. We're worried that you're thinking about lease for a high price because you're also the lessor. That's a conflict.

Q. Can a conflict of interest or related-party transaction ever pass muster or be okay?

A. Absolutely.

Q. I used a couple of Latin phrases there. I hope I didn't lose you. No, is that -- can it ever be okay to do a conflict of interest transaction?

A. Absolutely. And just to be clear, I'm certainly not trying to say that conflict of interest transactions are per se illegal. They are not. The only thing that a conflict of interest -- the reason why it's important to identify a conflict of interest transaction is because we scrutinize those transactions more because of the concern over the conflict, over the bias.

Q. And based on your experience with closely held companies, how should a conflict of interest transaction or related-party transaction between a company and one of its directors be handled?

A. Well, of course, the Judge is -- you know, it's

certainly the Judge's province to apply the law. But, you know, there's three methods; there has to be full disclosure of material facts to disinterested directors, or full disclosure of material facts -- and I realize this is disputed a bit, but it would certainly be my opinion to disinterested sharers, or the transaction has to be fair to the company.

Q. All right. And those -- and let me ask you, sir, on the fairness. Is that a factual analysis that goes on if that comes up?

A. Yes, fairness is presumably a totality of the circumstances inquiry into everything related to the fairness of the transaction; from the fair price, to fair dealing, to -- yes, it's a factually --

THE COURT: An issue for the fact finder; whether it be the Court or the jury?

THE WITNESS: Did you say --

THE COURT: It would be an issue for the fact finder?

THE WITNESS: Absolutely.

THE COURT: Whether it be the Court or a jury?

THE WITNESS: Absolutely. I've never heard of -- I mean, I've just never heard of -- no one would describe fairness as a question of law. I've certainly never seen that.

Q. (By Mr. Reasoner) And, sir, why is it important that a process along the lines you have described is followed with

respect to these conflict of interest transactions?

A. Well, I mean, I guess let me first say because there's a statute, but obviously the Judge is -- you know, that's in the Judge's province. But if I would give my -- you know, if I could give my own sort of policy thought; the rational is when there's -- normally we trust our fiduciaries. We have a concept called the business judgment rule, and it's all about the idea that we trust fiduciaries.

When there is a conflict, we worry that the fiduciary's conflict has made that fiduciary less trustworthy. And so the statute is there to say, if we can find a substitute, trustworthy party, then we're okay. We can't trust the fiduciary anymore. We've got to look for a substitute trustworthy party. Who might that substitute trustworthy party be? Disinterested directors, disinterested sharers, or the Court, or a jury who would have to determine whether the transaction was fair.

So the whole concept behind conflicts of interest are, we're worried that our fiduciary can't be trusted. We're worried -- we're not saying definitively, but we're worried, and so we look for an substitute trustworthy party. And that's what the statute is doing.

Q. Thank you, first of all.

MR. REASONER: I'll pass the witness, Your Honor.

THE COURT:  Cross.

CROSS-EXAMINATION

BY MR. ALLISON:

Q.  I just want to be very clear.  I know that Mr. Reasoner has said that you had limited information so far; fair enough?

A.  That's fair.

Q.  And I think you know just generally we're here because I guess Marty Berry -- one of the reasons anyway is Marty Berry made a loan to support the company at the time it needed capital.  I think that's agreed to by everybody, right?

A.  I don't know enough about the loan transaction and what the details were.  I'm happy to take your word for it.

Q.  Okay.  And are you aware, for example, that his brother, Dennis, who's not been sued, that his brother Dennis also made a loan to the company in the same timeframe?

A.  I think I am aware that Dennis made a loan.  I'm not sure I was aware about the timeframe.

Q.  If it's in the same timeframe, any reason to make those transactions different from each other, or are they same in the sense that they at least raise the issue you've said should be raised or looked at?

A.  Assuming Dennis is a fiduciary, which I think he's a director, and he's loaned --

Q.  He was.  He's passed.

A. Okay. Yeah. And he's personally loaning money to a corporation in which he is a director, then, yes, that would be a conflict of interest transaction.

Q. And same thing for Mrs. Berry? If she's loaning money to the company and she's family and she's got an interest, then she's also in that category?

A. And she's a director of the company that she's loaning to?

Q. At the time I'm not sure. She's family. What if she's just family?

A. Well, the normal problem is you have a fiduciary loaning money to a company of which that fiduciary is a fiduciary. So I would just need to know more about Ms. Berry's relationship.

Q. And, for example, for Lawrence Berry -- Lawrence Berry I think you were in the courtroom when they were talking about that there's a -- this 31 million dollars that Lawrence Berry borrowed from the company; you heard that when you were in the courtroom, right?

A. I definitely heard you-all having some discussion about 30 million dollars.

Q. Maybe that caught you ear?

A. Yeah. I just don't -- I'm not sure I remember the context being a loan. There was something about -- you-all used some acronym.

Q. There was 31 million dollars that Lawrence took from the company in order to start up a business for the company, then that would also fall in that category? If he's given full control of it as a director?

A. I kind of lost you. What category? Conflict of interest category?

Q. If Lawrence takes 31 million dollars is that a related-party transaction?

A. You say takes 31 million dollars. Are you saying Lawrence borrowed 31 million dollars?

Q. Yes, sir.

A. From the company that he is a director of?

Q. Yes, sir.

A. So that would be a conflict of interest transaction because you have a fiduciary, Lawrence as a director, transacting with the company that he owes a fiduciary duty to. So, yes, that would be a conflict of interest.

Q. And, for example, if he still owes -- if the document still shows that he owes 12 million of those dollars, he's still in that conflict of interest situation?

A. I mean, I think that's fair, yes. I mean, even if you pay the loan off it doesn't change the fact that it was a conflict of interest transaction.

Q. Right. And so all of these -- you're not saying -- and I want to make sure -- you're not saying any of those

transactions are necessarily inappropriate?  You're saying that they have to be looked at to be evaluated?

A.   I think that's fair.  At this point I'm not saying that there's anything per se illegal or improper.  It's just that they fall in the category where additional scrutiny is needed as we discussed.

Q.   And the person to do that additional scrutiny should either be -- one person that can do it is the directors of the company if they're interested, right?

A.   With the full disclosure caveat.  A majority of the disinterested directors, I agree with you.

Q.   Okay.  And what you're referring to there we both know -- we all know probably in the courtroom is 21.408, right?

A.   I wish I could tell you I've memorized the section number, but I -- it's in 21, but I don't know if it's 408.

Q.   Okay.  Maybe I'm wrong on the number, but I'm -- we're on the same page, right?  There's a section that deals specifically with it?

A.   Correct.

Q.   And --

A.   In the corporations code.  There's also one on the LLC code.

Q.   Okay.  But on the corporations code -- let's stick on Chapter 21.  In the corporations code -- and I know you know this because of the way you answered the question.  It also

says that shareholders can also evaluate what -- and accept that transaction as fair or not in conflict, right?

A. The statute does say that another body, in my opinion, a trustworthy body. It says shareholders, and then that has produced a question in the number of jurisdictions about whether that means all shareholders including the interested shareholders, or simply the disinterested shareholders.

Q. And you made that distinction very lightly when you were being asked questions a moment ago, but you made that distinction, right?

A. Yes.

Q. Yes. And because you and I both know that Texas statute when it's talking about directors says the -- it uses the word -- it's got to be a vote of the disinterested directors, right?

A. It does.

Q. And you and I both know that when you look at that same Texas statute in Chapter 21 now when it talks about -- and it's in the same rule -- when it talks about shareholders it does not use the word "disinterested", correct?

A. Well, it uses good faith. And one would argue you could not make the decision in good faith if you're interested. But the word "disinterested" is not technically in that subsection, I agree with you.

Q.   It's not not technically, I mean, it's just not in it?

A.   Well, that's fair.  It's not in it with good faith; isn't it?

Q.   Okay.  But, well -- and do you feel the need to banter because you're on their side?

MR. REASONER:  Objection, argumentative.

THE WITNESS:  I feel the need to banter only in the sense that you're trying to suggest that it does not require disinterested shares and I think you are wrong.

Q.   (By Mr. Allison)  Okay.  That's your opinion even though the word -- even though the Legislature put the word in there "disinterested", they put that word in there for directors, but the Legislature did not put the word in there for shareholders; that much we agree?

A.   I would say it's my opinion the opinion of the overwhelming number of jurisdictions in the country, the opinion of Delaware when has the same statute that does not include the word "disinterested", and the opinion of the Delaware cases have interpreted their almost exact wording statute to conclude that it has to be disinterested shares.

Q.   And so the answer to my question -- I know you want to give your argument, but the answer to my question is "correct", right?

A.   I mean, I thought I answered your question, but now

you'd have to ask it again.

THE COURT: So, I guess, what you're saying is that there's no Texas cases that interpret this issue? Because you said there's Delaware cases that interpret the issue.

THE WITNESS: I am not aware of a Texas case that has interpreted that issue. I am aware of Delaware cases, New York cases, there's cases from a number of other jurisdictions. And there's treatises in Texas that have talked about the issue, but I am not aware of a Texas case.

THE COURT: Got you.

Q. (By Mr. Allison) And when you look at all of that, those circumstances you probably -- you want to look at the interest rate that was being charged, right?

A. What are we now talking about? We look at what?

Q. When a shareholder -- if the shareholder -- some of the factors to consider in terms of the fairness that you should look at the --

A. So now we're on the fairness prong?

Q. Sure. If you want to look at it that way, that's fine. One of the factors to consider in terms of whether or not there's anything improper, that's a word you used earlier, would be the amount of interest charged? The interest rate?

A. Let me just make sure I'm following you, because we just jumped from -- remember, there are three options --

Q. He asked his question --

(Simultaneous speaking.)

MR. REASONER: If you'd let him finish his answer.

THE COURT: Okay. But we don't address one another, let's be clear, okay?

MR. REASONER: I'm sorry, Your Honor.

THE COURT: All right. Why don't you ask another question, because it was --

Q. (By Mr. Allison) One of the -- if not the directors -- and by the way, are you aware that the shareholders in this case have voted and ratified the loan that we're talking about?

A. I have seen written documentation, but when you say the shareholders?

Q. There's only one shareholder, right?

A. In a number of instances -- when you talk about shareholder ratification, the shareholder is -- I forgot the acronym for limited partnership.

Q. Let me help you there. I'll go ahead and do it so you have a clearer question. The sole shareholder of Berry GP is LDMA Limited Partnership, correct?

A. Of Berry GP, Inc., and you called it?

Q. LDMA.

A. I'm gonna take your word for it. I think that's correct.

Q. Okay.

A. It's certainly a limited partnership.

Q. Okay. And that limited partnership, LDMA -- just so we have a record over there. LDMA is solely controlled by a corporation called Becon, Inc., right?

A. So as a limited partnership it will have a general partner. I believe the general partner is a corporation, and you say it's Becon -- Becon, Inc.?

Q. Yes, sir.

THE COURT: It might be helpful to show him the chart.

MR. ALLISON: I don't have it handy. I'll do it on the board.

THE COURT: I mean, I think --

MR. ALLISON: I don't disagree. Let me just -- that way you can refer to it.

THE WITNESS: Okay.

MR. ALLISON: I can do it, but I think it will be quicker here.

THE COURT: Okay.

MR. REASONER: Your Honor, may I approach?

THE COURT: Yeah.

MR. REASONER: It might help move us along. This is PTX48, which is that chart.

MR. ALLISON: If you have it that would be great. Everybody can have one to look at. Your Honor, they're

being helpful.

THE COURT: Perfect. All right.

MR. REASONER: Here you go.

THE COURT: Yeah. Thank you. Okay. Now we can all look together.

Q. (By Mr. Allison) Just looking at the chart as a reference point it's -- this particular copy's called ALB000866. Generally speaking if it helps your refresh your recollection, we have Becon, Inc., which is the sole general partner of LDMA, right?

A. That's what the chart shows, yes.

Q. And they are the sole shareholder of Berry GP, right?

A. They being LDMA Limited Partnership?

Q. Is the sole shareholder of Berry GP, Inc.?

A. I agree according to the chart.

Q. And my question then to you was just an awareness question. Are you aware that the sole shareholders -- excuse me, that the shareholders of Becon, Inc. have voted to ratify the loan that you've been talking about, or that's been talked about here?

A. I definitely saw some shareholder ratification documents. I'd have to look at them again to see exactly who ratified it.

Q. Okay. And --

A. But, again -- well, you know that we disagree over

whether that's a factor or not.

Q. And I appreciate you pointed out, that's your Delaware disinterested argument?

A. Well, it's my Texas disinterested argument. But anyway. Yes, I realize you and I disagree about this.

Q. Okay. And then the -- another safeguard -- well, and this is where we were going a minute ago -- both places. The Judge also obviously can look at that transaction, or a jury -- I think you've said that -- and evaluate it?

A. For fairness.

Q. Yes, right?

A. That's a third safe harbor so to speak.

Q. Okay. And the second one being shareholder ratification?

A. Yeah. I think of it as disinterested director authorizations, one; disinterested shareholder authorization, two; fairness, three. But that's just the way I think about it. That's nowhere in the statute.

Q. Any one of those three, then it's a proper transaction?

A. Well, technically any one of those three the transaction can't be challenged on the grounds of a conflict. If there's some other problem with the transaction, it of course can be challenged. But what the statute says you can no longer challenge the transaction on the grounds if there's a

conflict.

Q. Right. It actually says there's no cause of action is the word it uses, right?

A. I mean, we'd have to look. But the meaning of it is there is no -- you cannot challenge that transaction on the grounds of the conflict, but it makes it clear that if there is some other problem such as a duty of care problem, such as a waste problem, you could.

Q. Okay. But if it says you have no cause of action, you'd agree with the statute, right?

A. If it says no cause of action, it says no cause of action on the grounds of the conflict. That's the important part. It's not immunization. That statute is resolving the conflict problem. If there's another problem, you address the other problem separately.

Q. And it says, if at least one of the conditions of Subsection (b) -- and that's what we've been talking about -- is satisfied neither the corporation nor any other corporation shareholder will have a cause of action against any of the persons described in Subsection (a), which would be the person who made the loan?

A. Yeah. But there's more in there about if you have no cause of action for the conflict.

Q. You don't disagree with what I just read; that's Texas law, right?

A.   If you read it accurately, I don't disagree.

Q.   Okay.  And so would -- in -- when looking, whether it's a Judge, or the jury, or shareholders, or disinterested directors -- you and I both know we say that a little bit differently for the reasons we discussed.  Let's not argue about it now, right?  Fair enough?

A.   Sure.

Q.   Okay.  The interest rate would be one thing to look at, right?

A.   Again, I think now we're talking about the third prong, which is fairness.  And if we're looking at fairness and you're talking about loans, I would assume the interest rate is something you would look at.

Q.   And whether or not it was collateralized?  In other words, was there any security given to make sure it gets paid back?  That's another issue in terms of fairness, right?

A.   Let me just be clear.  I'm not sure that I'm an expert in what makes a particular loan fair or not.  I don't really see myself giving opinions on that.  But if you're just asking me in general for a loan, I would imagine interest rates are relevant, and whether it's secured or unsecured is probably relevant as well.

Q.   And whether it's subordinated or not to other loans to help the business do well and excel, that's another thing to consider?

A.   I would imagine the purpose of the loan is important.

Q.   Yeah.  If it was used to pay off debt, for example, that could be important, right?

A.   Again, I would imagine the purpose of the loan is important.  If the company needed it or not need it.

Q.   If it was used to pay off, for example, lines of credit so as to free up capital for the business to do more projects, that would be important, right?

A.   Yeah.  I mean, we're sitting here in a vacuum with me not knowing anything in the transaction, but sure.  As a general matter what would go into whether a transaction is fair to the company.  If it's a loan I would imagine you'd look at the sorts of things you're talking about.

Q.   And, by the way, I just want to correct this a small thing:  You said, we're in a vacuum.  Really you're speaking for yourself only.  You're a vacuum, right?

A.   I guess I was parroting Mr. Reasoner's comment that -- when he said we're all a little bit at the beginning of this, but okay.  Fair enough.  I'll say, I'm in a vacuum.

Q.   Okay.  And that goes back to why he doesn't make assumptions because you haven't really completed a full analysis?  You don't have the information to make certain judgments?

A.   That's certainly true.

Q.   Okay.  And you just said it a moment ago, and you're

not an expert, and you're not giving any testimony as to whether or not this was a fair transaction?

A. Yeah. I don't think I have the background to be saying whether a particular loan transactions -- unless it's just so obvious that it's beyond the canon. But I don't think that's going to be my province or role in this case.

Q. Okay.

A. I may piggy back off of somebody who does have that expertise, but I don't think I'm the person who will provide the expertise with about whether a loan transaction --

Q. You're not climbing out on that limb yet?

A. I don't think I will ever climb out on that limb unless I can piggy back off of someone who does have that expertise.

Q. Would one other factor in terms of evaluating the transaction be that Lawrence, for example, had an opportunity and was continued to give an opportunity to participate as a -- in the -- on the exact same terms?

A. Well, the question is whether it's fair to the corporation, to the company. So whether some shareholder was given an opportunity at the moment I'm not seeing how that's relevant.

Q. Okay. That's all. Thank you, sir.

MR. HUMMELL: No questions.

THE COURT: All right. Anything else?

MR. REASONER: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. REASONER:

Q. Sir, you had testified that on the second prong, the shareholder approval prong, there -- you say commentators have indicated that they believe that that -- that the good faith shareholder approval requires disinterested shareholders; is that what you testified to?

A. So some people have argued that even though the statute in that shareholder approval prong doesn't say disinterested as we were discussing, that perhaps that requirement gets read in through the good faith requirement, which is in that -- which is in that second provision.

Q. And you indicated that a number of states with the same or similar statutes have held -- in that way have held that shareholder approval requires disinterested shareholders?

A. Yes. So a number of states -- I mean, Delaware is always sort of particularly persuasive in this area, at least in my field. But Delaware has sort of done the deepest dive into this.

And if I could just say one other very quick thing, I mean, conflicts of interest are probably the most important issue in business organization. If you could bless a conflict of interest transaction via interested parties, it's -- it makes absolutely no sense. What would be the point of

giving additional scrutiny to a conflict transaction if the person who could bless it is also conflicted? It just -- which is the reason why Delaware in my opinion and all these other states have come to the same conclusion.

Q. All right. Are Kansas, Louisiana and New York among the other states that have come to that conclusion?

A. Kansas follows Delaware so I feel pretty confident. New York I have definitely read a case on. Louisiana, I don't quite remember.

Q. But your point -- again, hypothetically, if someone had -- was the majority shareholder and had stolen something from a company, the idea is it would not be appropriate to let that person as the majority shareholder bless his or her own theft; is that the concept?

A. Exactly. And, you know, I mean no disrespect, but to me it sort of shows the absurdity of the provision or of the position that interested shareholders could bless the transaction. Because if you owned a majority of the shares -- you being the interested party -- you could bless all of your conflicted transactions, which is absurd. What would be the point of having a statute that is designed to give more scrutiny to those transactions if it was just a fiction?

Q. And then finally, counsel was asking you about the third prong, the fairness prong, and you talked about that analysis. Are there subsets of that -- of the fairness

analysis?

A. So I guess Texas is probably less clear about this in terms of cases, but generally speaking -- the question that everybody's clear on is it has to be fair to the company. And so normally we look at both fair price, which is what's considered to be the substantive aspects of the transaction, as well as fair dealing, which is forget the substance, just how did -- how did these fiduciary treat the corporation? Did they make full disclosure to the company? Were they on the up and up?

And so normally you look at both sort of the procedural aspects of fairness as well as the substantive aspects of fairness.

Q. Thank you, sir.

MR. REASONER: That's all. I pass the witness, Your Honor.

THE COURT: Anything else?

MR. ALLISON: Just very quickly.

RECROSS-EXAMINATION

BY MR. ALLISON:

Q. With regard to -- do you know of any place where there's a stated reason on why the Legislature put the word "disinterested" for directors, and did not use the word "disinterested" for shareholders?

A. So when you say --

Q.   -- a paper for us?

A.   Yeah.  When you say do you know, I mean, I suppose the short answer is no.  But all the statutes, probably they're following the first statute that got passed.

Q.   I'm not asking you to guess.  The answer is no?

A.   Well, no, then.  I do not know the definitive reason.

Q.   And you're familiar --

A.   I just want point to point out that Delaware and most states have the same phraseology.

Q.   And you keep going back to Delaware.  You're familiar, of course, with the *Richie* case out of the Texas Supreme Court?

A.   Yes.

Q.   And is that also the law in Delaware?

A.   Well, Delaware doesn't have a shareholder oppression doctrine, but there's no shareholder oppression cause of action in this dispute, so I'm not sure why it matters.

Q.   Okay.  Well, whether it matters or not, is the *Richie* case the law in the State of Texas?

A.   Yes.

Q.   Is it the law in the State of Delaware?

A.   I guess I'm not sure what you mean.  It would not be the law in the State of Delaware because it's a Texas case and Delaware doesn't have the shareholder oppression doctrine that *Richie* dealt with.

Q. Okay. That's all. Thank you.

MR. HUMMELL: Just a couple questions.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. HUMMELL:

Q. You said something that intrigued me. I'd like to follow up on. And that is basically why would you ever allow shareholders to come back and ratify the misconduct of the directors? Or say it's okay, right? I mean, why would it ever be authorized or permitted for them to rubber stamp their misconduct, right? Is that kind of?

A. Well, their own conflicted transactions.

Q. Right. Okay. So let's talk about that for just a second, because I want to the make sure we're really clear on this. Prong number 1, one of the three methods, it's okay to have a disinterested -- or have an interested transaction, right?

A. It's okay on -- it's okay -- when you say it's okay, prong number 1 -- one, two, and three are all methods of saying you can no longer challenge the transaction on the grounds of the conflict.

Q. Right. So the first one was full disclosure to disinterested directors, right? That was the first one?

A. I agree.

Q. Okay. And the disinterested directors, in our case

since two of the three directors were involved in actually helping prop up the company in dire times, you would say that as long as they told Lawrence the disinterested director about it, that they could go ahead and have their vote and approve it; is that right?

A.   I would not agree with that.

Q.   Okay.  They can't vote on it, they can't approve it at all because they're interested?  Before the loans are even made, you're saying it can't be done, right?

A.   I'm not entirely sure I know what you're talking about, but there's two things going on.  Number 1 is somebody has to vote to actually authorize the transaction.  That can be can done with interested parties, but if that's a conflict of interest transaction that doesn't -- there's whether it was authorized and there's whether it was a breach of fiduciary duty.  If interested parties authorized a transaction, you still have the breach of fiduciary duty question.

That's the question that the statute speaks to.  And so you would have to get a vote by a majority of disinterested directors, which if I take your hypothetical would mean the one disinterested director would have to separately approve the transaction.

Q.   That's where I was going.  Thank you.  So on number 2, full disclosure to all the shareholders, right?  It's your same -- and your same theory applies under the Delaware rule,

there's only one person that gets to vote, right?

A. Well, I cannot --

Q. -- the disinterested --

A. Under the hypothetical that you just gave me if there's only one disinterested shareholder, then I agree. That's the shareholder that matters.

Q. Okay. And then finally the third one is a determination of whether or not the transaction is fair by somebody on the outside looking in?

A. I mean.

Q. And that would be I think you said either a jury or the Judge, right?

A. Oh, that's what you mean. Yeah, well, right. Some fact finder is going to have to determine that it is fair to the company.

Q. Okay. And you know who our fact finder is here today, right?

A. You mean the Judge?

Q. Well, I'm asking if you know. I don't want to suggest an answer.

A. I believe it is the Judge.

Q. Okay. And you went through the list of things that the Court can take into consideration in deciding fairness, and that included the purpose of the loan, right?

A. Well, again, I mentioned that I'm not sure I have any

particular expertise in this area. I mean, I'm not an expert in loan transactions, but I would imagine if you're trying to determine the fairness of the loan transaction one of the things you would ask is what is the purpose of the loan?

Q. Okay. And payment terms, and on, and on, and on, right?

A. Seems relevant to me.

MR. HUMMELL: That's all I have, Judge.

THE COURT: Okay. Anything else?

MR. REASONER: Nothing further, Your Honor.

THE COURT: All right. You may stand down. You're free to go about your business.

THE WITNESS: Thank you. Should I return the exhibit?

MR. ALLISON: Just leave it there, sir.

MR. REASONER: We rest, Your Honor.

THE COURT: Okay. Do you have any witnesses you wish to present?

MR. ALLISON: We rest, Your Honor.

THE COURT: Okay. Well.

MR. ALLISON: Your Honor, it's probably appropriate to inform the Court -- may I confer with him one second?

THE COURT: Yeah. Yeah. In fact, let's take a short break and then we'll come back.

COURT BAILIFF: All rise, please.

MR. REASONER: Your Honor, would sort of a half hour each side on closing arguments?

THE COURT: Yeah, that's fine.

(Brief recess.)

THE COURT: Okay. We ready? Your motion.

MR. REASONER: Yes, Your Honor. May I approach?

THE COURT: You may. I've got that. Now, you may have updated it.

MR. REASONER: Oh, no. This is new and improved.

THE COURT: 2.0?

MR. REASONER: Hot off the presses.

THE COURT: All right. 2.0.

MR. REASONER: And, Your Honor, with the Court's permission, I'm gonna after a bit turn it over to Ms. Canales.

THE COURT: Okay.

MR. REASONER: We're gonna share the argument.

THE COURT: All right.

MR. REASONER: Your Honor, first, thank you on behalf of Mr. Lawrence Berry and our team for your time and careful attention. This is -- as you might imagine in a situation where it's family is involved and important issues, it's a very serious situation from Mr. Berry's perspective and the issues are important so we appreciate that.

If at you look at the second page, Your Honor, again, the requested relief that we've asked for -- and it's very I think focused -- and Ms. Canales will talk a little bit more about this, but focused and tailored at this point. One is the removal of Lawrence Berry from the Board, and then secondly simply notice on voting about sale of real property.

And as to the former, Your Honor, one of the things that the Court raised was the idea that keeping someone on the Board would be inconsistent with a procedure that exists for removal of folks from the Board and that sort of thing within the bylaws. But fundamentally -- and Ms. Canales will talk about the equitable power that the Court has here and in similar cases.

But fundamentally whenever the Court is asked to do irreparable harm to -- say this cannot happen until trial, or this must remain the same, that sort of thing, it is always something that is superimposed on the existing bylaws. Because in a typical situation the bylaws will allow a majority to do what they will. Here in a case that's like this where it's appropriate, the Court is saying you can't do this particular thing because we want to preserve the status quo because of the irreparable harm.

And I think the evidence has been clear, Your Honor. If we could go to slide -- well, and the second part -- the two weeks notice, there's been a suggestion by the other

side, well, you want that just for Lawrence. No. Of course, it would be for everyone.

The issue is that these folks, Mr. Marty Berry, has shown a propensity here to engage in transactions important, substantial, self-interested transactions while keeping Lawrence Berry totally in the dark. So there is a demonstrated need for some notice that would allow Lawrence Berry to -- he can still be outvoted, but to the extent anything untoward is going on, he would have the opportunity to have adequate notice.

And he has shown as a practical matter that he would -- when there is a short fuse and something is in the best interest of the company, he has voted in favor of transactions of that kind.

The third slide, Your Honor, is just to emphasize we really don't have a dispute here on the key transactions that we are focused on. The loan. The 45-million-dollar loan in particular from Marty Berry. Undisputed. You will not -- you haven't heard them say and you won't hear them say --

THE COURT: A lot of the facts aren't in much of a dispute.

MR. REASONER: Exactly, Your Honor.

THE COURT: I agree with that.

MR. REASONER: So, it was not disclosed to

367

Lawrence Berry, and it was not approved by the Board. And it is -- and I know Professor Moll said, and I know the Court knows, I mean, it is a quintessential conflict of interest or self-interested party, you know, related-party transaction. It's undeniable that that's what it is; a loan from one side or the other of the company.

Also you had a principle repayment that went on without disclosure in the amount of ten million dollars. And also the cranes. There is no dispute that Mr. Marty Berry said he has no idea, has no information that Lawrence Berry was told about the additional six cranes that are being rented to the tune of 450,000 in additional debt for the company every month, and that he does not contend that there was Board approval.

The Court is aware -- on the temporary injunction standard there on slide four, we believe those things have been absolutely shown. The irreparable harm here -- we had pointed the Court to cases saying in situations where someone will lose their place on the Board, their connection to the company, that that can be irreparable harm.

On the probable right to relief in slide five, again, we don't need to show the Court that we absolutely are going to win.

THE COURT: No.

MR. REASONER: We believe we will, but we -- what is the -- what's the key here, Your Honor, and we cited

the International Terminals case. You plead the causes of action and show some evidence that tends to sustain them. And we believe we have absolutely met that burden here, particularly in the self-dealing context where there is a presumption.

When you talk about a related-party or self-interested transaction, the law is clear that there is a presumption of unfairness that must be overcome by the defendants here. And they certainly cannot do that at the temporary injunctions stage.

Slide six. Again, these transactions where they're not disclosed and not approved during the realtime, that those are breaches of fiduciary duty. They certainly show some evidence of that for purposes of this stage.

Slide seven, Your Honor. On the safe harbor issue, the 21.418. I'm glad we finished with a very good discussion about that. They simply cannot fit themselves into any of the safe harbors. There's no contention on their part that disinterested directors voted later to approve these transactions.

And the shareholder piece. In Mr. Moll's testimony I think it became completely clear and obvious why other states that have the same statutory language that Texas, and Kansas, and others adopted from Delaware, why those states saw a good faith approval by the shareholder -- shareholders,

plural, needs to be disinterested shareholders. For the obvious reason that, you know, if a fraud fees or someone engaged in misconduct, if that person can just come in and say, yeah, I've got 51 percent and I've blessed it, that would gut the entire meaning of the statute. So that's why the commentators and why the cases have been consistent in how they interpret that.

And if we look, Your Honor, on the slide eight, the fairness piece. Fairness is something I think counsel was suggesting and you may hear them suggest, oh, well, the Judge can simply find it was fair today. That is a totality of circumstances analysis that needs to take place in this case by the fact finder.

And as we -- on slide eight as we've laid out there for the Court in the Estate of Poe case from the Texas Supreme Court, it's a two prong inquiry. You look at the decision making process. The failure to make full disclosure is an issue there. You look at the substantive fairness of the transaction. You do a deep dive, full analysis of the fairness of the transaction. They certainly have not been able to meet a burden at a temporary injunction stage at proving fairness of the transaction, nor could they.

On slide nine, again, these loans -- these undisputed -- the testimony is clear that they were not approved by the Board.

Slide ten. Undisputed testimony that Lawrence was not told of the loans. Remember Mr. Powers' e-mail there in Plaintiff's Exhibit 35 when Lawrence said in January 2023, I know nothing of this? And there on slide ten Plaintiff's Exhibit 35, Mr. Powers says, sorry, here's what it's all about. He tells about the loans. He says here's what it was used for. Didn't bring it up on a Board member, because some kids of the owners were there. Doesn't make any contention that Lawrence knew, nor has the other side presented any evidence that he did.

Slide 11, the fairness issue. Remember that Mr. Klein testified that the loans were initially accrued at 12 and a half percent interest, which would be a quite a high rate. His testimony is, well, that was -- that was -- somebody made a mistake, et cetera. All we know is that's the way it was be accrued on the front end, and then once Lawrence Berry was raising questions and concerns, and they documented it later -- months and months later -- then they added a more realistic interest rate. But, of course, still one that was higher than Mrs. Berry was being paid on hers.

If you look at slide 12. Remember that Laura Berry was being paid 3.75 percent interest, whereas Marty was being paid prime plus a quarter. So there's a lot to be delved into on the fairness of these particular undisclosed, unapproved transactions.

Slide 13, Judge, just a reminder there on the ten-million-dollar payment -- this -- Marty testified that that was, you know, a small payment that took place by preagreement. That -- ten million I think in any measure is substantial, and it was done again without any disclosure here in any way, shape, or form, and not approved by the Board.

14. On the Western Gulf issue. We went back and forth and there on the left -- because Marty Berry originally thought I was asking him about the original transaction between Bay Canada and Western Gulf Equipment where they bought one crane together. And I asked him, what about the six additional cranes that your company then bought and started renting to Bay? And he said, I have no clue if Lawrence Berry knew about those. And there was never any Board approval.

And I thought it was telling, Your Honor, during part of the back and forth on that, on the right-hand side where he was saying -- Mr. Marty Berry was saying, you know, there's a fiduciary duty on your part to know these things. Well, that has it backwards, Your Honor. The important thing under the law as the Court is aware is when you have a fiduciary duty and you're engaged in a related-party transaction, you've got the duty to disclose and get proper approval. It's not the case that they can never be okay and never be kosher, but you have the duty and you have the burden

as the party engaged in the related-party transaction.

Slide 15. These are significant, Your Honor, separate and apart from the loans, the Western Gulf transactions. Marty was not certain what the total was at this point. He said, at this snapshot in time that we looked at there on slide 15 it was 4.3 million dollars but he said it may be more. He said I have not been paid since June or July of last year. And that matters.

I mean, on the one hand he would argue, well, I'm not being benevolent. I'm not making them pay. On the other hand, this is saddling the company with a very high amount of debt going into the future to add with the loan. So, again, it is a totality of the circumstances analysis that needs to take place on this undisclosed, unapproved transaction.

Slide 16, just emphasizes the point that on the -- on the Western Gulf transactions -- well, on the loans, excuse me, the approval of the loans where they've tried to ratify things after this lawsuit. There's only one party who was not part of the loans, Ms. Bonnie Berry was through her husband and the estate.

THE COURT: In all fairness the loans are separate.

MR. REASONER: Yes.

THE COURT: Okay. So presumably Dennis Berry

could vote on Marty Berry's loan. But if he votes "no" and Dennis votes "yes" or "no" -- his wife -- you still don't have a majority. I get that, okay?

MR. REASONER: Yes. So you've got -- either way -- even if you say they can vote on the loans that they weren't a part of --

THE COURT: Which I think they could.

MR. REASONER: Yes. I think that's fair, Your Honor. They have a deadlock.

THE COURT: Yeah. They have a deadlock.

MR. REASONER: They have a deadlock and this -- but, of course, on the corporate documents they wrote passed. And you raised a good point, Your Honor, because on the Western Gulf Equipment, that is the situation. It was a deadlock in their after-the-fact attempt to ratify it because Bonnie Berry has no interest in Western Gulf Equipment.

THE COURT: Right.

MR. REASONER: She voted to ratify it later. Lawrence voted "no". So that was a deadlock on the Western Gulf Equipment.

THE COURT: But I think the same analysis goes with the loans.

MR. REASONER: I think that's fair, Your Honor.

THE COURT: All right.

MR. REASONER: A deadlock situation. And,

again, in 17, this is -- we talked about this during Mr. Moll's testimony, there are Courts that have -- Delaware, Kansas, Louisiana, and New York. And if you look in the Texas practice series on the right-hand side there on slide 17, that makes the point that we were talking about.

However, it would be odd if interested directors could bless their -- could not bless their self-dealing transactions at the Board level, but could bless their self-dealing at the shareholder level if they owned enough shares. Cases from other jurisdictions refuse to allow an interested shareholder to vote to bless a self-dealing transaction. This is -- this would seem to be the preferable view.

And below that Professor Moll and Professor Ragazo, who wrote a book on the closely held corporations, they made the same argument. And that's what the other courts have followed. And just as we talked through it, it makes all the sense in the world that you would want to protect from that kind of a situation.

So, as we talked about on slide 18, the shareholder resolutions. Again, they have not -- in either the crane situation or the loans, they have not had a majority of shareholders -- disinterested shareholders approve the transactions.

19, the marketing of the dock. Again, that is

simply a situation they're entitled to outvote him, but to take key and material assets and freeze out one of the directors from knowledge of an attempt to market, that is what is problematic and one of the sources of our compliant here.

They've talked less about it, Your Honor, on the defect of the parties at this point, but just to sort of close the loop on that on slide 20. It is under *Sneed v Webre*, shareholder -- owning shares in a parent company would allow you to bring claim derivatively involving the subsidiary. And that's Texas Supreme Court very clear. But regardless --

THE COURT: But you cleaned that up, so.

MR. REASONER: Yeah. All the players are here. So, and if you look at slide 21, we have talked about who -- I went through with Marty Berry about who owns what, and I don't think that's -- that is in dispute at this point. So with that I'll turn it over to Ms. Canales.

THE COURT: Okay.

MR. REASONER: Thank you.

MS. CANALES: Your Honor, may I proceed?

THE COURT: Yeah.

MS. CANALES: Judge, basically we're here to protect the status quo, okay, for injunctive relief. Currently Lawrence is basically asking for two things; that the status quo be kept -- one, that he not be removed from the Board while this litigation is pending, and, two, that he gets two weeks

notice prior to the sale of property.

THE COURT: And that he gets to vote on that?

MS. CANALES: Correct. So -- but he can be outvoted. So, in essence, what he is asking for would in no way affect the day-to-day operations of the company. They could still do what they wanted to do assuming they outvoted him. But he is in no way asking for anything to change the day-to-day operation of the company.

The reason we're here before this Court today is because it is imperative to keep the current status quo of this business. And the reason for that, Your Honor, is what potentially could happen would be irreparable harm, things that we could not undo, Judge. If they sell things. If they do things that the courts have long recognized that, especially with real estate, once it's gone, it's gone.

Your Honor, you can see through the testimony that has come out that Lawrence has had trouble getting information. Tonja testified that sometimes the only way he got information was attending the Board meetings. Having Lawrence sit in a Board meeting so that he can understand and take part of what's going on with his business until this litigation is resolved is not asking too much, Judge. It's asking that he be able to have a seat at the table so that he can hear what's going on.

And the reason he needs to do that, Judge, is

because if something is wrong, then he gets to come to you. Obviously there's something wrong, Judge. We're making huge loans -- two huge loans that later they're trying to ratify. And Mr. Marty Berry said, well, I can come back and ratify it even if it's wrong. Your Honor, that's not what the spirit of the law is. That's not what we -- that is why we as directors and as shareholders, we owe a upmost duty of loyalty to the corporation, so much so that you have to put its interest before yours. It has to be an uncorrupted interest.

So, for example, when they make these loans, it's okay as you heard the expert testify, but then let's get one of these uninterested persons to ratify it. But in essence what this does, Judge, is dilute Mr. Lawrence Berry's shares. This crane debacle and having -- that's clearly self-dealing, Your Honor.

THE COURT: Well, I mean, there's no doubt about that. But as the witness testified, that doesn't make it illegal.

MS. CANALES: No, it doesn't, Judge, but where we're at today is -- because at the end of this we're all gonna hash this out. And at the end when we actually come to trial and we all have more evidence, and depositions are taken, and we figure out what's going on, maybe it is in the best interest of the company. Maybe it was fair. But it on its face nobody has shown you that it is.

We've seen that 12 percent interest. That's what they -- they later come back and say, oh, no. We didn't mean that. But that was after this suit, Judge. The harm that would be caused would be irreparable, not only to the company, but to Mr. Berry himself, so both entities would be harmed.

The Court at the end -- another issue, Judge, that I know was somewhat telling to me -- and, of course, this didn't happen at the beginning, but we've got our CEO, Mr. Powers, who, you know, prayers to Mr. Powers and we hope for a speedy recovery, but we've been operating this company with nobody at the helm. And Mr. Marty Berry testified, we're not even looking. But he's over there acting, which, again, Your Honor, presents a problem for this immediate situation. Because we've got an interested person, who's now loaned millions of dollars, who is gonna be able to ratify actions and do things that would cause irreparable harm to the business as well as to Mr. Berry.

How can we not even have an interim search? Who is driving this train right now? Who do we have protecting the interest of Berry? Who do we have protecting the corporation? I know, Your Honor, at the beginning when we first started this hearing you made a statement, and you said, I am not inclined to alter what the bylaws say.

THE COURT: Bylaws say.

MS. CANALES: But, Your Honor, this Court on a

daily basis hears injunctions, and it hears equitable relief. And this Court --

THE COURT: I'm not saying I can't.

MS. CANALES: No, I understand, Judge. But -- and I think that we have shown why you should. But because the bylaws suggest, Your Honor, that the -- how you can and can't remove a director, the whole purpose of injunctive relief is an equitable one. And just like, Your Honor, until death do us part. You hear injunctions and restraining orders daily.

And when you go to marry somebody, you make a contract. It's basically your bylaws, I'm not gonna -- you know, this -- and we change those rules daily, Judge. No, you can't spend money. No, you can't do this, you know, because it's the Court's right to protect the assets. It's the Court's right to protect and keep the status quo while the litigation is pending. And this is no different from that, Your Honor.

And, again, what is imperative to know or to recognize is that Mr. Lawrence Berry is not asking for special treatment. He's not asking -- he's just asking, I want to sit here until this litigation is over so that I can protect and come to you, Judge, if something happens. He can always be outvoted. So he's not asking for any special treatment. Everybody should have the two weeks notice before they sell property. I think it's imperative that they get that.

I think that -- and in the past I think it was

in the testimony, Judge, that when they needed to do a quick sale Lawrence ratified one of those. He's not here to do what is not in the best interest of the company. He's in the -- he wants to make sure that everybody is acting on the up and up, Judge.

And based on why we're seeking injunctive relief, and based on what Mr. Berry is asking for, I believe that our injunction should be granted and that our two prongs that we should have. That Mr. Berry should be allowed at least pending this litigation to sit on the Board, and then that he should be allowed to have notification as to the property. And, again, Your Honor, I believe you said that there was no -- nothing in the bylaws on the sale of property.

THE COURT: I don't think so unless you guys found it. I didn't.

MS. CANALES: No, Your Honor, we did not.

THE COURT: I found it for the acquisition, but I didn't find it for the sale.

MS. CANALES: You know, Your Honor, because as the Court heard and the evidence before this Court is because Mr. Lawrence is having difficulties getting information, and it is imperative that he get that. And as such, Your Honor, we would ask that the injunction be granted.

THE COURT: Okay.

MR. ALLISON: Thank you, Your Honor. I'm gonna

kind of jump right into something, and then I'm gonna back up a little bit.

THE COURT: Okay.

MR. ALLISON: The part I want to jump into real hard is status quo, because the status quo for decades -- this is -- was that the shareholders get to choose, nominate, elect, or remove directors. That's even been the status quo before Lawrence, or Marty, or Dennis were ever directors. That goes back to Mr. And Mrs. Berry. That goes back to a document that I know you've read that I think was written in the 50's. It is very clear that the status quo is that the shareholder -- it's really a shareholder, but it's then shareholders of Becon that direct LDMA, who those directors nominated and elected are.

It has long, long, and always for those Berry companies been that the status quo is that the shareholder or shareholders get to nominate, elect, or remove directors. That's the status quo. If it were not in the document, which it is, you're right, then we also know -- and I don't have the provision, because I don't think there's any disagreement about this -- we also know Texas law allows the exact same thing. Period.

There is no reason to change that status quo. I'm gonna get into that discussion in a minute. I do want to jump to something you just raised. The status quo for decades has been -- and I know exactly what you read, and I've read the

same thing, and it uses the word "acquire", and you got to read the rest of the document to see how all that kind of fits together. And I'm gonna start with where we agree, and tell you what we think.

I think everybody probably agrees that the status quo is to acquire property, that there has to be a vote of the directors, okay? That's very clear. Now, for decades -- because -- and, again, you got to read the whole document. I'm sure you're familiar. I thought it was kind of interesting that it wasn't said more specifically. But I think when you read the entire document and the way that they --

THE COURT: And the addendum from the -- there was an addendum from the 80's I think.

MR. ALLISON: Right. When you read all of it, I think that the clear intent or the upshot, the spirit of it, if not the written word that also has been lived by as though it was written word for decade, is they follow the same practice for selling real property. I don't think you've heard anybody --

THE COURT: Well, and your client testified as to such.

MR. ALLISON: Absolutely. And nobody's disagreed with that.

Now, if -- so in his mind it's in there, okay? And in the Board -- in the members -- in the director's minds,

that's what they've been doing. That's been the status quo for decades. If it weren't in there -- and I'm suggesting that from their reading it is, but I understand the gap, okay -- then if you look at from Chapter 21, and I think from the last witness we're clear, that's the right one that applies to for-profit corporations. 21.462 says, a corporation -- that would be Berry GP, and -- that's Berry docks owned by Berry GP, it says, quote, a corporation may convey real property of the corporation when authorized by appropriate resolution of the Board of Directors.

So, if we want to read the document to say it's not in there -- and you understand why we think it's really in there and it's been the status quo for decades -- it's still in the law. And we would follow that -- and nobody said we've ever violated that law. No one ever said we've gone against that law. No one ever said, I need a safeguard from the law protection that's already there.

I mean, they -- everybody -- it was a month ago that Lawrence Berry went in, they had the sale of real property -- it was a two-day notice because the Board of Directors doesn't require much notice. He goes in and he looks at it and everybody agreed unanimously to sell real property.

THE COURT: To TxDOT?

MR. ALLISON: Yeah. To TxDOT, okay? And there's not been a problem with that status quo for decades.

Now, I want to say this at the outset: This idea that here's a loan that they say is self-dealing and bad, and here's the crane business, and somehow that has a nexus to don't let us -- don't let us change the rules, change the status quo on sale of real property? If they sold the real property -- and I'm just going straight to kind of the guts of it, and then like I said I want to step back.

But what does the crane business have to do with whether or not they sell a dock that is collateralizing -- by everyone's agreement -- collateralizing the Frost line of credit? If they sell the dock, gonna go to Bay Frost, okay? It's at least gonna be a big discussion that everybody here -- gonna hear about, talk about. Number 1. So, I mean, there's just no nexus.

Also, what did it have them do this idea of -- I mean, come on, the crane business has been going on since 2019. The loan has been out there for over a year now. Nothing's changed. There's no panic. It has nothing to do with -- really, quite frankly this idea of who gets to serve as director? Who gets to serve as director is a function of the bylaws and Texas law. So I think there's just -- there's so -- they're trying to make a huge leap by saying because he made a loan over a year ago that somehow now I get to stay on the Board forever and you can't sell property.

Now -- and I want to jump again to the heart of

something here. Selling property that's been on the market for a year, since before May -- since -- been talked about apparently in a Board meeting Lawrence said remembered in February or March of 2023, been on the market clearly since May of 2023, here we are about a year later. We've got no nibbles. No bites -- magic word, nothing imminent.

And we're gonna enjoin people from doing something when there's nothing imminent? When we don't even have an offer. When we don't even have a nibble. We don't even have a thought about -- and quite frankly, there would have to be, because we would do what we've done for decades and follow Texas laws as far as what -- requiring, you know, the directors to talk about it and take a vote on it. I've read that section.

And so we think -- we know the discussion goes something like this, that the dock is not getting its highest and best use. They use it, what, a week or two out of the every six months? They're just not getting value of it. It may be -- may be, we're not there yet -- maybe that if they get a company that wants to run liquids across it, that will make it hugely valuable to that company when it's not that valuable to our needs, and we reserve use of the dock when we offload large modules.

And then there may be a situation that quite frankly -- I honestly believe this, and maybe I'm just naive, I

actually think there is -- that Marty, and Bonnie, and Lawrence would agree if the right deal presents itself, I have an idea they'd agree. We don't even have a reason to think they'd disagree on it, other than he has fear of it. Marty has been very clear that he's not gonna sell it unless there are a reservation of a right to allow it to be used when they need to have use of it. Whether you it call that an easement or some sort of contracted for right where they get to use it a certain numbers of weeks per year at a certain rate, there's a million ways to cut that deal.

So, I guess what I wanted to say at the very outset is in terms -- I want to be very, very clear. The status quo is not, you know, Lawrence gets to be on the Board for life. That's not the status quo. Or Lawrence gets to be on the Board even if the other shareholders and directors want him, that's not the status quo. The status quo has always been that that Board -- that serving as a director is at the pleasure of the shareholders. It's been the way before they got there, and it's been that way ever since they got there, and it's been that way in the Texas laws and it's that way in the bylaws.

The status quo has also been that the piece of property -- any piece of property -- I mean, I guess he wants you to just enjoin one piece of property really. When you get down to it, he's voting for the rest of them, you know, to the

extent that's going to come up. It's rare we've heard from the witness stand that they sell real property. But there is absolutely no justification for changing the way it has worked well for years.

And as -- he is a director right now. I'm not even gonna speculate on what will happen. I will say on December 7th they could have removed him if they wanted to. They didn't. They appointed Bonnie, okay? They could have made that motion. It's within the confines what was noticed for a meeting for consideration of directors.

They got all up in arms about it, ran down here, lit their hair on fire, and here we are. And I'm not saying they won't, especially now, but it is their prerogative to have that conversation in accord with the bylaws and the Texas law. So we think the status quo is very cleer and very, very much in our favor.

I do want to back up a little bit and I do have -- in a reply that's on file, I want to the point out they really have been a moving target. Originally they wanted relief that we not interfere with Lawrence's right to vote as a shareholder. There's never been a hint of that. There's never been a suggestion of that. There's never been any inkling of that. And then they have since amended and withdrawn that request, and so I think it clearly is also denied.

They originally -- you'll remember, Your Honor,

they wanted to have you forbid the directors, which their witness on the stand for them says the directors -- disinterested directors have a right to consider whether or not they ratify the loan, or ratify the crane business, or ratify as they have the dealings with Frost Bank and IBC. Their own witness says they have a right to have those votes, okay? And originally they wanted to deprive us of the right to do that as directors. They're no longer asking for that relief.

They also want you to -- or they used to want you to forbid us from ratification as shareholders. They're no longer asking for that relief. So all of those requests should be denied.

They originally also were asking that we not be allowed to elect new directors. They have -- and then he voted for Bonnie to be elected as a director. He not only voted for that on December 7th, but he also voted -- Lawrence did -- for Bonnie to be a director of Becon -- which is the top company -- voted for her to be a director as of March 13th or 14th, 2024, this year. So they've withdrawn that request and we should prevail on that.

They've also -- and the one that becomes more germane here they originally asked that all of the people -- Ricketts (sic.), Marty, Powers, Hummell, Berry entities -- be enjoined from selling, mortgaging, or otherwise encumbering any real property that were Berry entities. They went and got a

TRO that says that -- ex parte, we were not there -- up in Houston. Then they got -- then they backed off of it now and said, okay, we realize that we cannot enjoin you from selling -- by the way, they've since agreed to it because they realized they were interfering grossly with the Frost Bank line of credit negotiations, and then they backed off, and now they're just saying, well, we just want two weeks notice, okay?

And, I mean, I just got to say this at the outset: I don't know why we're here asking, you know, for the Court to rewrite bylaws for us. Or to be the one who pens a bylaw. Something that Marty has said, you know what, you know, I can't do it the way you asked for it in your new pleading -- very clear, because in his new pleading what they're asking for right now is special treatment for Lawrence that he get notice.

I know Mr. Reasoner just said, oh, that's not the way we meant that. That's what it asked for. So they're really asking you then to step into the shoes of the company and rewrite the rules even though there's never been a problem with it in the it past and I don't think I'll be a problem with it now.

Sorry I said that so fast.

THE COURT: You broke the speed limit.

MR. ALLISON: I did on that one.

I mean, there's just -- there's no -- there's no threat whatsoever. No one's ever said we're gonna let a

shareholder know. No one's ever said that. In fact, we always let him know. In fact, he usually votes with us on it. In fact, he's been in this discussion. And we know they have this whole discussion about, he doesn't want to sell it at all, Bonnie's okay with selling it, and we know that Lawrence -- excuse me, that Marty's real big on, hey, we're not getting full value out of that piece of property. If we can sell it and maintain the use and benefit for our company by having an access agreement or whatever you want to call it, a use agreement, then he thinks maybe there's a window out there where that can happen.

But there's -- we've worked together on this for years. They can't point to a single time we've tried to sell real property without letting him know. He's a shareholder. He has a right to know. He'll get to know. We don't need you to rewrite -- with all due respect, rewrite bylaws, or rewrite Texas law which already says that there's a requirement of a director vote. And we quite frankly don't think we need help with the bylaws. We think -- we read them that way already, and that, you know, maybe they want to put it in there more express. He can make a motion. But I -- it's just beyond me on why we're here trying to get you to write bylaws.

So all of that said, I think it is very, very clear that they are here not on the original TI that needs to -- that's denied by having been be abandoned, but we want a

ruling on it. I think you understand --

THE COURT: No, I agree.

MR. ALLISON: You understand --

THE COURT: I agree with that.

MR. ALLISON: That's why I bring it up.

THE COURT: They've got two specific requests today and that's all I'm considering.

MR. ALLISON: And now we're down to that -- those other ones need to be denied because of the --

THE COURT: All right. So they're denied.

MR. ALLISON: All right. So we're here on two things that, first of all, have no nexus to the causes of action pleaded, right? There's no nexus between the cranes and the property. There's no nexus between the cranes or between the -- Marty's loan, and Dennis' loan, and his mother's loan that are at very low interest rates, in this case set by the company. That in this case there's only one person, and it's in an e-mail that Rob Powers says we took those loans and we paid off debt and we paid off lines of credit. We needed those loans in order to continue to do business.

We did those loans and they were disclosed. And I know they think they should have been disclosed sooner, but they were disclosed as of September of 2022, and it's been more than a year before he decides to make it an issue. Those loans have been in place, were disclosed to the bank, have been

subordinated to the Frost line of credit and the Wells Fargo line of credit.

We have professional staff that has done it, and they come up with this 12.5 calculation, which is hog wash and I don't even want to beat on it too much. But, I mean, they tried to scope up something when -- and they put in, by the way, a lot of other documents, Your Honor, that when you do the calculation I think it's like five percent.

All of those documents are in the record to show that the loan has been carried, just like their bookkeeper said -- or I shouldn't say that, accountant, CFO. CFO is the correct term. Just like their CFO said, hey, if that was a mistake then we've obviously corrected it, okay? And now they want to latch on to one piece of evidence to, you know, try to say you're criminal, you're horrible, you're bad, and you're, you know, a bad actor. That's just not what's going on here.

They are asking for those two specific forms of relief. Both of the relief sought by them, which is advanced notice, okay? They will get notice of the director's meeting, and he's a shareholder. He'll get information and continue to get information. He does. I think the record has shown he gets a lot of information. Apparently, there's a breakdown on some of that when it comes to some personal expenses that go back 15 years, but, I mean, the (indiscernible).

And that the status quo also is we have a right

under the Texas law if we want to to notice it and remove him or affirm him as a director, and we would like to continue to follow Texas law. There is no imminent harm. There is nobody's hair that should be on fire. There's -- truly we think there is no probable right of recovery. I think under the *Richie* case, and knowing what we know about 21.418, there is no probable right for recovery. In fact, it says there's no cause of action that arises out of that. There is a safe harbor.

I mean, there are so many reasons I think that the requests to, quite frankly, interfere with an important business in this community, there are so many reasons to try to deescalate. And we need to deescalate. And the idea that -- that there's gonna be a word out on the street, if they got their way, that now Lawrence is in charge and that now, you know, the Court's running the company, it's a train wreck. And its just not supported by Texas law. Thank you.

THE COURT: Okay. All right. So, the Court has heard evidence over a three-day period. Temporary injunction's requested. Bylaws provide for the removal and appointment of a Board of Director, so I'm not gonna interfere with that.

With regards to the second issue the Court will partially grant for any sale of real property there must be 48 hours notice to all of the Board members; whoever they may be at the time. Board members may participate by phone in the

vote if they choose.  This only applies to real property.
Granted and rendered.

(End of proceedings.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF NUECES )

I, ALICIA BROOKS, Deputy Official Court Reporter in and for the District Courts of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the total cost for the preparation of this Reporter's Record is $702 and was paid by Gibbs & Bruns, LLP.

WITNESS MY OFFICIAL HAND this the 29th day of April, 2024.


/S/Alicia Brooks
ALICIA BROOKS, Texas CSR #8726
Expiration Date: 03/31/2025
Deputy Official Court Reporter
Nueces County, Texas
901 Leopard St. Rm 402
Corpus Christi, Texas 78401
361-888-0751
Alicia.brooks@nuecescountytx.gov

# EXHIBIT 9

Filed
3/14/2024 1:36 PM
Anne Lorentzen
District Clerk
Nueces County, Texas

CAUSE NO.: 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and as Trustee of the ALLEN LAWRENCE BERRY TRUST, directly and derivatively on behalf of BECON, INC.; LDMA LIMITED PARTNERSHIP; and BERRY GP, INC.; | § § § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| BERRY GP, INC.; LDMA LIMITED PARTNERSHIP; and BECON, INC.; | § § § § | NUECES COUNTY, TEXAS |
| *Nominal Plaintiffs,* | § § § | |
| v. | § § § | **JURY TRIAL DEMANDED** |
| MARTY BERRY; MICHAEL HUMMELL; BERRY GP, INC.; BERRY OPERATING COMPANY LLC; and BERRY CONTRACTING LP; | § § § § § | 94TH JUDICIAL DISTRICT |
| *Defendants.* | § § § | |

**PLAINTIFF'S FIRST AMENDED VERIFIED PETITION
AND APPLICATION FOR TEMPORARY INJUNCTION**

TO THE HONORABLE JUDGE OF THIS COURT:

Lawrence Berry ("Lawrence" or "Plaintiff"), in his personal capacity and as Trustee of the

Allen Lawrence Berry Trust, directly and derivatively on behalf of Becon, Inc., LDMA Limited

Partnership, and Berry GP, Inc. (with Lawrence, "Plaintiffs"), files this First Amended Verified

Petition and Application for Temporary Injunction against Marty Berry ("Marty"), Michael

"Mike" Hummell ("Hummell"), Berry GP, Inc., Berry Operating Company LLC, and Berry

Contracting LP (collectively, "Defendants"). Plaintiff asserts claims for breach of fiduciary duty,

declaratory judgment, conversion, corporate waste, a demand for an equitable accounting, a

1
398

demand for books and records, and an application for temporary injunction as described herein. In support of these claims, Plaintiff respectfully shows as follows:

## I.    INTRODUCTION

1.    This action concerns the management and finances of several Texas companies—Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP (collectively, the "Berry Entities")—which are majority owned in equal shares by Plaintiff Lawrence Berry and his two brothers, Marty Berry ("Marty") and Dennis Berry ("Dennis"). In the past several months, it has become apparent that the Berry Entities have been unlawfully usurped, controlled, and mismanaged in secret by Defendants Marty Berry and Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel.

2.    The Berry Entities operate a large organization of companies engaged in the construction, fabrication, and maintenance contracting industries throughout the United States, and have successfully done so since the 1950s. While the Berry Entities were founded and originally controlled by Lawrence's father, ownership passed to Lawrence and his brothers beginning in the 1990s.

3.    In recent months, Lawrence—an officer, director, and shareholder of the Berry Entities—has come to learn that Marty Berry, with assistance from Mike Hummell and other management personnel, has been mismanaging the Berry Entities' finances such that he imperiled a long-standing line of credit that represented the Berry Entities' primary source of operational funding, causing that line of credit to be placed in default. Further, Hummell and other management personnel colluded in secret to authorize self-dealing loan agreements from Marty and Dennis—themselves officers, directors, and shareholders of the Berry Entities—to the Berry Entities without notice or consultation with the other officers and directors. What is more, Marty

has been secretly usurping corporate opportunities by buying cranes through a personally owned company, and then leasing the cranes back to the Berry Entities in a series of undisclosed self-dealing transactions. Finally, presumably in an attempt to repay the self-interested loans, Defendants have recently begun secretly attempting to sell the company's real property, including an important and valuable dock facility, without notice to or authorization from the Board of Directors. This type of undisclosed engagement in self-dealing and ultra vires transactions violates the Defendants' fiduciary obligations and Texas law.

4. When Lawrence inquired about this mismanagement and apparent covert self-dealing through valid requests for books and records information, his requests went ignored, in further violation of Texas law.

5. Lawrence, both directly and derivatively on behalf of the Berry Entities, brings this lawsuit against Marty Berry, Hummell, and the Berry Entities, to recover damages, enforce his rights to inspect the Berry Entities' books and records, and to demand an accounting of the Berry Entities' finances.

## II. DISCOVERY LEVEL

6. Discovery should be conducted in accordance with a Level 3 tailored discovery control plan under Rule 190.4 of the Texas Rules of Civil Procedure.

## III. JURISDICTION AND VENUE

7. Plaintiff seeks monetary relief of over $1,000,000, including damages, penalties, costs, expenses, pre- and post-judgment interest, and attorney fees, as well as non-monetary relief. The relief sought by Plaintiff is within the jurisdiction of this Court.

8. The Court has subject matter jurisdiction to hear this matter because the amount in controversy exceeds the jurisdictional minimum of this Court.

9. This Court has personal jurisdiction over Defendant Marty Berry because he is a resident of Texas and Plaintiff's claims against him arise directly from his contacts with and activities in this state.

10. This Court has personal jurisdiction over Defendant Michael Hummell because he is a resident of Texas and Plaintiff's claims against him arise directly from his contacts with and activities in this state.

11. This Court has personal jurisdiction over Defendant Berry Contracting LP because it is a Texas limited partnership headquartered in this state.

12. This Court has personal jurisdiction over Berry GP, Inc. because it is a Texas corporation headquartered in this state.

13. This Court has personal jurisdiction over Becon, Inc. because it is a Texas corporation headquartered in this state.

14. This Court has personal jurisdiction over LDMA Partnership because it is a Texas limited partnership.

15. This Court has personal jurisdiction over Defendant Berry Operating Company LLC because it is a Texas limited liability corporation headquartered in this state.

16. Venue is proper in Nueces County, Texas because it is the county of the Berry Entities' principal offices in this state.

## IV. PARTIES AND SERVICE

17. Plaintiff Lawrence Berry is an individual residing in Harris County, Texas. At all relevant times, Lawrence has owned shares of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP individually, through a series of holding companies, including Becon, Inc. and LDMA Limited Partnership. Lawrence is also the beneficial owner of the shares in those

companies held in the Allen Lawrence Berry Trust. Finally, at all relevant times, Lawrence has been an Officer, Director, partner, and/or shareholder of LDMA Limited Partnership; Becon, Inc.; Berry GP, Inc.; Berry Operating Company LL;, and Berry Contracting LP.

18. Nominal Plaintiff LDMA Limited Partnership is a Texas limited partnership with a registered address at 1414 Valero Way, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and it can be served at 1414 Valero Way, Corpus Christi, Texas 78409.

19. Nominal Plaintiff Becon, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Charles Vanaman is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

20. Defendant Berry Contracting LP, doing business as Bay Ltd., is a Texas limited partnership with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

21. Defendant Berry Operating Company LLC is a Texas limited liability company with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

22. Defendant Berry GP, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

23. Defendant Marty Berry is a natural person. Marty Berry is an Officer, Director, and shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and he

maintains custody and control over the corporate records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Marty Berry can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

24. Defendant Mike Hummell is a natural person. He is the Vice President and General Counsel of Berry GP, Inc. Mr. Hummell can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

## V. STANDING

25. Plaintiff Lawrence Berry is a 19% limited partner of LDMA Limited Partnership ("LDMA"). Lawrence Berry is also the Trustee of the Allen Lawrence Berry Trust, which is a 11 2/3% limited partner of LDMA. LDMA owns Berry GP, Inc., which is the umbrella company over the Berry Entities and their subsidiaries.

26. Lawrence Berry is also a 1/3 shareholder of Becon, Inc., which is the 3% general partner of LDMA.

27. Lawrence Berry—in his personal capacity and as Trustee of the Allen Lawrence Berry Trust—has standing to bring these claims directly and derivatively on behalf of LDMA Limited Partnership, Becon, Inc., and Berry GP, Inc. pursuant to Texas Business Organizations Code §§ 21.563 & 153.413, as well as Texas common law providing for representative actions in closely held limited partnerships and corporations.

## VI. FACTUAL BACKGROUND

**A. The Berry Entities are a family operation.**

28. The Berry Entities and their subsidiaries are a group of companies focused on the construction, fabrication, and maintenance contracting industries throughout the United States.

The Berry Entities were founded in the 1950s by Lawrence Berry's father, Marvin Berry, who ran the organization for several decades.

29. Marvin Berry had four sons: Plaintiff Lawrence Berry, Marty Berry, Dennis Berry, and Kenneth Berry. When Marvin passed away in 1997, control of the Berry Entities began shifting to his sons, although the other brothers bought Kenneth out several years ago. LDMA sits at the top of the Berry organization. LDMA's 3% general partner is Becon, Inc., which is owned in equal shares by Lawrence, Marty, and Dennis. Lawrence, Marty, and Dennis are each direct 19% limited partners of LDMA, and each is also a beneficial owner of trusts which are 11 2/3% limited partners of LDMA. The remaining 5% limited partner of LDMA is Lone Star Equipment, Inc., which is a subsidiary of Berry Contracting LP. Dennis Berry passed away in 2024 and, on information and belief, his shares passed via his estate plan.

30. LDMA owns Berry GP, Inc., which in turn owns several holding companies which own Berry Operating Company LLC, which in turn functions as the 1% owner and general partner of Berry Contracting LP.

31. An organizational chart reflecting the structure and ownership of the various entities at issue is attached hereto as Exhibit A.

32. While the Berry Entities employ several officers who are not members of the Berry Family—including Robert Powers, who has served as President and Chief Executive Officer of Berry GP, Inc., and Defendant Hummell, who serves as Vice President and General Counsel of Berry GP, Inc.—ownership and control of the Berry Entities is vested with Lawrence and the other shareholders.

33. The Berry Entities are governed by the Board of Directors of Berry GP, Inc. (the "Board"), in accordance with the Bylaws of Berry GP, Inc., which are attached hereto as Exhibit B. The Board consists of directors Lawrence, Marty, and Dennis Berry's wife—Bonnie Berry.

**B. Defendants have excluded Lawrence from key decisions related to the Berry Entities, including improper self-interested transactions.**

34. Despite Marvin Berry's wishes that the Berry Entities operate as a family business, it has become clear that Marty, with Hummell's assistance, has gone behind Lawrence's back to exclude him from key decisions related to the Berry Entities, instead choosing to engage in self-dealing and attempt major corporate transactions without informing the other officers and directors of his actions.

35. For instance, in the past several years, Defendants have, among many other things:

- Purported to approve the acquisition of major equipment such as cranes and "yellow iron" without Board discussion or authorization;

- Negotiated and purported to approve terms with major equipment lenders that include significant potential negative impacts to the Berry Entities without Board discussion or authorization;

- Marketed corporate aircraft owned by the Berry Entities for resale without Board discussion or authorization; and

- Deliberately dissolved the largest revenue producing division of the Berry Entities by systematically terminating key individuals material to that division's structure and revenue development.

36. Of particular concern, Lawrence recently came to learn that Marty has engaged in multiple improper self-dealing transactions with the Berry Entities.

37. Specifically, it appears that Rob Powers and Defendant Hummell approved and executed two loan agreements, each between Marty and Dennis on the one hand, and one of the Berry Entities on the other, by which Marty and Dennis loaned a total of approximately $75 million to the Berry Entities (the "Berry Loans"). For nearly a year, Defendants refused to provide the

8
405

loan documents or information about the loan terms despite requests from Lawrence. After being forced to file this lawsuit, Lawrence was finally provided with the purported loan documents and learned that Marty loaned $45 million and Dennis loaned $30 million to one or more of the Berry Entities.

38. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was never directly informed about the Berry Loans, never consulted about their propriety, and never asked to vote on them as an officer, director, or shareholder. Nor was Lawrence informed about the terms of the Berry Loans; how the proceeds of the Berry Loans were used; or how, when, and to what extent Marty and Dennis expected repayment from the Berry Entities with respect to the Berry Loans.

39. Review of the limited financial information to which Lawrence has been privy since the filing of this lawsuit indicates that the Berry Entities have made payments to Marty and Dennis in service of the Berry Loan. In particular, Marty approved payments to himself of at least $10 million in principal, despite the purported promissory note governing his loan indicating that the loan is not payable until December 31, 2024. Because the self-dealing loans were made without Board authorization and Defendants have largely refused to provide the requested documentation to Lawrence, the extent of further improper payments is presently unclear.

40. Prior to the filing of this lawsuit, the Berry Loan transactions were never discussed by the directors of Berry GP, Inc., were not voted on at any meeting of the directors, and do not appear in any minutes of Board meetings. In fact, it appears that Powers, Hummell, Marty, and Dennis were the only individuals at the Berry Entities who were aware that they were encumbering the Berry Entities with this $75 million unauthorized debt.

41.     Lawrence also recently came to learn that Defendant Marty Berry has been purchasing "rolling stock" equipment such as motor cranes through a company unaffiliated with the Berry Entities called Western Gulf Equipment LLC ("Western Gulf").  Western Gulf was originally established as a special purpose entity that would purchase a portion of a crane in Canada in conjunction with a Canadian affiliate of the Berry Entities, and then lease the crane back to that Canadian affiliate.  This original transaction was fully disclosed and approved by the Board.  However, Western Gulf now appears to have purchased at least six (6) additional cranes without first presenting the opportunity to the Board or the Berry Entities, and then leased those cranes back to the Berry Entities in a self-dealing transaction—again, without disclosing the transaction to the Board or seeking Board approval.  According to the limited financial information presented to Lawrence, it appears that Western Gulf is leasing seven (7) cranes to the Berry Entities at a total rate of $449,000 per month.  To date, the full extent of Marty's undisclosed, self-dealing transactions with Western Gulf remains unclear.

42.     Plaintiff understands that Western Gulf is wholly owned by Marty Berry and his wife, Courtenay Berry, and that the registered address for Western Gulf is the Berry Entities' headquarters in Corpus Christi.  What is more, the registered agent for Western Gulf is Mike Hummell, indicating that Defendant Hummell is aware of Marty's self-dealing transactions perpetrated through Western Gulf.  On information and belief, Marty uses corporate assets of the Berry Entities to operate Western Gulf for his own personal gain.

43.     Plaintiff also recently learned that Defendants have offered to sell some of the Berry Entities' vital real property assets, including a dock facility and adjacent real property that generates tens of thousands of dollars in monthly revenue, presumably in an effort to repay the unauthorized and self-interested loans.  Plaintiff believes that Marty intends to sell the Berry real

property to raise funds for additional unauthorized self-dealing payments to himself in service of the Berry Loans.

44. Plaintiff recently was made aware that in or around late May 2023, Defendants began an effort to sell the dock facility and other real property to at least one third party. In their communications to that third party, Defendants falsely represented that "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C (May 30, 2023 Letter from Berry G.P. to Port of Corpus Christi). In truth, the decision to sell significant company assets was made unilaterally by Marty and without calling a Board meeting and without discussion with or notice to Lawrence.

**C. Defendants have threatened the financial operations of the Berry Entities.**

45. Until recently, the Berry Entities relied on a $50,000,000.00 revolving line of credit (the "LOC") with International Bank of Commerce ("IBC") for general operations. This LOC was governed by a loan agreement between several of the Berry Entities and IBC, dated March 31, 2019 (the "Loan Agreement").

46. The Loan Agreement contained provisions allowing IBC to invoke default if certain conditions were not met, including particular thresholds for EBITDA and combined net profit after taxes.

47. Under Defendants' mismanagement, the Berry Entities recently failed to meet certain of the thresholds detailed in the Loan Agreement.

48. In fact, IBC recently made repeated requests to members of the Berry Entities' management team for information related to standard reporting as part of the Loan Agreement covenants. This includes quarterly financials, WIP reports, financial projections, and more. It appears as if the management team either refused or was unable to produce this information to

IBC. Further, when IBC made an effort to schedule a meeting with the Board of Directors to discuss the status of the Berry Entities in person, Marty did not show up, imperiling the 30-year banking relationship with IBC. Lawrence was never informed that IBC was sending repeated requests for information, that the Berry Entities were struggling to produce accurate or timely reporting, or that IBC had attempted to schedule meetings with the Board of Directors to discuss the problems in person.

49. Accordingly, on March 13, 2023, IBC sent a letter to the Berry Entities informing them that IBC had placed the LOC in default. IBC asserted that the Berry Entities had failed to achieve the minimum EBITDA and net profits targets for the 2022 fiscal year. Defendants did not share this letter with Lawrence at the time.

50. Because of these claimed defaults, IBC (1) elected to limit future advances to the Berry Entities on the LOC to $30 million rather than the full $50 million, and (2) accelerated maturation of the LOC to March 31, 2023, at which time IBC was going to require the entire balance to be due and payable.

51. Following this March 13, 2023 letter, IBC and counsel for the Berry Entities engaged in additional correspondence regarding the extension of the LOC. On March 28, 2023, IBC proposed an extension of the LOC to October 1, 2023, pursuant to several terms, including a reduction of the LOC from $50 million to $30 million, a requirement that the $75 million debt purportedly owed by the Berry Entities to Marty and Dennis be subordinated to the LOC debt owed to IBC, and a requirement that no payments be made on that debt until the Berry Entities' indebtedness to IBC was fully satisfied. On March 30, 2023, counsel for the Berry Entities responded and rejected many of these terms, including the subordination and repayment proposals.

Lawrence was not consulted regarding these decisions, nor was he made aware of the IBC proposal at the time.

52. As a result of the March 30, 2023 rejection letter from the Berry Entities, IBC appears to have placed the LOC into default. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was not informed of the precise status of the LOC with IBC, nor of the Berry Entities' plan for ensuring sufficient liquidity to fund its operations. Defendants apparently decided to keep Lawrence in the dark regarding the Berry Entities' financial status.

53. Following the collapse of the IBC banking relationship, Marty unilaterally caused the Berry Entities to repay himself $10 million in principal on his loan, despite the fact that the terms of the purported promissory note governing his loan did not require Berry GP to make any principal or interest payments to Marty until December 31, 2024.

54. Around the same time, Defendants began negotiations with Frost Bank to obtain a new revolving line of credit. As part of these negotiations, Defendants pledged the Berry Entities' real property as collateral, including the Entities' commercial property in Corpus Christi. Lawrence was not fully apprised of the situation with Frost Bank, nor was he initially consulted about or asked to approve the collateralization of any of the Berry Entities' real property.

55. Indeed, as part of the negotiations with Frost Bank, Marty executed a "Certificate of Corporate Resolutions" that purports to set forth "resolutions duly adopted either: (a) at a meeting of [Berry GP, Inc.'s] Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of [Berry GP, Inc.], which resolutions save not in any way been amended or modified[.]". *See* Ex. D. No such Board meeting was ever held, and Lawrence was never notified of or asked to approve

any written consents adopting the purported resolutions contained in this "Certificate of Corporate Resolutions."

56. Lawrence has since signed resolutions authorizing the creation of a Frost Bank relationship because it is in the best interest of the Berry Entities to receive outside financing.

**D. Defendants refuse to honor Lawrence's legitimate requests for information related to the Berry Entities.**

57. On April 18, 2023, Lawrence sent an email to Powers and Jim Klein—CFO of Berry GP, Inc.—copying Marty and Dennis. This email attached a memorandum of "Key Concerns" that the Berry Entities apparently received from IBC and requested information from Powers and Klein related to the financial condition of the Berry Entities.

58. Lawrence sent the information request so that he could better understand the Berry Entities' present financial condition and what may have caused the Berry Entities to purportedly fail to meet the thresholds included in the Loan Agreement with IBC. Lawrence also requested information related to the Berry Loans, since he has still been kept in the dark as to the nature and terms of that debt.

59. As an officer, director, and shareholder of the Berry Entities, Lawrence is entitled to inspect the books and records of the Berry Entities, and a valid request such as the April 18, 2023 email should have been honored. However, Lawrence never received a response to his April 18, 2023 request, much less access to any of the books and records he requested.

60. Lawrence has made numerous other requests for information since April 18, 2023, including since filing this lawsuit, but all have been ignored or refused.

**E. Defendants attempt to ratify their own improper conduct.**

61. Immediately after filing his Original Petition on November 27, 2023, Plaintiff secured a hearing on the application for temporary restraining order and provided notice to

14
411

Defendants. The hearing took place on November 28, 2023 in the Harris County Ancillary Court before the Honorable Lauren Reeder. Despite receiving notice from Plaintiff nearly 24 hours previously, Defendants did not appear at the temporary restraining order hearing.

62. After considering Plaintiff's Original Petition and evidence, Judge Reeder granted the Berry TRO on November 28, 2023, enjoining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the disinterested members of the Board of Directors.

63. On the evening of December 1, 2023, Defendants sent an email to Lawrence, attaching two "notices of special meetings."

64. The first purported to give notice that a "Special Meeting of the Board of Directors" of Berry GP, Inc. was called by Marty and Dennis Berry to be held on December 7, 2023 (the "Board Notice"). The Board Notice, which was signed by Marty and Dennis Berry, indicated that the purpose of the Board meeting was to discuss the following agenda items:

   a. Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

   b. Discussion and action regarding the employment contract of CEO Robert Powers;

   c. Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

   d. Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

   e. Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale;

   f. Consider and take action on need to transfer title to property acquired in Robert Rickett's name, using Berry funds, to any Berry owned Company;

g.  Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce;

h.  Discussion and ratification of previous board action establishing a banking relationship with Frost Bank;

i.  Discussion and ratification of previous board action establishing an operational credit line and any other action needed to provide security for loans;

j.  Evaluation of accounts as to any and all director debt (individually or director owned or controlled entities) to any Berry owned Company and development of plans for repayment; and

k.  Other business.

65.  The second purported to give notice that a "Special Meeting of the Shareholders" of Berry GP, Inc. was called by Marty and Dennis Berry to be held on December 7, 2023 immediately following the Special Meeting of the Board of Directors (the "Shareholder Notice"). The Shareholder Notice, which was also signed by Marty and Dennis Berry, indicated that the purpose of the shareholder meeting was to discuss the following agenda items:

a.  Discussion and action concerning the election of and/or removal of Directors.

66.  The Special Meetings of the Board of Directors and Shareholders took place on December 7, 2023 while counsel for the parties were reaching agreement on the Agreed TRO. At the Special Meeting of the Board of Directors, Marty and Dennis Berry purported to ratify—frequently over Lawrence's objection—all of the topics and actions listed in the Board Notice. This included topics on which Marty and Dennis were unquestionably interested Directors, such as "defense and indemnity" and "loans from shareholders Dennis Berry and Marty Berry."

67.  After the meeting, Defendant Hummell circulated proposed meeting minutes to the members of the Board, including Lawrence. The minutes incorrectly reflected that certain of the agenda items had passed, despite the fact that they required—and had not gotten—approval by disinterested members of the Board of Directors. Accordingly, Lawrence sent redlines of the

minutes back to Defendant Hummell in advance of the upcoming December 12, 2023 Board meeting, which properly reflected what had occurred at the December 7, 2023 meeting.

68. At the December 12, 2023 meeting, Defendant Hummell claimed that he "could not open" the redlines that Lawrence had sent—despite the fact that they were sent as PDFs. Further, Marty and Dennis purported to accept Hummell's incorrect meeting minutes, over Lawrence's objection.

69. The same conduct occurred again at the February 13, 2024 meeting of the Shareholders of Berry GP, Inc., at which Marty and Bonnie Berry purported to ratify post hoc a number of actions over Lawrence's objections. Several of those votes should not have passed, since they failed to garner approval from a majority of the disinterested shareholders.

## VII. CAUSES OF ACTION

### COUNT 1
### Breach of Fiduciary Duty
### (against Marty Berry and Mike Hummell)

70. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

71. Defendant Marty Berry has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. Defendant Mike Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times. In those positions, Marty and Hummell owe certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty and Hummell owe to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

72.     While serving in their respective positions, Marty and Hummell have engaged in, directed, approved, and/or taken actions in contravention of the fiduciary duties they owe to the Berry Entities, including without limitation the following willful and intentional misconduct:

A.      <u>Self-Dealing</u>

   i.   Marty and Hummell approved and directed at least one of the Berry Entities to enter into loan agreements with Marty and Dennis—who are themselves officers, directors, and shareholders of Berry GP, Inc. and the other Berry Entities—without giving notice to or obtaining the consent or approval of Berry GP, Inc.'s Board;

   ii.  At a minimum, Marty's and Hummell's actions breached their fiduciary duties of loyalty to Berry GP, Inc. and amounted to self-dealing.

B.      <u>Unauthorized Acts and Failure to Make Full and Adequate Disclosure</u>

   i.   Marty and Hummell failed to disclose their unauthorized decision to sell vital company assets and the self-dealing Berry Loans and failed to properly seek or obtain board approval or approval of the sole disinterested director for those self-dealing transactions;

   ii.  Marty and Hummell similarly failed to disclose the Berry Entities' financial information to Lawrence before IBC held the Berry Entities in default with respect to the LOC.

C.      <u>Usurpation of Corporate Opportunity and Self-Dealing</u>

   i.   Marty directed his wholly owned company—Western Gulf Equipment—to purchase cranes without first presenting the opportunities to the Board or the Berry Entities. Then, Marty directed Western Gulf to lease those cranes back

to the Berry Entities, without disclosing such lease transactions to the Board or seeking approval by the disinterested members of the Board. Mike Hummell participated in these actions as the registered agent for Western Gulf Equipment. These and other actions by Marty and Hummell amounted to breaches of their fiduciary duties of loyalty to the Berry Entities and to behave with the utmost good faith, fairness, and honesty.

73. The Berry Entities and Lawrence have been damaged by the Defendants' self-dealing, unauthorized acts, breaches of fiduciary duty, and failure to make full disclosure.

74. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

75. Alternatively, Plaintiff brings these claims derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 2
## Demand for an Equitable Accounting

76. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

77. As an officer and director of Berry GP, Inc. at all relevant times, Marty owed fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting. Additionally, as an officers of Berry GP, Inc. at all relevant times, Hummell owes fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting.

78. Defendants have provided Lawrence with almost no financial records related to the Berry Entities. The task of determining whether those records are accurate or complete, and the need to verify details about the concealment, wrongdoing, and mismanagement detailed above, is

19
416

likely to be complex. Adequate relief is unlikely to be obtained at law or through traditional discovery. Performing an accurate accounting for the Berry Entities is likely to require the creation of accurate financial records where none exist, as opposed to merely granting Plaintiff access to the Berry Entities' existing records.

79. Plaintiff therefore seek an order appointing an independent auditor and requiring the Berry Entities, Marty, and Hummell to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023. *See* TEX. R. CIV. P. 172.

80. Plaintiff bring this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

### COUNT 3
### Demand for Books and Records

81. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

82. At all relevant times, Plaintiff Lawrence Berry has been a shareholder of at least 5% of Berry GP, Inc. through his interests in LDMA Limited Partnership and Becon, Inc.

83. On April 18, 2023, Lawrence sent a good faith written demand to Defendants for books and records related to Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities. However, this request was ignored, and Lawrence never received a response.

84. As a shareholder of Berry GP, Inc. for at least six months immediately preceding that April 18, 2023 demand, and as a holder of at least 5% of all of the outstanding shares in Berry GP, Inc., Lawrence is entitled to examine and copy Berry GP, Inc.'s books, records of account, minutes, and share transfer records. TEX. BUS. ORG. CODE § 21.218.

85. The Bylaws of Berry GP, Inc. do not alter or limit Lawrence's right to inspect Berry GP, Inc.'s books and records. Indeed, Section XXIV states that "the books, accounts and records of [Berry GP, Inc.] shall be open to inspection by the shareholders at all reasonable times[.]" *See* Ex. B, at 11.

86. Defendants never responded to Lawrence's lawful request, let alone provided any reason why Lawrence would not be entitled to inspect the books and records of Berry GP, Inc. and its subsidiaries.

87. Plaintiff Lawrence Berry therefore seeks an order compelling the production for examination of the books and records of Berry GP, Inc. and its subsidiaries, including but not limited to the other Berry Entities, pursuant to Section 21.218(c) of the Texas Business Organizations Code.

88. Plaintiff Lawrence Berry brings this claim directly and derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 4
## Declaratory Judgment

89. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

90. Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001 *et. seq.*, Plaintiff seeks a judicial declaration of his rights, status, and other legal relations with respect to Defendants under the Berry GP bylaws and laws of the State of Texas.

91. First, Plaintiff seeks a judicial declaration that the purported December 7, 2023 "ratifications" of the following agenda items were ineffectual, because they were not procured with the approval of a majority of the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of the disinterested shareholders after disclosure of all material facts:

a. Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

b. Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

c. Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

d. Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale; and

e. Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce;

92. Second, Plaintiff seeks a judicial declaration that the purported February 13, 2024 "ratifications" or "resolutions" were ineffectual, because they were not approved by a majority of the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of a majority of the fully informed and disinterested shareholders:

a. BE IT RESOLVED that all action previously taken by any Director of Berry GP, Inc. or any employee of Bay Ltd. to promote, advertise, or seek offers for the sale of the Berry Dock is hereby ratified. The Board further determines that the Berry Dock and adjacent property is to remain listed for sale and that no sale shall take place pending the resolution of the TRO currently in place in Nueces County, Texas.

b. BE IT RESOLVED that the loans made to Berry GP Inc. by Dennis Berry and Marty Berry in July 2022 are recognized as fair, and in the best interest of Berry GP, and are ratified.

c. BE IT RESOLVED that the two (2) aircraft owned by Berry GP Inc. are to remain listed for sale, and are to be sold upon approval of an acceptable offer to purchase.

d. BE IT RESOLVED that all actions taken by any director of Berry GP, Inc. or any employee of Bay Ltd. including Robert Powers and Mike Hummell, in furtherance of discontinuing the banking relations between Berry GP, Inc. and International Bank of Commerce is hereby ratified.

e. BE IT RESOLVED that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the

22
419

subsequent leasing of that company to any Berry company for performing the work of that Berry company, is approved. To the extent such conduct has occurred in the past, it is ratified.

93. Each of the "ratifications" or "resolutions" detailed above required informed approval by a majority of the disinterested Directors or Shareholders, pursuant to TEX. BUS. ORGS. CODE § 21.418. However, they were not approved by a majority of the disinterested Directors or Shareholders, because Lawrence Berry objected.

94. Plaintiff brings this claim individually and derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 5
## Conversion

95. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

96. Pursuant to Texas law, Defendants are liable to Plaintiff for conversion.

97. Becon Inc., LDMA Limited Partnership and Berry GP, Inc. have the right to possess property of the Berry Entities.

98. By unlawfully voting to indemnify themselves and advance themselves litigation costs—over the objection of Lawrence as the sole disinterested member of the Board for such vote—Defendants are depriving Plaintiffs of their rightful interest in the property of the Berry Entities.

99. Lawrence's objection to the vote constitutes his demand for the return of the advanced litigation fees. Alternatively, demand was not required.

100. As a result of Defendants' unlawful vote and improper squandering of the Berry Entities' money, LDMA Limited Partnership, Becon Inc., and Berry GP, Inc. have suffered damages within the jurisdictional limits of this Court. Further, under the Texas Damages Act and

23
420

Texas common law, Plaintiff is entitled to recover exemplary damages because Defendants acted with actual malice when converting the Berry Entities' property.

101. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

102. Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

**COUNT 6**
**Corporate Waste (against Marty Berry)**

103. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

104. Defendant Marty Berry's use of corporate assets for personal applications constitutes corporate waste.

105. In particular, on information and belief, Defendant Marty Berry uses assets of the Berry Entities to operate his personally-owned company, Western Gulf Equipment. Defendant Marty Berry does not provide adequate consideration to the Berry Entities in return for these uses of Berry Entity assets, and instead further encumbers the Berry Entities by charging lease payments for the Berry Entities' use of Western Gulf cranes. There is no business justification for using the Berry Entities' corporate assets for Defendant Marty Berry's personal applications without adequate consideration.

106. Further, Defendant Marty Berry approved payments to himself from the Berry Entities of at least $10 million in principal on his undisclosed and improper self-dealing loan, despite the purported promissory note governing his loan indicating that the loan is not payable

until December 31, 2024.  There is no business justification for using the Berry Entities' corporate assets to make such voluntary payments for Marty's personal benefit, thus depriving the Berry Entities' of vital liquidity.

107.    Finally, on information and belief, Plaintiff understands that Defendant Marty Berry engages in additional corporate waste by using other Berry Entity assets for personal applications without adequate consideration.  However, because Plaintiff has been denied adequate access to the Berry Entities' books and records, the scope and extent of that additional corporate waste is not yet clear.  Plaintiff reserves the right to add additional claims for corporate waste after a proper accounting has been made and Plaintiff has been able to perform a fulsome review of the Entities' books and records.

108.    The Berry Entities and Lawrence have been damaged by Defendant Marty Berry's waste of corporate assets.

109.    Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

110.    Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

### VIII.    APPLICATION FOR TEMPORARY INJUNCTION

111.    Plaintiff incorporates the above paragraphs as if set forth in their entirety.

112.    Plaintiff also incorporates its February 15, 2024 Brief in Support of Temporary Injunction as if set forth in its entirety.

113. Plaintiff attaches and incorporates by reference the Verification of Lawrence Berry, which verifies the allegations relevant to this application for injunctive relief.

114. Pursuant to Rules 680 and 681 of the Texas Rules of Civil Procedure and Texas Civil Practice and Remedies Code §§ 65.011(1), (3), and (5), Plaintiff requests that the Court issue a temporary injunction enjoining Defendants from selling any of the Berry Entities' real property without first giving two weeks written notice to Lawrence Berry, including details of the proposed transaction. Further, Plaintiff requests that the court issue a temporary injunction enjoining Defendants from removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities. Plaintiff further requests that upon final trial on the merits, the Court award a permanent injunction against Defendants for the same activity.

115. By this filing, Plaintiff merely seeks to "preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). In the injunction context, "status quo" is defined as the "last, actual peaceable, non-contested status which preceded the pending controversy." *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (citations omitted). Here, the status quo that should be preserved is that Plaintiff Lawrence Berry is one of the three Directors of Berry GP, Inc., he has not ratified or approved any of the Defendants' self-dealing or unauthorized actions as the only disinterested Director, and Defendants are not authorized to sell any of the Berry Entities' real property absent notice to and approval of the Berry GP Board of Directors.

116. To obtain a temporary injunction to preserve this status quo, Plaintiff must show a cause of action against Defendants, a probable right to relief, and probable injury. *See, e.g., Butnaru*, 84 S.W.3d at 204. The "probable injury" requirement has been divided into subcategories of: (1) imminent harm; (2) irreparable injury; and (3) inadequate remedy at law. *See id*. In cases

involving real or personal property such as this one, the movant need not show the lack of an adequate remedy at law. TEX. CIV. PRAC. & REM. CODE § 65.011(5).

**A. Defendants have committed and threaten to commit further torts against Plaintiff. Plaintiff has a right to relief from such torts.**

117. Defendants are already liable for causes of action 1-5, above. If Defendants are permitted to direct the Berry Entities to sell the Berry Entities' real property without proper notice to Lawrence, they will continue to commit breaches of fiduciary duty and deprive the company of critical assets, causing additional damage to Plaintiff.

118. To be entitled to a temporary injunction, Plaintiff need not show that he will prevail at trial on these causes of action. Rather, Plaintiff must merely plead a cause or causes of action and present some evidence that tends to sustain them. *Intercont'l Terminals Co., LLC v. Vopak North America, Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The unauthorized sale of the Berry Entities' unique and valuable real property—especially if done in furtherance of the repayment of the self-dealing Berry Loan—would not only bolster the causes of action above but would supply all the evidence necessary for Plaintiff to prevail on them.

119. Further, in the fiduciary self-dealing context at issue here, a "presumption of unfairness" attaches to the transactions of the fiduciary, shifting the burden to the defendant to prove the fairness of the transactions. *See Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508-09 (Tex. 1980). If that presumption cannot be rebutted at the temporary injunction stage, then the injunction should be granted if the plaintiff has presented a prima facie case of the existence of a fiduciary relationship and a probable breach of that duty. *See Health Discovery Corp. v. Williams*, 148 S.W.3d 167, 169-70 (Tex. App.—Waco 2004, no pet.). Here, Lawrence will easily establish a prima facia case that Defendants owed fiduciary duties to the Berry Entities and to the other officers of the Berry Entities and that Defendants have breached those duties.

**B.     The harm facing Plaintiff is imminent.**

120.    For the purposes of obtaining an injunction, an injury is "imminent" if one has expressed "demonstrable intent to do that for which injunctive relief is sought," *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 717-18 (Tex. App.—Corpus Christi 2001, no pet.), or if the "defendant will engage in the activity sought to be enjoined." *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no writ).

121.    Defendants have already made unauthorized offers to sell real property belonging to the Berry Entities, including a unique and valuable commercial dock and other real property. Defendants are believed to be selling such assets to raise money for further unauthorized payments in service of the self-dealing Berry Loan.  This past behavior, coupled with the Defendants recent purported Board and shareholder resolutions, demonstrates that Defendants intend to engage in activity that will undoubtedly alter the status quo—and irreparably harm Lawrence—if they are not enjoined from doing so until resolution of the merits of Plaintiff's claims.

**C.     The harm facing Plaintiff is irreparable.**

122.    If Defendants are not enjoined as requested above, the harm Plaintiff will suffer is irreparable.  "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204.  Injury is likewise irreparable if "damages [are] not presently ascertainable or readily subject to calculation." *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) (citing *Butnaru*, 84 S.W.3d at 204).  The loss of management rights over a company can constitute irreparable harm, because those rights are "unique, irreplaceable, and 'cannot be measured by any certain pecuniary standard.'" *Cheniere Energy, Inc. v. Parallax Enters.*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd (citing

*Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.)). Additionally, "a trial court may grant injunctive relief when the enjoined conduct threatens to disrupt an ongoing business." *Sonwalkar*, 394 S.W.3d at 199; *see also Intercont'l Terminals Co., LLC*, 354 S.W.3d at 896 ("[d]isruption to a business can be irreparable harm," and "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.").

123. Further, trial courts typically grant injunctive relief in "actions involving real property because real estate is generally considered unique" and "irreplaceable," such that money damages are generally inadequate. *See Chenier Energy*, 585 S.W.3d at 76-77 (citing cases).

124. First, as explained above, Plaintiff has already been damaged by Defendants' actions, but the extent of that damage is not readily ascertainable because of Defendants intentional concealment of information and the lack of clear records detailing the financial status of the Berry Entities. Additionally, Defendants actions have already caused irreparable harm to the Berry Entities' decades-long banking relationship with IBC and could cause similar harm to the new banking relationship with Frost Bank. Assigning a dollar amount to remedy this kind of intangible but serious harm is not easy.

125. Second, Plaintiff understands that Defendants have pledged the Berry Entities' real property as collateral to secure an increase to the new Frost Bank line of credit. Should unauthorized self-dealing payments made in service of the Berry Loans imperil the line of credit with Frost Bank such that the company's real property interests are threatened, Plaintiff will be irreparably harmed as a result.

126. Third, Defendants have been secretly attempting sell—without notice to or authorization from the Board—other real property belonging to the Berry Entities, including the

company's valuable dock facility, presumably to raise funds to make additional self-dealing payments. If Defendants dispose of such real property without the requisite notice or approval, Plaintiff will be irreparably harmed.

**D.**  **Plaintiff lacks an adequate remedy at law, or in the alternative, is not required to prove lack of an adequate remedy at law.**

127. Because Plaintiff moves for a temporary injunction under Section 65.011(5) of the Texas Civil Practice and Remedies Code, he is not required to prove lack of an adequate remedy at law. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(5) ("A writ of injunction may be granted if: (5) irreparable injury to real or personal property is threatened, *irrespective of any remedy at law*.") (emphasis added).

128. Alternatively, Plaintiff has no adequate remedy at law, so a temporary injunction must issue. An irreparable injury is one that, by definition, has no adequate remedy at law. *See, e.g.*, *Kennedy v. Gulf Coast Cancer & Diag. Center at Southeast, Inc.*, 326 S.W.3d 352, 260 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("An injury is irreparable if there is no adequate remedy at law; if for example, a prevailing applicant could not be compensated adequately in damages or if damages cannot be measured by any certain pecuniary standard.") (citations omitted). As explained above, the injuries Plaintiff will suffer—including the likely loss of management rights and of unique and valuable real property belonging to the company—cannot be adequately compensated in damages, and Plaintiff thus has no adequate remedy at law.

129. Further, to justify denial of an application for injunction, a remedy at law must be as "complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int.'l Ltd.*, 572 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Here, the equitable relief that Plaintiff seeks is for the purpose of avoiding harm that could not be responded to fully in money damages, including threatening the status of

the Berry Entities' real property interests and of Plaintiff's management rights in the Berry Entities. Damages would be an incomplete remedy at best, because the harm Defendants threatens to impose on Plaintiff is non-monetary in part. *See RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 275 (Tex. App.—Dallas Apr. 12, 2019, no pet.) ("Generally, an adequate remedy at law exists and injunctive relief is improper where any potential harm may be adequately cured by monetary damages.").

**E.      Plaintiff is entitled to a temporary injunction and is willing to post bond.**

130.    For the reasons set forth above, Plaintiff is entitled to a temporary injunction. Plaintiff requests that upon notice and hearing, the Court enjoin Defendants from (1) removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities; and (2) voting on the sale of the Berry Entities' real property without first giving two weeks' written notice to Lawrence Berry, including details of the proposed transaction. Plaintiff further requests that upon final hearing, the Court award a permanent injunction against Defendants for the same conduct.

## IX.      ATTORNEY'S FEES

131.    Plaintiff Lawrence Berry is entitled to recover his attorneys' fees incurred in this matter pursuant to Sections 21.222 and 21.561 of the Texas Business Organizations Code and Section 37.009 of the Texas Civil Practice and Remedies Code.

## X.      JURY DEMAND

132.    Plaintiff hereby requests a jury trial.

## XI.      CONDITIONS PRECEDENT

133.    Plaintiff pleads that all conditions precedent to the relief requested have been satisfied, waived, excused, and/or are deemed as a matter of law to have been satisfied.

## XII.  PRAYER

134.  Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that the Court:

(1)    Enter a temporary injunction restraining Defendants from (1) removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities; and (2) voting on the sale of the Berry Entities' real property without first giving two weeks' written notice to Lawrence Berry, including details of the proposed transaction;

(2)    Order that Plaintiff recover from Defendants the reasonable costs and expenses Plaintiff incurred in obtaining the temporary injunction;

(3)    Order that Defendants produce the books and records of the Berry Entities for inspection by Plaintiff Lawrence Berry;

(4)    Order that Plaintiff Lawrence Berry recover from Defendants the reasonable costs and expenses Plaintiff incurred in obtaining the books and records;

(5)    Appoint an independent auditor and order Defendants to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023;

(6)    Set a trial date and upon final hearing enter a permanent injunction that enjoins Defendants from performing the acts described above, and order that Plaintiff have final judgment against Defendants for breach of fiduciary duty and award:

     (i)      compensatory, actual, consequential, restitutionary, and disgorgement damages,

     (ii)     exemplary damages,

     (iii)    pre-judgment interest,

     (iv)     post-judgment interest,

     (v)      reasonable and necessary attorneys' fees and costs, and

     (vi)     any other relief to which Plaintiff may show himself justly entitled.

Dated: March 14, 2024

Respectfully submitted,

By: */s/ Barrett Reasoner*

Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805
Fax: 713.750.0903

and

Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

and

Gabi S. Canales
State Bar No. 24012376
gabilaw14@gmail.com
**GABI CANALES LAW OFFICE**
5262 South Staples St., Suite 100
Corpus Christi, Texas 78411
Tel: 361.887.4700
Fax: 361.887.4761

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2024, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

    */s/ Bruce Baldree*
L. Bruce Baldree

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Christina Pena on behalf of Barrett Reasoner
Bar No. 16641980
cpena@gibbsbruns.com
Envelope ID: 85562149
Filing Code Description: Amended Petition
Filing Description: Plaintiff's First Amended Verified Petition and Application For Temporary Injunction
Status as of 3/20/2024 8:57 AM CST

Associated Case Party: Lawrence Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 3/14/2024 1:36:43 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 3/14/2024 1:36:43 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 3/14/2024 1:36:43 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 3/14/2024 1:36:43 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 3/14/2024 1:36:43 PM | SENT |
| Sherry Rakestraw | | srakestraw@gibbsbruns.com | 3/14/2024 1:36:43 PM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 3/14/2024 1:36:43 PM | SENT |
| Katrina Chamblee-Boyd | | katrinaboyd@butchboydlawfirm.com | 3/14/2024 1:36:43 PM | SENT |

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas Allison | | doug@dallisonlaw.com | 3/14/2024 1:36:43 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 3/14/2024 1:36:43 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 3/14/2024 1:36:43 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Shanna Gohlke | | gohlkes@bayltd.com | 3/14/2024 1:36:43 PM | SENT |
| Stephanie Jennings | | sjennings@porterhedges.com | 3/14/2024 1:36:43 PM | SENT |
| Cheri Deason | | cdeason@porterhedges.com | 3/14/2024 1:36:43 PM | SENT |

Associated Case Party: Robert Rickett

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Christina Pena on behalf of Barrett Reasoner
Bar No. 16641980
cpena@gibbsbruns.com
Envelope ID: 85562149
Filing Code Description: Amended Petition
Filing Description: Plaintiff's First Amended Verified Petition and Application For Temporary Injunction
Status as of 3/20/2024 8:57 AM CST

Associated Case Party: Robert Rickett

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Van Huseman | | vhuseman@husemanlawfirm.com | 3/14/2024 1:36:43 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 3/14/2024 1:36:43 PM | SENT |

Associated Case Party: Robert Powers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Clay Steely | | csteely@porterhedges.com | 3/14/2024 1:36:43 PM | SENT |
| William Stukenberg | | wstukenberg@porterhedges.com | 3/14/2024 1:36:43 PM | SENT |

Associated Case Party: Michael Hummell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Van Huseman | | vhuseman@husemanlawfirm.com | 3/14/2024 1:36:43 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 3/14/2024 1:36:43 PM | SENT |

# EXHIBIT A



434

# EXHIBIT B

# BYLAWS OF

# BERRY CONTRACTING, INC.

## I.

TITLE:  The title of the corporation is Berry Contracting, Inc.

## II.

LOCATION:  The location of its principal office shall be 1414 Corn Products Road in the City of Corpus Christi, Nueces County, Texas

## III.

CORPORATE SEAL:  The corporate seal of the company shall have inscribed thereon:  "Berry Contracting, Inc."

## IV.

DIRECTORS:  The property and business of the company will be managed and controlled by a board of directors consisting of not less than three nor more than seven members.  They shall hold office until the next annual meeting of the shareholders or until their successors are elected and have qualified.

## V.

POWERS OF DIRECTORS:  The board of directors shall have the management of the business of the company and in addition to the powers and authorities by these bylaws expressly conferred upon them, may exercise all such powers and do all such acts and things as may be exercised or done by the corporation, but subject, nevertheless, to the provisions of the statute, of the charter and of these bylaws and to any regulations from time to time made

436

by the shareholders, provided that no regulations so made shall invalidate any prior act of the directors which would have been valid if such regulations had not been made.

Without prejudice to the general powers conferred by the last preceding clause and other powers conferred by these bylaws, it is hereby expressly declared that the board of directors shall have the following powers, that is to say:

To purchase and otherwise acquire for the company and property, rights or privileges which the company is authorized to acquire, at such prices and on such terms and conditions and for such consideration as they think proper. At their discretion, to pay for any property or rights acquired by the company, either wholly or partially, in money or in stocks, bonds, debentures, or other securities of the company.

To appoint, and at their discretion, remove or suspend, such subordinate managers, officers, assistants, clerks, agents, and servants, permanently or temporarily, as they may from time to time think fit, and to determine their duties and fix, and from time to time change their salaries or emoluments, and to require security in such instances and in such amounts as they think proper.

To confer, by resolution, upon any officer of the company the right to choose, remove or suspend such subordinate officers, agents or factors.

To appoint any person or persons to accept and hold in trust for the company any property belonging to the company or in

437

which it is interested or for any other purpose, and to execute and do all such duties and things as may be requisite in relation to any such trust.

To create, make and issue mortgages, bonds, deeds of trust, trust agreements and negotiable or transferable instruments and securities, secured by mortgage or otherwise, and to do every other act and thing necessary to effectuate the same.

To determine who shall be authorized to sell on behalf of the company bills, notes, receipts, acceptances, endorsements, checks, releases, contracts and documents.

From time to time to provide for the management of the affairs of the company in such manner as they think proper and in particular, from time to time to delegate any of the powers of the board of directors to any committee, officer or agent, and to appoint any person to be the agent of the company with such powers, including the powers to subdelegate, and upon such terms as may be thought proper.

## VI.

MEETINGS OF THE DIRECTORS: The directors elected at the annual meeting of the shareholders shall meet immediately following each such meeting for the purpose of electing officers and considering any other business that may come before the board.

Other meetings of the directors may be held at such times, at such places and upon such notice as may be determined from time to time by the board.

A majority of the whole board of directors shall be necessary to constitute a quorum for the transaction of business at all meetings.

*VI-A added aug 11, 1981*

## VII.

MEETINGS OF THE SHAREHOLDERS: Meetings of the shareholders shall be held in the City of Corpus Christi, Nueces County, Texas, unless otherwise specified in the notice of any such meeting or waiver thereof.

All shareholders entitled to vote may vote at all meetings, either in person or by proxy in writing. All proxies shall be filed with the secretary of the meeting before being voted upon. A majority of the shareholders in amount of stock issued and outstanding, represented by the holders in person or by proxy, shall be requisite at all meetings to constitute a quorum for an election of directors or the transaction of other business.

The annual meeting of the shareholders shall be held on the second Tuesday of each August at 10 o'clock a.m. in each year, beginning with the year 1963, if not a legal holiday, and if a legal holiday, then on the day following, when they shall elect by a plurality vote, by ballot, a board of directors to serve for one year and until their successors are elected and have qualified, each shareholder being entitled to vote for each share of stock standing registered in his or her name on the twentieth day preceding the election, exclusive of the date of such election.

Notice of the annual meeting shall be mailed by the secretary to each shareholder entitled to vote at his or her last known post

439

office address, at least ten days prior to the meeting.

Special meetings of the shareholders may be called by the president, and shall be called at the request in writing or by vote of a majority of the board of directors or at the request in writing of·the holders of a majority of the stock of the company issued and outstanding. Notice of each special meeting, indicating briefly the object or objects thereof, shall be mailed by the secretary to each shareholder at his or her last known post office address at least five days prior to the meeting.

## VIII.

STANDING COMMITTEES: The board of directors may appoint from their number, standing committees and may invest them with all their own powers, subject to such conditions as they may pre-scribe, and all committees thus appointed shall keep regular min-utes of their transactions and shall cause them to be recorded in books to be kept for that purpose in the office of the company and shall report the same to the board of directors at their regular meeting.

IX. *amended Aug 11,1981*

OFFICERS: The officers of the company shall consist of a president, one or more vice presidents, a secretary and treasurer, and one or more assistant secretaries or treasurers, and such subordinate officers as may from time to time be elected or ap-pointed by the board of directors. Any person may hold more than one such office, except that the president and secretary shall not be the same person.

440

OFFICERS - HOW CHOSEN: At the first meeting after their election and annually thereafter beginning on the second Tuesday of August, 1963, the directors shall elect the officers of the corporation, such officers to hold office for one year and until their successors are elected and have qualified. They shall be subject to removal during their respective terms of office for cause and may be removed at any time by a majority vote of the directors then in office.

## XI.

PRESIDENT: The president shall be the chief executive officer of the company; he shall preside at all meetings of the directors; he shall have general and active management of the business of the company; and shall see that all orders and resolutions of the board are carried into effect. He shall execute all contracts and agreements authorized by the board. He shall have the general supervision and direction of all the other officers of the company and shall see that their duties are properly performed. He shall be ex-officio member of all standing committees and shall have the general powers and duties of supervision and management usually vested in the office of the president of a corporation.

The president shall submit a report of the operations of the company for the fiscal year to the directors at their first regular meeting in each year, and to the shareholders at their

441

annual meeting, and from time to time shall report to the directors all matters within his knowledge which the interests of the company may require to be brought to their notice.

XI-A - *added aug 11, 1981*
XII *amended aug. 11, 1981*

VICE PRESIDENT:  Any vice president shall be vested with all the powers and shall perform all the duties of the president in his absence, and shall perform such other duties as may be prescribed by the board of directors.

XII-A *added aug 11, 1981*
XIII.

SECRETARY:  The secretary shall attend all sessions of the board and act as clerk thereof and record all votes and the minutes of all proceedings in a book to be kept by him for that purpose and shall perform like duties for the standing committees when required.  He shall keep in safe custody the seal of the company and when authorized to do so shall affix the seal of said corporation to any instrument requiring the same, and the seal when so affixed shall be attested by the signature of the secretary.

He shall see that proper notice is given of all meetings of the shareholders of the company and of the board of directors and shall perform all such other duties as may be prescribed from time to time by the board of directors or the president.

XIV.

TREASURER:  The treasurer shall keep full and accurate records of receipts and disbursements in books of accounts belonging to the company and shall deposit all money and other valuable effects in the name and to the credit of the company

442

in the depository or depositories designated from time to time by resolution of the board of directors.

He shall disburse funds of the company as may be ordered by the board, or the president, taking proper vouchers for such disbursements, and shall render to the president and directors at the regular meetings of the board, or whenever they may require it, an account of all his transactions as treasurer and of the financial condition of the company. He shall keep the accounts of stock registered and transferred in such form and manner and under such regulations as the board of directors may prescribe. If required by the board of directors, he shall give the company a bond in form and in a sum with security satisfactory to the board of directors, for the faithful performance of the duties of his office and the restoration to the company, in case of his death, resignation or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession belonging to the company. He shall perform such other duties as the board of directors may from time to time prescribe or require.

XV _Amended Aug 11, 1981_

VACANCIES: If the office of any director, or of the president, vice president, any secretary or treasurer or other officer or agent, one or more, becomes vacant by reason of death, resignation, retirement, disqualification, removal from office or otherwise, the directors in office, although less

443

than a quorum, by a majority vote, may choose a successor or successors who shall hold office for the unexpired term in respect of which such vacancy occurred.

XVI. *Amended Aug 11, 1981*

DUTIES DELEGATED: In the case of the absence of any officer of the company, the board of directors may delegate the powers and duties of such officer to any other officer or to any director for the time being.

XVII.

CERTIFICATE OF STOCK: Every shareholder shall have a certificate, signed by the president or vice president, and either the treasurer or the secretary, certifying the number of shares owned by him in such corporation.

XVIII.

TRANSFERS OF STOCK: All transfers of the stock of the company shall be made as required by the Uniform Stock Transfer Act. Certificates shall be surrendered and cancelled at the time of transfer. No transfer of stock shall be made within ten days next preceding the day appointed for paying a dividend.

XIX.

LOSS OF CERTIFICATES: In the case of loss or destruction of a certificate of stock, another may be issued in its place upon proof of such loss or destruction and the giving of a satisfactory bond of indemnity. The provisions of the Uniform Stock Transfer Act as to court order may be required.

XXI.

DIVIDENDS: Dividends upon the capital stock of the
444

company when earned may be declared by the board of directors at any regular or special meeting. Before the payment of any dividends or making any distribution of profits there may be set aside out of the net profits of the company such sum or sums as the directors from time to time in their absolute discretion think proper as a reserve fund to meet contingencies, or for equalizing dividends, or for any such other purpose as the directors may think conducive to the best interest of the company.

## XXII.

CHECKS FOR MONEY: All checks, drafts, or orders for the payment of money shall be signed as directed by resolution of the board of directors from time to time.

## XXIII.

DEPOSITORY: A depository or depositories for the corporation shall be designated from time to time by the board of directors, and requested and directed to honor checks, drafts or other orders for the payment of money drawn in this corporation's name, including those payable to the individual order of any person or persons who name or names appear thereon as signed or signers thereof, when bearing or purporting to bear the signature of any person or persons authorized to sign the same by resolution of the board of directors, and said depository or depositories shall be entitled to honor and to charge this corporation with such checks, drafts, or other orders so drawn

445

until and unless such authority and designation is revoked by resolution of the board of directors of said corporation and upon due notice to said depository or depositories.

## XXIV.

BOOKS AND RECORDS: The books, accounts and records of the company shall be open to inspection by the shareholders at all reasonable times which are to be fixed by resolution of the board of directors.

## XXV. *Amended Aug 9, 1966*

NOTICE: Whenever under the provisions of the statute or by these bylaws notice is required to be given to any director, officer or shareholder, it shall not be construed to mean personal notice, but such notice may be given in writing by depositing the same in the post office or letter box in a postpaid, sealed wrapper, addressed to such director, officer or shareholder at his or her address as the same appears in the books of the corporation; and the time when the same shall be mailed shall be deemed to be the time of the giving of such notice.

## XXVI. *Amended Aug 9, 1966*

WAIVER OF NOTICE: Whenever any notice whatever is given or required to be given to any director, officer or shareholder, a waiver thereof in writing, signed by said shareholder, director, or officer, whether before or after the time stated in said waiver, shall be deemed equivalent thereto.

## XXVII.

AMENDMENT OF BYLAWS: These bylaws may be amended at any

446

time and from time to time by a majority of the entire board of directors then in office at any regular or special meeting of the board of directors or by the vote of a majority of the shareholders in amount of the stock then issued and outstanding at any regular or special meeting of the shareholders.

By-Laws approved as correct:

_____
Marvin L. Berry, President

By-Laws attested as duly adopted:

_____
Mattie L. Boyce, Secretary-Treas.

447

# AMENDMENT TO THE BY-LAWS
## BERRY CONTRACTING, INC.

BE IT RESOLVED that the By-Laws of Berry Contracting, Inc. be amended as follows:

That Article XXV and XXVI be amended by adding the following phrase to said Article XXVI:

>"Attendance in person or by proxy at any meeting of shareholders, either annual or special, shall constitute waiver of notice of such shareholders meeting and it will not be necessary for a formal written waiver of notice to be executed by such shareholders."

>"Attendance in person at any directors meeting, whether annual, regular, special or called, shall constitute waiver of notice of call of such meeting and shall not be necessary for such director so attending in person to execute a formal written waiver of notice of same."

By-Laws adopted this 9th day of August, 1966, at the annual meeting of shareholders and a copy ordered signed and affixed to the By-Laws of the Corporation.

Certified correct:

ATTEST:

Marvin L. Berry, President and
Chairman of Shareholders Meeting

Mattie L. Boyce, Secretary of
Shareholders Meeting and Secretary-
Treasurer of Corporation

NOTICE OF DIRECTORS MEETINGS:   No notice of annual meeting
need be given directors.

IX
(As Amended)

OFFICERS:   The officers of the company shall consist of a
President, an Executive Vice President, one or more Vice Presidents,
a General Counsel, a Secretary and Treasurer and one or more assis-
tant Secretaries or Treasurers and such subordinate officers as may
from time to time be elected by the Board of Directors or appointed
by the President.

X
(As Amended)

OFFICERS - HOW CHOSEN AND REMOVED:   The President, Executive
Vice President, Vice Presidents and the Secretary of the Corporation
shall be elected by the Board of Directors at either its annual
meeting (to be held on the second Tuesday of August of each year
immediately following the annual meeting of the Shareholders) and
shall serve for one year or until their successors have been
elected provided however, that vacancies may be filled or new officers
elected at any special meeting of the Board of Directors called for
such purpose.   All other Corporation employees shall be appointed by
the President.   The salaries and emoluments of all officers shall be
determined by the President subject only to the right of review by
the Board of Directors on the written request of a majority of the
entire Board of Directors, but provided that no such review shall
have retroactive effect on any officer.   Any officer may be removed
by a majority vote of the Board of Directors.

XI-A
(New Section)

EXECUTIVE VICE PRESIDENT:   There is hereby created the office
of Executive Vice President,  The Executive Vice President shall
be a person thoroughly familiar with the broad spectrum of activities
and projects of the Corporation and its subsidiary entities and shall
be a person knowledgeable in the business and professional affairs
of the Corporation.   The Executive Vice President shall act for, as
and in the place of the President in the event of absence or dis-
ability of the President.   In addition, the Executive Vice President
shall supervise the Vice Presidents, the Secretary, managers,
departments and activities as directed by the President and is
vested with broad executive management of the Corporation subject
to direction of the Board of Directors and the President.

XII
(As Amended)

VICE PRESIDENT:   If both the President and the Executive Vice
President be absent, disabled or unable to serve or fulfill their
duties, any vice president may and shall serve in the place of and
perform all or any of the duties of the President and/or Executive
Vice President; and shall, in addition, perform such regular and
other duties, including supervision of departments, as may be
prescribed by the Board of Directors or delegated or assigned by
the President or Executive Vice President.

XII-A
(New Section)

GENERAL COUNSEL:   There is herewith created the office of
General Counsel of Berry Contracting, Inc.  The person appointed
General Counsel may be also designated as Vice President and shall
receive such compensation and be employed on such terms and conditions
as may be properly designated.   The General Counsel shall supervise
the Legal Department of the Corporation, shall be responsible for and
direct the legal affairs of the Corporation including drafting and
preparation of documents and instruments, shall provide legal counsel
to the Corporation, and shall direct and hangle litigation and shall

generally perform the duties of Corporate Attorney under the
direction of the President, Executive Vice President and the
Board of Directors. The General Counsel shall be a licensed
attorney at law and a person schooled and knowledgeable in
general corporation law and other activities in which the
company engages. If the General Counsel is also named Vice
President, he shall perform such executive duties as pertains
to the office of Vice President and as be assigned and being
in addition to that of General Counsel.

## XV
### (As Amended)

VACANCIES:  If the office of any director or any officer
becomes vacant by reason of death, resignation, retirement,
disqualification or removal from office or otherwise, the
Directors then in office, although less than a quorum may,
by a majority vote, choose a successor or successors who
shall hold such office for the unexpired term of such officer
or officers and until their successors be nominated and elected.

## XVI
### (As Amended)

DUTIES DELEGATED:  In the case of the absence of any
officer of the Company, the Board of Directors or the President
may delegate for temporary purposes the powers and duties of
such officer to any other officer or to any other Director.

I, R. W. Black, being Secretary of Berry Contracting, Inc. do
certify that the foregoing amendments to the Bylaws of Berry
Contracting, Inc. were duly, lawfully and legally adopted at
an annual meeting of the Board of Directors held pursuant to
the Bylaws on the 11th day of August, 1981.

WITNESS my hand and the seal of the corporation.

R. W. BLACK, Secretary

## AMENDMENT TO THE BY-LAWS
## BERRY CONTRACTING, INC.

BE IT RESOLVED that the By-Laws of Berry Contracting, Inc. be amended as follows:

That Article IV be amended as follows:

The Board of Directors shall consist of not less than two directors.

By-Laws adopted this 9th day of August 1982.

CERTIFIED CORRECT:

*Marvin L Berry*

Marvin L. Berry, President  and
Chairman of Shareholders Meeting

ATTEST:

D. E. Spangler, Secretary-Treasurer

451

# EXHIBIT C



P.O. Box 4858
1414 Valero Way
Corpus Christi, Texas
78469-4858
Bus: (361) 693-2100

May 30, 2023

Sean Strawbridge, Director
Port Of Corpus Christ
400 Harbor Drive
Corpus Christi, TX 78401

Dear Mr. Strawbridge,

After immense consideration, the principals at Berry G.P. have decided to open two strategic properties to the marketplace. The property's synergy directly enhances one another and will be packaged as one. This asset's development would greatly benefit the port and the immediate properties contiguous, thus Berry G.P. would like to offer this to the Port as a first option. The Port of Corpus Christi will be responsible for the offer, based on knowledge of future growth and economic strategy. Please be respectful in timing of response, as this divestment will be presented for open offers. Attached you will find surveys and legal descriptions for both tracts. Thank you very much.

Sincerely,

Robert Rickett
Berry, G.P.
361-693-2841
409-771-1267
RickettR@Bayltd.com

# EXHIBIT D



# CERTIFICATE OF CORPORATE RESOLUTIONS
## OF
## BERRY GP, INC

I, M. G. Berry, Secretary of BERRY GP, INC, a Texas corporation (the "Corporation"), do hereby certify as follows:

1.  I am the duly elected and qualified Secretary of the Corporation and the custodian of the Corporation's records.

2.  Set forth below is a true and correct extract from the records of the Corporation showing resolutions duly adopted either: (a) at a meeting of its Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of the Corporation, which resolutions have not in any way been amended or modified and are in full force and effect:

    RESOLVED, that the President, any Vice President, or Secretary of the Corporation be and is hereby authorized and directed to obtain a loan in the amount of $20,000,000.00 from FROST BANK ("Lender"), upon such terms and conditions as the said officer shall in his or her sole discretion deem necessary or advisable; to execute and deliver on behalf of the Corporation all promissory notes, deeds of trust, security instruments, documents, certificates and agreements (collectively, the "Loan Documents") required by Lender, and to pledge as security for the loan such assets of the Corporation as such officer deems necessary or advisable; and to do any and all things in connection with such loan or any renewal, extension or rearrangement thereof that such officer deems necessary or advisable and in the best interests of the Corporation.

    FURTHER RESOLVED, that the President, any Vice President, or the Secretary of the Corporation be and hereby is authorized and empowered on behalf of the Company from time to time to execute, acknowledge and deliver any interest rate swap agreement, interest rate exchange agreement, currency exchange agreement, foreign exchange agreement, interest rate and currency exchange agreement, forward rate agreement, rate floor agreement, interest rate protection agreement, interest rate cap agreement, rate collar agreement, any option agreement respecting the foregoing, International Swaps and Derivatives Association, Inc. (ISDA) Master Agreement, or any similar agreement or arrangement and any schedule, confirmation, exhibit, document or instrument evidencing any interest in a transaction covered by any such agreement as the same may be modified, supplemented, amended or revised and in effect from time to time;

    FURTHER RESOLVED, that all acts of the President, any Vice President, or the Secretary of the Corporation authorized and directed herein, including the execution and delivery of the Loan Documents and all other documents referenced herein relating to the loan herein referenced, are reasonably expected to benefit, directly or indirectly,

the Corporation;

FURTHER RESOLVED, that the officers of the Corporation are hereby severally authorized to (a) sign, execute, certify to, verify, acknowledge, deliver, accept, file and record any and all instruments and documents, and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Corporation or otherwise, as in any such officer's judgment is necessary, desirable or appropriate in order to consummate the transactions contemplated by or otherwise to effect the purposes of the foregoing resolutions;

FURTHER RESOLVED, that all actions heretofore taken by the directors or the officers of the Corporation, and all things done by their authority, in connection with the transaction described herein, be and the same are hereby ratified, approved and adopted as the acts of the Corporation;

FURTHER RESOLVED, that said officers are authorized and empowered to perform all acts and execute and deliver all instruments, documents and agreements required by Lender to carry out the purposes of these resolutions;

3.     The following are duly elected, qualified and serving officers of the Corporation, and that the signature set out opposite the name of each officer is the genuine signature of such person, to-wit:

| Name | Title | Signature |
|------|-------|-----------|
| Robert Powers | President | |
| M. G. Berry | Secretary | |

4.     (a) all franchise and other taxes required to maintain the Corporation's corporate existence have been paid when due and that no such taxes are delinquent; (b) no proceedings are pending for the forfeiture of the Corporation's Certificate of Incorporation or the Corporation's dissolution, voluntary or involuntary; (c) the Corporation is duly qualified to do business in the State of Texas and any other states in which it is doing business, and is in good standing in such states; (d) there is no provision of the Articles of Incorporation or Bylaws of the Corporation limiting the power of the Board of Directors to pass the resolutions set out above, and that such resolutions are in conformity with the provisions of said Articles of Incorporation and Bylaws.

IN WITNESS WHEREOF, I have hereto set my hand this 29th day of June, 2023.

M. G. Berry, in the capacity of Secretary

DocuSign Envelope ID: 1E8B4C27-F225-4399-946F-E2B8C4CB35B6

## <u>DECLARATION OF LAWRENCE BERRY</u>

My name is Allen Lawrence Berry. I am of sound mind and capable of making this declaration. I have read the foregoing First Amended Verified Petition and Application for Temporary Injunction and have personal knowledge of the facts and statements contained therein. I declare under penalty of perjury that the facts and statements contained therein are within my personal knowledge and true and correct.

Declarant states nothing further.

Executed in _____Houston Texas_____ on the 14th day of March, 2024.

<span>DocuSigned by:</span>

*Lawrence Berry*
C13985179A0B4F0
Lawrence Berry

457

# EXHIBIT 10

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                    )
Individually and                   )  IN THE DISTRICT COURT
Derivatively on behalf             )
Of BERRY GP, INC.                  )
                                   )
    Plaintiff                      )
                                   )
BERRY GP, INC.,                    )
    Normal Plaintiff               )
                                   )
VS.                                )  NUECES COUNTY, TEXAS
                                   )
MARTY BERRY, ROBERT                )
RICKETT;                           )
ROBERT POWERS;                     )
MICHAEL HUMMELL;                   )
BERRY GP, INC.; BERRY              )
OPERATING COMPANY, LLC;            )
and BERRY CONTRACTING,             )
LOP                                )  94TH JUDICIAL DISTRICT


-----------------------------

JUDGE'S RULING

-----------------------------


On the 25th day of March, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable BOBBY GALVAN, Judge presiding, held in Corpus Christi, Nueces, Texas;


Proceedings reported by machine shorthand.

A P P E A R A N C E S

MR. BARRETT REASONER
SBOT NO. 16441980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDTREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
Houston, Texas
Telephone: (713) 650-8805

        AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77002
Telephone: (713) 589-8744

        AND

MR. DOUGLAS A. ALLISON
SBOT NO. 01083500
Law Office of Douglas Allison
403 North Tancahua Street
Corpus Christi, Texas 78401
Telephone: (361) 888-6002

        AND

MR. VAN HUSEMAN
Huseman Law Firm
615 North Upper Broadway, Suite 2000
Corpus Christi, Texas 78401
Telephone: (361) 883-3563

        AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas 78411
Telephone: (361) 887-4700

P R O C E E D I N G S
March 25, 2024
(In open court.)

THE COURT: Okay. All right. So, the Court has heard evidence over a three-day period. Temporary injunction's requested. Bylaws provide for the removal and appointment of a Board of Director, so I'm not gonna interfere with that.

With regards to the second issue the Court will partially grant for any sale of real property there must be 48 hours notice to all of the Board members; whoever they may be at the time. Board members may participate by phone in the vote if they choose. This only applies to real property. Granted and rendered.

(End of requested portion.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF NUECES )

I, ALICIA BROOKS, Deputy Official Court Reporter in and for the District Courts of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the total cost for the preparation of this Reporter's Record is $12 and was paid by Gibbs & Bruns, LLP.

WITNESS MY OFFICIAL HAND this the 26th day of March, 2024.

/S/Alicia Brooks
ALICIA BROOKS, Texas CSR #8726
Expiration Date: 03/31/2025
Deputy Official Court Reporter
Nueces County, Texas
Corpus Christi, Texas
361-888-0751

# EXHIBIT 11

## TRANSFER OF INTEREST

For adequate consideration, I, Allen Lawrence Berry, Trustee of the Allen Lawrence Berry 2007 Trust ("Trust"), on behalf of the Trust, do hereby transfer 100% interest in Axis Midstream Holdings LLC, a Texas limited liability company to Allen Lawrence Berry effective this 20th day of September 2017.

_____
Allen Lawrence Berry, Trustee

464

# EXHIBIT 12

TRANSFER OF INTEREST

For adequate consideration, I, Allen Lawrence Berry, the sole member of Axis Midstream Holdings LLC, a Texas limited liability company ("Axis") do hereby transfer 100% interest in Axis to Gansevoort Investments LLC effective this 20th day of September 2017.

_____
Allen Lawrence Berry

# EXHIBIT 13

## TRANSFER OF INTEREST

For adequate consideration, I, Allen Lawrence Berry, the Manager of Gansevoort Investments LLC do hereby transfer 100% interest in Axis Midstream Holdings LLC to Berry GP, Inc. effective this 30th day of November 2017.

_____
Allen Lawrence Berry

# EXHIBIT 14

**From:** "Albert Theodore Powers" <atpowers@allied-pacific-group.com>

**To:** "Bill Schoppe" <billwschoppe@gmail.com>, "Scott Baker" <1952scottrbaker@gmail.com>, "Robert Blaney" <rtblaney@flash.net>

**Cc:** "Lawrence Berry" <alb@riverway.us>, "Tonja Fulghum" <tfulghum@riverway.us>, "Boyd Butch" <butchboyd@butchboydlawfirm.com>, "Dennis Berry" <berryd@bayltd.com>, "Berry Marvin (Marty)" <captberry@aol.com>

**Subject:** Diligence Documents

**Date:** Thu, 23 Apr 2020 23:56:08 +0000

**Importance:** Normal

**Attachments:** TRANSFER_OF_AXIS_INTERESTS_FROM_BERRY_GP_TO_REDFISH_BAY_TERMINAL,_INC_(042120).pdf; TRANSFER_OF_AXIS_INTERESTS_FROM_REDFISH_BAY_TERMINAL,_INC_TO_LSPH_(042120).pdf; TRANSFER_OF_AXIS_INTERESTS_FROM_LSPH_TO_LSPE_(042120).pdf; TRANSFER_OF_INTERESTS_IN_LSP_TEXAS,_MJP,_RFB,_HIP,_AND_AXIS_FROM_LSPH_TO_LSPE_(042120).pdf; TRANSFER_OF_LSPE_INTERESTS_FROM_LSPH_TO_LSPV_(042220).pdf

---

Good Evening,

I attach the following additional documents:

1. Transfer of Interests in Axis Midstream Holdings, LLC from Berry GP, Inc, to Redfish Bay Terminal, Inc

2. Transfer of Interests in Axis Midstream Holdings LLC from Redfish Bay Terminal, Inc to Lone Star Ports Holdings LLC

3. Transfer of Interests in Axis Midstream Holdings LLC from Lone Star Ports Holdings LLC to Lone Star Ports Enterprises, LLC

4. Transfer of Interests in Lone Star Ports, LLC (Texas), Midway Junction Properties, LLC, Redfish Bay Properties, LLC. Harbor Island Properties, LLC, and Axis Midstream Holdings, LLC from Lone Star Ports Holdings, LLC to LOne Star Ports Enterprises, LLC

5. Transfer of Interests in Lone Star Ports Enterprises, LLC from Lone Star Ports Holdings, LLC to Lone Star Ports Ventures LLC

If you have any questions, please give me a call.

Ted

--
Albert Theodore Powers
Allied Pacific Group
Email: atpowers@allied-pacific-group.com

New York
Telephone: +(1) (212) 899-9889
Mobile: +(1) (212) 899-9888
Hong Kong

Telephone: +(852) 8108-8380
Mobile: +(852) 9099-3909

## TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT** is made and entered into as of this 21ˢᵗ day of April, 2020 (the "**Effective Date**"), by and between Berry GP, Inc. a Texas corporation (the "**Transferor**"), and Redfish Bay Terminal, Inc, a Texas corporation (the "**Transferee**").

## RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Axis Midstream Holdings, LLC, a Texas limited liability company ("**Axis**"); and

**WHEREAS**, Transferor is the sole Member and Manager of Axis; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in Axis; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor wishes to cease being the sole Member and Manager of Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee wishes to commence being the sole Member and Manager of Axis;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests**. Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in Axis, free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After such transfer, Transferor shall have no further direct interest in the equity and operating interests in Axis and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

2. **Acceptance of Operating Interests**. Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in Axis.

472

After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

3. **Cessation By Transferor as Member and Manager**.  Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor shall cease to be the sole Member and Manager of Axis.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee shall commence being the sole Member and Manager of Axis.

**IN WITNESS WHEREOF**, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**BERRY GP, INC.**
a Texas corporation

By _____
Name: _____

For and on behalf of
**REDFISH BAY TERMINAL, INC.**
a Texas corporation

By _____
Name: Dennis W. Berry

## TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT** is made and entered into as of this 21st day of April, 2020 (the "**Effective Date**"), by and between Redfish Bay Terminal, Inc. a Texas corporation (the "**Transferor**"), and Lone Star Ports Holdings, LLC, a Delaware limited liability company (the "**Transferee**").

### RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Axis Midstream Holdings, LLC, a Texas limited liability company ("**Axis**"); and

**WHEREAS**, Transferor is the sole Member and Manager of Axis; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in Axis; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor wishes to cease being the sole Member and Manager of Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee wishes to commence being the sole Member and Manager of Axis;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests.** Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in Axis, free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After such transfer, Transferor shall have no further direct interest in the equity and operating interests in Axis and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

2. **Acceptance of Operating Interests.** Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in Axis.

After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

3. **Cessation By Transferor as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor shall cease to be the sole Member and Manager of Axis.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee shall commence being the sole Member and Manager of Axis.

    **IN WITNESS WHEREOF**, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**REDFISH BAY TERMINAL, INC.**
a Texas corporation

By _____
Name: _____

For and on behalf of
**LONE STAR PORTS HOLDINGS, LLC,**
a Delaware limited liability company

By _____
Name: _____

475

# TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT** is made and entered into as of this 21st day of April, 2020 (the "**Effective Date**"), by and between Lone Star Ports Holdings, LLC, a Delaware limited liability company (the "**Transferor**"), and Lone Star Ports Enterprises, LLC, a Delaware limited liability company (the "**Transferee**").

## RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Axis Midstream Holdings, LLC, a Texas limited liability company ("**Axis**"); and

**WHEREAS**, Transferor is the sole Member and Manager of Axis; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in Axis; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor wishes to cease being the sole Member and Manager of Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee wishes to commence being the sole Member and Manager of Axis;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests**. Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in Axis, free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After such transfer, Transferor shall have no further direct interest in the equity and operating interests in Axis and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

2. **Acceptance of Operating Interests**. Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in Axis.

476

After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in Axis.

3. **Cessation By Transferor as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferor shall cease to be the sole Member and Manager of Axis.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in Axis, Transferee shall commence being the sole Member and Manager of Axis.

**IN WITNESS WHEREOF**, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**LONE STAR PORTS ENTERPRISES, LLC**
a Delaware limited liability company


By _____
Name: _____


For and on behalf of
**LONE STAR PORTS HOLDINGS, LLC,**
a Delaware limited liability company


By _____
Name: _____

## TRANSFER OF INTERESTS AND CHANGE OF MANAGERS AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGERS AGREEMENT** is made and entered into as of this 21st day of April, 2020 (the "**Effective Date**"), by and between Lone Star Ports Holdings, LLC, a Delaware limited liability company (the "**Transferor**"), and Lone Star Ports Enterprises, LLC, a Delaware limited liability company (the "**Transferee**").

### RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in each of (a) Lone Star Ports, LLC, a Texas limited liability company ("**LSP Texas**"), (b) Midway Junction Properties, LLC, a Delaware limited liability company ("**MJP**"); (c) Redfish Bay Properties, LLC, a Delaware limited liability company ("**RBP**"), (d) Harbor Island Properties, LLC, a Delaware limited liability company ("**HIP**"), and (e) Axis Midstream Holdings, LLC, a Texas limited liability company ("**Axis**"); and

**WHEREAS**, Transferor is the sole Member and Manager of each of LSP Texas, MJP, RBP, HIP, and Axis; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis, Transferor wishes to cease being the sole Member and Manager of LSP Texas, MJP, RBP, HIP, and Axis; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis, Transferee wishes to commence being the sole Member and Manager of LSP Texas, MJP, RBP, HIP, and Axis;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests**. Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis, in each case free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After

478

such transfer, Transferor shall have no further direct interest in the equity and operating interests in any of LSP Texas, MJP, RBP, HIP, or Axis and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis.

2. **Acceptance of Operating Interests**. Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis. After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis.

3. **Cessation By Transferor as Member and Manager**. Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis, Transferor shall cease to be the sole Member and Manager of each of LSP Texas, MJP, RBP, HIP, and Axis.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in each of LSP Texas, MJP, RBP, HIP, and Axis, Transferee shall commence being the sole Member and Manager of LSP Texas, MJP, RBP, HIP, and Axis.

IN WITNESS WHEREOF, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**LONE STAR PORTS ENTERPRISES, LLC,**
a Delaware limited liability company:


By _____
Name: _____

For and on behalf of
**LONE STAR PORTS VENTURES, LLC,**
a Delaware limited liability company

By _____

Name: _____

## TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT

**THIS TRANSFER OF INTERESTS AND CHANGE OF MANAGER AGREEMENT** is made and entered into as of this 21st day of April, 2020 (the "**Effective Date**"), by and between Lone Star Ports Holdings, LLC, a Delaware limited liability company (the "**Transferor**"), and Lone Star Ports Ventures, LLC, a Delaware limited liability company (the "**Transferee**").

### RECITALS:

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Transferee; and

**WHEREAS**, Transferor owns One Hundred Percent (100%) of all equity and operating interests in Lone Star Ports Enterprises, LLC, a Texas limited liability company ("**LSPE**"); and

**WHEREAS**, Transferor is the sole Member and Manager of LSPE; and

**WHEREAS**, Transferor wishes to transfer to Transferee all equity and operating interests in LSPE; and

**WHEREAS**, Transferee wishes to acquire from Transferor all equity and operating interests in LSPE; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in LSPE, Transferor wishes to cease being the sole Member and Manager of LSPE; and

**WHEREAS**, simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in LSPE, Transferee wishes to commence being the sole Member and Manager of LSPE;

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Transferor and the Transferee hereby agree as follows:

1. **Transfer of Operating Interests.** Effective as of the Effective Date, Transferor hereby irrevocably transfer to Transferee all equity and operating interests in LSPE, free and clear of all liens, charges, pledges, options, mortgages, deeds of trust, hypothecations, encumbrances, security interests, claims, limitations, restrictions, or other rights or interests of any kind (including any restrictions on the right to vote, sell, or otherwise dispose of such right or interest). After such transfer, Transferor shall have no further direct interest in the equity and operating interests in LSPE and Transferee shall own One Hundred Percent (100%) of all equity and operating interests in LSPE.

2. **Acceptance of Operating Interests.** Effective as of the Effective Date, Transferee hereby accepts the transfer from Transferor of all equity and operating interests in LSPE.

After such transfer, Transferee shall own One Hundred Percent (100%) of all equity and operating interests in LSPE.

3. **Cessation By Transferor as Member and Manager**. Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in LSPE, Transferor shall cease to be the sole Member and Manager of LSPE.

4. **Commencement By Transferee as Member and Manager.** Effective as of the Effective Date and simultaneously with the transfer by Transferor to Transferee of all equity and operating interests in LSPE, Transferee shall commence being the sole Member and Manager of LSPE.

        **IN WITNESS WHEREOF**, the signatories to this Transfer of Interests and Change of Managers Agreement, intending to be bound, have executed this Agreement as of the date first written above.

For and on behalf of
**LONE STAR PORTS VENTURES, LLC**
a Delaware limited liability company


By _____
Name: _____


For and on behalf of
**LONE STAR PORTS HOLDINGS, LLC,**
a Delaware limited liability company


By _____
Name: _____

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rosa Brennan on behalf of Barrett Reasoner
Bar No. 16641980
rbrennan@gibbsbruns.com
Envelope ID: 94875127
Filing Code Description: Answer/Response
Filing Description: Exhibits to Defendants Response to Motion to Remand, Dismiss, or Transfer Venue
Status as of 12/3/2024 2:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |
| Douglas Allison | 1083500 | doug@dallisonlaw.com | 12/3/2024 11:55:08 AM | SENT |
| Alistair Dawson | 5596100 | adawson@beckredden.com | 12/3/2024 11:55:08 AM | SENT |
| Michael Hummell | 10271100 | hummellm@bayltd.com | 12/3/2024 11:55:08 AM | SENT |
| Michael McClellan | 24109525 | jmcclellan@beckredden.com | 12/3/2024 11:55:08 AM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |
| Madeline Gay | | mgay@beckredden.com | 12/3/2024 11:55:08 AM | SENT |
| Business Court 11A | | BCDivision11A@txcourts.gov | 12/3/2024 11:55:08 AM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 12/3/2024 11:55:08 AM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 12/3/2024 11:55:08 AM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 12/3/2024 11:55:08 AM | SENT |

# EXHIBIT 15

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § § | |
| Defendants. | § § | 94TH JUDICIAL DISTRICT |

## COUNTER-PLAINTIFFS' SECOND~~FIRST~~ AMENDED ORIGINAL PETITION ASSERTING COUNTER-CLAIMS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Berry GP Inc., Berry Operating Company LLC, Berry Contracting LP, and Marty Berry, sometimes collectively referred to as Counter-Plaintiffs, and make and file this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims complaining of A. Lawrence Berry, in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, sometimes referred to as Counter-Defendants, and in support of same would show:

1

## PARTIES

1.      Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Berry GP is one of the "Berry Entities" as may be referenced herein.

2.      Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Berry Operating is one of the "Berry Entities" as may be referenced herein.

3.      Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4.      Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd.  Marty Berry resides in Nueces County, Texas.

5.      A. Lawrence Berry ("L.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd.  A. Lawrence Berry resides in Harris County, Texas.  A. Lawrence Berry may and shall be served by notice of these proceedings upon legal counsel for A. Lawrence Berry:  Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.  Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6.      Allen Lawrence Berry, as Trustee of the Allen Lawrence Berry Trust ("ALB Trust") is a trust wherein Allen Lawrence Berry serves as trustee of the ALB Trust, and is – along with others – a beneficiary of the Trust.  ALB Trust has already appeared in these proceedings, and thus this

2

Counter-Plaintiffs First Amended Original Petition Asserting Counter-Claims will be served upon Allen Lawrence Berry, Trustee, and the Trust by service upon their attorney: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6. Berry GP, Berry Operating, Bay Ltd., Marty Berry, and A. Lawrence Berry may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7. L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition"). The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas. A Counter-Plaintiffs' Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97. L.Berry, adding Lawrence Berry in his capacity as trustee of the Allen Lawrence Berry Trust ("Trust"), then filed Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction. The~~This~~ Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims was~~is now being~~ filed as counter-claim to Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction in compliance with Texas Rule of Civil Procedure ("TRCP") 97.

## II.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all Parties. Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas. M.Berry and L.Berry reside in Texas. As such, all Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

9.     Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) inasmuch as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred; and section 15.011 inasmuch as Counter-Plaintiffs seek to recover an interest in and/or quiet title to real property. See Exhibit C (with attachment. See Exhibit C (with attachments).

Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3).  See Exhibit B.

## III.

## DISCOVERY

10.     Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## EXECUTIVE SUMMARY

11.     Counter-Plaintiffs file this amended counter-petition asserting claims against L.Berry and the Trust for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud, and other causes of action. Counter-Plaintiffs' causes of action pleaded against and complaining of L.Berry and Trust are directly responsive to L.Berry's claims for self-dealing and breach of fiduciary duty filed against one or more Counter-Plaintiffs.  For all claims referenced in this Counter-Plaintiffs' SecondFirst Amended Original Petition Asserting Counter-Claims, Counter-Plaintiffs now sue Counter-Defendants.

## VI.

## FACTUAL BACKGROUND

12.     The Berry Entities and Berry-Related Entities are a large organization of companies engaged in various businesses throughout the United States, and have successfully done so since the 1950s.

4

13. Marvin Berry had four (4) sons: Marty Berry (M.Berry), Dennis Berry (D.Berry), A. Lawrence Berry (L.Berry), and Kenneth Berry. After Marvin Berry passed in 1997, control of the Berry Entities shifted to Laura Berry (Marvin's wife), and then to their (Marvin's and Laura's) sons — M.Berry, D.Berry, and L.Berry. LDMA LP ("LDMA") sits at the top of the Berry Entities. LDMA's 3% general partner is Beacon Inc. which is owned by M.Berry, D.Berry, and L.Berry. LDMA owns Berry GP which, through a series of legal entities, own Berry Operating and Bay Ltd. The Board of Directors of Berry GP (M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojosa Phd.) — in accordance with the by-laws of Berry GP — primarily govern Berry GP, the Berry Entities, and some of the other affiliated entities (indirectly). All considered (generally), ownership of the Berry Entities is vested with M.Berry, Bonnie Berry,[1] and L.Berry (shareholders); and control of the Berry Entities (generally, at a policy level) is with M.Berry, Bonnie Berry, ~~L.Berry,~~ and Chrissy Hinojosa,~~Hinojsa~~ Phd. (all serving as directors of Berry GP).[2]

14. For purposes of this pleading, the Berry Entities refers to Berry GP, Berry Operating, and Bay Ltd. For purposes of this pleading, the Berry-Related Entities[3] refer to the Allen Lawrence Berry 2007 Trust, Redfish Bay Terminals Inc. ("RBT"), Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca ICI Development ("Orca ICI," a Texas partnership), Orca ICI Development JV, Orca Petroleum Ltd., Orca Properties LLC (a/k/a Orca Specialty Equipment LLC, Providence Plantation, and/or Casa de Juego), West 17th Resources LLC, Gansevoort Investments LLC, Axis Midstream Holdings LLC (TX), Lone Star Ports LLC (TX), Midway Junction Properties LLC (TX), Halcon Mineral Interest LLC, Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Southern Comfort Equipment, Ridgefield Energy Investments LLC,

---

[1] Successor in interest to Dennis Berry, recently deceased
[2] In mid-2024, L.Berry was removed as director of Berry GP.
[3] Please note that the definition of Berry-Related Entities in this Nueces County, Texas, legal action was broadened to include Axis Midstream Holdings LLC, Lone Star Ports LLC, Midway Junction Properties LLC, and Redfish Bay Terminals Inc. in May, 2024 (approximately six (6) months in advance of Allied Ports LLC's filing of a competing lawsuit in Harris County, Texas).

Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, CEC Ridgefield Holdings LLC, Blue Wagon Energy Investments LLC, Alamo Resources IV JV LLC, B.B.I. Inc., Escopeta Oil & Gas Corporation, Furie Operating Alaska LLC, Helios Power Capital LLC, Danskammer Energy LLC, Berry Y&V Fabricators LLC (and related companies). The Berry Entities and Berry-Related Entities may be sometimes referred to as the "Berry Companies."

15. The Berry-Related Entities Companies, except for the Trust and RBT, are and have been started up, owned (legally and/or beneficially), held in trust, managed, developed, operated, and/or controlled at various times by and through Berry GP, and/or by and through (in part) M.Berry, D.Berry, and/or L.Berry (one or all of them), since the 2000s. Such business practices are investments for one or more of the Berry Entities and/or their owners/shareholders.

16. As an example of how Berry Entities invested, Counter-Plaintiffs invested substantially in ICI, ICI Orca, and Orca (related companies). Berry Entities/Counter-Plaintiffs also substantially invested in Axis and LSP (related companies). Specifically, Counter-Plaintiffs seeded capital (money, assets, manpower) to Orca/Axis (et al) to start-up, manage, develop, operate, and/or control an investments investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets (including mineral/real property interests as assets) for several of the Berry-Related Entities (the "Investment").

17. From time to time, M.Berry, D.Berry, and/or L.Berry (or all of them) had meetings to discuss how to manage the Investment, whether to sell or continue with the Investment, and other business-type meetings/discussions.

18. Seeded capital money/assets from Counter-Plaintiffs to some Berry-Related Entities ICI to Orca/ICI to Orca involved an agreement/contract as between these legal entities requiring payment-in-full for the base value of the seeded money/assets received by Orca. In contravention

6

of such agreement/contract, L.Berry, individually and as trustee for the Trust, has very recently refused to pay and/or transfer rights as required by the agreement/contract.

19.     Seeded capital money/assets from Counter-Plaintiffs to some Berry-Related Entities~~ICI to Orca/ICI to Orca~~ also included the agreement/contract that L.Berry/~~Orca~~/Trust (all or in part) would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment in trust and for the benefit of Counter-Plaintiffs.  In contravention of such agreement/contract, L.Berry/~~Orca~~/Trust (all or in part) has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs.

20.     Specifically, L.Berry/Trust has participated in self-dealing transactions involving the Investment (and the Investment's earnings) — taking of seeded money and assets of value (wealth) for personal benefit, and not for the benefit of any one or more of the Counter-Plaintiffs.  This on-going practice by L.Berry/~~Orca~~/Trust of self-dealing transactions and ultra vires transactions violates the fiduciary obligations owed by L.Berry, individually and as trustee of the Trust, to Counter-Plaintiffs (and others).

21.     In furtherance of L.Berry's/Trust's wrongful conduct, L.Berry/Trust has intentionally obscured self-dealing transactions by transfers of money/assets of substantial value to and/or through the Berry-Related Entities.  All such transactions constitute L.Berry's, individually and as trustee for the Trust, wrongful taking of money and assets belonging to, held in trust for, and held for the benefit of Counter-Plaintiffs.  L.Berry, individually and as trustee for the Trust, has and is engaged in wrongful takings, and also has failed to disclose same (as is required by his (L.Berry's, individually and as trustee of the Trust) fiduciary duties owed).

22.     L.Berry's (individually and as trustee of the Trust) wrongful conduct (as described herein) continues to-date.  Counter-Plaintiffs file this legal action to demand L.Berry (individually and as

trustee of the Trust) provide financial information as shall be requested through the legal discovery process. Counter-Plaintiffs now plead the following claims and causes of action against L.Berry (individually and as trustee of the Trust) and the Trust: conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, and fraud.

## VII.
## CAUSES OF ACTION

### Count 1
### Conversion

23.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 1 in their entirety.

24.     Counter-Plaintiffs would show that L.Berry (individually and as trustee of the Trust, Counter-Defendants) are liable to Counter-Plaintiffs for conversion of Counter-Plaintiffs' Investment (+ earnings). Specifically, Counter-Plaintiffs seeded capital (money, assets) to L.Berry/~~Orca~~/Trust (and their benefit) to start-up, manage, develop, operate, and/or control Investment ~~an investment in the Eagle Ford Shale and/or Permian Basin~~ — which, in turn, became seed-money/assets for several of the Berry-Related Entities (the Investment). L.Berry and the Trust were to hold the Investment (+ earnings) in trust for Counter-Plaintiffs.[4] Wrongfully, L.Berry and the Trust have absconded with the Investment (+ earnings) through a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs. L.Berry's/Trust's wrongful conduct is a conversion of Counter-Plaintiffs' Investment (+ earnings).

25.     The elements of conversion are: 1) claimants (Counter-Plaintiffs) owned or were entitled to

---

[4] Although some monies have been paid by L.Berry or one of his legal entities to one or more Counter-Plaintiffs as part of these transactions, the amounts of money paid have only been a partial repayment of monies owed to Counter-Plaintiffs — still in disregard for that which was agreed to be held in trust by L.Berry/Trust for Counter-Plaintiffs.

8

possession of property; 2) another assumes or exercises control of the property in an unauthorized manner to the exclusion of the claimants; and 3) the claimants' demand for return of

the property is refused. By this Counter-Plaintiffs' Second~~First~~ Amended Counter-Claim these Counter- Plaintiffs continue to request return of all converted assets. In this case, Counter-Plaintiffs clearly own and are entitled to possession of the Investment (+ earnings). Such Investment (+ earnings) were supposed to be held in trust by L.Berry, individually and as trustee for the Trust (the sole person in control of such Investment (+ earnings)) for Counter-Plaintiffs. Counter-Defendants have wrongfully assumed and exercised control over such Investment (+ earnings), and done so in a manner unauthorized by Counter-Plaintiffs and to the exclusion of Counter-Plaintiffs. Further, and in disregard of requests from Counter-Plaintiffs, Counter-Defendants have failed and refused to return the Investment (+ earnings) to Counter-Plaintiffs. This is a wrongful conversion of such Investment (+ earnings) — the money/assets — belonging to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

26. Counter-Defendants' wrongful conversion of Counter-Plaintiffs' Investment (+ earnings) has caused substantial financial harm and losses to Counter-Plaintiffs. Counter-Plaintiffs now sue for the return of such Investment (+ earnings), or alternatively for the value of such Investment (+ earnings).

**Count 2**
**Breach of Fiduciary Duty**

27. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 2 in their entirety.

28. Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendants held the Investment (+ earnings) in trust for Counter-Plaintiffs all relevant times. As such, Counter-Defendants owe fiduciary duties to

Counter-Plaintiffs for all relevant times. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs include, but are not limited to, the duty of loyalty, duty of utmost good faith and fair dealing, and duty of fairness and honesty. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs further include putting Counter-Plaintiffs' interest before his (L.Berry's, individually and as trustee of the Trust) own interest, inclusive of devoting full time and efforts in favor of Counter-Plaintiffs' best interests — not L.Berry's own or just the Trust's interests. These duties that Counter-Defendants owe to Counter-Plaintiffs encompass obligations and/or duties to refrain from self-dealing transactions and to make full disclosures of information.

29.     While owing fiduciary duties to Counter-Plaintiffs, Counter-Defendants have engaged in, directed, approved, and/or taken actions in contravention of fiduciary duties owed, including but without limited to the following:

     a.     L.Berry/Trust took substantial money/assets from Counter-Plaintiffs, and failed to invest same in the name of and/or for the benefit of Counter-Plaintiffs (thereby putting their own financial interest ahead of Counter-Plaintiffs' financial interest). By way of example, L.Berry and Trust took Counter-Plaintiffs money/assets yet wrongfully placed things of value (mineral leases) into Orca (a legal entity that ultimately (later) was determined to be 100% for the benefit of Trust). L.Berry and Trust took Counter-Plaintiffs money/assets for Axis/LSP, yet wrongfully purport to have transferred some of this interest to others (e.g., Allied Ports LLC); and other. This breach of fiduciary duty caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter- Plaintiffs now sue.

     b.     L.Berry/Trust were supposed to hold the Investment (+ earnings) in trust for Counter-Plaintiffs, yet L.Berry/Trust refuses to account for and

surrender such Investment (+ earnings) in favor of Counter-Plaintiffs —
but rather appears to have absconded with the Investment (+ earnings).
This failure to hold, account for, and then surrender the Investment (+
earnings) for the benefit of Counter-Plaintiffs is self-dealing — and a
breach of fiduciary duty. This breach of fiduciary duty has caused
substantial financial harm and losses to Counter-Plaintiffs, and for which
Counter-Plaintiffs now sue.

c.      L.Berry/Trust took the Investment (+ earnings) for their own benefit (as
set forth above), and did so without full disclosure of details of the
Investment (and earnings) to Counter-Plaintiffs.      Rather than comply
with Counter- Defendants' fiduciary duties owed, Counter-Defendants
have engaged a series of transactions to obscure Counter-Plaintiffs'
rights to its Investment (+ earnings). This lack of full disclosure is
L.Berry's and Trust's breach of fiduciary duty of full disclosure and
candor owed to Counter-Plaintiffs. This breach of fiduciary duty has
caused substantial financial harm and losses to Counter-Plaintiffs, and
for which Counter- Plaintiffs now sue.

d.      L.Berry/Trust have used Counter-Plaintiffs money/assets to promote and
make profit for their own businesses in various manners and locations.
This is more self-dealing, and a breach of the fiduciary duty owed by
L.Berry/Trust to the Counter-Plaintiffs. This breach of fiduciary duty has
caused substantial financial harm and losses to the Counter-Plaintiffs, and
for which Counter-Plaintiffs now sue.

e.      There are additional transactions / ventures by Counter-Defendants that

11

are a breach of fiduciary duties owed to Counter-Plaintiffs, and all of which have caused substantial financial harm and losses to Counter-Plaintiffs.

For same, Counter-Plaintiffs now sue.

30. Counter-Defendants have taken money/assets/manpower from one or more of the Counter-Plaintiffs; the Investment (+ earnings) from one or more of Counter-Plaintiffs; misappropriated equipment, personnel, and other assets from one or more of the Counter-Plaintiffs; and all to the detriment of one or more of the Counter-Plaintiffs — while only benefiting Counter-Defendants. This is self-dealing. All such conduct described herein evidences Counter-Defendants' breaches of fiduciary duties owed; that is, self-dealing, advancing their (L.Berry's/Trust's) own interest rather than Counter-Plaintiffs' interest, breaches of loyalty to the Counter-Plaintiffs, breaches of good faith and fair dealing owed to Counter-Plaintiffs, breaches of full disclosure and candor owed to Counter-Plaintiffs, and more. Counter-Defendants' misconduct has been and continues to be designed as a subterfuge of obligations to the Counter-Plaintiffs (whereas other shareholders who may have received benefits account for same to the Berry Entities). Counter-Defendants' breaches of fiduciary duties owed to Counter-Plaintiffs have caused substantial financial harm and losses to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

## Count 3
## Breach of Contract

31. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 3 in their entirety.

32. As noted herein, seeded capital money/assets from Counter-Plaintiffs included the agreement/contract that L.Berry, individually and as trustee of the Trust, would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the

12

Investment (+ earnings) in trust and for the benefit of Counter-Plaintiffs.  In contravention of such agreement/contract, L.Berry, individually and as trustee of the Trust, have refused to perform as promised, but rather engaged a series of self-dealing transactions designed to allow L.Berry and the Trust to keep all (or some) of the Investment (+ earnings) for himself (L.Berry) and/or the Trust.

33.     Counter-Defendants' refusals to abide by the agreement/contract is a breach of agreement/contract.  Counter-Defendants' breach of the agreement/contract has caused Counter-Plaintiffs substantial financial harm and losses, and for such substantial financial harm and losses Counter-Plaintiffs now sue.

**Count 4**
**Unjust Enrichment**

34.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 4 in their entirety.

35.     Recent events now give rise to a concern on Counter-Plaintiffs' behalf that Counter-Defendants may deny the agreement/contract (and/or some terms of the agreement/contract) as between Counter-Plaintiffs and Counter-Defendants — all in an effort by Counter-Defendants to wrongfully abscond with Counter-Plaintiffs' Investment + earnings.  Such a result would be inequitable, and unjustly enrich Counter-Defendants.

36.     Counter-Plaintiffs would show that Counter-Plaintiffs did, in fact, provide seed capital money/assets from Counter-Plaintiffs to Orca/ICI /Orca and Axis/LSP as a benefit to Counter-Defendants, and to allow Counter-Defendants to invest (again, the Investment). This benefit to Counter-Defendants was provided by Counter-Plaintiffs, and it will cause a substantial detriment to Counter-Plaintiffs if the Investment + earnings are not returned to Counter-Plaintiffs.  As such, equity demands that the Investment + earnings be returned to Counter-Plaintiffs or compensation

13

for value.

37.     For these reasons set forth herein, Counter-Plaintiffs now sue Counter-Defendants for unjust enrichment, as fairness demands Counter-Plaintiffs be made whole by: (1) return of all Investment (+ earnings); or (2) the value of all Investment (+ earnings) be paid by Counter-Defendants to Counter-Plaintiffs.

## Count 5
## Breach of Constructive Trust

38.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 5 in their entirety.

39.     As noted above, Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendant L.Berry held the Investment (+ earnings) in trust for Counter-Plaintiffs for all relevant times. L.Berry, as trustee for the Trust, held the Investment (+ earnings) in trust for the Counter-Plaintiffs for all relevant times. As such, Counter-Defendants owed and owe fiduciary duties to Counter-Plaintiffs for all relevant times.

40.     Counter-Plaintiffs made transfer of monies/assets to Counter-Defendants (money, manpower, and assets). Counter-Plaintiffs made these transfers of monies/assets in reliance upon Counter-Defendants' promise to protect and deliver Counter-Plaintiffs' share of the Investment (+ earnings) to Counter-Plaintiffs.

41.     Counter-Defendants now refuse to perform upon Counter-Defendants' promise (but rather now wants to keep for L.Berry's and his Trust's own gain/profit all of the Investment (+ earnings)). As such, Counter-Defendants will be unjustly enriched. Given these facts, Counter-Plaintiffs now sue for breach of constructive trust for the Investment (+ earnings) and related, traceable monies/assets. All such monies and assets should be placed in a constructive trust for the benefit of Counter-Plaintiffs or distributed to same.

14

## Count 6
## Fraud

42. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 6 in their entirety.

43. As noted above, Counter-Plaintiffs invested heavily ($millions$, the Investment) in ICI/, Orca ICI/,Orca and Axis/LSP, and other Berry-Related Entities for the benefit of Counter-Plaintiffs. Such Investment was seed-money/assets for — and investment in — Berry-Related Companies.

44. Counter-Plaintiffs invested the millions of dollars/assets based specifically upon Counter-Defendants' representations/promises to start-up, manage, develop, operate, and/or control Investmentsforinvestments in the Eagle Ford Shale and/or Permian Basin for the benefit of Counter-Plaintiffs (which is also for the benefit of L.Berry and his Trust, in part).

45. More specifically, and to induce the Investment, Counter-Defendants promised to re-pay the original value of the Investment ($millions$) to the Counter-Plaintiffs; and further promised that the Investment would be for the benefit of the Counter-Plaintiffs (and understandably so given that L.Berry and the Trust would still share substantially in the benefits/profits).

46. Instead, Counter-Defendants — although Counter-Defendants have paid some interest-only payments from time to time — have absconded with all or a substantial portion of the value of the Investment monies/assets + earnings. On information and belief, Counter-Defendants apparently made interest payments to prolong the process (run out the clock) — all the while never intending to re-pay the original value of the Investment; and all the while never intending to deliver such Investment (+ earnings) to Counter-Plaintiffs.

47. Presently, Counter-Defendants have gone dark on this discussion, and thereby indicated that L.Berry, individually and as trustee for the Trust, never intended to abide by the

15

representations/promises designed to induce the Investment.

48.     Counter-Defendants' fraud/fraud in the inducement has resulted in substantial, unearned profits for Counter-Defendants, personally and for the Trust; and great financial losses to the Counter-Plaintiffs.

49.     The above-described conduct constitutes fraud and fraud in the inducement, and thus is actionable in favor of one or more of the Counter-Plaintiffs.  For such fraud and fraud in the inducement, the Counter-Plaintiffs now file and assert all such claims and causes of action against Counter-Defendants.

## VIII.
## CAUSATION

50.     Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

51.     Counter-Plaintiffs would show that all causes of action/claims set forth herein have been the cause, proximate cause, producing cause, and cause-in-fact of substantial harm and financial losses to Counter-Plaintiffs.  For all such harm and financial losses, these Counter-Plaintiffs sue.

## IX.
## LEGAL DAMAGES / REMEDIES

52.     Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

53.     For all harm and financial losses suffered by Counter-Plaintiffs and arising from wrongful and/or inequitable conduct of Counter-Defendants, these Counter-Plaintiffs now sue.

54.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the substantial harm and financial damages suffered by Counter-Plaintiffs; to wit; compensatory damages, actual damages, consequential damages, restitution damages, disgorgement damages, and other damages.  Counter-Plaintiffs claims asserted herein are for substantial harm and financial losses greatly in excess of $1,000,000.00.

55.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary

16

relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; attorneys' fees.

56.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; prejudgment and post-judgment interests — as allowed by law.

57.     Counter-Plaintiffs, pursuant to Texas Civil Practice & Remedies Code ("TCPRC") section 37.004, seek declaration that transfers / conveyances / contracts / Manager appointments executed/ accepted by Counter-Defendant L.Berry (e.g., purportedly involving Orca Assets GP LLC, and/or Axis Midstream Holdings LLC (as wholly owned/Managed by Berry GP and/or Redfish Bay Terminal Inc.), and/or others)) without majority Board of Directors approval are void, void ab initio, voidable, invalid, and/or of no legal force or effect.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein, for costs of court in addition thereto, and for such other and further relief to which Counter-Plaintiffs may show themselves justly entitled as against Counter-Defendants (L.Berry and the ALB Trust).

Respectfully submitted,

LAW OFFICE OF DOUGLAS ALLISON

By: /s/ Douglas A. Allison
      Douglas A. Allison
      State Bar No. 01083500
      doug@dallisonlaw.com
      403 N. Tancahua Street
      Corpus Christi, Texas 78401
      Telephone: (361) 888-6002
      Facsimile: (361) 888-6651

      ATTORNEY FOR MARTY BERRY,
      BERRY GP, INC., BERRY
      OPERATING COMPANY, LLC and
      BERRY CONTRACTING LOP

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 3rd~~14th~~ day of December 3,~~April~~ 2024, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

*/s/ Douglas A. Allison*
Douglas A. Allison

18

# EXHIBIT 16

Lawrence's Petition in the Nueces County Lawsuit makes clear that it relates to management and

finances of Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP:

> **I.    INTRODUCTION**
>
> 1.    This action concerns the management and finances of several Texas companies—Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP (collectively, the "Berry Entities")—which are majority owned in equal shares by Plaintiff Lawrence Berry and his two brothers, Marty Berry ("Marty") and Dennis Berry ("Dennis"). In the past several months, it has become apparent that the Berry Entities have been unlawfully usurped, controlled, and mismanaged in secret by Defendants Marty Berry and Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel.

*See* Ex. 4 to Lawrence's Response.

Lawrence's Nueces County Petition specifies the entities at issue in the Nueces County Lawsuit:

> 28. The Berry Entities and their subsidiaries are a group of companies focused on the construction, fabrication, and maintenance contracting industries throughout the United States.

> The Berry Entities were founded in the 1950s by Lawrence Berry's father, Marvin Berry, who ran the organization for several decades.
>
> 29. Marvin Berry had four sons: Plaintiff Lawrence Berry, Marty Berry, Dennis Berry, and Kenneth Berry. When Marvin passed away in 1997, control of the Berry Entities began shifting to his sons, although the other brothers bought Kenneth out several years ago. LDMA sits at the top of the Berry organization. LDMA's 3% general partner is Becon, Inc., which is owned in equal shares by Lawrence, Marty, and Dennis. Lawrence, Marty, and Dennis are each direct 19% limited partners of LDMA, and each is also a beneficial owner of trusts which are 11 2/3% limited partners of LDMA. The remaining 5% limited partner of LDMA is Lone Star Equipment, Inc., which is a subsidiary of Berry Contracting LP. Dennis Berry passed away in 2024 and, on information and belief, his shares passed via his estate plan.
>
> 30. LDMA owns Berry GP, Inc., which in turn owns several holding companies which own Berry Operating Company LLC, which in turn functions as the 1% owner and general partner of Berry Contracting LP.
>
> 31. An organizational chart reflecting the structure and ownership of the various entities at issue is attached hereto as Exhibit A.

*See id.*

Exhibit A to Lawrence's Nueces County Petition confirms this scope:



The Berry Entities at issue in the Nueces County Lawsuit are not parties to the Harris County

Lawsuit:

---

CAUSE NO. 24-BC11A-0025

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; ALLIED PORTS LLC, | § § § | IN THE BUSINESS COURT |
| *Plaintiffs,* | § § § | |
| v. | § § | ELEVENTH DIVISION |
| AXIS MIDSTREAM HOLDINGS, LLC; ALLEN LAWRENCE BERRY; MARVIN GLENN BERRY; AND BONNIE BERRY, as successor in interest to DENNIS WAYNE BERRY | § § § § § § | |
| *Defendants.* | § | HARRIS COUNTY, TEXAS |

**PLAINTIFFS' VERIFIED THIRD AMENDED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

---

*See* Pet.

Plaintiffs in the Harris County Lawsuit do not seek relief related to control or finances of the Berry Entities. Instead, they bring a breach of contract action pertaining to Agreements unrelated to the Berry Entities or Nueces County Lawsuit:

> **COUNT II- BREACH OF CONTRACT**
>
> 28. Plaintiffs reallege and incorporate all preceding allegations.
>
> 29. Under the Compensation Agreement, Powers is entitled to be paid for the expenses he has incurred and continues to incur in connection with this work on the Project. Powers performed and continues to perform by providing the services set forth in the Agreements.
>
> 30. Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' expenses incurred under the Compensation Agreement breaching the Agreements.

*See* Pet.

4

Plaintiffs in the Harris County Lawsuit also seek declaratory relief to confirm their alleged ownership in the Lone Star Ports Project, which is also unrelated to the Nueces County Lawsuit:

27. Plaintiffs seek the following declarations:

a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

*See* Pet.

Plaintiffs' Petition confirms that the Harris County Lawsuit does not include disputes about control over the Berry Entities, but rather ownership and control of separate Project entities:

16.     The Investment Agreement anticipates that Powers would create and structure the entities involved in the Project. **Ex. 2** at ¶¶ 1-2. Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests. Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest. In most of the documents exchanged between the parties, the agreed holding structure for the Project was as follows:



*See* Pet.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 97255570
Filing Code Description: Appendix
Filing Description: Relators' Appendix Volume 4 of 5
Status as of 2/11/2025 4:47 PM CST

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas AAllison | | doug@dallisonlaw.com | 2/11/2025 3:55:15 PM | SENT |
| Vanessa AGilmore | | vg@robertsmarkland.com | 2/11/2025 3:55:15 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 2/11/2025 3:55:15 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 2/11/2025 3:55:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosa Brennan | | rbrennan@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |
| Michelle Bultman | | MBultman@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |

Associated Case Party: AllenLawrenceBerry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Absmeier | 24050195 | mabsmeier@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |
| Barrett Reasoner | 16641980 | breasoner@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 2/11/2025 3:55:15 PM | SENT |

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 97255570
Filing Code Description: Appendix
Filing Description: Relators' Appendix Volume 4 of 5
Status as of 2/11/2025 4:47 PM CST

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Alistair Dawson | 5596100 | adawson@beckredden.com | 2/11/2025 3:55:15 PM | SENT |

Associated Case Party: Allied Ports, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Roland Garcia | 7645250 | garciar@gtlaw.com | 2/11/2025 3:55:15 PM | SENT |